# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

## CIVIL DIVISION

LEO DONOHOE,                              :
                                          :
      Plaintiff,                    :
                                          :
v.                                        :        Civil Action No.: 07-949 (RWR)
                                          :
BONNEVILLE INT'L CORP.,                   :
                                          :
      Defendant.                    :

## PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Plaintiff Leo Donohoe ("Donohoe"), by counsel, Carr Maloney P.C., and pursuant to Rule 37 of the Federal Rules of Civil Procedure, respectfully requests an order compelling Defendant Bonneville International Corporation ("Bonneville") to produce properly requested and discoverable documents.  Bonneville's repeated refusal to provide Donohoe with these discoverable documents is causing undue prejudice and irreparable harm against Donohoe, denying him his constitutional right to properly litigate his claims.

The specific discoverable documents Bonneville refuses to produce include:

- Documents explaining Bonneville's 2006 "Reduction in Force;"

- Bonneville's Sales and Financial Documents;

- Bonneville's file containing harassment claims made against Matt Mills;

- All documents requested in Donohoe's Supplemental Requests for Production of Documents; and,

- The documents properly requested of Bonneville's corporate representative pursuant to Donohoe's Notice of 30(b)(6) Deposition, currently scheduled for May 5, 2008.

- Documents and information relating to Bonneville's similar "reduction in force" conducted in San Francisco, CA.

These documents are vital to Donohoe's ability to prosecute his claims against Bonneville. They are directly relevant to Donohoe's claims of age-based discrimination, as well as Bonneville's proposed defenses. Furthermore, because Bonneville has exclusive possession of these documents, absent an order compelling discovery, Mr. Donohoe has no other means by which to retrieve this necessary information.

Should this Court agree with Bonneville's position regarding the Supplemental Request for Production of Documents and documents requested through Donohoe's Notice of 30(b)(6) Deposition, Donohoe alternatively requests leave to conduct additional discovery to obtain the additional information requested herein.

## I.    **FACTUAL BACKGROUND**

Plaintiff filed this action seeking to recover damages he sustained as the direct result of the Defendant's wrongful termination of, and refusal to rehire, Donohoe on the basis of his age. On January 4, 2006, Bonneville terminated Donohoe's employment after nearly twenty years. At the time of his termination, Mr. Donohoe's direct supervisor (and one of the individuals responsible or Mr. Donohoe's termination) was Mr. Matt Mills. According to Mr. Mark O'Brien, a former Bonneville's Vice President and General Manager (WWZZ) and one of Mills' former supervisors, "you can't teach an old dog new tricks," was part of Mr. Matt Mills' vernacular. *See* Depo. Transcript of Mark O'Brien, Exhibit 1 p. 43:13-46:4; 47:8-12; 49:21-51:3; 91:12-92:6). Mr. O'Brien also testified that Mr. Mills told Mr. Donohoe that Donohoe was old and would never change. *Id.* at p. 47:13-48:17.

At the time of his termination, Mr. Donohoe worked primarily for WTOP in the role of National Sales Director. As part of his job, he also undertook sales of WGMS and WFED. National Sales for WTOP, however, constituted 90% of Mr. Donohoe's job. *Id.* at p. 55:16-56:20.

In an obvious effort to eliminate Mr. Donohoe as National Sales Director and replace him with a much younger and less qualified worker, Michael Spacciapolli, Bonneville contrived a "reduction in force" of the WGMS station.[1] Mr. Donohoe was the **only** WTOP employee permanently terminated as a result of the alleged RIF.[2] In fact, by Bonneville's own statements, all individuals who worked primarily for WTOP were specifically exempted from the RIF – that is *except Mr. Donohoe.*

As a result of the alleged RIF in January 4, 2006, ten (10) WGMS sales employees were terminated.[3] Of the ten (10) WGMS employees RIF'd, five (5) were over-40 and five (5) were under-40. Only 12 (twelve) days after the alleged RIF, Bonneville rehired five (5) sales employees to work for WGMS. All but one of the individuals rehired were under-40; the only under-40 employee not rehired, Ms. Tiffani Gates, was not rehired only because she did not reapply.[4] Therefore, all of the under-40 employees who reapplied for employment following the January 4, 2008, RIF were rehired.

The over-40 employees, on the other hand, did not fare as well as the under-40 employees following the January 2006 RIF. Although all of the under-40 employees who

---

[1] Bonneville also terminated all WWZZ employees through the RIF because WWZZ was completely removed from air. Mr. Donohoe did not work for WWZZ. Those positions, therefore, are not relevant to Mr. Donohoe.

[2] Mr. Donohoe's assistant (under-40) was also terminated on January 4, 2006, but was rehired within two weeks of the alleged RIF.

[3] This number includes Mr. Donohoe because Bonneville mischaracterized him as a WGMS employee to force the RIF to apply to him.

[4] According to Mr. Mills' testimony, had Ms. Gates reapplied, he saw no reason why she would not have been rehired.

reapplied for employment were rehired, only one such employee over-40 was rehired.  As for that only over-40 employee rehired, Ms. Patricia Cochran, she was not even rehired into the position from which she was RIF'd.  Instead, she was demoted from the sales manager position to the non-management level position of account executive.  All other over-40 employees applied, but were denied rehire.

With regard to Mr. Donohoe's position, which Bonneville claims was a different position (although the position still required national sales of WTOP, WGMS, WFED), Bonneville replaced Mr. Donohoe with a much younger individual, Michael Spacciapolli, who had never sold any of these stations on a national level.  In fact, Mr. Spacciapolli had never even sold news radio, which according to Mr. O'Brien is a much different sell than music.  *See* Exhibit 1 at p. 13:8-14:12.  Mr. Spacciapolli was removed from that position less than six months later.

Clearly, the evidence thus far unequivocally demonstrates that Mr. Donohoe's termination, and Bonneville's refusal to rehire him, were improperly motivated by age discrimination.  Mr. Donohoe strongly believes, however, that the limited information provided by Bonneville represents only the surface of the evidence of discriminatory animus and pretext, and that Bonneville is stonewalling the discovery process to avoid providing Mr. Donohoe with even more incriminating evidence.

Again, Bonneville refuses to produce:

- Documents explaining Bonneville's 2006 "Reduction in Force;"

- Bonneville's Sales and Financial Documents;

- Bonneville's file containing harassment claims made against Matt Mills;

- All documents requested in Donohoe's Supplemental Requests for Production of Documents; and,

- The documents properly requested of Bonneville's corporate representative pursuant to Donohoe's Notice of 30(b)(6) Deposition, currently scheduled for May 5, 2008.

- All documents and information relating to Bonneville's similar RIF in San Francisco, CA.

Bonneville's alleged reasons for refusing to provide this clearly relevant evidence are baseless and intended to preclude Mr. Donohoe from proving his case. This attempt to thwart justice by refusing to provide Mr. Donohoe with the documents and information to which the Rules of this Court indicate he is entitled should not be condoned. Instead, Bonneville should be compelled to produce the documents at once.

## II.    PROCEDURAL BACKGROUND

On October 19, 2007, the parties submitted a Joint Report pursuant to Local Civil Rule 16.3 (Exhibit 12) and this Court's Order of August 27, 2007. That Joint Report included a preliminary discovery schedule which stated the following:

> The parties agree that the discovery schedule for standard cases should apply. December 17, 2007, is an acceptable deadline for Post Rule 26(a) discovery requests. March 31, 2008, is an acceptable deadline for the completion of all discovery (including answers to interrogatories, document production, requests for admissions and depositions). The parties anticipate that 30 interrogatories and 30 document requests per party should be adequate. Plaintiff anticipates that ten depositions per party will be necessary. Defendant believes that five (5) depositions per party will be adequate.

The clear language of the Joint Report shows that the parties did not agree or stipulate to any number of requests, but rather "anticipated" that thirty (30) document requests per party would be adequate. Moreover, at the time of the filing of the Joint Report, the parties were unable to agree on the limit for depositions in this matter.

On October 26, 2007, this Court issued a Scheduling Order in this matter. *See* Exhibit 2. While the Court limited each side to seven (7) depositions and thirty (30) interrogatories, it ***did not*** set a limit on the number of Requests for Production of Documents.

On December 20, 2007, Donohoe propounded his First Requests for Production of Documents and Interrogatories to Bonneville ("Donohoe's First Request"), attached hereto as Exhibit 3. Donohoe's First Requests sought documents and information relating to Plaintiff's claims of discrimination, including, but not limited to, Bonneville's "Reduction in Force" campaigns, Bonneville's pattern/practice of its treatment and termination of older workers, and Bonneville's employment practices and workforce "reorganizations" at its other radio stations. *Id.*

On February 13, 2008, Bonneville provided limited responses to Donohoe's First Request for Documents. Bonneville's responses were grossly deficient and failed to comply with the Rules of this Court and the spirit of discovery.

On March 11, 2008, in accordance with this Court's Rules regarding discovery, Donohoe served his supplemental discovery requests upon Bonneville ("Supplemental Requests"). *See* Exhibit 4. On April 14, 2008, Bonneville wrongfully asserted objections for each supplemental request and indicated that it was refusing to provide any additional materials or information. *See* Exhibit 5. Bonneville's main objection was that Donohoe had exhausted its document requests as per the Joint Report, and as a result, the requests are "impermissible." *Id.; See also* Exhibit 6, Bonneville Correspondence of April 10, 2008. Bonneville also complained that the Supplemental Requests were duplicative of Donohoe's First Requests, and, that the requests were outside the scope of permissible discovery. *Id.* As a result, Bonneville did not provide any more materials in response to Donohoe's Supplemental Requests.

Plaintiff has made repeated requests directly to Bonneville's counsel in an effort to resolve these discovery issues without Court intervention.  On March 12, 2008, counsel for Donohoe corresponded with Bonneville and explained in detail the basis for each request that Bonneville asserted an objection, and further described the documents sought in Donohoe's First Requests.  *See* Exhibit 7.  In that letter, counsel for Donohoe emphasized the need for the requested materials and requested that Bonneville supplement its responses.

On April 8, 2008, Bonneville sent correspondence to Donohoe's counsel asserting the same objections previously raised in Bonneville's formal responses and subsequent correspondence, including the Joint Report "limit" on requests, Bonneville's unilaterally drawn narrow discovery parameters of Plaintiff's lawsuit, and the lack of documents in the DC Radio Group's possession. *See* Exhibit 8.  Bonneville supplemented its objections in an April 10, 2008 correspondence by wrongfully invoking the Joint Report and requesting that Donohoe withdraw its supplemental requests. *See* Exhibit 6. Bonneville further stated that it would not provide any financial documents on the basis that "such requests are premature."  *Id*.

Between April 11 and April 18, 2008, counsel for Donohoe attempted to resolve this dispute by sending emails explaining its basis for each request and supplemental request for which it felt that Bonneville's written responses and production were deficient.  *See* Exhibit 9. For each of these emails, Bonneville responded by repeating the previous objections, wrongly invoking the language of the Joint Report and rejecting any further supplementation of documents responsive to Donohoe's First Requests or Supplemental Requests. *Id.*.

On March 21, 2008, Donohoe issued a Notice of Deposition for Bonneville's Corporate Designee.  *See* Exhibit 10.  Attached to the Notice of Deposition, Donohoe enclosed

"Attachment A" requesting that Bonneville's Corporate Designee bring the documents specified therein to the deposition. *Id.* On April 21, 2008, Bonneville's counsel delivered correspondence to Donohoe's counsel stating its objections to the documents requested in Attachment A. On April 22, 2008, counsel for Donohoe issued correspondence to Bonneville's counsel stating its intention to obtain those materials for the May 5, 2008, deposition and that court intervention was now unavoidable. *See* Exhibit 11.

### III.    LEGAL STANDARD

It is well settled law that under the Federal Rules of Civil Procedure discovery rules are to be liberally construed. *See, e.g., Hickman v. Taylor*, 329 U.S. 495, 507, 67 S. Ct. 385, 392 (1947). Rule 26(b)(1) states: "Parties may obtain discovery regarding any matter not privileged, that is relevant to a claim or defense of any party . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed.R.Civ.P. 26. Under this rule, "relevancy" is very broadly defined, and a party's responses to discovery requests should include both directly relevant material and material likely to lead to the discovery of admissible evidence. *See Avianca, Inc. v. Correia*, 705 F.Supp. 666, 676 (D.D.C.,1989)(citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978) (Rule 26(b)(1) "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."); *United States v. American Telephone & Telegraph,* 461 F.Supp. 1314, 1341 n. 81 (D.D.C.1978) ("The clear policy of the rules is toward full disclosure ... [I]t is rare that a particular item of requested information is not 'relevant' under the broad definition given that word in Rule 26.") (quoting Judge Kaufman, Judicial Control Over Discovery, 28 F.R.D. 111, 119 (1961)); 8 Wright & Miller, Civil §§ 2008, 2009.

## IV.    SPECIFIC REQUESTS AND ARGUMENT

Mr. Donohoe alleges that Bonneville's termination of his employment and failure to rehire him for the position he previously held was the product of unlawful age-based discrimination in violation of the ADEA and District of Columbia Human Rights Act.   To establish a prima facie case of wrongful termination as the result of age-based discrimination under either statute, Mr. Donohoe needs to show: he (i) was within a protected age group, (ii) was doing satisfactory work, (iii) was discharged despite the adequacy of his work, and (iv) has some evidence the employer intended to discriminate against him in reaching its RIF decision. *See* e.g. *Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir.1998).*   To establish a case of failure to hire on the basis of age, Mr. Donohoe needs to show:  (1) he is a member of the protected class; (2) he was qualified for the position for which he applied; (3) he was not hired; and (4) he was disadvantaged in favor of a younger person. Age Discrimination in Employment Act of 1967, §2 *et. seq.*, 29 U.S.C.A. §621 *et. seq.*

Following the McDonald Douglas burden shifting requirements, once Mr. Donohoe proves his prima facie case, the burden shifts back to Bonneville to articulate a legitimate, nondiscriminatory reason for his termination/non-rehire.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).  Once Bonneville meets that burden of production, Mr. Donohoe must prove that the reason offered by Bonneville was mere pretext for discrimination.  *Id.*

The information requested by Mr. Donohoe is not privileged and is directly relevant either to the essential elements of his claims or pretext.  Bonneville, therefore, should be required to produce the information.

### A.    Documents Regarding Bonneville's 2006 Reduction in Force

In Donohoe's First Requests Nos. 7-10, and 24-25, Supplemental Requests Nos. 3, 4, 6, and 8, and "Attachment A" Requests Nos. 1-7, 10, 12, and 13, Bonneville is specifically asked to produce documents and materials that refer or relate to the "Reduction of Force" ("RIF") that was implemented by Defendant in 2006, including, but not limited to:  the decision-making process leading up to the RIF; the decision to RIF all WGMS employees only to rehire the younger employees only twelve (12) days later; the decision-making process as to who to RIF; the decision-making process leading to the inclusion of Mr. Donohoe in the RIF, even though 90% of his position involved sales for WTOP and all other employees who worked predominately for WTOP were specifically excluded from the RIF.   There can be no question that this information is relevant to the issue of whether Bonneville intended to discriminate against Mr. Donohoe through the purported RIF.   There can also be no question that this information is relevant to the issue of whether the RIF was genuine or a veiled attempt to rid the company of the older workers.  (This is especially the case in light of the fact that all but one of the under-40 employees were rehired in sales for WGMS twelve (12) days after all WGMS employees were RIF'd, and the only under-40 employee not rehired likely would have been had she reapplied.  On the other hand, only one of the over-40 employees were rehired, and that one employee was rehired in a demoted position.

In correspondence dated April 8, 2008, counsel for Bonneville represents that all documents regarding the RIF were produced.  *See* Exhibit 8.  It is unfathomable, however, that a entity as large as Bonneville can plan, implement and conduct a RIF without documents

reflecting the reason for conducting a RIF as to a station that was still functioning; the reason the RIF was conducted on January 4, 2006, who would be effected by the RIF; the reason for rehiring RIF'd employees only twelve (12) days after the RIF to work for the same station as that from which they were just RIF'd; the reason for including Leo Donohoe (a WTOP employee) in the RIF when their own corporate documents specifically exclude individuals who work primarily for WTOP from the RIF, etc. Instead, Mr. Donohoe strongly believes that either Bonneville is hiding these clearly relevant documents or have not conducted a reasonable search to locate these documents. Therefore, Mr. Donohoe respectfully requests an order compelling Bonneville to either produce all relevant documents they have with-held, conduct a more thorough search for the documents or indicate what reasonable efforts they have taken to locate all relevant and responsive documents.

### B.    Bonneville's Sales and Financial Documents

In Donohoe's First Requests Nos. 15, 16, and 21, Supplemental Requests Nos. 5 and 12, and "Attachment A" Request No. 19, Bonneville is specifically asked to produce documents and materials that refer or relate to the financial data, including but not limited to all sales reports, for all markets going back to the year 2000. Bonneville objects to this information alleging that the information is not discoverable unless and until Mr. Donohoe proves a prima facie case for punitive damages.

The financial information regarding gross income generated from sales, however, is relevant not only to Mr. Donohoe's claim for punitive damages, but also his direct claims of discrimination. Mr. Donohoe was National Sales Director for WTOP, WGMS and WFED. His performance, therefore, is reflected by his budgets, his rates and his sales records. Mr. Spacciapolli was National Sales Director of WWZZ and then Local Sales Manager for WWZZ.

His performance is also reflected by budgets, rates and sales records.  As its legitimate nondiscriminatory reason for selecting Mr. Spacciapolli over Mr. Donohoe, Bonneville has asserted that Mr. Spacciapolli was more qualified for the National Sales Director/Sports Sales position.  The financial information is directly relevant to this alleged defense.  The information will demonstrate whether Mr. Donohoe or Mr. Spacciapolli was more productive to the companies, and whether Mr. Spacciapolli was truly more qualified for the NSD/SS position.  This information is relevant and reasonably calculated to lead to the discovery of admissible evidence and must be produced.

Furthermore, Mr. Donohoe is entitled to discovery of all financial records relevant to his claim for punitive damages.  Pursuant to Federal Rule of Civil Procedure 26(b)(1), a party is entitled to discovery of any non-privileged matter that is relevant to the subject matter involved in the pending action.  Information of Bonneville's financial condition is relevant in this case because it can be considered in determining punitive damages. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270, 101 S.Ct. 2748, 2761, 69 L.Ed.2d 616 (1981); *Ramsey v. Culpepper*, 738 F.2d 1092, 1099 (10th Cir.1984) (court followed state law in a diversity action); *Spaeth v. Union Oil Co. of California*, 710 F.2d 1455, 1460 (1983), cert. denied, 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986) (same); *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 75-76, 755 P.2d 1319, 1334 (1988).

While this jurisdiction has not definitively resolved the issue, *D'Onofrio v. SFX Sports Group, Inc.*, 247 F.R.D. 43 D.D.C.,2008, a majority of federal courts permit pretrial discovery of financial information of the defendant without requiring plaintiff to establish a prima facie case on the issue of punitive damages. *Randall v. County of Wyandotte*, No. 87-2580, 1988 WL 139522 (D.Kan. Dec. 5, 1988) (O'Connor, C.J.); *Baker v. CNA Ins. Co.*, 123 F.R.D. 322, 329-30

(D.Mont.1988); *St. Joseph Hospital v. INA Underwriters Ins. Co.*, 117 F.R.D. 24, 25-26 (D.Me.1987); *Marsillo v. National Surety Corp. (In re Bergeson)*, 112 F.R.D. 692, 696 (D.Mont.1986); *Fretz v. Keltner*, 109 F.R.D. 303, 310-11 (D.Kan.1986); *Renshaw v. Ravert*, 82 F.R.D. 361, 363 (E.D.Pa.1979); *American Benefit Life Ins. Co. v. Ille*, 87 F.R.D. at 542-43; *Lackawanna Refuse Removal, Inc. v. Procter and Gamble Paper Products Co.*, 26 Fed.R.Serv.2d 375, 376 (M.D.Pa.1978); *Miller v. Doctor's General Hospital*, 76 F.R.D. 136, 140 (W.D.Okla.1977); *Vollert v. Summa Corp.*, 389 F.Supp. 1348, 1351 (D.Haw.1975); *Holliman v. Redman Development Corp.*, 61 F.R.D. 488, 490-91 (D.S.C.1973); *See* also Annotation, Pretrial Discovery of Defendant's Financial Worth on Issue of Damages, 27 A.L.R.3d 1375, 1377 (1969) (most state courts permit pretrial discovery of defendant's financial condition without requiring a prima facie showing of entitlement to punitive damages).   This court should follow the majority position and compel relevant, discoverable information.

Moreover, the requirement that claimant establish a prima facie case applies to the admissibility of evidence about financial status, not its discoverability. *Baker*, 123 F.R.D. at 330. Relevancy governs whether information is discoverable, not admissibility at trial. *St. Joseph Hospital*, 117 F.R.D. at 25-26. "To require a prima facie showing of entitlement to punitive damages at this time, before the completion of discovery, could also be quite difficult for the plaintiff and would not be logical since the very purpose of discovery is to locate evidence to support a punitive damages claim. Furthermore, to deny discovery of net worth until plaintiff can make a showing of a prima facie case at trial would only lead to delay and confusion while plaintiff reviews the information for the first time." *See Mid Continent Cabinetry, Inc. v. George Koch Sons, Inc.* 130 F.R.D. 149 D.Kan., 1990 citing *St. Joseph Hospital*, 117 F.R.D. at 26.

Finally, Bonneville's interest in nondisclosure and confidentiality of its financial records can be adequately protected by the protective order already in place in this case. Mr. Donohoe has no objection to Bonneville's designating the information "for attorneys' eyes only."

### C.    Bonneville's File of Complaints of Harassment Against Matt Mills.

Mr. Mark O'Brien, former General Manager of various Bonneville stations testified at length that he was informed by Mr. Mill's direct supervisor, Joel Oxley, on numerous occasions that Bonneville maintains a file containing harassment complaints filed by employees against Mills. *See* Depo. Transcript of O'Brien, Exhibit 1, at p. 31:13-32:20; 39:6-7; 83:8-86:3; 92:7-18. Notwithstanding this binding testimony, counsel for Bonneville has insisted that no such file exists. *See* Exhibit 8.

Notably, in the same correspondence, counsel for Bonneville also asserted that Mr. Mills had no written notes from interviews he conducted for Mr. Donohoe's National Director of Sales position following the January 2006 RIF. During his deposition, Mr. Mills perpetuated this misrepresentation. On April 24, 2008, however, Bonneville supplemented its discovery responses to provide the written interview notes that both counsel and Mr. Mills insisted did not exist.

In light of Bonneville's misrepresentation regarding the nonexistence of other evidence and Mr. O'Brien's unequivocal testimony that such file exists, Mr. Donohoe has no reason to doubt that Bonneville is, in fact, maintaining a file of harassment complaints against Mr. Mills. This file is clearly relevant to Mr. Mills' discriminatory animus and propensity for discrimination. Bonneville must be compelled to provide this file.

**D.    Donohoe's Supplemental Request for Documents and Request for Documents pursuant to 30(b)(6) Notice of Deposition**

Bonneville refuses to provide responses to any more than thirty (30) requests for production of documents including all of Mr. Donohoe's March 21, 2008, supplemental document requests, all documents requested pursuant to Donohoe's Rule 30(b)(6) notice of deposition and others. *See* Exhibits 6 and 8.

In refusing to provide any responsive documents, Bonneville argue that the parties "stipulated" in their Rule 16.3 Statement that thirty (30) requests per side would be sufficient. Bonneville misrepresents the record. First, the parties did not make any such "stipulation." Instead, in their Rule 16.3 Statement, the parties indicated that, at the time they prepared the statement they "anticipated" that 30 requests per side would suffice. An "anticipation" is simply not equivalent to a "stipulation."

More importantly, on October 26, 2007, this Court issued a Scheduling Order in this matter. *See* Exhibit 2. While the Court limited each side to seven (7) depositions and thirty (30) interrogatories, it ***did not*** set a limit on the number of Requests for Production of Documents. Neither this Court's order nor the Rules of this Court restrict Mr. Donohoe's ability to obtain the documentary evidence relevant to this case. Bonneville should not be allowed to unilaterally impose such restriction; instead, Bonneville should be compelled to provide all responsive documents. Alternatively, Donohoe seeks leave from this court to request the supplemental documents and documents pursuant to the 30(b)(6) Notice of Deposition to avoid undue prejudice and irreparable harm to him resulting from the arbitrary constraints placed on his ability to seek evidence and the truth as to why Bonneville terminated his employment in 2006.

### E.    Bonneville's RIF in San Francisco in 2006

In close temporal proximity to the alleged reduction in force that caused many older workers to suffer lost employment by Bonneville in the District of Columbia, Bonneville implemented a similar RIF in San Francisco.  Mr. Donohoe has reason to believe that the result of the San Francisco RIF was the same as the alleged RIF in DC – intentional termination of the older workers.

The information surrounding the ages of individuals whose employment was terminated in San Francisco is directly relevant to Mr. Donohoe's claims arising out of the District of Columbia.  In support of his claim for punitive damages, as well as liability, Mr. Donohoe has the right to prove that the wrongful acts by the DC management was authorized and ratified by the corporation, not merely perpetrated by certain employees. *Lake Shore & Michigan Southern Railway v. Prentice*, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1883); *Franklin Investment Co., Inc. v. Smith*, D.C.App., 383 A.2d 355, 359 (1978); *Wardman-Justice Motors, Inc. v. Petrie*, 59 App.D.C. 262, 265, 39 F.2d 512, 515 (1930). One way to prove that the corporation was involved is to show that an executive officer of high rank participated in the misconduct or that Bonneville maintained a pattern and practice of terminating older workers and maintaining only the younger employees. *Wardman-Justice Motors, Inc. v. Petrie*, supra.

In his efforts to prove pattern and practice discrimination, Mr. Donohoe has reasonably limited his request to only the terminations resulting from the similar RIF in San Francisco.  He has not requested data of all terminations in all jurisdictions in which Bonneville owns and operations stations across the nation.  Mr. Donohoe's request for information regarding the San Francisco RIF is reasonably tailored, relevant and likely to lead to the discovery of admissible evidence.  Bonneville, therefore, should be compelled to provide this information.

## V.    CONCLUSION

For the reasons set forth in this motion to compel, and to avoid undue prejudice and irreparable harm to Mr. Donohoe, Bonneville should be compelled to produce:

- Documents explaining Bonneville's 2006 "Reduction in Force;"

- Bonneville's Sales and Financial Documents;

- Bonneville's file containing harassment claims made against Matt Mills;

- All documents requested in Donohoe's Supplemental Requests for Production of Documents; and,

- The documents properly requested of Bonneville's corporate representative pursuant to Donohoe's Notice of 30(b)(6) Deposition, currently scheduled for May 5, 2008.

- Documents and information relating to Bonneville's similar "reduction in force" conducted in San Francisco, CA.

Respectfully submitted,

CARR MALONEY P.C.

_____
Thomas L. McCally, Esquire
Tina M. Maiolo, Esquire
1615 L Street, NW, Suite 500
Washington, DC 20036
(202) 310-5500/(202)310-5555 (fax)
Attorney for Plaintiff

### RULE 37(a)(2) CERTIFICATE

Attorneys for Plaintiff Leo Donohoe wrote several letters and attempted several telephone conversations with counsel for the Defendant in a good faith attempt to resolve the present discovery dispute without the necessity of court intervention. The letters attempting to resolve this dispute are attached hereto.

_____
Tina Maiolo

17

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 25th day of April, 2008, a copy of the foregoing was sent via the Court's electronic filing and via first class mail, postage prepaid to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC 20006, Attorney for Defendant.

_____

Thomas L. McCally

# EXHIBIT 1



Page 1

1

2                    In the U.S. District Court

                  For the District of Columbia

3

      ------------------------------x

4                                   :

      Leo Donohoe                   :

5                                   :

                    v.              : NO.  07-949

6                                   :

      Bonneville International      :

7     Corp.                         :

                                    :

8     ------------------------------x

9                    April 22, 2008

10    DEPOSITION OF:

11                    Mark O'Brien,

12    a witness, called by counsel pursuant to notice,

      commencing at 10:00 a.m. which was taken at Carr

13    Maloney, 1615 L Street, NW, Washington, DC

14

15

16

17

18

19

20

21

Page 2

```
1              Appearances
2    Thomas L. McCally, Esq.
3    Tina Maiolo, Esq.
4    Carr, Maloney
5    1615 L Street, NW
6    suite 500
7    Washington, DC 20036
8    for the Plaintiff
9
10   Constance M. Peldleton, Esq.
11   Davis, Wright, Tremaine
12   1919 Pennsylvania Ave., NW
13   suite 200
14   Washington, DC 20006-3402
15   for the Defendant
16
17
18
19
20
21
```

Page 3

```
1         INDEX OF EXAMINATIONS
2    WITNESS                        PAGE
3
4    Mark O'Brien
5
6    Direct Examination By Mr. McCally      4
7
8    Cross-Examination By Ms. Pendleton    64
9
10   Cross-Examination By Mr. McCally      86
11
12   Recross-Examination By Ms. Pendleton  93
13
14
15
16
17
18
19
20
21
```

Page 4

```
1         (Morning session)
2            Stipulations
3       (It is stipulated and agreed by and
4    between counsel for the respective parties that
5    the reading and signing of this transcript by the
6    witness are not waived.
7       It is further stipulated and agreed
8    that the filing of this transcript with the clerk
9    of the court be and the same is hereby waived.)
10      *    *    *    *    *
11
12   Whereupon,
13            Mark O'Brien
14
15   was called for examination by counsel and,
16   after having been duly sworn, was examined
17   and testified as follows:
18   DIRECT EXAMINATION:
19   BY MR. McCALLY:
20      Q.  Good morning, Mr. O'Brien.  For the
21   record, one housekeeping matter.  Mr. Joel Oxley is
```

Page 5

```
1    here.  Mr. Oxley is with Bonneville.
2       Mr. O'Brien, we're going to start your
3    deposition with a few instructions and the like.
4       You and I talked briefly before the
5    deposition started and I indicated to you that if
6    there's any question asked that don't understand,
7    please tell me and I'll be happy to try to rephrase
8    it.
9       I just want to make certain you and I
10   understand each other completely and that goes for
11   the other counsel as well.  If at any time you don't
12   understand a question, please tell us and we'll try
13   to rephrase it.
14      A.  Understood.
15      Q.  If at any time you need a break, please
16   let me know and we'll be happy to take a break.
17      I would ask, however, that it not be in the
18   middle of a question and answer, that we try to wait
19   until the answer is given and then we can take a
20   break.
21      If at any point during the deposition you
```

2 (Pages 2 to 5)

Page 6

1  have a question about something, please let me know
2  and I'll be happy to try and answer it to the extent
3  I can.
4      A.  Okay.
5      Q.  Do you understand all those instructions?
6      A.  I do.
7      Q.  Have you ever been deposed before?
8      A.  Yes, I have.
9      Q.  In a business capacity or a personal
10  matter?
11      A.  Both.
12      Q.  What type of business matter have you been
13  deposed in?
14      A.  Couple of employment issues.  One
15  specifically was regarding wrongful dismissal.
16      Q.  Were you deposed as a corporate
17  representative?
18      A.  Yes.
19      Q.  Who were you working for at that time?
20      A.  The Washington Redskins.
21      Q.  Is that Zebra?

Page 7

1      A.  Yes.
2      Q.  What's the full name?
3      A.  Red Zebra.
4      Q.  What did that matter involve?
5      A.  It just was testimony on my part, what I
6  knew about the alleged wrongful dismissal, which was
7  very little.  I was there ten minutes and was out.
8      Q.  What was the claim of wrongful dismissal
9  based on?
10      A.  There wasn't a fair time limit given to
11  the employee to improve their efforts and they
12  challenged it.
13      Q.  Any other depositions in a business
14  capacity?
15      A.  No.
16      Q.  The personal capacity, what type of case
17  was that?
18      A.  Divorce.
19      Q.  For the record, would you state your
20  address?
21      A.  605 Still Creek Lane, Gaithersburg,

Page 8

1  Maryland 20878.
2      Q.  What's your age?
3      A.  50.
4      Q.  Would you give me a rundown of your
5  educational background?
6      A.  Went to the University of Maryland for two
7  years, did not finish.
8      Q.  Would you give me a rundown of your
9  employment background?
10      A.  Starting when?
11      Q.  Why don't we start when you got out of
12  college?
13      Let me ask it this way.  Have you been in
14  radio or radio sales your entire career?
15      A.  I've been in radio since 1986.
16      Q.  Why don't we take it from there?
17      A.  Okay.  Started in sales at DC 101 in the
18  early part of 1986.  It was for a year; went to work
19  for WTOP in a sales capacity, was promoted to sales
20  manager in a year and stayed sales manager there for
21  approximately a couple of years, was moved over to

Page 9

1  be a sales manager at WASH FM.
2      Q.  When you say moved on to be a sales
3  manager --
4      A.  Same company owned the two stations.
5      Q.  Who owned that?
6      A.  At that time it was Outlet Communications,
7  I believe.  There's been a lot of companies, a lot
8  of mergers but I believe it was Outlook
9  Communications.
10      Q.  WTOP sales and sales manager was from 1987
11  through what date?
12      A.  Approximately up to late 1988, and 1989 I
13  went to WASH.
14      Q.  As a sales manager?
15      A.  Sales manager role.
16      Q.  How long did you stay at WASH?
17      A.  I was there approximately a year and then
18  moved back over to WTOP, again same company owned
19  both radio stations, in a sales management role.
20      Q.  1989 until what in that role?
21      A.  Probably a couple of years total between

Overnite Court Reporting Service
Washington, DC Metro Area
(301) 593-0671
Fax - (301) 593-8353
www.DCCourtReporters.com

Page 10

1   those two years.
2     Q.   Up to 1990, 1991?
3     A.   Approximately 1991. I'm not sure of the
4   date.
5     Q.   Then what?
6     A.   I became the director of sales for both
7   those stations, WTOP and WASH. I believe that was
8   in mid-1992 to 1994.
9     Q.   Then what?
10     A.   Became the vice-president, general manager
11   of WASH some time in 1994.
12     Q.   How long did you hold that position?
13     A.   Held that position until 2000.
14     Q.   What was your next?
15     A.   Included in that position I ran WASH, also
16   had a station called DC 101 where I was a VP/GM,
17   WGAY FM where I was in the same position during
18   those six years.
19     Q.   VP, general manager, all those stations
20   were under you?
21     A.   Correct.

Page 11

1       Left on my own accord some time in March of
2   2000.
3     Q.   For what reason?
4     A.   The company just merged with a large
5   company. I didn't agree with their philosophy.
6     Q.   What company did it merge with?
7     A.   Clear Channel Communications.
8     Q.   Outlet Communications merged with Clear
9   Channel or was it --
10     A.   I'll try to give you the best recollection
11   I can on that beginning with that 1986 date.
12       I believe it went from Outlet
13   Communications -- this is tough. Outlet to -- there
14   was a company in Rhode Island, another company. I'm
15   drawing a blank.
16     Q.   Was Bonneville in that chain of ownership
17   at any time?
18     A.   No. Well, I never worked for Bonneville
19   during that time period.
20       They purchased WTOP with a few other
21   stations I want to say in the late nineties. I

Page 12

1   don't remember when. But I never worked for them
2   during that time period.
3     Q.   Who was the merger partner with Clear
4   Channel in 2000 when you left?
5     A.   That was a company called AM/FM
6   Communications that was merged into Clear Channel
7   with some other companies. It was a large merger.
8     Q.   You left because you didn't agree with
9   what?
10     A.   Clear Channel ran their stations based on
11   a market philosophy and not an individual basis
12   where there was one market manager for the entire
13   group of radio stations within a given market and I
14   didn't think that was the right way to do it.
15     Q.   Why not?
16     A.   I thought that companies, if they did
17   that, would cut their expenses so much that stations
18   wouldn't be run properly and the larger stations
19   would end up doing very well and the mediocre and
20   smaller ones would never have a chance to get out of
21   that position.

Page 13

1     Q.   That would be across the formats as well?
2     A.   Yes.
3     Q.   Any problem with that, all formats being
4   sold under one management scheme, so to speak?
5     A.   I think it eliminates individuality and
6   creativeness. I think it's difficult for even one
7   talented person to pull that off.
8     Q.   What about the sales of stations with
9   different formats, say news format versus talk
10   versus music versus classical, did those require
11   different types of approaches to the sales?
12     A.   All formats would take different talents.
13   Some are easier than others to sell. Some are not.
14       To be specific, the best formats to sell if
15   you are in sales and broadcasting traditionally have
16   been the news or news talk type formats.
17     Q.   What are the harder ones?
18     A.   The harder ones are the formats that have
19   multiple competitors. That would be most music
20   formats.
21       Generally news and news talk stations don't

4 (Pages 10 to 13)

Page 14

1  have as many competitors as the music stations
2  would.
3      Q.  What about classical music?
4      A.  Classical music had been a dying format
5  when I got in the business and continued to die off
6  and I don't believe there was many left even in the
7  nineties around the country.
8          It was a difficult sale, mostly because the
9  people that listen to the station are a little on
10  the older end of the demographic that is out there
11  for advertisers.
12          So it's a challenging sale.
13      Q.  When you left in 2000 where did you go?
14      A.  Left in 2000.  I didn't go anywhere until
15  some time in I guess late November of 2000 at which
16  point I took a position as VP/GM with Bonneville
17  International.
18      Q.  What stations did they have at the time?
19      A.  At that time I was assigned to what was
20  then known as Z 104.  I'm drawing a blank on the
21  call letters.  WWBZ and WWZZ FM I believe were the

Page 15

1  call letters.
2      Q.  During these time periods did you ever
3  work with Mr. Donohoe?
4      A.  Yes.
5      Q.  What time periods would those be?
6      A.  Leo and I started working together at
7  DC 101 back in 1986.  That's when I first met him.
8  He actually went over to WTOP I believe before me
9  when I moved over there or right after me.  We were
10  close.
11      Q.  Is that around 1987?
12      A.  1987 I guess was the number, right around
13  there.  We missed each other by a couple of months
14  one way or the other.
15          We worked together on the same staff and he
16  ended up working for me.
17      Q.  That was when you became sales manager at
18  WTOP from 1989 to 1991?
19      A.  Whatever year it was, the late eighties
20  some time.
21      Q.  You were above Leo when you were sales

Page 16

1  manager at TOP?
2      A.  Yes.
3      Q.  What was Leo selling in 1989, in that
4  timeframe when you were sales manager at TOP?
5      A.  My experience with Leo was he was an
6  account executive which meant he would call on local
7  accounts.
8          Primarily at that time in his career most of
9  them would be direct accounts.  To specify, that's a
10  non-advertising agency account.
11      Q.  When you say non-advertising agency, you
12  mean -- is that the equivalent of a rep firm?
13      A.  It's the equivalent of calling on an
14  individual car dealer as an example instead of going
15  through the advertising agency who works for that
16  individual car dealer.
17      Q.  Is an advertising agency known as a rep
18  firm?
19      A.  No, two different things.
20      Q.  Explain that difference for me.
21      A.  A rep firm is just that.  It's a

Page 17

1  representative firm that is hired by radio stations
2  that has offices throughout the country, primarily
3  in New York, the major markets, that represent that
4  radio station for national sales.
5      Q.  That would be a Katz or Crystal?
6      A.  Katz, Crystal, now today Clear Channel has
7  their own rep firm, CBS has their own rep firm.
8          In those days there was a lot more rep
9  firms.  Thinking back, I think Katz was one of our
10  clients back them, probably Crystal, probably all of
11  them, because you did go through them based on
12  performance.
13      Q.  Based on their performance?
14      A.  Yes.
15      Q.  That relationship between the rep firm and
16  the station, explain that for me if you would.
17      A.  The relationship is the rep firm as a
18  sales force.  Usually in New York, Los Angeles,
19  Chicago, Boston, Atlanta, Dallas, the larger
20  markets, those salespeople could be selling 3, 400
21  stations for different companies.

5 (Pages 14 to 17)

Page 18

1    They also represent you on what is called a
2 veiled business. A veiled business comes from an
3 advertising agency. It is literally veiled.
4    They come to you and say we're going to be
5 on the air in May in Washington. Here are our
6 demographics. We're trying to reach this group of
7 people. Here is the name of the client. Here is
8 the cost basis we're looking for. You are entitled
9 at that point to bid on the business.
10    That salesperson in New York, Chicago, LA,
11 wherever they are, is representing you to that ad
12 agency.
13    Q. That rep firm is representing the local
14 station?
15    A. Correct.
16    Q. To the ad agency?
17    A. Correct. They work with, usually, a
18 national sales manager at the individual radio
19 station who guides them through the process, gives
20 them the rates, whatever else they may need or
21 require to get that deal done.

Page 19

1    Q. From the late eighties until early
2 nineties when you were sales manager at WTOP and
3 Mr. Donohoe was working under you, did that ever
4 change?
5    A. When I went to WASH in a management role
6 Leo did not work for me. He was still with WTOP.
7    Q. That was 1994 through about 2000?
8    A. I went there in a sales management role
9 which was some time in 1989. At that point he did
10 not work for me. We still worked in the same office
11 and the same company but he didn't work for me at
12 that point.
13    Q. I have 1989 to 1991 you went back to TOP
14 as sales manager?
15    A. After my WASH management role I went back
16 over to TOP.
17    Q. Was Mr. Donohoe underneath you then in the
18 management chain?
19    A. He was.
20    Q. Still an account executive?
21    A. Still as an account exec.

Page 20

1    Q. Then you became director of sales for both
2 stations, TOP and WASH?
3    A. Yes.
4    Q. Was he still underneath you in that
5 capacity?
6    A. Yes.
7    Q. Did that end in 1994 when you became VP
8 general manager of WASH?
9    A. Yes.
10    Q. Was Mr. Oxley working in any of those
11 stations at that time?
12    A. Joel worked for WASH and WTOP when we
13 combined the sales force some time in the early
14 nineties.
15    Q. What was his role?
16    A. He was originally an account executive and
17 then was promoted to national sales manager. I do
18 not recall the year. That was for both of those
19 stations.
20    Q. During that time was Mr. Donohoe selling
21 sports for the stations?

Page 21

1    A. Yes. During the time at TOP we had the
2 Baltimore Orioles play by play broadcast that we
3 sold.
4    I think in the early days back in the
5 eighties, if you go back then, we had the Washington
6 Capitals and the then Washington Bullets or whatever
7 they were called then.
8    Q. I think it was the Bullets.
9    A. At one point we had the Bullets, the
10 Capitals and the Orioles.
11    Q. Did Mr. Donohoe do sports sales at that
12 time?
13    A. Everybody did everything. The answer is
14 yes.
15    Q. How did he do in sports sales?
16    A. Very good.
17    Q. Did he make his budgets?
18    A. Yes.
19    Q. How long under your supervision was he in
20 sports sales?
21    A. I'd say approximately three and a half to

6 (Pages 18 to 21)

Page 22

1  four years during that mixture of time period.
2      Q.  That would be the late eighties through
3  the early nineties?
4      A.  Correct.
5      Q.  How did he do in sales in general under
6  you?
7      A.  Leo was always a good performer, very
8  budget, goal oriented.
9          He would always outperform the majority of
10  the staff and you could count on him to reach his
11  annual goal.
12      Q.  Is hitting budget an important thing in
13  sales?
14      A.  In my opinion, it's the only thing.
15      Q.  In 2000, November of 2000 VP/general
16  manager of Bonneville at the Z 104 station, I'm
17  going to call it Z 104 rather than all the call
18  numbers, in that role, how long did you stay in that
19  role?
20      A.  Approximately three years.
21      Q.  Why did you leave that role?

Page 23

1      A.  The company consolidated the management
2  force in Washington.
3      Q.  Were you terminated?
4      A.  I don't know what they call it.
5      Q.  Let go?
6      A.  To be honest, I do not recall what the
7  settlement said.
8          It was one of those we'll give you this if
9  you just go away.  I can't remember.
10      Q.  You had a severance agreement?
11      A.  It was not my choice to leave.
12      Q.  Understood.  Was Mr. Oxley there at that
13  time?
14      A.  Not at that station.  He was over at WTOP
15  and WGMS.
16      Q.  When you were at Z 104 from November of
17  2000 through some time in 2003 was Mr. Michael
18  Spacciapoli on your staff?
19      A.  Yes.
20      Q.  In what capacity?
21      A.  Originally as an account executive and

Page 24

1  towards the end of that time period promoted to the
2  national sales manager.
3      Q.  As national sales manager he was
4  responsible for doing what you just described
5  earlier, the relationship between national sales
6  manager and the rep firms?
7      A.  Correct.  His job was to work with the rep
8  firm to generate business, and in addition,
9  depending on which station you're at, that position
10  will have local client contact as well.
11          That would be a requirement, particularly at
12  the stations that are not well developed or that are
13  new.
14      Q.  Was Z 104 one of those --
15      A.  It was a fledgling, it was a rebuild
16  operation.
17      Q.  Its format was what?
18      A.  Let's see which year.
19          When I took the station over it was a top 40
20  format.  I took the station over with the knowledge
21  that we would not be in that business for long.

Page 25

1  Once we found a new format that we could make some
2  money off of we would be changing the format.  It
3  was not within the company's comfort zone to be in
4  that format.
5          So some time, I don't know, eight months,
6  approximately, we did change formats and moved over
7  to a more music format with less commercials which
8  was the brainchild of the chief executive officer of
9  Bonneville to try a format with half the commercials
10  or 60 percent or 80 percent less commercials than
11  the average music station and see if that would be a
12  successful operation.
13      Q.  Did that last until you left?
14      A.  In different phases, yes.  Yes, within
15  that format until I left, yes.
16      Q.  Mr. Spacciapoli, his budget numbers as
17  national sales manager, do you recall what they were
18  during that time period?
19      A.  I do not.
20      Q.  Is it fair to say Z 104 had a much smaller
21  national sales budget than WTOP?

Page 26

1    A.   Much, yes, much smaller.  I would say
2  maybe 30 percent of what they might be trying to do.
3    Q.   Of what WTOP might be trying to get?
4    A.   Yes.
5    Q.   Is it fair to say WTOP was the jewel in
6  the crown, its rates were the highest, it generated
7  the most money for the Bonneville Group in D.C.?
8        MS. PENDLETON:  Objection to form.
9  BY MR. McCALLY:
10   Q.   What was that?
11   A.   Without question it was the top station,
12 not even close to the other ones.
13   Q.   During your time at Z 104 -- actually,
14 prior to that did Mr. Mills ever work under you,
15 Mr. Matt Mills?
16   A.   Yes, Matt Mills, I recruited Matt when I
17 first took over WASH as general manager.
18       So that would have been some time after
19 1994.  I don't recall the year.  But recruited Matt
20 to be an account executive for WASH radio.
21       Matt worked with me for I don't know the

Page 27

1  time limit, a couple of years in that role, maybe
2  three years, and then was promoted at some point in
3  the latter nineties to the national sales manager
4  role at WASH.
5        So he never worked directly for me.  I was
6  the general manager.
7    Q.   You were the head person?
8    A.   Yes, but I did recruit him over to the
9  company.
10   Q.   As the general manager, the top person in
11 the management chain, I understand he didn't work
12 directly for you but he was under your management
13 chain, is that correct?
14   A.   Correct.
15   Q.   Did you work with him anywhere else?
16   A.   No.
17   Q.   That was the WASH time period?
18   A.   Yes.
19   Q.   Now --
20   A.   He did, just to correct that, he did come
21 over to work for Bonneville but did not work with me

Page 28

1  or for me later on.
2    Q.   In November of 2000 when you became VP
3  general manager at Bonneville Z 104 he was over at
4  the WTOP station?
5    A.   No.
6    Q.   Explain that.
7    A.   He was still working at WASH and I don't
8  recall if that was in the general sales manager role
9  or still the national sales manager role.  I think
10 it was the general sales manager role and was
11 recruited over to go to WTOP which would be a much
12 bigger job.
13   Q.   Was that some time around 2001?
14   A.   Approximately in that time period, yes.
15   Q.   Do you know who recruited him?
16   A.   I believe I started the process.  Joel and
17 I worked together on a lot of things.
18       I had an interest in Joel's general sales
19 manager, his current sales manager at WTOP, and
20 moving him over to Z 104, and Matt and I had a very
21 good relationship and I think I originally talked to

Page 29

1  him and said would you have interest and hooked him
2  up with Joel and they took it from there.
3    Q.   You say you originally had a good
4  relationship?
5    A.   With?
6    Q.   Mr. Mills.
7    A.   We've always had a good relationship.
8  We've always had a good relationship.
9    Q.   During the times you either worked with
10 Mr. Mills at WASH or when he was in the Bonneville
11 Group when you were VP general manager, did you ever
12 become aware of any performance problems he had or
13 complaints about him?
14       MS. PENDLETON:  Objection to form.
15 BY MR. McCALLY:
16   Q.   Go ahead.
17   A.   During the WASH time period I was never
18 aware of any complaints about Matt from anybody.  He
19 was an outstanding employee and worker and good
20 person.
21       During his time at WTOP as he grew into that

8 (Pages 26 to 29)

Page 30

1    general sales manager role he was, in my opinion, a
2    little harder than previous management, perhaps
3    stricter, perhaps correctly so.
4        So you would hear rumblings that he was
5    tough.
6        Q.   Were there ever any complaints about him
7    from employees beyond just he's tough, complaints
8    that went into areas of maybe he's trying to bring
9    in younger people than are currently at the station,
10    treating younger employees more favorably than the
11    older workers?
12        MS. PENDLETON:  Objection to form.
13        THE WITNESS:  I never heard any
14    specific complaints that he, in fact, because of
15    someone's age, treated somebody differently.
16    BY MR. McCALLY:
17        Q.   Did you hear any general complaints?
18        A.   Did I hear of any?
19        Q.   Yes.
20        A.   No.
21        Q.   You seemed to pause on that.  Is there a

Page 31

1    problem with the words "did you hear"?
2        A.   No.
3        Q.   Let me ask it this way.  Are you aware of
4    any?
5        A.   I think, and this is my opinion --
6        Q.   Understood.
7        A.   Nothing else besides that.  That Mr. Mills
8    wanted his own staff for his own reasons and wanted
9    to structure his staff his way and liked people that
10    worked like him.
11        I believe if you did not do that, you were
12    treated differently, if that answers the question.
13        Q.   Were you aware of any file that was being
14    kept about Mr. Mills by Bonneville?
15        A.   My understanding was, and I never saw it,
16    that there was a file that had some complaints
17    regarding the way Matt treated some employees.
18        Q.   Do you know which employees?
19        A.   I do not.
20        Q.   What else do you know about the file?  How
21    did you learn about it?

Page 32

1        A.   From conversation with Joel.  Joel and I
2    generally would -- we had similar positions and we
3    would share pretty much everything.
4        Q.   You are referring to Mr. Oxley who is
5    sitting here?
6        A.   I am.
7        Q.   What exact complaints?
8        A.   I believe they were harassment complaints.
9    Technically exactly what they were, I do not know.
10        Q.   What knowledge do you have of them from
11    your discussions with Mr. Oxley or being in the
12    position you were in?
13        A.   Just that there was, in fact, a file at
14    Bonneville.
15        It was a very well run company, very strict
16    in its procedures, and if someone does complain
17    about anything, it will be put in a file, it will be
18    recorded with Human Resources and that there were at
19    least one, perhaps two, complaints regarding Matt
20    with harassment from people that worked for him.
21        Q.   What do you mean by harassment?

Page 33

1        A.   I don't know specifically what they were
2    and I don't know who they were.  I just know they
3    worked for him.  I don't know what Bonneville's
4    technical term for harassment was then or what that
5    included.
6        My opinion, probably just the way they were
7    treated versus somebody else, but I don't know that
8    for a fact.
9        Q.   Do you recall your conversations with
10    Mr. Oxley about these complaints?
11        A.   I recall our conversations.
12        Q.   What do you recall Mr. Oxley saying?
13        A.   That Matt is such a great employee, he's
14    really helped turn the place around, get it pointed
15    in the right direction, but that he struggles with
16    his people management.
17        Q.   Did you ever hear comments or become aware
18    of complaints that he had trouble working with older
19    employees?
20        A.   I will say what I heard --
21        Q.   Meaning Mr. Mills.

9 (Pages 30 to 33)

Page 34

1    A.   What I heard was Matt had trouble working
2  with people that weren't like him.  I did not hear
3  because they were older.
4    Q.   When you say not like him, what do you
5  mean by that?
6    A.   They didn't conduct business exactly the
7  way he conducted it.
8    Q.   Meaning what?
9    A.   Matt is a very meticulous
10 manager -- forget about manager -- person, and very
11 much is interested in the process and how things are
12 done and not as much the end result, in my opinion,
13 and if you were like that you were treated I think a
14 little better.
15     Contrary, if you were the other way, he
16 wouldn't appreciate that and had a rough time
17 understanding that, I think.  I think that's really
18 what it amounted to.  He didn't understand how
19 somebody could get to a positive result unless it
20 was done his way.
21    Q.   Did you ever see or did you ever become

Page 35

1  aware of complaints regarding Mr. Mills' concerns
2  about the way he treated the veteran employees?
3    A.   Yes.
4    Q.   What were those?
5    A.   There was a feeling from a number of
6  employees at that time that they were trying to be
7  run out.
8     I never heard because of their age but there
9  was a general feeling that certain employees, it
10 would be better if they weren't there.
11    Q.   When you use the words "veteran
12 employees," what does that mean?
13    A.   The people that had been there in the
14 specific circumstances, each of these people that I
15 can think of, and I'll name them for you, more than
16 ten years.
17    Q.   Who are they?
18    A.   Leo Donohoe would be one, Jean Fowler
19 would be another, not quite ten years but Jody Lish
20 would be another one that had been there for a
21 while.

Page 36

1    Q.   What did you hear about Mr. Mills trying
2  to run them out?
3    A.   I don't know if he was trying to run them
4  out.  I didn't say that.
5     That was their feeling, that they were being
6  run out.  I don't know if that was his intention or
7  he was doing that.  They felt that there was
8  different pressure on them than the other part of
9  the staff and that Matt would prefer to bring in his
10 own people.
11    Q.   How did you learn about this?
12    A.   I learned from each of the people.  They
13 all at some point had worked for me at different
14 stations.  Most of that staff had.
15     So we talked.
16    Q.   Did Mr. Donohoe make those types of
17 complaints to you?
18    A.   Yes.
19    Q.   Did Ms. Fowler make those types of
20 complaints to you?
21    A.   Yes.

Page 37

1    Q.   Did Ms. Lish?
2    A.   Yes.
3    Q.   Now, this is while you were the VP/general
4  manager at Bonneville from late 2000 through
5  approximately 2003?
6    A.   Correct.
7    Q.   What did you do with these complaints?
8    A.   With each of those people, and I've known
9  them all for years, I mean I gave them counsel what
10 I would do and my counsel to each one of them was
11 Matt is Matt.  He's going to run things the way he
12 wants to run them.  Make sure you make your numbers.
13 That's what I told them.
14    Q.   Why did you tell them make sure you make
15 your numbers?
16    A.   Because I felt if they didn't, as with
17 most employees, they wouldn't be around any longer.
18    Q.   Making your numbers means making your
19 budget?
20    A.   Correct.
21    Q.   That's the most important thing in the

Page 38

1  sales staff?
2      A.  That is the most important thing.
3      Q.  Did they make their numbers?
4      A.  I have no knowledge of that.
5      Q.  Did you express these concerns to
6  Mr. Oxley?
7      A.  I didn't express those concerns.
8      Joel and I would speak daily, not about
9  this, but certainly we had conversations regarding
10  Matt's management style.
11      Q.  Did it include him being harder on the
12  veterans as you described?
13      A.  Yes.
14      Q.  What exactly did you discuss with
15  Mr. Oxley about that?
16      A.  It was more friendship between Joel and I.
17  We were good friends.  Helping each other manage
18  people, what's the best way to get Matt who was a
19  fabulous employee, and is, to change his ways in
20  regards to other people.  It was more how do we help
21  get him better?

Page 39

1      Q.  Why did he need ways to be changed?
2      A.  I think he needed his ways to be changed
3  because if you get things put in a file for
4  harassment eventually that's going to bring it out,
5  no matter how good your numbers are.
6      Q.  This file, who told you a file existed?
7      A.  Joel.
8      Q.  Do you recall what Ms. Fowler's specific
9  complaints were?
10      A.  I don't.  People that used to work for me
11  and also friends of mine and who used me for
12  counsel, and it was more how do I make this
13  situation better, what do I got to do, what do you
14  recommend?
15      Q.  Making it better means get Mr. Mills off
16  their back, so to speak?
17      A.  Correct.
18      Q.  Would you find it unusual for someone in
19  Mr. Mills' position to continue criticizing someone
20  in sales if they are making their budget and getting
21  high rates?

Page 40

1      A.  Would I find it unusual?
2      Q.  Yes.
3      A.  Yes.
4      Q.  Why is that?
5      A.  Everybody has got a different judgment
6  factor.  Mine is based on results.
7      Q.  If you are hitting your budget and getting
8  high rates what else more is a salesperson do?
9      A.  In my opinion, that's the way I judge it.
10      Q.  That's the way you judge it?
11      A.  Yes.
12      Q.  Would you find it unusual if someone is
13  making their numbers to be criticized?
14      A.  I would find it unusual.
15      Q.  Do you recall any specific complaints from
16  Ms. Lish?
17      A.  No, just the general complaints, how do I
18  make it better?
19      Q.  Do you recall any discussions about
20  Ms. Fowler keeping e-mails that she felt were
21  particularly unwarranted that she received from

Page 41

1  Mr. Mills?
2      A.  I do not.
3      Q.  Any e-mails that she thought were of a
4  cruel nature that she received from Mr. Mills?
5      A.  I do not.
6      Q.  Were you aware of any of Mr. Mills' direct
7  hires while he was there?
8      A.  Was I aware when he hired somebody?
9      Q.  Yes.
10      A.  Yes.
11      Q.  Do you recall the names of the people he
12  hired?
13      A.  I don't.  If my memory was refreshed I can
14  say yes or no, but not off the top of my head.
15      Q.  Do you recall whether they tended to be
16  younger workers or older?
17      A.  As I recall, they were younger.
18      Q.  What do you base that on?
19      A.  Most of the veteran people in the
20  business, in the broadcasting business, I had either
21  worked with or worked for me at some point in time

11 (Pages 38 to 41)

Page 42

1   in Washington.
2       I would have known them and I would have
3   recalled it.  If they were younger, I probably
4   didn't know them or I may have just had a faint
5   acquaintance of them.
6       Q.  If we were to provide you with a list of
7   names, you would be able to approximate ages, you
8   believe?
9       A.  I think so, yes.
10      Q.  Do you recall any complaints about
11  Mr. Mills and how he would distribute accounts to
12  the sales staff?  By "distribute" I mean give or
13  take away.
14      A.  I don't recall anything specific.
15      I will tell you that is a natural complaint
16  of any salesperson with any sales manager.  Rarely
17  do they think they've got the right accounts.  They
18  want as much as they can get and that's the type of
19  person, salesperson, but I don't recall anything
20  specific, somebody saying they took this away from
21  me or it was unfair.

Page 43

1       Q.  Do you recall there ever being any
2   comments made that you have to be young with long
3   legs to get Matt Mills to pay attention to you?
4       A.  From who?
5       Q.  Anyone.
6       A.  I never recall that specific statement.
7       Q.  How about a statement along those lines?
8       A.  No.
9       Q.  Any statements concerning how you would
10  get Matt Mills to pay attention to you as a member
11  of a sales force?
12      A.  No, none that I can recall.
13      Q.  Did you ever hear Mr. Mills or are you
14  aware of him making such comments as:  You can't
15  teach an old dog new tricks?
16      A.  I've heard Matt make that statement.
17      Q.  In what capacity or what instance?
18      A.  In how to manage people.  I've heard him
19  make those statements.  I can't honestly tell you if
20  they were done in jest or not.
21      Q.  When do you recall hearing him say that?

Page 44

1       A.  Through the many years I knew him.
2       Q.  While you were at Bonneville?
3       A.  And before that.
4       Q.  Who was the old dog in the comment?
5       A.  I think it was a generic statement as he
6   used it, as I recall.
7       He would use it a lot and it was not
8   specific in its nature as much as it was a generic
9   thought process.
10      Q.  Directed at his sales staff?
11      A.  I think directed at anything.  I can't
12  tell you it was specifically directed toward his
13  sales staff.
14      Q.  What do you recall when he would use it?
15  Was he commenting on his sales staff or what was he
16  commenting on?
17      A.  He would be commenting on, could be sales
18  staff, it could be a client, it could be a personal
19  relationship.
20      I think it was a general thought process
21  that he had.

Page 45

1       Q.  In terms of you can't teach an old dog new
2   tricks in relation to the sales staff, what was your
3   understanding of what he meant?
4           MS. PENDLETON:  Objection.
5           THE WITNESS:  My understanding, my
6   theory, my understanding, I think Matt honestly
7   believed then, years ago, that it was, in fact,
8   difficult to teach older people, if you will, a new
9   way of doing things and that there was more
10  resistance from older people towards doing it his
11  way.
12      I think he actually believed that.
13  BY MR. McCALLY:
14      Q.  How many times did you hear him make that
15  comment while you were with him at Bonneville?
16          MS. PENDLETON:  Objection.  Which
17  comment?
18          MR. McCALLY:  The one we've just been
19  talking about.
20          THE WITNESS:  An old dog new tricks.
21  He would make that comment all the time.  It was

12 (Pages 42 to 45)

Page 46

1  part of his vernacular.
2       I don't know how many times it was done
3  in jest and how many times there were specific
4  circumstances. It was part of his vernacular.
5  BY MR. McCALLY:
6    Q. Was Mr. Oxley aware of that?
7    A. I don't know.
8    Q. Was anyone else in management aware of it?
9    A. I don't know.
10   Q. Were you around when he would say it
11 around other people?
12   A. Yes.
13   Q. Who were some of the people who would be
14 around when he would say it?
15   A. Ralph Renzi who worked for me at the time
16 and was good friends with Matt. He had the same
17 positions he went up for that Matt had at Z 104 as
18 Matt had at WTOP.
19   Q. Anyone else?
20   A. I would say Michael Spacciapoli, who I
21 refer to as Spack, and I would say Joel heard it at

Page 47

1  some point in time.
2       We had many lunches together, many
3  breakfasts together, spent a lot of time together,
4  all of us.
5    Q. You, Mr. Mills, Mr. Oxley?
6    A. Correct, Ralph Renzi. We've all known
7  each other for years and socialized.
8    Q. That's where this comment, you would hear
9  it in that capacity as well, you can't teach an old
10 dog new tricks?
11   A. You could hear it on the golf course.
12 Like I said, it was part of his vernacular.
13   Q. Did you ever hear him make such comments
14 as he's been doing this too long, he's set in his
15 ways, things of that nature?
16   A. Yes.
17   Q. Give me some examples of that.
18   A. I know he said that about Leo. He said it
19 to me, that Leo was way too set in his ways for his
20 taste and did not want to accept Matt's change and
21 that was very frustrating to Matt.

Page 48

1    Q. When do you recall him saying this?
2    A. He would say it in front of Leo. It was
3  not something he would hide. He was very forthright
4  with it. It was almost a joke.
5    Q. Give me an example of when he would say it
6  to Leo, examples you can recall.
7    A. I can't give you dates, times, anything
8  like that.
9       We could be having lunch, we could be having
10 a cup of coffee, we could have been playing golf and
11 he would say it to Leo, that you are old and you are
12 set in your ways and you're never going to change.
13   Q. You're old, you're set in your ways and
14 you're never going to change?
15   A. Yes.
16   Q. That's yes?
17   A. Yes.
18   Q. What would Mr. Donohoe's response be?
19   A. He would just laugh. He would laugh and
20 just say "I am what I am."
21   Q. Do you recall any other such comments that

Page 49

1  Mr. Mills would make?
2    A. Concerning?
3    Q. Along these lines, people being older, not
4  wanting to change, can't teach an old dog new
5  tricks, that type of comment?
6       MS. PENDLETON: Objection.
7       THE WITNESS: Nothing pops in my
8  head.
9  BY MR. McCALLY:
10   Q. Did other people in management hear the
11 comment that you're old, you're set in your ways and
12 you're not going to change?
13   A. I'm fairly confident that Joel heard it.
14 I know Ralph Renzi who was my sales manager heard
15 it.
16   Q. Do you know if anyone ever reported that
17 to HR?
18   A. That specific term?
19   Q. Those types of comments from Mr. Mills.
20   A. I do not know.
21   Q. Let's finish your chronology, if I could.

13 (Pages 46 to 49)

Page 50

1  Before we do that, you said you had heard those
2  comments from Mr. Mills, those types of comments
3  when you were at Bonneville but even before that at
4  WASH?
5      A.  Yes.
6      Q.  What did you hear him say at WASH?
7      A.  That specific line, like I said, was part
8  of his vernacular.  Whether it was in jest or of a
9  specific nature, I don't recall, but it was part of
10  his vernacular.
11      Q.  That line of you can't teach an old dog
12  new tricks?
13      A.  Right.
14      Q.  When he was at WASH did he ever use to use
15  the expression "you're old, you're set in your ways,
16  you're not going to change" or statements of similar
17  intent?
18          MS. PENDLETON:  Objection.
19          THE WITNESS:  Nothing specific I
20  recall.
21  BY MR. McCALLY:

Page 51

1      Q.  Anything generally?
2      A.  Other than the old dog, new tricks
3  vernacular, no.
4      Q.  You left Bonneville in 2003.  Where did
5  you go next?
6      A.  Where did I go after that?  I went to work
7  for ZGS Communications which is a Latino
8  broadcaster.
9      Q.  How long were you there?
10      A.  I was with them for approximately a year
11  and a half.
12      Q.  2003 to 2004, 2005?
13      A.  I don't think I went to work for them
14  until 2004 or some time at the end of 2003.  Let's
15  call it the beginning of 2004.
16          From there after approximately a year and a
17  half I was there in a VP role for their radio
18  stations, moved on to Red Zebra Broadcasting as VP
19  of sales.
20      Q.  How long were you there?
21      A.  I was there a short period.  Let's say

Page 52

1  March 2006 through the end of that year.
2      Q.  Why did you leave there?
3      A.  They consolidated their management team.
4      Q.  Were you let go as a result of the
5  consolidation?
6      A.  Yes.
7      Q.  Was there any litigation following that
8  involving you?
9      A.  Current.
10      Q.  It's current?
11      A.  Yes.
12      Q.  What's the nature of that litigation?  Let
13  me ask it this way.  Is there a lawsuit pending?
14      A.  There is.
15      Q.  What is the claim in the lawsuit?
16      A.  The claim is 401K matching money that is
17  due and failure to fulfill the total settlement that
18  was reached.
19      Q.  So it's a breach of contract claim?
20      A.  Yes.
21      Q.  Are you represented in that?

Page 53

1      A.  Yes.
2      Q.  Who is your attorney?
3      A.  John Sutherland.
4      Q.  After you left Red Zebra -- that's the
5  Redskins broadcasting?
6      A.  Yes.
7      Q.  Is it all sports?
8      A.  Yes, that was a sports -- those are sports
9  radio stations, primarily sold the Washington
10  Redskins.
11      Q.  After you left there in 2006 where did you
12  go?
13      A.  To Westwood 1 Broadcasting.
14      Q.  What's your title?
15      A.  General manager of sales, mid-Atlantic.
16      Q.  What do you sell or what does the Westwood
17  Group that you are responsible for sell?
18      A.  My primary responsibility is traffic
19  sponsorships throughout the country.
20          We represent, my team represents the
21  mid-Atlantic for the whole country.  So I see any

14 (Pages 50 to 53)

Page 54

1  business that's conducted out of the mid-Atlantic
2  states is conducted from my office, selling the
3  radio stations, 2800 radio stations throughout the
4  country.
5      Q.  While you were at Red Zebra did
6  Mr. Spacciapoli ever approach you for a job?
7      A.  Not in a specific nature.
8          He certainly was very interested in what we
9  were doing and showed interest in working there but
10 never asked me can I have a job or if there's an
11 opening, let me know.
12     Q.  What do you mean by he showed interest?
13     A.  We spoke.  We were friends.  He knew I
14 went over there.
15         I think he was interested in the fact that I
16 was working really for the Redskins and wanted to
17 know all about it and to keep him posted if
18 something came up that might interest him.  Pretty
19 normal things that happen.
20     Q.  Do you recall a year?  I take it it was in
21 2006?

Page 55

1      A.  It had to be in 2006, yes.
2      Q.  Did you have more than one discussion?
3      A.  I don't recall.  I know we spoke a few
4  times about it.  Neither one was specific in nature.
5  More general.
6      Q.  Did he ever express to you any concerns or
7  complaints about the position he was in of director
8  of national sales at Bonneville?
9      A.  No.
10     Q.  Did you ever discuss the position with
11 him?
12     A.  Other than to congratulate him when he got
13 the job and to check with him every now and then to
14 see how he was doing but, no, I never recall any
15 complaints from him.
16     Q.  When you were at Bonneville, 2000 to 2003,
17 were you aware of Mr. Donohoe's role as national
18 sales manager?
19     A.  Yes.
20     Q.  What did you know about that?
21     A.  I knew what he was responsible to do.  I

Page 56

1  knew what he had to do every day to get it done and,
2  of course, knew Leo very well.
3      Q.  He at that time, 2000 through 2003, at
4  some point he took over the national sales manager
5  for WGMS as well?
6      A.  Yes.
7      Q.  Do you know how that came about?
8      A.  My understanding of it is there was
9  another kind of consolidation play and they had
10 asked Leo to do WGMS national sales as well as his
11 WTOP duties.
12     Q.  Is it fair to say that the vast majority
13 of his duties were for WTOP?
14     A.  I would say 90 percent.
15     Q.  Why is that?
16     A.  GMS at the time was struggling.  The
17 station was struggling.  WTOP was on top of the
18 world and most of the demand would be on WTOP which
19 would mean he would be spending most of his time
20 there.
21     Q.  With increased demand comes increased work

Page 57

1  and responsibilities?
2      A.  As I recall, probably three times the
3  revenue at that point.
4      Q.  Were you around or involved in the RIF
5  that occurred in early 2006?
6      A.  No.
7      Q.  Were you around at Bonneville when the
8  discussions occurred regarding the Nationals
9  baseball team contract?
10     A.  No.
11     Q.  Do you have any knowledge of that contract
12 with Bonneville and how it works?
13     A.  I have limited knowledge only because when
14 I was with Red Zebra we were bidding for it.  You
15 kind of get an idea of what somebody may be offering
16 or the team may be offering them to broadcast the
17 games.
18     Q.  Tell me -- you were bidding on the same
19 contract, trying to get the contract with the
20 Nationals?
21     A.  Yes.

15 (Pages 54 to 57)

Page 58

1    Q.  What did that contract involve?
2    A.  At that point it was in the infancy stage
3  and stations were trying to determine the value of
4  it.
5       The team was trying to decide how do they
6  get the most out of this.
7    Q.  A new product?
8    A.  A new product, and there were
9  conversations with the team with a lot of stations.
10       Also the one I was at with Red Zebra, I'm
11  sure Bonneville, what is the best way to conduct an
12  arrangement, is it a revenue share arrangement, do
13  we sell all the inventory, does the team sell all
14  the inventory, do we split it up, what's the best
15  way to do it?
16    Q.  What do you mean by "revenue share"?
17    A.  There are arrangements in sports sales
18  where stations might take a percentage of the
19  inventory.
20       As an example, they'll take 25 percent, the
21  station will sell that, the team will sell the

Page 59

1  remaining 75 percent.
2    Q.  When you say "inventory," you mean air
3  time for ads?
4    A.  I mean air time for ads, right.
5    Q.  Sell all the inventory, what did you mean
6  "sell all the inventory,"?  What did you mean by
7  that?
8    A.  The way it used to be done with most
9  stations is you would pay a rights fee to the team
10  and you would own all the sales inventory.
11    Q.  Do you know how WTOP's contract, which
12  kind it was?
13    A.  My understanding is it's predominantly the
14  sales inventory is owned by the team and that
15  Bonneville owns a small portion, very small portion
16  of it.
17    Q.  Was it that way from the beginning, do you
18  know?
19    A.  I don't know.
20    Q.  Do you know what involvement, if any,
21  Mr. Spacciapoli had with the Nationals?

Page 60

1    A.  I believe he was responsible for Nationals
2  sales.
3    Q.  In the Nationals sales manager role?
4    A.  I'm not sure of that.  I seem to recall a
5  conversation of that.
6    Q.  Prior to that, do you have any knowledge
7  of his involvement with Bonneville's negotiating a
8  contract with the Nationals?
9    A.  No.
10    Q.  Do you know who was negotiating the
11  contract for Bonneville?
12    A.  I would say it was Joel Oxley.  I don't
13  know that for a fact though.  That's usually the
14  position that does it.
15    Q.  How would you describe Mr. Mills and
16  Mr. Spacciapoli's relationship?
17    A.  Friends.
18    Q.  So it went beyond work?
19    A.  Yes.
20    Q.  Do you have any knowledge of their social
21  involvement?  Would they do things together outside

Page 61

1  of work?
2    A.  They played golf together and I believe
3  they would go to each other's homes, their wives
4  would have dinner.
5    Q.  Do you have any knowledge of Leo Donohoe's
6  reputation with the rep firms?
7    A.  Leo is one of the best liked people in the
8  business, and that would include the rep firms.
9  He's a very, very likable guy, incredibly honest
10  person and I think well respected.
11    Q.  Did you become aware of when
12  Mr. Spacciapoli left the position of director of
13  national sales, sports sales for Bonneville and
14  became the LSM for WTOP?
15    A.  No, I can't recall that time.  Eventually
16  I knew it happened but I don't remember when it
17  happened.
18    Q.  Do you have any knowledge of the
19  reorganization of the San Francisco radio stations
20  by Bonneville?
21       MS. PENDLETON:  Objection.

16 (Pages 58 to 61)

Page 62

1          THE WITNESS:  Only from the trades,
2   reading about it in the trades but no direct
3   knowledge.
4   BY MR. McCALLY:
5       Q.  What do you know from reading about it in
6   the trades?
7       A.  There was -- Bonneville owned a very
8   powerful radio station.  It was KOIT, in
9   San Francisco.
10          They were profitable.  They had either sold
11  or traded it for some other stations, which was
12  surprising to me.  San Francisco is a very lucrative
13  market.
14          They had another station there that had
15  never done well.  It was a poor performer.  But I
16  don't know why they did it or what the reasoning was
17  behind it.  That happens a lot.
18          MR. McCALLY:  Let's take a five
19  minute break.  I may be close.
20          (Whereupon a recess was taken from
21  11:01 a.m. - 11:13 a.m.)

Page 63

1   BY MR. McCALLY:
2       Q.  Mr. O'Brien, we're back on the record.  I
3   think I'm almost finished.  Do you know Jory
4   Steiber?
5       A.  Yes.
6       Q.  Was he at Bonneville when you were there?
7       A.  Yes.
8       Q.  What was his position?
9       A.  Account executive, salesperson.
10      Q.  For what station?
11      A.  For WTOP.
12      Q.  Was he under Mr. Mills?
13      A.  I believe he was, yes.
14      Q.  Was he let go or did he resign, do you
15  know?
16      A.  I don't recall.
17      Q.  Do you recall Mr. Steiber making any
18  complaints about Mr. Mills?
19      A.  I don't.
20          MR. McCALLY:  Thank you, Mr. O'Brien.
21  That's all I have right now.

Page 64

1   CROSS EXAMINATION:
2   BY MS. PENDLETON:
3       Q.  I have some cross.
4          Good morning, Mr. O'Brien.  How do you
5   describe your relationship with Mr. Donohoe?
6       A.  Friends.
7       Q.  Would you say you socialize together
8   outside the office?
9       A.  We don't socialize.  We'll play golf a
10  couple of times a year together.
11      Q.  How often do you see Mr. Donohoe a year?
12      A.  Maybe two times.
13      Q.  How often do you talk with him on the
14  phone typically?
15      A.  We talk on the phone every other week, say
16  hi, how are you doing?
17      Q.  Have you ever talked with Mr. Donohoe
18  about the fact he was RIFed from Bonneville?
19      A.  Yes.
20      Q.  How many times have you talked to him
21  about that?

Page 65

1       A.  I can't recall the number.  When it
2   happened he called to let me know what had happened
3   and looking for jobs, see what jobs might be out
4   there.
5          Since then maybe a dozen times we've spoken
6   about it.
7       Q.  During these dozen times what has
8   Mr. Donohoe said to you about having been RIFed?
9       A.  He felt that he was not treated properly
10  and did tell me that he had hired counsel and was
11  going to file suit.
12      Q.  What else?
13      A.  He told me that he wanted to play it out
14  to the end.
15          He really felt that it was very destructive
16  toward not only his career but his spirit and his
17  soul.
18      Q.  Did he say anything more along the lines
19  of not having been treated properly?
20      A.  Yes, he said "all I ever did was make my
21  numbers.  That's what I was there to do."

17 (Pages 62 to 65)

Page 66

1    He felt that he was always a TOP employee
2  primarily and that he was labeled as a WGMS employee
3  and he felt that was unfair.
4    Q.  Anything else?
5    A.  No, that would be it.
6    Q.  What did you say to him during this
7  conversation about the RIF?
8    A.  Asked him how I could help him, how job
9  opportunities look like, how I could help him with
10  that, asked him what happened, why did he feel that
11  he was RIFed.
12    He told me.  He said he still doesn't
13  understand it to this day and he to this day is
14  still visibly upset when you talk to him, when you
15  see him, about the situation.
16    Q.  Anything else you can remember about those
17  conversations?
18    A.  He would ask my counsel, not legal
19  counsel, but employment counsel, of where he needs
20  to go.
21    He was certainly close to me when he took

Page 67

1  the job he was currently in and said what do you
2  think, and we talked a lot about that and from time
3  to time I would ask him how is your situation with
4  Bonneville, how is it proceeding?
5    He would not talk specifics with me.  He
6  just said it was ongoing and the last time we
7  specifically spoke about it is when me called to say
8  "by the way, you are probably going to be deposed."
9    Q.  When you asked him how you could help, did
10  he actually seek your help with regard to specific
11  employment?
12    A.  Yes, he spoke with me before he took his
13  current job with CBS and asked me what I thought,
14  what the pros and the cons were about that job and
15  if I thought he would be good at it, he could do it,
16  and gave me my advice.
17    Q.  Did you ever talk with Mr. Donohoe about
18  the fact that he had specifically not been rehired
19  for the director of national sales, support sales
20  position?
21    A.  I did.

Page 68

1    Q.  What was that?
2    A.  He asked me if I thought he should
3  reapply, as I'm assuming that offer was extended for
4  him to do, and I said "do you want to work there?"
5    He said "not particularly, not after the way
6  they've treated me."  He said "but, you know,
7  something inside of me doesn't want to give up.  I
8  feel like I've been wrongly treated and I want to
9  reapply."
10    I said "you'll regret it if you don't.  Go
11  reapply."
12    Q.  What other conversations did you have with
13  him about his lawsuit against Bonneville?
14    A.  Specifically I can't recall.
15    If you have something, I can agree with you
16  or not agree with you, I'll be happy to do it but
17  nothing specific.  He was very vague about the
18  lawsuit.
19    I just knew it was ongoing, I knew what it
20  was about.
21    Q.  Did he ask for your advice with regard to

Page 69

1  whether he should file suit?
2    A.  Yes, from day one.
3    Q.  What did you say?
4    A.  I said "absolutely."
5    Q.  Have you ever talked to Mr. Donohoe's
6  counsel?
7    A.  No, other than he called to try to ask me
8  some questions beforehand which my counsel, general
9  counsel at my company, said I'd prefer we didn't, so
10  I didn't answer him.  The same thing I did with you.
11    Q.  Have there ever been any instances where
12  you've had the opportunity to hire Mr. Donohoe for a
13  position while you were at Bonneville?
14    A.  Is there anything he's ever applied for?
15    Q.  Did you ever have the opportunity to hire
16  him for a position at Bonneville?
17    MR. McCALLY:  Objection to form.  The
18  witness has asked for clarification.
19    THE WITNESS:  You are going to have
20  to clarify it.
21  BY MS. PENDLETON:

18 (Pages 66 to 69)

Page 70

1    Q.   Did you ever consider hiring Mr. Donohoe
2    for a position while you were at Bonneville?
3    A.   No.  If he would have applied, I would
4    have.
5    Q.   When you were at Z 104 did you consider
6    hiring Mr. Donohoe for the NSM position?
7    A.   No.
8    Q.   When Theresa Taylor left that position in
9    2002 did you ever consider hiring Mr. Donohoe to
10   fill that spot?
11   A.   No.
12   Q.   Did you ever talk with anyone about
13   considering him for that position?
14   A.   No.
15   Q.   You never talked to Ralph Renzi about
16   considering Leo Donohoe for that position?
17   A.   No.  We may have spoken about Leo but
18   never to replace Theresa Taylor in that position.
19   Q.   What would you have spoken with him about
20   with regard to Leo?
21   A.   We were old friends and quite honestly, I

Page 71

1    thought Leo was in a very good spot where he was and
2    for him to come -- I wouldn't give it any thought
3    for him to come over and take that position because
4    it really would have been a couple steps down.
5    Q.   You are saying under oath that you never
6    spoke with Ralph Renzi about considering Leo for the
7    position of NSM at 104?
8         MR. McCALLY:  Objection to form,
9    mischaracterizes the testimony.
10        THE WITNESS:  Never had that
11   conversation.
12   BY MS. PENDLETON:
13   Q.   You never said "no way would I ever hire
14   Leo for that position"?
15   A.   Never had that conversation.
16   Q.   Who did you hire for that position, NSM at
17   104 in 2002?
18   A.   I didn't hire anybody.  That would have
19   been the general sales manager's responsibility.
20        I believe that in the beginning Ralph
21   handled national himself and then we promoted

Page 72

1    Michael Spacciapoli up to that position, as I
2    recall.
3    Q.   You said you've had experience with
4    Michael Spack?
5    A.   Not direct experience, but overall, yes.
6    Q.   He's worked under you in some capacity?
7    A.   Yes.
8    Q.   Do you know why he was selected for the
9    NSM position at Z 104?
10   A.   He was selected there -- we had a very
11   difficult time recruiting and Michael was an
12   able-bodied salesperson at Z 104 and had had
13   previous experience on the other side working for
14   the rep firm.
15        We felt that Michael could do that job as
16   well as handle some other accounts, local accounts,
17   and we would give him that job.
18        That's kind of the way it was but it wasn't
19   my decision.  It was recommended to me by Ralph and
20   I agreed with him.
21   Q.   Was anyone else recommended to you for

Page 73

1    that position?
2    A.   Not that I recall.
3    Q.   Do you have an opinion about a comparison
4    of Mr. Spacciapoli and Mr. Donohoe in the sales
5    position?
6         MR. McCALLY:  Objection to form.  Go
7    ahead.
8    BY MS. PENDLETON:
9    Q.   In a sales position at Bonneville?
10   A.   In an account executive role?
11   Q.   Yes.
12   A.   They are two different kinds of
13   salespeople, both good.
14        I think one is -- I think Michael is much
15   better with ad agencies.  In that context I thought
16   Leo was a much better relationship type seller with
17   clients and with relationships with the rep firm.  I
18   thought he had incredible relationships and Michael
19   was much better with the agencies and well liked as
20   well.
21   Q.   How about as account executive, do you

Page 74

1  have an opinion as to whether -- which one was a
2  more effective seller?
3              MR. McCALLY: Objection to form.
4              THE WITNESS: I'll answer it.
5              Depending on the station. If it was a
6  news station, Leo, I'd hire Leo before Michael to
7  sell.
8  BY MS. PENDLETON:
9      Q.  Why?
10     A.  News stations, usually the people that can
11  do very well with direct accounts and client contact
12  and relationships, do very well.
13         Leo in the many years he worked for me
14  excelled at that. I had direct experience with him
15  and knowledge that he could, in fact, do that.
16     I don't believe Michael ever sold at the
17  station before that. Perhaps he had. I can't
18  recall. If he had, it would have been for a short
19  period of time.
20     Q.  Do you have an opinion as to which one was
21  more proactive?

Page 75

1              MR. McCALLY: Objection to form.
2              THE WITNESS: Be specific.
3  BY MS. PENDLETON:
4      Q.  Proactive as a seller.
5              MR. McCALLY: Same objection.
6              THE WITNESS: Be specific.
7  BY MS. PENDLETON:
8      Q.  Do you have an opinion about which one
9  displayed more effort in the position?
10             MR. McCALLY: Objection to form.
11             THE WITNESS: I'll answer that. I
12  think they both had a lot -- showed it in different
13  ways.
14  BY MS. PENDLETON:
15     Q.  In what ways?
16     A.  I think Leo was much more relationship
17  oriented. I think that was his style, that was his
18  strength.
19     In all his cases, whether it be the rep
20  personnel or the client personnel, he excelled at
21  that.

Page 76

1      I think Michael was much more number savvy,
2  he would work the numbers part of the sales equation
3  better than Leo.
4      I think they have similar skill sets but
5  they probably excel at different things.
6      Q.  Would you say the same about their skills
7  as sales managers?
8              MR. McCALLY: Objection to form.
9              THE WITNESS: Neither one of them
10  were -- they were national sales managers. People
11  don't work for them. They are not managing people,
12  other than an assistant.
13     From a national perspective I'd rather
14  have Leo. From a local perspective, if you were
15  managing a staff, I think I'd rather have Michael.
16  I think he would be less reactionary with people,
17  although I never did get to see either one do it.
18  That's just an opinion.
19  BY MS. PENDLETON:
20     Q.  In the summer of 2002 you said you were
21  employed by Red Zebra Broadcasting.

Page 77

1      A.  No.
2      Q.  Or the year 2006, I'm sorry.
3      A.  Yes.
4      Q.  You said you had some communications with
5  Mr. Spacciapoli?
6      A.  Yes. We would talk. We were friends.
7      Q.  You talked possibly about a job with Red
8  Zebra?
9      A.  I don't recall.
10     As I said before, I don't recall talking
11  about a specific job.
12     Michael was very curious as to what we were
13  doing, fascinated by the Redskins and how we were
14  going to try to make this thing work and if there
15  was ever anything that looked like an opportunity
16  for him, to please talk to him, but we never had
17  that specific situation.
18     Q.  Who contacted whom?
19     A.  We would contact each other as friends,
20  e-mail here, give me a call, let's get together for
21  lunch type of thing.

20 (Pages 74 to 77)

Page 78

1    Q.   Do you recall if you contacted
2  Mr. Spacciapoli first?
3    A.   I don't recall.
4    Q.   So it may be that you did contact him
5  first?
6         MR. McCALLY:  Objection to the form.
7         THE WITNESS:  I don't recall.
8  BY MS. PENDLETON:
9    Q.   When you worked at Red Zebra Broadcasting
10 did you ever communicate with Mr. Donohoe about jobs
11 at Red Zebra?
12   A.   No.
13   Q.   Why not?
14   A.   I don't believe I had any openings for
15 Leo.
16      Actually, we did have a conversation right
17 before I started, actually before I worked there,
18 and I did ask him if he was interested.
19      He said "no, I want to play the CBS thing, I
20 want to look into the CBS thing, it's more in my
21 comfort zone because I could be a national sales

Page 79

1  manager again."
2       Yes, we did have a conversation.  There was
3  never a job offer or anything of that sort because I
4  didn't even work there yet.
5       I was kind of seeing who may or may not be
6  interested before I got into my position and I let
7  it go after that because he went on to accept that
8  job at CBS.
9    Q.   What position were you discussing with
10 Mr. Donohoe?
11        MR. McCALLY:  Objection to the form.
12        THE WITNESS:  We didn't have a
13 specific position.
14      It was more of hey, would you ever be
15 interested in coming over here and it was a direct
16 answer, look, I think I'm going to take this CBS
17 job, be the national sales manager.
18      That's kind of the direction he was
19 going.
20 BY MS. PENDLETON:
21   Q.   Did you have any specific jobs that you

Page 80

1  and Mr. Spacciapoli discussed?
2    A.   If we did, I do not recall.
3    Q.   You testified that you were not employed
4  by Bonneville in January of 2006 when the RIF
5  occurred?
6    A.   Correct.
7    Q.   You discussed -- I think you said, correct
8  me if I'm wrong, that most everyone in sales sold
9  sports while at Bonneville?
10        MR. McCALLY:  Objection to the form,
11 mischaracterizes the testimony.
12        THE WITNESS:  While at TOP, not
13 Z 104.  We didn't have sports.
14 BY MS. PENDLETON:
15   Q.   Do you know if Leo Donohoe had any
16 experience selling the Nationals baseball team when
17 he was at Bonneville?
18   A.   Experience?  We had plenty of experience
19 with the Orioles which would be the same sale.
20   Q.   Did he have any experience selling the
21 Nationals baseball team?  When he was at WTOP?

Page 81

1    A.   I believe he did but I don't know that for
2  a fact.
3    Q.   What's the basis for your belief?
4    A.   I think he was there at the time that they
5  had them, as I recall the history of it.
6    Q.   You don't know for a fact if Leo Donohoe
7  ever sold --
8    A.   I never saw an order, no.
9    Q.   Do you know if he would have been involved
10 with negotiating any contract with the Nationals
11 baseball team?
12   A.   I don't.  I would think they would seek
13 his counsel in regard to sales since he spent so
14 many years selling the Orioles.
15   Q.   What's your basis for assuming that?
16        MR. McCALLY:  Objection to form.
17 There is no assumption here.
18        THE WITNESS:  That's what I would do
19 as vice-president and general manager, I would seek
20 out people who had a lot of history in this market
21 selling that particular product and say "what do you

21 (Pages 78 to 81)

Page 82

1    think?"
2    BY MS. PENDLETON:
3        Q.   You don't know for a fact whether he had
4    any involvement with the contract?
5        A.   No.
6        Q.   You mentioned some comments you had heard
7    from Matt Mills about teaching an old dog new
8    tricks.
9        Did you say that you thought Mr. Oxley had
10   been privy to his comments?
11       A.   I think he had.
12       Q.   What's your basis for saying that?
13       A.   We all hung out together.  We spent a lot
14   of time together, ate a lot of lunches together,
15   played golf, had beers together.  Yes, I would say
16   he heard that.
17       Q.   When specifically would Mr. Oxley have
18   heard that?
19       A.   I don't have a date.
20       Q.   Where do you recall that happening?
21       A.   Don't have a place.

Page 83

1        Q.   Do you recall who was present?
2        A.   No.  We ate lunch together pretty much
3    three or four times a week when we were all in the
4    same building together.  We all had real strong
5    relationships and talked to each other all the time
6    but, as I said, I don't have a day or time or a
7    place.
8        Q.   You testified about a file at Bonneville
9    concerning written complaints about Matt Mills, is
10   that correct?
11       A.   I testified that I had knowledge from Joel
12   that there was, in fact, a file regarding Matt Mills
13   and regarding harassment complaints.  I never saw
14   the file.
15       Q.   When did you hear about this file from
16   Joel Oxley?
17       A.   When I was the vice-president/general
18   manager of Z 104.
19       Q.   Do you recall what year that would have
20   been?
21       A.   It would have had to have been not in

Page 84

1    2000, probably 2001 or 2002.
2        Q.   Do you recall if anyone was present during
3    this discussion that you remember having with
4    Mr. Oxley?
5        A.   No, we would talk on the phone.
6        Q.   How many times did you and Mr. Oxley
7    discuss this alleged file?
8        A.   More than one.
9        Q.   Two?
10       A.   Don't know.
11       Q.   Five?
12       A.   Don't know.  Don't have a specific number,
13   but it was more than once.
14       Q.   Less than five?
15       MR. McCALLY:  Objection, asked and
16   answered.
17       THE WITNESS:  It was multiple times.
18   I do know that.
19       MR. McCALLY:  Withdraw the objection.
20   BY MS. PENDLETON:
21       Q.   Do you recall who had filed these alleged

Page 85

1    written complaints that were contained in this file?
2        A.   I don't recall any conversations with Joel
3    that he named names.
4        Q.   Did Joel use the term "harassment"?
5        A.   Yes.
6        Q.   Did he say what kind of harassment?
7        A.   Treatment of employees, which would be a
8    version of harassment under the Bonneville
9    procedures.
10       Q.   What Bonneville procedures are you
11   referring to?
12       A.   Employee handbook.
13       Q.   You've never seen the alleged file, have
14   you?
15       A.   No, I haven't.
16       Q.   Do you know where it would be contained?
17       A.   Would have been contained in Human
18   Resources in Washington and probably at that time,
19   and I don't know, there should have been a copy
20   going to Salt Lake.  I don't know if that was the
21   exact procedure at that time.

Page 86

1    Human Resources was done in Washington at
2 the 3400 Idaho office and I think they had to send a
3 copy off to Salt Lake, but I'm not sure of that.
4    Q.  Did you ever talk to anyone else about
5 this alleged file?
6    A.  My wife.
7    Q.  No one else at Bonneville said there's a
8 written file of complaints about Matt Mills?
9         MR. McCALLY:  Objection to the form.
10        THE WITNESS:  I never told anybody
11 else at Bonneville.  That was between Joel and I.
12 BY MS. PENDLETON:
13    Q.  Did anyone else mention it, that it
14 existed, to you?
15    A.  No.
16        MS. PENDLETON:  I think we'll take a
17 five minute break.
18        (Whereupon a recess was taken from
19    11:36 a.m. - 11:39 a.m.)
20 CROSS EXAMINATION:
21 BY MR. McCALLY:

Page 87

1    Q.  Mr. O'Brien, I just have a couple other
2 questions.  What's your relationship with Joel
3 Oxley?
4    A.  Joel and I know each other I guess since
5 around the early nineties and we're friends.
6    Q.  You've had lunch with him since leaving
7 Bonneville?
8    A.  Yes.
9    Q.  You see him socially?
10    A.  No.  We used to socialize a lot more but
11 not in the past few years.
12    Q.  You've had lunch with him recently?
13    A.  Yes.
14    Q.  In the recent lunch with him did he
15 indicate or say words to the effect of if Leo's
16 deposition is taken it will be rough on him?
17    A.  I don't recall that.
18    Q.  Do you recall Mr. Oxley at one of these
19 lunches discussing the case at all?
20    A.  A little bit.
21    Q.  What did he say?

Page 88

1    A.  He didn't understand why Leo was
2 proceeding forward.
3    Q.  Was that it?
4    A.  Pretty much.  He obviously knew that Leo
5 and I are friends.  We didn't talk much about it.
6    Q.  When you said earlier, you were being
7 asked questions about why didn't you interview
8 Mr. Donohoe for the Z 104 national sales manager job
9 and you said it would be a big step down or several
10 steps down?
11    A.  Couple of steps.
12    Q.  What did you mean by that?
13    A.  At the time Z 104 was a brand new radio
14 station and TOP is one of the most established radio
15 stations in the country.
16    To leave that to go to that would make no
17 sense at all.
18    Q.  I take it it would be a pay cut?
19    A.  Be a large pay cut, and insulting.
20    Q.  Probably not something you want to make an
21 offer on?

Page 89

1    A.  No.  He would need to be moving way up the
2 ladder to do that.
3    Q.  You said you had a difficult time
4 recruiting for the national sales manager position
5 in Z 104.
6    Why was that?
7    A.  Again, new radio stations have not
8 established ratings yet and without ratings you
9 can't really perform nationally the way you need to.
10 Most of national business is based on ratings.
11 Until you earn a reputation and develop a
12 relationship up in New York, but most of the numbers
13 were in.
14    Q.  How are WTOP's ratings?
15    A.  They are the best.
16    Q.  In this region?
17    A.  Yes.
18    Q.  As a national sales manager you are paid
19 commission, part of your package is commission?
20    A.  Well, I don't know.  All packages are
21 different.

23 (Pages 86 to 89)

Page 90

1    Q.   TOP has the best ratings in the region?
2    A.   TOP has the best ratings in the region.
3    Q.   Does that mean you get the highest rates
4 for your ads?
5    A.   If it sold, probably yes.
6    Q.   You talked about the Orioles and Nationals
7 and you said the Orioles are the same sale as the
8 Nationals.
9         What did you mean by that?
10   A.   Selling play by play baseball takes a
11 certain talent and skill. It's not done through the
12 ad agencies, it's not done with numbers.
13        It's done building, finding relationships
14 and, quite honestly, fans of the team, who control
15 business.
16   Q.   When you said the same sale, did you mean
17 baseball, the product is play by play baseball
18 regardless of who the team is?
19   A.   Yes. In fact, the Nationals would be
20 easier because it's local.
21        The Orioles, the struggle with that was it

Page 91

1 was a Baltimore team.
2    Q.   How many years did Mr. Donohoe sell the
3 Orioles for, do you know?
4    A.   I don't know, I believe eight, I believe.
5    Q.   You were asked questions about teaching an
6 old dog new tricks.
7         You said the conversations with Mr. Oxley
8 happened frequently at either lunch, business
9 lunches or in the station.
10        MS. PENDLETON:  Objection.
11 BY MR. McCALLY:
12   Q.   You were asked questions about what times
13 did Mr. Oxley indicate or have knowledge of you
14 can't teach an old dog new tricks and those comments
15 being made.
16   A.   Yes. As I said, with Matt's comments like
17 that, it was, in fact, part of his vernacular and
18 could have been used at any given time, which could
19 include a golf course, lunchtime, business
20 conversations.
21        It was part of his kind of deal.

Page 92

1    Q.   Did you witness him saying those kinds of
2 things in Mr. Oxley's presence?
3    A.   Yes.
4    Q.   On a regular basis?
5    A.   I would think, like I said, it was part of
6 his vernacular. If he was around, he would use it.
7    Q.   This file, you said you assume the file on
8 Matt Mills would also be kept in Salt Lake. You
9 mean Salt Lake City?
10   A.   Yes. What I don't recall is if that was a
11 requirement.
12        I bring it up thinking, yes, I think you had
13 to have a copy of HR at the home office, which would
14 be Salt Lake.
15   Q.   That's Bonneville's home office, Salt Lake
16 City?
17   A.   I think. And I don't recall that. I just
18 seem to remember that's the way it was.
19        MR. McCALLY:  That's all we have.
20        MS. PENDLETON:  I have one followup.
21 RECROSS-EXAMINATION:

Page 93

1 BY MS. PENDLETON:
2    Q.   When you discussed that if Leo were to
3 move to Z 104 to the NSM, that that would be a step
4 down?
5    A.   Yes.
6    Q.   Wouldn't Leo Donohoe have taken on Z 104
7 in addition to his responsibilities at WTOP?
8        MR. McCALLY:  Objection to the form,
9 assumes facts not in evidence.
10        THE WITNESS:  I never would have done
11 that. It would have made no sense.
12 BY MS. PENDLETON:
13   Q.   What do you mean?
14   A.   The time and effort it would take to do a
15 brand new radio station combined with what Leo was
16 already doing would have been a mistake.
17   Q.   Why?
18   A.   He wouldn't have the time in the day.
19        I don't believe in consolidation at all. I
20 don't believe you should do two stations, let alone
21 three.

24 (Pages 90 to 93)

Page 94

1          MR. McCALLY:  You have the right to
2    read your transcript to make sure it's transcribed
3    accurately.
4          You can do that or you can trust the
5    court reporter to transcribe it accurately and waive
6    your signature.  It's up to you.
7          THE WITNESS:  Can you forward it to
8    me?
9          MR. McCALLY:  Yes.
10          THE WITNESS:  Yes.
11          MR. McCALLY:  You want to read?
12          THE WITNESS:  Yes.
13          MR. McCALLY:  We'll forward it to
14    you.
15          (Deposition adjourned at 11:45 a.m.)
16
17
18
19
20
21

Page 95

1          Reporter's Certificate
2
3          I, the undersigned, Certified Court Reporter,
4    do hereby certify that the foregoing transcript of
5    testimony was taken by me in stenotype and
6    thereafter reduced to print under my direction,
7    that said transcript is a full, true and
8    substantially accurate record of the proceedings,
9    to the best of my ability.
10
11          I do further certify that I am neither counsel
12    for, related to, nor employed by any of the parties
13    to the action in which this deposition was taken;
14    and, further, that I am not a relative or employee
15    of any attorney or counsel employed by the parties
16    hereto, nor financially or otherwise interested
17    in the outcome of the action.
18
19          _____
20          Certified Realtime Reporter
21

Page 96

1          Certificate of Deponent
2          I hereby certify that I have read and
3    examined the foregoing transcript, and the same
4    is a true and accurate record of the testimony
5    given by me.
6          Any additions or corrections that I feel
7    are necessary I will attach on a separate sheet
8    of paper to the original transcript.
9
10          _____
11          Signature of witness
12          I hereby certify that the individual
13    representing him/herself to be the above named
14    individual, appeared before me this _____
15    day of _____ and executed the above
16    certificate in my presence.
17
18
19
20          _____
21          Notary Public

Page 97

1
2          Errata Page of Deponent
3    Please note any errors on this sheet. The
4    reasons may be general, such as "to correct
5    stenographic error" or "to clarify the record."
6    When completed, send this page to the attorney
7    who took your deposition, NOT the court reporter.
8    Page   Line      Correction      Reason For Change
9
10
11
12
13
14
15
16
17
18
19
20
21

25 (Pages 94 to 97)

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEO DONOHOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-949 (RWR) |
| | ) | |
| BONNEVILLE INT'L CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SCHEDULING ORDER

Upon consideration of the representations made in court by the parties at the October 26, 2007 initial scheduling conference, it is hereby

ORDERED that:

1.    This case shall proceed with the following deadlines:

| | |
|---|---|
| Joinder of parties; amended complaint | November 19, 2007 |
| Initial disclosures | November 26, 2007 |
| Proponent's expert witness designations | December 21, 2007 |
| Opponent's expert witness designations | January 22, 2008 |
| All discovery closed | March 31, 2008 |
| Dispositive motions | May 7, 2008 |

2.    Each side is limited to a maximum of 7 depositions and each party is limited to a maximum of 30 interrogatories.

3.    The post-discovery status conference is scheduled for April 7, 2008 at 9:30 a.m.  Parties must bring full settlement authority to this conference.  If settlement is not reached, a pretrial conference and trial date will be selected.  Parties must be prepared at the status conference to advise the Court of the expected length of trial and of the number of fact and expert witnesses that each party will present, and whether the electronic courtroom will ne needed.  Trial counsel themselves

-2-

must appear at all hearings, unless excused by the Court in advance of the hearing date.

4.   **Court dates and the deadline for the close of discovery may be continued only by leave of the undersigned.**   A motion for a continuance of a court date must include alternative dates that have been agreed to by all parties.   Failure to provide such information may result in denial of the motion.

5.   **Deadlines (other than the deadline for the close of discovery) and discovery limits may be altered, when all parties consent, by the filing of a Consent Notice specifying the altered deadlines or limits and stating all parties' consent.   The altered deadlines or limits shall be effective upon the filing of the Consent Notice; no court Order shall be required.**

6.   Any motion that does not comply with Local Civil Rule 7(c) or 7(m) may be, *sua sponte*, denied.

7.   Every motion for summary judgment and opposition to such a motion must comply with Local Civil Rule 56.1.   Every statement of undisputed material facts accompanying such a motion and every separate concise statement of genuine disputed issues accompanying such an opposition must be set forth in separately numbered paragraphs.   Every opposition to a motion for summary judgment must contain a response to the statement of undisputed material facts that sets forth each paragraph of the movant's statement and immediately following each such paragraph sets forth the opponent's response to those facts along with specific references to the parts of the record relied upon to support the response.   If an opposition fails to include a separate concise statement of genuine disputed issues, or a response to the statement of undisputed material facts, or specific references to the parts of the record relied upon to support the statement or response, the court may treat as conceded any facts asserted in the movant's statement of undisputed material facts.

-3-

8.    The parties and their counsel are expected to evaluate
their respective cases for settlement purposes.  Submission to
alternative dispute resolution, *e.g.*, mediation or neutral
evaluation, is encouraged and available upon request to the Court
at any time, as is a settlement conference before a magistrate
judge.  If the case settles in whole or in part, plaintiff shall
advise the Court by promptly filing a stipulation.

9.    All discovery disputes shall be referred to a
Magistrate Judge.  Before bringing a discovery dispute to the
Magistrate Judge, the parties shall confer in good faith in an
effort to resolve the discovery dispute, and parties are warned
that failure to do so will result in sanctions.  Moreover, if any
judicial officer is called upon to resolve a discovery-related
**motion**, the losing party's **attorney** (or the losing party if *pro
se*) shall be sanctioned pursuant to Federal Rule of Civil
Procedure 37(a)(4).

10.    There shall be a Pretrial Conference set at the post-
discovery status conference.  **Three weeks** in advance of the
Pretrial Conference, parties are required to meet and prepare a
Joint Pretrial Statement that must be submitted not less than
**eleven days** prior to the Pretrial Conference in accordance with
Local Civil Rule 16.5(d)(5) and 16.5(a)(2).  At the meeting,
parties must discuss and attempt to resolve all objections to
exhibits (including as to authenticity) and all motions in
limine.  The form for the Joint Pretrial Statement is attached to
this Order as Appendix A.  Separate Pretrial Statements may be
struck, *sua sponte*.

11.    Parties' written communication with the Court is to be
by motion, opposition, and reply, rather than by letter.  Oral
inquiries concerning the status or scheduling of any pending
matter shall be directed to the Courtroom Deputy Clerk, Ms. Linda
Romero, (202) 354-3166, rather than to chambers.  If Ms. Romero
is unavailable, such inquiries shall be directed to the staff

−4−

person in the Clerk's Office designated as her substitute.  In an emergency, however, chambers can be reached at (202) 354-3400.

SIGNED this 26th day of October, 2007.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge

-5-

## APPENDIX A

[*Form of Joint Pretrial Statement to be Filed **Eleven Days before Pretrial Conference**]*

### [CASE CAPTION]

JOINT PRETRIAL STATEMENT

1.  **Parties and Counsel:**  List names, addresses, and telephone numbers of all parties and counsel on whose behalf this Statement is filed.

2.  **Nature of the Case:**  Give a brief statement describing the nature of the case, the identities of the parties, and the basis of the Court's jurisdiction.  The statement of the case should be sufficiently brief, clear, and non-argumentative to be suitable for reading to the jury.

3.  **Claims and/or Defenses:**  Give a statement of claims setting forth, concisely, each party's claims against any other party (*including counter-, cross-, and third-party claims*) and the party or parties against whom the claim is made.  The statement of defenses shall set forth each defense a party interposes to a claim asserted against it by any other party, including defenses raised by way of general denial, without regard to which party has the burden of persuasion.

4.  **Undisputed Issues/Stipulations:**  List all issues not in dispute or facts to which the parties have stipulated.

5.  **Witness Schedule:**  List the name, address, and telephone number of each witness scheduled to be called by a party, including rebuttal witnesses.  The schedule shall also set forth a brief description of the testimony to be given by the witness, and an estimate of the time necessary for direct examination. Opinion witnesses shall be designated by an asterisk.  Witnesses called for impeachment purposes only need not be listed. However, no party may call at trial any witness not listed (*except for impeachment purposes*) on their Pretrial Statement.

6.  **Exhibit List:**  Describe each exhibit to be offered in evidence, including (*if possible*) rebuttal exhibits, with each exhibit identified by number, title, and date (*if applicable*). No exhibit will be admitted at trial unless it is listed on the Pretrial Statement.  Each exhibit listed will be deemed authentic

-6-

and admitted at trial unless an objection is made in the Joint
Pretrial Statement and its basis is articulated.  **If there are
objections to an exhibit in the Joint Pretrial Statement, the
exhibit should be produced at the Pretrial Conference for the
Court's review.**

7.  **Deposition Testimony:**  Identify each deposition or portion
thereof (*by page and line numbers*) the party intends to offer in
evidence.  **All** cross-designations under Federal Rule of Evidence
106 must be identified as well.

8.  **Relief Sought:**  Set forth separately each element of damages
and the monetary amount claimed, including prejudgment interest,
punitive damages, and attorneys' fees.  Do not include amounts
claimed for intangible damages.  Set forth all other types of
relief sought against any party.

9.  **Pending Motions:**  List all pending motions showing title and
filing date.  List any motions to be decided at commencement of
trial.

10.  **Trial Brief:**  A trial brief addressing any unusual issues of
fact or evidence not already submitted to the Court shall be
filed with the pretrial statement.

11.  **Motions in Limine:**  Motions in limine shall be filed with
the Court and served on opposing counsel no later than twenty
calendar days before the date of the pretrial conference;
oppositions shall be due not later than fifteen calendar days
before the pretrial conference.  All evidence that a party offers
at trial under Federal Rule of Evidence 404(b) must be disclosed
to all other parties no later than 30 days prior to the deadline
for filing motions in limine.

12.  **Demonstrative Evidence:**  Describe all such items to be used
at trial.  Any objections must be made in the Joint Pretrial
Statement.

13.  **Jury Cases:**  Submit list of requested voir dire questions,
showing those agreed upon and not agreed upon; submit list of
standard instructions showing those agreed upon and not agreed
upon; submit complete text of non-standard instructions with
authorities relied upon showing those agreed upon and not agreed
upon; submit text of verdict form, including any special
interrogatories.  **Submit all of the items identified in this
paragraph formatted in Word Perfect Version 9.0 or higher via e-
mail to roberts_chambers@dcd.uscourts.gov.  Counsel are
admonished NOT to use this e-mail address for ANY other purpose.**

-7-

14.  **Non-Jury Cases:**  Submit detailed proposed findings of fact
and conclusions of law with supporting authorities.  **Submit all
of these proposed findings and conclusions formatted in Word
Perfect Version 9.0 or higher via e-mail to
roberts_chambers@dcd.uscourts.gov.  Counsel are admonished NOT to
use this e-mail address for ANY other purpose.**

15.  **Estimated Length of Trial:**  List number of days, and any
scheduling problems with witnesses.

16.  **Miscellaneous Matters:**

        The following text and signature line shall be included
after the signatures of counsel:

        The foregoing Joint Pretrial Statement, as revised at the
Pretrial Conference in the presence of counsel, shall stand as
the Pretrial Order in this case.


 October 26, 2007                     /s/
DATE                           RICHARD W. ROBERTS
                               United States District Judge

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

LEO DONOHOE,                          :
                                      :
    Plaintiff,                :
                                      :
v.                                    :    Civil Action No.: 07-949 (RWR)
                                      :
BONNEVILLE INT'L CORP.,               :
                                      :
    Defendant.                :

### PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

Pursuant to Rule 33 of the Federal Rules of Civil Procedure Plaintiff, Leo Donohoe, (hereinafter referred to as "Plaintiff") hereby propounds the following interrogatories to Defendant Bonneville International Corp. (hereinafter referred to as "Defendant").

### DEFINITIONS

Wherever used in these interrogatories unless the context requires otherwise:

1.    The word "identify" or any variation thereof means:

(a)    With respect to a person, state: his or her full name and other name(s) by which the person has been known; date of birth; marital status; residence address; business address; and employer or business activity;

(b)    With respect to a firm, business, or corporation, state: its full and correct name; the address of its place of business; its place of incorporation or partnership; and the name and address of its registered agent;

(c)    With respect to a document, state: the type of document; its author; and any other characteristics necessary to identify the document, including its present location and custodian, so as to form the basis for a Rule 34 request for production. As to any document which was, but no longer is in the possession, custody or control of Defendant, state whether it (i) is missing or lost, (ii) has been destroyed, (iii) has been transferred to another person or entity, or (iv) has been otherwise disposed of (and, if so, how it has been disposed of).

2.     As used herein, the term "document" is used in the broad sense and includes, but is not limited to, the following items, whether printed or recorded or reproduced by any other mechanical process, or written or produced by hand, and whether sent or received or neither: namely, correspondence; letters; papers; agreements; communications (including intracompany communications); memos; statements; notes; cables; telegrams; telephonically transmitted tangible communications; "faxes"; telexes; memoranda; notices; records; books; summaries or records of telephone conversations; summaries or records of personal conversations or interviews; diaries; newspapers, magazines and other publications and clippings therefrom; forecasts; statistical statements; accountants' work papers; graphs; charts; ledgers; journals; books or records of account; summaries of accounts; balance sheets; income statements; minutes or records of meetings or conferences; desk calendars; wall calendars; appointment books (including pocket appointment books); reports and/or summaries of interviews; reports and or summaries of investigations; rough or scratch pad notes; records; reports or summaries of negotiations; studies; brochures; pamphlets; circulars; press releases; contracts; memoranda of understanding; projections; all drafts of any documents; working papers; marginal notations; photographs; drawings; checks (front and back); audio or video recordings and any transcripts thereof; computer printouts; data processing input and output; microfilms; check stubs or receipts; and any other document or writing or written or recorded text of whatever description.

As used herein, "document" means the original and any non-identical copy. Handwritten notations of any kind on the original or on any copy of a document render same non-identical.

3.     The word "or" means and/or.

## INSTRUCTIONS

1.     These interrogatories are continuing in character so as to require supplemental answers when Defendant comes into the possession of knowledge or information responsive to the interrogatories that has not previously been supplied. Defendant shall serve such supplemental answers upon obtaining such further information or knowledge. In addition, Defendant shall state the date when such additional knowledge or information came into Defendant's possession and shall identify the persons who furnished such additional information or knowledge.

2.     Whenever Plaintiff is asked in these interrogatories to "state", "explain", "set forth", "list", "describe" or "define" a fact, event, item assertion or allegation, Defendant is to explain and describe the fact, event, item, assertion or allegation, completely and in detail, giving the reasons therefore, the dates and places involved and the persons and acts involved.

3.     Whenever appropriate in these interrogatories, the singular shall be interpreted as plural and vice versa; the present tense shall include the past tense and vice versa; and the neuter shall include the masculine and feminine.

10506dc001\pldgs\fed\interrogatories

4.      If Defendant lacks the knowledge necessary to answer any interrogatory, Defendant should so state.

5.      If any answer is made upon information and belief, Defendant should so state and set forth and identify with specificity the source of such information and belief.

6.      If Defendant refuses to answer an interrogatory on the ground of privilege, Defendant should state the specific nature of the privilege claimed, set forth the factual basis supporting that claim, and identify with specificity and clarity the information or material with regard to which Defendant asserts the privilege.

## **INTERROGATORIES**

TO:      BONNEVILLE INTERNATIONAL CORP.
         c/o Richard Cys, Esq.
         Davis, Wright, Tremaine, LLP
         1500 K Street, NW, Suite 450
         Washington, DC  20005

FROM:    LEO DONOHOE
         c/o Thomas L. McCally, Esq.
         Carr Maloney P.C.
         1615 L Street, NW, Suite 500
         Washington, DC  20036

1.      State the full name, address, social security number, place of employment and title of each individual (other than Complainant's counsel) participating in the completion these discovery responses.

**ANSWER**

2.      Please describe in detail all facts, identify all documents, and identify all witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way to the Bonneville's decision to implement any "Reduction in Force" from January 1, 2003 through the present time, including but not limited to the Reduction of Force referred to in your Answer to paragraph 18 of the Complaint.  Please note that this request is not limited to any geographical region.

**ANSWER:**

3.      Please provide a detailed description of all individuals who were terminated from employment as a result of any "Reduction in Force" that has been implemented by Bonneville from 2003 through the present time.  Please note that this interrogatory is not limited to the

Washington D.C. area, but includes any terminations that occurred during the stated time period regardless of region. Please include in your answer the following information for each employee that was included in a "RIF":

      a.      The employee's name, date of birth, last known address and last known telephone number;

      b.      Identify the position that was held by each employee and identify the radio station(s) that the employee worked for;

      c.      Describe in detail the duties that were performed by each employee;

      d.      Identify all positions held by each employee while employed by Bonneville;

      e.      State how long each employee worked for the radio station and identify all positions held at the radio station;

      f.      Describe in detail all reasons for including each individual in the 2006 "RIF"

      g.      Provide the name, date of birth and last known address of the person who was hired to replace the terminated individual.

**ANSWER:**

    4.      Please identify all individuals who applied for any position with Bonneville subsequent to any "RIF" from January 1, 2003, through the present time. Please include the following information in your answer:

      a.      Identify each applicant's name, date of birth, last known address and last known telephone number.

      b.      State whether the applicant was previously employed by Bonneville, and if so, state whether the applicant was included in the 2006 "RIF."

      c.      Identify the position for which the applicant applied, including a detailed description of the qualifications required for the position in question.

      d.      State whether the applicant was selected for an interview, and state why or why not.

      e.      State whether the applicant was selected for the job, and, if so, whether the applicant still holds that position.

**ANSWER:**

5.     Please provide a detailed description of all individuals who were terminated from employment for reasons other than as part of a "Reduction in Force" by Bonneville from 2003 through the present time.  Please note that this interrogatory is not limited to the Washington D.C. area, but includes any terminations that occurred during the stated time period regardless of region.  Please include in your answer the following information for each employee that was terminated:

      a.      The employee's name, date of birth, last known address and last known telephone number;

      b.      Identify the position that was held by each employee and identify the radio station(s) that the employee worked for;

      c.      Describe in detail the duties that were performed by each employee;

      d.      Identify all positions held by each employee while employed by Bonneville;

      e.      State how long each employee worked for the radio station and identify all positions held at the radio station;

      f.      Provide the name, date of birth and last known address of the person who was hired to replace the terminated individual.

6.  Please describe in detail all facts, identify all documents, and identify all witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way to complaints or concerns of discrimination, including but not limited to claims of age discrimination, that have been raised against Bonneville during the time period that Mr. Donohoe was employed, whether formal or informal and whether written or oral.

**ANSWER:**

7.     If you expect to call as an expert witness at the trial of this case, please state the subject matter on which the expert is expected to testify, the substance of the findings and opinions to which the expert is expected to testify, a summary of the grounds for each such opinion and attach hereto copies of all reports received from each expert witness.

**ANSWER:**

8.     Please describe in detail all facts, identify all documents, and identify all witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way

10506dc001\pldgs\fed\interrogatories

5

to any complaints or concerns of that have been raised against Matt Mills during the time period that Mr. Mills has been employed by Bonneville, whether formal or informal and whether written or oral.

### ANSWER:

9.    Please describe in detail all facts, identify all documents, and identify all witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way to the involvement of Katz Radio Group, in any employment decisions made by Bonneville from January 1, 2003 through the present time, including but not limited to employment decisions made regarding the 2006 RIF referred to in your Answer to paragraph 18 of the Complaint and the selection of individuals to fill open positions after the implementation of the RIF.

### ANSWER:

10.    Please identify all instance in which Bonneville has relied on any third party, including but not limited to Katz Radio Group, in making decisions related to recruiting, selection, interview, employment and/or the termination of employment of any person seeking employment or employee(s) employed by at Bonneville during the time period that Mr. Donohoe was employed by Bonneville up through the present time. Please include in your answer a detailed description of the involvement of the third party, identify the position(s) that were involved, identify all persons involved including applicants, employees of Bonneville and/or employees of the third party, and identify all documents that relate or refer in any way to the involvement of the third party in the employment decision.

### ANSWER:

10.    Please describe in detail what procedure(s), if any, was in force and effect during the implementation of the 2006 "RIF" for an employee to report concerns of discrimination and adverse impact created by the "RIF", or to challenge inclusion in the "RIF" and state how these procedures were communicated to employees who were impacted by the RIF.

### ANSWER:

11.    Please provide a breakdown of all Bonneville employees from January 1, 2003, through the present, identifying the employee; their age; the year(s) of employment with Bonneville; their title or position; a brief description of the employee's duties and responsibilities, and the employee's salary.

### ANSWER:

10506dc001\pldgs\fed\interrogatories

12.    Please state in detail all facts and information known or learned concerning any investigation conducted into plaintiff's allegations of age based discrimination.

**ANSWER:**

13.    Please state the total net financial worth of Bonneville for the years 2003 through the present and identify all documents that can verify such information.

**ANSWER:**

14.    If there is or may be insurance coverage for any of the counts alleged in the complaint please state the name of the insurance company and extent of coverage including limitations on punitive damages.

**ANSWER:**

15.    Please describe in detail all facts, identify all documents, and identify all witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way to the Bonneville's contention, as set forth in paragraph 26 of its Answer, that the position of Director of National Sales/Sports Sales Manager differed in duties from the previous position held by Mr. Donohoe.

**ANSWER:**

16.    Please describe in detail all facts, identify all documents, and identify all witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way to Bonneville's decision to include Mr. Donohoe in the 2006 "RIF."

**ANSWER:**

17.    Please describe in detail all facts, identify all documents that refer or relate to such facts, and identify all witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way to the Bonneville's decision not to rehire Mr. Donohoe after the 2006 "RIF."

**ANSWER:**

18.    Please identify each and every individual who applied for the position of Director of National Sales/Sports Sales from January 2006 through the present. For each such person identified, please state the age of each applicant, indicate which individuals were selected to be interviewed, identify which individuals were offered the position, state whether the individuals accepted the position, and state the reasons for Bonneville's decisions in each such instance.

ANSWER:

19.    Please state with specificity all reasons that Mr. Spaciapolli was selected over Leo Donohoe for the position of Director of National Sales/Sports Sales in 2006. Please include in your answer an identification of all individuals or entities who were involved in the decision to hire Mr. Spaciapolli over Mr. Donohoe, give a detailed description of all reasons for the decision, and identify all documents that refer or relate in any way to the decision.

ANSWER:

20.    Please describe in detail all facts, identify all documents, and identify all witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way to the Bonneville's decision to move Mr. Spacciapolli from the position of Director of National Sales/Sports Sales to Local Sales Manager in July of 2006, as set forth in your Answer at number 31.

ANSWER:

21.    Please provide a detailed description of the duties associated with the positions of Director of National Sales/Sports Sales and the position of Local Sales Manager. Please identify all documents that refer or relate to the duties of these two positions, and identify the salary and benefits that are associated with these two positions.

ANSWER:

22.    Please describe in detail how and why Katz Radio was involved in the decision to hire Mr. Spaciapolli for the position of Director of National Sales/Sports Sales in 2006. Please include in your answer a detailed description of the relationship between Bonneville and Katz Radio, describe the nature of the business of Katz Radio, describe the relationship between Mr. Spaciapolli and Katz Radio, and state whether Katz Radio had previously ever been involved in Bonneville's employment decision making process.

ANSWER:

23.    Please describe in detail all facts, identify all documents, and identify all witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way to the affirmative defenses that Bonneville asserted in its Answer.

ANSWER:

24.    Please identify all witnesses that you intend to call to testify at the trial of this matter and give a detailed description of the subject matter of their expected testimony.

10506dc001\pldgs\fed\interrogatories

**ANSWER:**

25.    Please identify all exhibits that you intend to introduce as evidence at the trial of this matter.

**ANSWER:**

26.    State the factual basis for any denial of a Request for Admission that is propounded upon you by the Plaintiff.

Respectfully submitted,

CARR MALONEY P.C.

By:_____
      Thomas L. McCally, Esq., #45071
      1615 L Street, NW, Suite 500
      Washington, DC 20036
      (202) 310-5500/(202) 310-5555

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of December, 2007, a copy of the foregoing was sent via first class mail, postage prepaid, to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1500 K Street, NW, Suite 450, Washington, DC 20005, Attorney for Defendant.

By:_____
      Thomas L. McCally

10506dc001\pldgs\fed\interrogatories

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

LEO DONOHOE,                        :
                                    :
            Plaintiff,              :
                                    :
v.                                  :          Civil Action No.: 07-949 (RWR)
                                    :
BONNEVILLE INT'L CORP.,             :
                                    :
            Defendant.              :

## PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS

The Plaintiff, Leo Donohoe, by and through counsel, CARR MALONEY P.C., and pursuant to Federal Rules of Civil Procedure 34, requests that the Defendant, Bonneville International Corp., to produce the documents identified below at the offices of counsel for the Plaintiff within 30 days.

## DEFINITIONS AND INSTRUCTIONS

The following definitions and instructions apply to these requests to produce:

1.      As used herein, the term "document" is used in the broadest sense and includes, but is not limited to, the following items, whether hand-written or typed or printed or electronically stored or recorded or reproduced by any process, namely: agreements; communications (including intra-company communications); memos; statements; notes (whether formal or informal); correspondence; telegrams; cables; telexes, faxes; telephonically transmitted tangible communications; memoranda; records; books; summaries or records of telephone conversations;

telephone message slips (including those which indicate only that a call was received or made); summaries or records of conversations or interviews; diaries; appointment books; desk calendars; wall calendars; forecasts; statistical statements; accountants work papers; graphs; charts; accounts; minutes or records of meetings or conferences; reports and/or summaries or interviews; reports and/or summaries of investigations; items published in a newspaper or other publication; pencil or scratch pad notes; records; reports or summaries of negotiations; studies; brochures; pamphlets; circulars; press releases; contracts; notes; projections; all drafts of any documents; working papers; copies; marginal notations; photographs; drawings; checks; (front and back); tape recordings and transcripts thereof; video recordings; computer printouts; check stubs or receipts; letters and correspondence (including file copies thereof); any other documents or writings or papers or printed text of whatever description.

The term "document" is further defined to include any attachments or other matters affixed thereto.

As used herein, the term "document" means the original and any non-identical copy. Any notations, comments or alterations on any copy render it non-identical and require production.

2.    The materials enumerated in this request are, for the purpose of this request, to be considered to be such materials as may be in the actual possession of the Defendant or in the possession of any person, firm or corporation acting on behalf of Defendant and/or from whom the Defendant has the right to request actual possession.

3.    For any requested document as to which any claim of privilege is made or as to which any claim of protection from discovery is made, identify the privilege or Rule upon which you rely, identify the document by date, author, addressee, present custodian, general subject

matter, and location, and set forth the facts upon which such claim of privilege or protection is based.

4.    These document requests are to be deemed continuing so as to require supplemental production if Defendant obtains or discovers further documents responsive to these requests after production has been made. Such supplemental production shall be made to defendant's attorneys no later than five (5) days after such further documents come into Defendant's custody, possession or control or are discovered by Defendant or within ten (10) days prior to any court proceeding in this case, whichever is earlier.

5.    Each document produced in compliance with this request should be accompanied by an indication as to the particular paragraph(s) under which it is being introduced.

## DOCUMENT REQUESTS

REQUEST FOR PRODUCTION NO. 1:  All documents referred to or relied on by Defendant in responding to Plaintiffs Complaint.

RESPONSE:

REQUEST FOR PRODUCTION NO. 2:  All documents referred to or relied on by Defendant in responding to Plaintiffs First set of Interrogatories.

RESPONSE:

REQUEST FOR PRODUCTION NO. 3:   All documents, pertaining to Plaintiff's employment by Defendant for the entire period of his employment.

RESPONSE:

REQUEST FOR PRODUCTION NO. 4: All documents relating to Plaintiffs duties as Defendant's employee during the entire time period that Plaintiff was employment with Defendant.

RESPONSE:

REQUEST FOR PRODUCTION NO. 5: All documents, including but not limited to letters, communications, complaints, administrative complaints and lawsuits by applicants for employment, employees or former employees against Defendant that relate, regard or in any way concern complaints against Matt Mills while Mr. Mills was employed by Bonneville.

REQUEST FOR PRODUCTION NO. 6: All documents, including but not limited to letters, communications, complaints, administrative complaints and lawsuits by applicants for employment, employees or former employees against Defendant that relate, regard or in any way concern complaints of discrimination including but not limited to complaints of age discrimination that were made against the Defendant, during the period that Mr. Donohoe was employed by Bonneville through the time of answering this request for production.

RESPONSE:

REQUEST FOR PRODUCTION NO. 7: All documents which refer or relate in any way to the "Reduction in Force" that was implemented by Defendant in 2006.

RESPONSE:

REQUEST FOR PRODUCTION NO. 8: All documents which refer or relate in any way to the inclusion of Plaintiff in the "Reduction in Force" that was implemented by Defendant in 2006.

RESPONSE:

REQUEST FOR PRODUCTION NO. 9: All documents which refer or relate to the hiring of individuals for any position with Bonneville after the "Reduction in Force" that was implemented by Bonneville in 2006, including but not limited to documents reflecting or relating to position descriptions, announcements regarding the open positions, documents submitted in conjunction with applications for the positions, all documents relating to the selection of applicants for interview, and all documents pertaining to the selection of applicants for hire.

RESPONSE:

REQUEST FOR PRODUCTION NO. 10: All documents which pertain, relate or refer in any way to the involvement of Katz Radio Group, Inc. in any employment decisions made by Bonneville from January 1, 2003, through the present time, including but not limited to employment decisions made regarding the 2006 RIF referred to in your Answer to paragraph 18 of the Complaint and the selection of individuals to fill open positions after the implementation of the RIF.

RESPONSE:

REQUEST FOR PRODUCTION NO. 11: All documents contained in any personnel or other files maintained or kept by Defendant about Mike Spacciapolli including but not limited to, copies of the front and back cover, inside covers, performance appraisals, complaints, job descriptions, salary information and reviews.

RESPONSE:

REQUEST FOR PRODUCTION NO. 12: All documents contained in any personnel or other files maintained or kept by Defendant about Matt Mills including but not limited to, copies

of the front and back cover, inside covers, performance appraisals, complaints, job descriptions, salary information and reviews.

RESPONSE:

REQUEST FOR PRODUCTION NO. 13: All documents that concern or relate in any way to Plaintiff, including but not limited to Plaintiffs performance and the decision or decisions not to select Plaintiff for any or all the positions for which he applied.

RESPONSE:

REQUEST FOR PRODUCTION NO. 14: All documents that support Defendant's affirmative defenses.

RESPONSE:

REQUEST FOR PRODUCTION NO. 15: Annual financial reports for Defendant for the years commencing 2003 and up to and including the present time..

RESPONSE:

REQUEST FOR PRODUCTION NO. 16: Documents sufficient to show the current financial status of the Defendant, including net worth.

RESPONSE:

REQUEST FOR PRODUCTION NO. 17: All files designated and maintained by Defendant that are identified or designated by Plaintiff's name.

RESPONSE:

REQUEST FOR PRODUCTION NO. 18: All documents maintained by defendant in connection with the selection of the person(s) selected to fill the position of Director of National

Sales/Sports Sales Manager for Bonneville radio stations WTOP, Washington Post Radio, WGMS and WFED since January 1, 2006.

RESPONSE:

REQUEST FOR PRODUCTION NO. 19:  All documents maintained by defendant in connection with the selection of the person(s) selected to fill the position of Local Sales Manager for Bonneville radio stations WTOP, Washington Post Radio, WGMS and WFED since January 1, 2006.

RESPONSE:

REQUEST FOR PRODUCTION NO. 20:  All documents maintained by defendant in connection with the selection of the person(s) selected to fill the position(s) of National Sales Manager for Bonneville radio stations WTOP, Washington Post Radio, WGMS and WFED since January 1, 2006.

RESPONSE:

REQUEST FOR PRODUCTION NO. 21:   All documents that refer or reflect the profitability of National Sales for Bonneville radio stations WTOP, Washington Post Radio, WGMS and WFED since January 1, 2006.

RESPONSE:

REQUEST FOR PRODUCTION NO. 22:   All documents relating to, reflecting or concerning the responsibilities and/or duties associated with the position(s) that Mike Spacciapolli held while employed by Bonneville.

RESPONSE:

REQUEST FOR PRODUCTION NO. 23:   All documents that refer, relate to, or reflect information pertaining to any individual who has applied for or been considered for the position of National Sales Manager and/or Director of National Sales/Sports Sales Manager for Bonneville radio stations WTOP, Washington Post Radio, WGMS and WFED during Mr. Donohoe's employment through the present time.

RESPONSE:

REQUEST FOR PRODUCTION NO. 24:   All documents that contain, refer or relate to statistical data of all individuals who were included in any "Reduction of Force" that was implemented by Bonneville from the time period commencing January 1, 2003 through the present time, including information reflecting the ages of all individuals who were included in the Reduction of Force.  Please note that this request is not limited to any geographical region.

RESPONSE:

REQUEST FOR PRODUCTION NO. 25:   All documents that contain, refer or relate to statistical data of all individuals who were included in any "Reduction of Force" that was implemented by Bonneville for the time period commencing January 1, 2003 through the present time, but who were subsequently rehired by Bonneville, including information reflecting the ages of all individuals who were included in the Reduction of Force and later rehired. Please note that this request is not limited to any geographical region

RESPONSE:

REQUEST FOR PRODUCTION NO. 26:   All documents that contain, refer to, or relate to statistical data reflecting the workforce of Bonneville from January 1, 2003, through the

present time, including but not limited to documentation that reflects the age of employees employed by Bonneville during that time period. Please note that this request is not limited to any geographical region.

RESPONSE:

REQUEST FOR PRODUCTION NO. 27:  The personnel files maintained by defendant of each of the persons who was selected to fill for the positions for which plaintiff applied, but for which he was not selected, i.e., the position of Director of National Sales/Sports Sales Manager for Bonneville radio stations WTOP, Washington Post Radio, WGMS and WFED since January 1, 2005.

RESPONSE:

REQUEST FOR PRODUCTION NO. 28:  All documents relating to any communication between Defendant and any other person, including, but not limited to, any current or former employee of Defendant relating to the issues involved in the Complaint.

RESPONSE:

REQUEST FOR PRODUCTION NO. 29:  All documents identified in Defendant's response to Plaintiffs First Set of Interrogatories to Defendant in this case.

RESPONSE:

REQUEST FOR PRODUCTION NO. 30:  All documents, including but not limited to all letters, notes, diaries, memoranda, summaries, telephone logs or other formal or informal documents that relate to or refer to, or which you will use in support of the defenses asserted in your Answer to the Complaint.

RESPONSE:

REQUEST FOR PRODUCTION NO. 31:  All documents furnished to, prepared by, reviewed by, or relied upon by any expert whom you intend to call to testify at the trial of this matter.

RESPONSE:

REQUEST FOR PRODUCTION NO. 32:  Provide the *curriculum vitae* of any expert that you have retained in this matter, as well as any report that such expert has prepared.

Respectfully submitted,

CARR MALONEY P.C.

By:_____
    Thomas L. McCally, Esq., #45071
    1615 L Street, NW, Suite 500
    Washington, DC 20036
    (202) 310-5500/(202) 310-5555
    Attorney for Plaintiff

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of December, 2007, a copy of the foregoing was sent via first class mail, postage prepaid, to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1500 K Street, NW, Suite 450, Washington, DC  20005, Attorney for Defendant.

By:_____
    Thomas L. McCally

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

LEO DONOHOE,                                    :
                                                :
        Plaintiff,                              :
                                                :
v.                                              :        Civil Action No.: 07-949 (RWR)
                                                :
BONNEVILLE INT'L CORP.,                         :
                                                :
        Defendant.                              :

**PLAINTIFF'S SUPPLEMENTAL
REQUEST FOR PRODUCTION OF DOCUMENTS**

The Plaintiff, Leo Donohoe, by and through counsel, CARR MALONEY P.C., and

pursuant to Federal Rules of Civil Procedure 34, requests that the Defendant, Bonneville

International Corp., to produce the documents identified below at the offices of counsel for the

Plaintiff within 30 days.

**DEFINITIONS AND INSTRUCTIONS**

The following definitions and instructions apply to these requests to produce:

1.      As used herein, the term "document" is used in the broadest sense and includes, but

is not limited to, the following items, whether hand-written or typed or printed or electronically

stored or recorded or reproduced by any process, namely: agreements; communications

(including intra-company communications); memos; statements; notes (whether formal or

informal); correspondence; telegrams; cables; telexes; faxes; telephonically transmitted tangible

communications; memoranda; records; books; summaries or records of telephone conversations;

telephone message slips (including those which indicate only that a call was received or made); summaries or records of conversations or interviews; diaries; appointment books; desk calendars; wall calendars; forecasts; statistical statements; accountants work papers; graphs; charts; accounts; minutes or records of meetings or conferences; reports and/or summaries or interviews; reports and/or summaries of investigations; items published in a newspaper or other publication; pencil or scratch pad notes; records; reports or summaries of negotiations; studies; brochures; pamphlets; circulars; press releases; contracts; notes; projections; all drafts of any documents; working papers; copies; marginal notations; photographs; drawings; checks; (front and back); tape recordings and transcripts thereof; video recordings; computer printouts; check stubs or receipts; letters and correspondence (including file copies thereof); any other documents or writings or papers or printed text of whatever description.

The term "document" is further defined to include any attachments or other matters affixed thereto.

As used herein, the term "document" means the original and any non-identical copy. Any notations, comments or alterations on any copy render it non-identical and require production.

2.    The materials enumerated in this request are, for the purpose of this request, to be considered to be such materials as may be in the actual possession of the Defendant or in the possession of any person, firm or corporation acting on behalf of Defendant and/or from whom the Defendant has the right to request actual possession.

3.    For any requested document as to which any claim of privilege is made or as to which any claim of protection from discovery is made, identify the privilege or Rule upon which you rely, identify the document by date, author, addressee, present custodian, general subject

matter, and location, and set forth the facts upon which such claim of privilege or protection is based.

4.      These document requests are to be deemed continuing so as to require supplemental production if Defendant obtains or discovers further documents responsive to these requests after production has been made.  Such supplemental production shall be made to defendant's attorneys no later than five (5) days after such further documents come into Defendant's custody, possession or control or are discovered by Defendant or within ten (10) days prior to any court proceeding in this case, whichever is earlier.

5.      Each document produced in compliance with this request should be accompanied by an indication as to the particular paragraph(s) under which it is being introduced.

## DOCUMENT REQUESTS

REQUEST FOR PRODUCTION NO. 1:  All documents that refer or relate to the reorganization of Bonneville stations including but not limited to stations in Washington, DC, California and Utah that occurred from 2005 to present, including but not limited to documents that in any way refer or relate to the motivations for the "reorganization."

RESPONSE:

REQUEST FOR PRODUCTION NO. 2:  All documents that contain, refer or relate information concerning individuals who were terminated, hired and/or re-hired in the reorganization of Bonneville's radio stations including but not limited to stations in Washington, DC, California and Utah  from 2005 to present, including information relating to the ages of all individuals who were involved or affected by the reorganization.

RESPONSE:

REQUEST FOR PRODUCTION NO. 3:  Produce all personnel files of individuals who were terminated as a result of the reorganization of Bonneville radio stations from January 1, 2003 through present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 4:  All documents that contain, refer or relate to the individuals who were terminated, re-hired or replaced employees that were affected by the organization of Bonneville's radio stations including but not limited to stations in Washington, DC, California and Utah from January 1, 2003 – present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 5:  All documents that refer or reflect the revenue, sales, profitability, financial information in the Washington metropolitan area (including but not limited to WTOP, WZ 104, WWZZ, WGMS, Washington Post Radio, WFED, WWWT) for the period January 1, 2000 through the present.  This request includes, but is not limited to, any market revenue reports generated by any entity, Marketron data, financial performance data, profitability of sales data, average spot costs data, national billing reports, national performance reports and documents from Miller, Kaplan, Arse & Company, LLP.

RESPONSE:

REQUEST FOR PRODUCTION NO. 6:   All documents that concern or relate in any way to the involvement of Katz Radio Group, Inc., Christal Radio, Eastmond Radio and any employment decisions made by Bonneville from January 1, 2003 through the present time including, but not limited to, employment decisions made regarding the 2006 RIF referred to in Answer to Paragraph 18 of the Complaint and the selection of individuals to fill positions after

implementation of the RIF; as well as any and all documents that refer or pertain to the involvement of those entities in the employment decisions pertaining to the Bonneville reorganization of its radio stations including but not limited to stations in Washington, D.C., California and Utah.

RESPONSE:

REQUEST FOR PRODUCTION NO. 7: Any and all documents pertain, relate or refer to in any the program logs for WTOP from 2003 through the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 8: All documents which refer or relate to the hiring of individuals for any position with Bonneville after the "Reduction in Force" that was implemented by Bonneville in 2006, including but not limited to documents reflecting or relating to position descriptions, announcements regarding the open positions, documents submitted in conjunction with applications for the positions, all documents relating to the selection of applicants for interview, and all documents pertaining to the selection of applicants for hire.

RESPONSE:

REQUEST FOR PRODUCTION NO. 9: All documents that refer or relate in any way to the organizational structure of the Bonneville radio statements in the Washington Metropolitan Area from 2002 through the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 10: All documents contained in any personnel or other files maintained or kept by Defendant about Matt Mills including but not limited to, copies of the front and back cover, inside covers, performance appraisals, complaints, job descriptions, salary information and reviews.

RESPONSE:

REQUEST FOR PRODUCTION NO. 11: Any and all documents that refer or in any way relate to Bonneville's contractual agreements with the National's baseball franchise from 2003 through the present.

RESPONSE:

REQUEST FOR PRODUCTION NO. 12: Any and all documents that refer or in any way relate to the contractual agreements, sales, charges, commissions between Bonneville and Katz, Christal and Redmond from 1998 through the present time.

RESPONSE:

REQUEST FOR PRODUCTION NO. 13: Any and all documents, notes minutes or memoranda that refer or in any way relate to any meetings or discussions between Bonneville and Katz, Christal or Redmond in which Leo Donohoe was discussed or referred to in any way, including but not limited to any such meetings or discussions that involved consideration of Leo Donohoe for the position of Director of National Sales/Sport Sales for WTOP, Washington Post Radio, WGMS and WFED.

REQUEST FOR PRODUCTION NO. 14: Any and all documents that contain, refer to or pertain in any way to Bonneville's employment and or personnel policies with respect to hiring, terminating employment, applying for transfer, rehiring former employees, discrimination, and/or policies relating to how employees can voice concerns about employment decision. This request includes, but is not limited to, all handbooks, manuals, memorandum or other documents that refer or relate in any way to Bonneville's policy with respect to age discrimination.

REQUEST FOR PRODUCTION NO. 15:   All documents that refer, relate to, or reflect information pertaining to any individual who has applied for or been considered for any position with Bonneville subsequent to October 2005 through the present time in the Washington, D.C. and San Francisco areas.

REQUEST FOR PRODUCTION NO. 16: All documents that relate to, refer to or in any way pertain to any concern or complaints of age discrimination that have been raised  by any applicants for employment, employees or former employees against Defendant or any of Defendant's employees, including but not limited to letters, communications, complaints, administrative complaints and lawsuits.  This request is not limited to any geographical region.

REQUEST FOR PRODUCTION NO. 17: With respect to Bonneville employees and/or radio stations that were or are located in the Washington/Baltimore metropolitan region, please produce all documents that relate to, refer to or in any way pertain to any concern or complaints of discrimination or unfair employment practices of any type that have been raised by any applicants for employment, employees or former employees against Defendant or any of Defendant's employees, including but not limited to letters, communications, complaints, administrative complaints and lawsuits.

Respectfully submitted,

CARR MALONEY P.C.

By:_____

Thomas L. McCally, Esq., #45071
1615 L Street, NW, Suite 500
Washington, DC 20036
(202) 310-5500/(202) 310-5555
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of March, 2008, a copy of the foregoing was sent via first class mail, postage prepaid, to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC 20006, Attorney for Defendant.

By:_____
         Thomas L. McCally

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| LEO DONOHOE, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Civil Action No.: 07-949 (RWR) |
| | : |
| BONNEVILLE INT'L CORP., | : |
| | : |
| Defendant. | : |

## DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S SUPPLEMENTAL REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Local Rule 26(C), Defendant Bonneville International Corporation ("Bonneville"), by its undersigned counsel, hereby submits its responses and objections to Plaintiff Leo Donohoe's Supplemental Request for Production of Documents.

By responding to and producing documents in response to Plaintiff's document requests, Defendant does not waive any objections to the relevance, materiality, authenticity, or admissibility of any the requests. Defendant expressly reserves all objections to the use, at hearing or otherwise, of information provided in these responses and any documents produced or previously produced pursuant to the requests.

### GENERAL OBJECTIONS

Defendant makes the following general objections to Plaintiff's Supplemental Request for Production of Documents on the ground that they require Defendant to furnish Plaintiff with information beyond what is required by Fed. R. Civ. P. 26 and 34. Where appropriate, the

1

General Objections are specifically incorporated into individual objections but are intended to apply to all Requests. For ease of reference, those objections are restated below.

1.     Defendant objects to Plaintiff's Supplemental Request for Production of Documents because they exceed the number of document requests agreed to by the parties. The parties stipulated on October 19, 2007 in the Rule 16.3 Joint Report that a total of thirty document requests would be adequate. This stipulation is binding upon the parties by rule. *See* LCvR 26.2(b); Fed. R. Civ. P. 29; *see also Riley v. Walgreen Co.*, No. H-04-2189, slip op. at 6-7 (S.D. Tex. Jan. 31, 2005) (stipulated deadlines for interrogatories included in discovery plan are binding unless contradicted by court order). In order to exceed this limitation, Plaintiff is required to either seek Defendant's consent to raising the limit or move the court to do so. Plaintiff has done neither. Plaintiff already exceeded the thirty request limit by two in his first set of document requests and Defendant repeats its request of April 11, 2008 that the additional seventeen document requests be withdrawn.

2.     Defendant objects to the definitions and instructions provided in Plaintiff's Supplemental Request for Production of Documents to the extent they purport to impose upon Defendant duties and/or responsibilities greater than those imposed by the Federal Rules of Civil Procedure.

3.     Defendant objects to Plaintiff's Supplemental Request for Production of Documents to the extent that they seek documents that are neither relevant to the subject matter of the pending action nor reasonably calculated to lead to the discovery of admissible evidence.

4.     Defendant objects to Plaintiff's Supplemental Request for Production of Documents to the extent that the individual requests are not reasonably limited in scope.

2

5.      Defendant objects to Plaintiff's Supplemental Request for Production of Documents to the extent that they seek information protected from disclosure by Rule 26(b) of the Federal Rules of Civil Procedure.

6.      Defendant objects to Plaintiff's Supplemental Request for Production of Documents to the extent that they seek information protected by the attorney-client privilege, the work product doctrine or any other applicable privilege or protection.  In the event Defendant produces any privileged document, its production is inadvertent and does not constitute a waiver of any privilege.

7.      Defendant objects to Plaintiff's Supplemental Request for Production of Documents to the extent that they require Defendant to make available documents in the possession, custody, or control of Defendant's attorneys, accountants, representatives, agents and/or persons consulted as being beyond the requirements of Rule 34 of the Federal Rules of Civil Procedure.

8.      Defendant objects to Plaintiff's Supplemental Request for Production of Documents to the extent that they seek production of documents which are not within Defendant's possession, custody or control or which have not yet come into existence.

9.      Defendant objects to Plaintiff's Supplemental Request for Production of Documents to the extent they seek production of any documents outside the scope, geographic or otherwise, of Bonneville's Washington DC radio networks at the time of the January 1, 2006 reduction in force, *i.e.*, WTOP, WGMS, WTWP and WFED (the "DC Radio Group").

10.     Defendant reserves the right to modify or supplement its objections and responses based upon any information it may discover or information omitted from these responses as the result of any oversight.  Defendant further reserves the right to use, and to rely upon at trial,

3

subsequently discovered information or information omitted from these responses as the result of any oversight.

11.    Each response is made subject to and without waiving the above objections.

## REQUESTS AND RESPONSES

REQUEST FOR PRODUCTION NO. 1:    All documents that refer or relate to the reorganization of Bonneville stations including but not limited to stations in Washington, DC, California and Utah that occurred from 2005 to present, including but not limited to documents that in any way refer or relate to the motivations for the "reorganization."

RESPONSE:  Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 1 because it exceeds the number of permitted requests.  In addition, to the extent the request seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

REQUEST FOR PRODUCTION NO. 2:    All documents that contain, refer or relate information concerning individuals who were terminated, hired and/or re-hired in the reorganization of Bonneville's radio stations including but not limited to stations in Washington, DC, California and Utah from 2005 to present, including information relating to the ages of all individuals who were involved or affected by the reorganization.

RESPONSE:  Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 2 because it exceeds the number of permitted requests.  In addition, to the extent the request seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, the request is not reasonably

4

limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

REQUEST FOR PRODUCTION NO. 3:    Produce all personnel files of individuals who were terminated as a result of the reorganization of Bonneville radio stations from January 1, 2003 through present.

RESPONSE: Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 3 because it exceeds the number of permitted requests. In addition, the request seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, and is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

REQUEST FOR PRODUCTION NO. 4:    All documents that contain, refer or relate to the individuals who were terminated, re-hired or replaced employees that were affected by the organization of Bonneville's radio stations including but not limited to stations in Washington, DC, California and Utah from January 1, 2003 – present.

RESPONSE: Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 4 because it exceeds the number of permitted requests. In addition, to the extent the request seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

REQUEST FOR PRODUCTION NO. 5:    All documents that refer or reflect the revenue, sales, profitability, financial information in the Washington metropolitan area

(including but not limited to WTOP, WZ 104, WWZZ, WGMS, Washington Post Radio, WFED, WWWT) for the period January 1, 2000 through the present. This request includes, but is not limited to, any market revenue reports generated by any entity, Marketron data, financial performance data, profitability of sales data, average spot costs data, national billing reports, national performance reports and documents from Miller, Kaplan, Arse & Company, LLP.

RESPONSE: Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 5 because it exceeds the number of permitted requests. In addition, to the extent the request seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

Defendant also objects to Request No. 5 because the request is premature as no *prima facie* case has been made that Plaintiff is entitled to punitive damages. *Skinner v. Aetna Life Ins. Co.*, No. 83-cv-679, 1984 U.S. Dist. LEXIS 19817, at *3 (D.D.C. Feb. 2, 1984) (discovery of a party's financial status should not be turned over until necessary to prove punitive damages – *i.e.*, until a *prima facie* case has been established). *See John Does 1-VI v. Yogi*, 110 F.R.D. 629, 633 (D.D.C. 1986) (discovery of financial status deferred until "necessary" to prove punitive damages). *See also Thibodeau Gen'l Contractors, Inc. v. Brault, Graham, Scott & Brault*, No. 90-cv-533, 1991 WL 255950 (D.D.C. Nov. 15, 1991) (in a trial likely to be bifurcated, discovery of financial information deemed to be "premature" prior to completion of compensatory damages phase). "[U]ntil the Court concludes, as a matter of law, that plaintiff has made a sufficient showing to permit the jury to consider such damages," the Court has the discretion to defer financial discovery. *D'Onofrio v. SFX Sports Group, Inc.*, No. 06-cv-687, op. at 19-20 (D.D.C.

Jan. 23, 2008). Defendant further objects that Request No. 5 is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

REQUEST FOR PRODUCTION NO. 6:    All documents that concern or relate in any way to the involvement of Katz Radio Group, Inc., Christal Radio, Eastmond Radio and any employment decisions made by Bonneville from January 1, 2003 through the present time including, but not limited to, employment decisions made regarding the 2006 RIF referred to in Answer to Paragraph 18 of the Complaint and the selection of individuals to fill positions after implementation of the RIF; as well as any and all documents that refer or pertain to the involvement of those entities in the employment decisions pertaining to the Bonneville reorganization of its radio stations including but not limited to stations in Washington, D.C., California and Utah.

RESPONSE: Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 6 because it exceeds the number of permitted requests. In addition, the term "involvement" is vague. Defendant further objects to the extent Request No. 6 seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, and because the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome. Subject to and without waiving these objections, Defendant states that it has previously produced, subject to a protective order, documents responsive to this request.

REQUEST FOR PRODUCTION NO. 7:    Any and all documents pertain, relate or refer to in any the program logs for WTOP from 2003 through the present.

7

RESPONSE:  Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 7 because it exceeds the number of permitted requests.  In addition, the request is not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

REQUEST FOR PRODUCTION NO. 8:    All documents which refer or relate to the hiring of individuals for any position with Bonneville after the "Reduction in Force" that was implemented by Bonneville in 2006, including but not limited to documents reflecting or relating to position descriptions, announcements regarding the open positions, documents submitted in conjunction with applications for the positions, all documents relating to the selection of applicants for interview, and all documents pertaining to the selection of applicants for hire.

RESPONSE:  Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 8 because it exceeds the number of permitted requests. Defendant further objects to the extent this request seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, and because the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.  Subject to and without waiving these objections, Defendant states that it has previously produced, subject to a protective order, documents responsive to this request.

REQUEST FOR PRODUCTION NO. 9:    All documents that refer or relate in any way to the organizational structure of the Bonneville radio statements [sic] in the Washington Metropolitan Area from 2002 through the present.

RESPONSE:  Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 9 because it exceeds the number of permitted requests.  In

addition, to the extent it seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome. Subject to and without waiving these objections, Defendant states that it has previously produced documents responsive to this request.

REQUEST FOR PRODUCTION NO. 10:    All documents contained in any personnel or other files maintained or kept by Defendant about Matt Mills including but not limited to, copies of the front and back cover, inside covers, performance appraisals, complaints, job descriptions, salary information and reviews.

RESPONSE:  Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 10 because it exceeds the number of permitted requests. In addition, the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome. Subject to and without waiving these objections, Defendant states that it has previously produced Matt Mills' personnel file, BIC 001056-1194, subject to a protective order.

REQUEST FOR PRODUCTION NO. 11:    Any and all documents that refer or in any way relate to Bonneville's contractual agreements with the National's [sic] baseball franchise from 2003 through the present.

RESPONSE:  Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 11 because it exceeds the number of permitted requests. In addition, the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

REQUEST FOR PRODUCTION NO. 12:    Any and all documents that refer or in any way relate to the contractual agreements, sales, charges, commissions between Bonneville and Katz, Christal and Redmond from 1998 through the present time.

RESPONSE: Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 12 because the request exceeds the number of permitted requests. In addition, the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

REQUEST FOR PRODUCTION NO. 13:    Any and all documents, notes, minutes or memoranda that refer or in any way relate to any meetings or discussions between Bonneville and Katz, Christal or Redmond in which Leo Donohoe was discussed or referred to in any way, including but not limited to any such meetings or discussions that involved consideration of Leo Donohoe for the position of Director of National Sales/Sport Sales for WTOP, Washington Post Radio, WGMS and WFED.

RESPONSE: Defendant incorporates by reference the foregoing general objections. It also objections to Request No. 13 because it exceeds the number of permitted requests. In addition, Defendant states that, if it had any responsive documents, those documents were previously produced.

REQUEST FOR PRODUCTION NO. 14:    Any and all documents that contain, refer to or pertain in any way to Bonneville's employment and or personnel policies with respect to hiring, terminating employment, applying for transfer, rehiring former employees, discrimination, and/or policies relating to how employees can voice concerns about employment decision. This request includes, but is not limited to, all handbooks, manuals, memorandum or

10

other documents that refer or relate in any way to Bonneville's policy with respect to age discrimination.

RESPONSE:  Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 14 because it exceeds the number of permitted requests.

REQUEST FOR PRODUCTION NO. 15:    All documents that refer, relate to, or reflect information pertaining to any individual who has applied for or been considered for any position with Bonneville subsequent to October 2005 through the present time in the Washington, D.C. and San Francisco areas.

RESPONSE: Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 15 because it exceeds the number of permitted requests. In addition, to the extent the request seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome. Subject to and without waiving these objections, Defendant states that it has previously produced, subject to a protective order, documents responsive to this request.

REQUEST FOR PRODUCTION NO. 16:    All documents that relate to, refer to or in any way pertain to any concern or complaints of age discrimination that have been raised by any applicants for employment, employees or former employees against Defendant or any of Defendant's employees, including but not limited to letters, communications, complaints, administrative complaints and lawsuits. This request is not limited to any geographical region.

RESPONSE: Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 16 because it exceeds the number of permitted requests.

11

In addition, Defendant objections to the request to the extent it seeks information outside the scope, geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP and WFED, and because the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome. Defendant also objects to Request No. 16 because the request seeks information protected by the attorney-client privilege and the work product doctrine. Subject to and without waiving these objections, Defendant states that there are no responsive documents.

REQUEST FOR PRODUCTION NO. 17:     With respect to Bonneville employees and/or radio stations that were or are located in the Washington/Baltimore metropolitan region, please produce all documents that relate to, refer to or in any way pertain to any concern or complaints of discrimination or unfair employment practices of any type that have been raised by any applicants for employment, employees or former employees against Defendant or any of Defendant's employees, including but not limited to letters, communications, complaints, administrative complaints and lawsuits.

RESPONSE: Defendant incorporates by reference the foregoing general objections. Defendant also objects to Request No. 17 because it exceeds the number of permitted requests. In addition, Defendant objects to the request to the extent it seeks information relating to alleged discrimination other than on the basis of age and because the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome. Defendant also objects to Request No. 17 because the

12

request seeks information protected by the attorney-client privilege and the work product doctrine.

Dated:  April 14, 2008

DAVIS WRIGHT TREMAINE LLP

*Constance M. Pendleton*

Richard L. Cys  (D.C. Bar No. 087536)
Constance M. Pendleton (D.C. Bar No. 456919)
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, DC  20006-3402
(202) 973-4200
(202) 973-4499 facsimile
richardcys@dwt.com
conniependleton@dwt.com

Counsel for Defendant Bonneville International
Corporation

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of April 2008, I directed that true and

correct copies of the foregoing Defendant's Responses and Objections to Plaintiff's

Supplemental Request for Production of Documents be delivered by electronic mail and

first class mail, postage prepaid, to the following:

          Thomas L. McCally, Esq.
          Carr Maloney P.C.
          1615 L Street, NW
          Suite 500
          Washington, D.C. 20036

          Constance M. Pendleton

# EXHIBIT 6

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE   BELLEVUE   LOS ANGELES   NEW YORK   PORTLAND   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, D.C.

CONNIE M. PENDLETON            SUITE 200                    TEL (202) 973-4200
DIRECT (202) 973-7229          1919 PENNSYLVANIA AVE NW     FAX (202) 973-4499
conniependleton@dwt.com        WASHINGTON, DC 20006         www.dwt.com

April 10, 2008

Thomas L. McCally, Esq.
Carr Maloney P.C.
1615 L Street, NW
Suite 500
Washington, DC 20036

Re:    *Donohoe v. Bonneville International Corp.*, CA No. 07-949 (RWR)

Dear Tom:

I write in response to your supplemental document requests served on March 11, 2008. These requests are impermissible, and we suggest that you withdraw them. The parties stipulated on October 19, 2007 in the Rule 16.3 Joint Report that a total of thirty document requests would be adequate. This stipulation is binding upon the parties by rule. *See* LCvR 26.2(b); Fed. R. Civ. P. 29; *see also Riley v. Walgreen Co.*, No. H-04-2189, slip op. at 6-7 (S.D. Tex. Jan. 31, 2005) (stipulated deadlines for interrogatories included in discovery plan are binding unless contradicted by court order). In order to exceed this limitation, you must either seek our consent to raising the limit or move the court to do so. You have done neither. This letter also serves as notice that you already exceeded the thirty request limit by two in your first set of document requests and we do not consent to any further increase in the number of requests, let alone the increase of seventeen that you have sought to impose unilaterally upon our client.

Apart from these problems with your supplemental document requests, many of your requests appear duplicative and have already been responded to. Moreover, we object to the substance of the requests and plan to file formal objections to the extent the requests seek documents outside the scope, geographic or otherwise, of Bonneville's DC Radio Group at the time of the January 2006 RIF, and to the extent the requests are not reasonably calculated to lead to the discovery of admissible evidence, are overbroad, unduly burdensome or are protected by the attorney-client or

April 10, 2008
Page 2

other privilege. We also object to your requests for financials on the basis that such requests are premature as no *prima facie* case has been made that plaintiff is entitled to punitive damages.

Sincerely yours,

Constance M. Pendleton

# EXHIBIT 7

# Carr Maloney P.C.

1615 L Street, NW
Suite 500
Washington, DC 20036
(202) 310-5500
FAX (202) 310-5555
www.carrmaloney.com

Tycon Towers
8000 Towers Crescent Drive
Suite 1350
Vienna, VA 22182
(703) 691-8818

The World Trade Center
401 East Pratt Street
Suite 1622
Baltimore, MD 21202
(410) 752-1570

8120 Woodmont Avenue
Suite 650
Bethesda, MD 20814
(301) 424-7024

**Thomas L. McCally**
**(202)310-5506**
Admitted in DC, MD & GA
tlm@carrmaloney.com

March 12, 2008

**VIA E-MAIL ONLY**

Richard Cys, Esq.
Constance Pendleton, Esq.
Davis Wright Tramaine LLP
1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
rickcys@dwt.com
conniependleton@dwt.com

      RE:    Donohoe/Bonneville Int'l Ltd.
              Our File No.:  10506DC001

Dear Counsel:

      I am writing to formally request that you supplement your client's written discovery responses to provide the following information that was either deliberately withheld or inadvertently not produced.

      First, as for Defendant's responses to Plaintiff's Request For Production Of Documents:

1.      Defense counsels' objections to Request for Production No. 1, seeking "all documents referred to or relied on by Defendant in responding to Plaintiff's complaint," on the alleged ground that the request is "not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome," are baseless. As such, if there are any responsive documents in additions to the ones provided, please supplement your client's discovery at once. If no other responsive documents exist, please so indicate to avoid a motion to compel.

Richard Cys, Esq.
Constance Pendleton, Esq.
March 12, 2008
Page 2 of 7

2.    For the same reasons set forth in number one above, Defense counsels' objections to Plaintiff's Request No. 2, seeking "all documents referred to or relied on by Defendant in responding to Plaintiff's First set of Interrogatories, are also baseless. As with Defendant's response to Request No. 1, please supplement your response to Request No. 2, if there are any responsive documents in addition to the ones provided. If not, please so indicate to avoid a motion to compel.

3.    With regard to Plaintiff's Request for Production No. 3, seeking "all documents pertaining to Plaintiff's employment by Defendant for the entire period of his employment," please state what efforts to locate documents your client undertook and allegedly could not undertake because those efforts were unduly burdensome. Please also advise as to what documents could have been retrieved but for the alleged overly burdensome nature of the retrieval. Furthermore, based upon our review of the documents you have produced, your client did not include any documents discussing or documenting why Plaintiff was targeted for the purported RIF in January 2006. You also failed to produce any documents showing how Mr. Donohoe was performing in National Sales compared to other National Sales professionals locally, regionally or nationally. Please produce all such documents at once. Documents reflecting why Leo Donohoe was chosen to be part of the RIF, even though at least 90% of his job responsibilities were for WTOP, and only an insignificant portion was for WGMS. Please supplement your client's document production to include any and all documents relating or referring to such responsive information to avoid a motion to compel.

4.    With regard to Plaintiff's Request for Production No. 5, your client indicates that there are no documents reflecting or referring to complaints made by present or former employees against Matt Mills while Mr. Mills was employed by Bonneville. Based upon our resources, however, notwithstanding your client's representations to the contrary, there is at least one file reflecting complaints against Mr. Mills. Moreover, we have information that two, if not more, employees (including Lish and Fowler) have complained to Bonneville about Mr. Mills' discriminatory employment practices. Please produce these documents at once, or we will proceed with a motion to compel.

5.    As for Plaintiff's Request for Production No. 6, your objection "to the extent it seeks information relating to alleged discrimination other than on the basis of age and to the extent it seeks information outside the scope, geographic or otherwise,

Richard Cys, Esq.
Constance Pendleton, Esq.
March 12, 2008
Page 3 of 7

of the DC Radio Group . . . and because the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in the case, and is overbroad and unduly burdensome," is misguided. Bonneville's ongoing or repeated discriminatory animus, based upon age or any other protected status, is clearly reasonably calculated to lead to the discovery of admissible evidence. There is no basis for limiting the information to which Plaintiff is entitled to the jurisdiction in which Bonneville unlawfully discriminated against him or to the protected status based upon which Bonneville discriminated against Mr. Donohoe. Accordingly, please supplement your client's response to provide information regarding all complaints of discrimination against Bonneville during the period that Plaintiff was employed by Bonneville through present date.

6. Your client's response to Request for Production No. 7, which requests all documents that refer or relate to the "Reduction of Force" that was implemented by Defendant in 2006, fails to provide any documentation regarding: the decision-making process leading up to the RIF, the decision to RIF WGMS employees even though WGMS was continuing to broadcast and positions were not eliminated, decision to RIF Plaintiff, even though he was employed primarily with WTOP. Please supplement your client's discovery to include such documents, which are clearly relevant and reasonably calculated to lead to the discovery of admissible evidence. Moreover, your client objects to the request for production on the alleged ground that that "it seeks information outside the scope, geographic or otherwise, of the DC Radio Group and because the request is not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome." In light of the fact that the alleged "Reduction in Force" is your client's purported "legitimate nondiscriminatory reason" for the adverse job action it took against Plaintiff, this information is clearly relevant to this case and reasonably calculated to lead to the discovery of admissible evidence. Please supplement your client's responses with any documents not otherwise provided to avoid a motion to compel.

7. Your objections to RFP No. 8, seeking "All documents which refer or relate in any way to the inclusion of Plaintiff in the "Reduction of Force" that was implemented by Defendant in 2006, are unfounded. Again, the alleged "Reduction in Force" is your client's purported legitimate nondiscriminatory reason for Mr. Donohoe's termination. As such, the request seeks information that is reasonably calculated to lead to the discovery of admissible evidence, is

Richard Cys, Esq.
Constance Pendleton, Esq.
March 12, 2008
Page 4 of 7

     reasonably limited in scope and is not overbroad or unduly burdensome. Please supplement your client's discovery responses to include any documents not otherwise provided because of the unfounded objections.

8.     Again in response to Requests for Production Nos. 9, 10, 11, 14, 22, 23, 24, 25, 26, 27, 28, 29, 30 and 31, you have apparently asserted the same boilerplate objections that the requests are "not reasonably limited in scope, not reasonably calculated to lead to the discovery of admissible evidence and is overly broad and unduly burdensome." These requests all seek information regarding Plaintiff's prima facie case for age based discrimination, your client's alleged "legitimate nondiscriminatory reason" for Bonneville's termination of Plaintiff's employment, Plaintiff's claim of pretext (including information regarding the individuals hired to replace Plaintiff and the other older workers displaced by Bonneville during the alleged RIF), and Bonneville's own affirmative defenses. The boilerplate objections, therefore, are unfounded. Please supplement your client's responses to provide any responsive documents not already provided to avoid a motion to compel.

9.     With regard to your client's response to Request for Production No. 18, your client produced some responsive documents, but we suspect not all. For example, your client produced Mr. Mills' handwritten notes taken during Mr. Donohoe's interview for the Director of National Sales/Sports Sales Manager for Bonneville radio stations WTOP, Washington Post Radio, WGMS and WFED since January 1, 2006. None of Mr. Mills' notes from other interviews, including the interview of Mr. Spacciapolli, were provided. Please provide these documents at once.

10.     Please provide all documents responsive to the inquiry made by Mary Kay LeMay to Scarlett Pate in BIC 000282.

11.     With regard to your privilege log, we object to your client's withholding the redacted information in BIC 000275-276. The information redacted appears to be a "to do" list of issues to address with counsel. There is no evidence that this information was a communication between Bonneville and its counsel for the purpose of rendering/receiving legal advice. Please produce an unredacted version of the document to avoid a motion to compel.

Richard Cys, Esq.
Constance Pendleton, Esq.
March 12, 2008
Page 5 of 7


Second, as for Defendant's Answers to Plaintiff's First Set of Interrogatories:

1.    As with your client's response to Plaintiff's request for production of documents, you have asserted boilerplate objections to many of Plaintiff's interrogatories. For example, in response to interrogatory number 1 that seeks "the full name, address, social security number, place of employment and title of each individual . . . participating in the completion of these discovery responses" you object that "the interrogatory is not limited in scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and is overbroad and unduly burdensome." You also object because "the request seeks information protected by the attorney-client privilege and the work product doctrine." Clearly, none of these objections are appropriate.   You repeat this boilerplate objection process in response to most, if not all, of the other interrogatories – regardless of whether the objections were truly applicable.   Please supplement your client's answers to interrogatories to provide information to which these objections were not properly asserted. Otherwise, we will be forced to file a motion to compel.

2.    Your client has also generally objected to any and all requests for information and documents regarding Bonneville's decision to reduce its force in any jurisdiction other than Washington, DC. As discussed previously, information regarding the RIF's or layoffs in other jurisdictions is reasonably calculated to lead to discoverable evidence regarding Bonneville's intent to discriminate against older workers.    As such, please supplement all of your client's written discovery responses to include this information.

3.    You object to Interrogatories numbers 4 and 5 on the alleged ground that the term "RIF" is "undefined and vague." Clearly, this objection is baseless. It is well understood by all parties that RIF is short for "Reduction of Force." In fact, your client uses the term throughout many of its own answers to interrogatories. As such, to the extent any information was not provided based upon that "objection," please supplement the information at once.

4.    With regard to your client's answer to interrogatory number 8, please supplement your response to provide the nature of the complaints against Matt Mills heard by Joel Oxley. Also, based upon our information, complaints were also made against Mr. Mills by employees other than Patrick Puglisi, including without limitation Lish and Fowler.   Please supplement your client's answer to provide such information.

Richard Cys, Esq.
Constance Pendleton, Esq.
March 12, 2008
Page 6 of 7

5.    Please supplement your client's response to Interrogatory 10 to provide the names of all applicants/employees, and positions, to which Katz (or any other third party) had involvement or input into Bonneville's employment decision. Please also provide the date on which such the third party had such involvement. Please do not limit your response to employment decisions made as a result of the RIF of January 4, 2006. The interrogatory is not so limited in time because Bonneville's reliance on third party involvement in employment based decisions prior to the January 4, 2006, RIF is relevant and reasonably calculated to lead to the discovery of admissible evidence. Moreover, your objection based upon attorney client privilege is unfounded because this interrogatory does not seek confidential communications between Bonneville and counsel. Please provide any information withheld based upon this alleged objection.

6.    Please supplement your client's response to Interrogatory No. 12, as indicated in its original answer.

7.    Please supplement your client's answer to interrogatory number 13 to provide information regarding who conducted the investigation, when the investigation was conducted, who was interviewed as part of that investigation and that individual's position.

8.    Your client's answer to Interrogatory No. 17 fails to provide the information requested. Specifically, your client's answer provides no facts or information regarding why Bonneville decided to include Mr. Donohoe in the 2006 RIF. Please supplement your client's answer to provide the requested information.

9.    Your client's answer to Interrogatory No. 18 also fails to provide the information requested. Your client's answer provides no facts or information regarding why Bonneville decided not to rehire Mr. Donohoe after the 2006 RIF. Please supplement your client's answer to provide the requested information.

10.    Similarly, your client's answer to Interrogatory No. 21 fails to provide facts regarding Bonneville's decision to move Mr. Spacciapolli from the position of Director of National Sales/Sports Sales to Local sales Manager in July of 2006. Please supplement your client's answer to Interrogatory No. 21 to provide the requested information.

Richard Cys, Esq.
Constance Pendleton, Esq.
March 12, 2008
Page 7 of 7

11.     Your client's answer to Interrogatory No. 23 is incomplete.  Your client failed to
        state whether Katz Radio had previously ever been involved in Bonneville's
        employment decision process.   Please provide a complete response.

With regard to information and/or documents pertaining to Bonneville's net worth,
profitability, financial reports and financial status, etc., Plaintiff in no way waives his right to
move to compel this information or for supplementation should the court determine that
sufficient evidence exists to create a prima facie case for punitive damages.

As I am sure you appreciate, given the number of depositions both sides need to conduct and
the rapidly approaching discovery deadline, time is of the essence.  As such, please supplement
your client's discovery responses within 7 days.  Failure to do so will result in our being forced
to file a motion to compel.

If you would like to discuss any of the information contained in this letter, please do not
hesitate to contact me.

Sincerely,

Thomas L. McCally

TLM:daw

# EXHIBIT 8

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

CONSTANCE M. PENDLETON
Direct (202) 973-4229
conniependleton@dwt.com

SUITE 200
1919 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20006-3402

TEL (202) 973-4200
FAX (202) 973-4499
www.dwt.com

April 8, 2008

**Via Email**

Thomas L. McCally, Esq.
Carr Maloney P.C.
1615 L Street, NW
Suite 500
Washington, D.C. 20036

Re:     *Leo Donohoe v. Bonneville International Corp.,*
        **U.S. District Court for D.C., CA No. 07-949 (RWR)**

Dear Tom:

We have reviewed your letter and email concerning Bonneville's alleged discovery deficiencies.

As to Requests for Production Nos. 1-3, 7-11, 14, 22-31, and Interrogatory 1 and others to which you object based upon the use of "boilerplate objections," Bonneville repeats and reasserts its general objections in its specific objections to preserve those objections, as is standard practice. Upon information and belief, all responsive documents have been produced. No other responsive documents exist. A motion to compel based on these objections would only serve to waste the time of the parties and the Court.

As to Request for Production No. 3 and Interrogatory Nos. 4, 5, 17 and 18, in addition to reasserting Bonneville's general objections, all documents relating to the RIF have been provided. If you find no documents in the three bankers boxes that were produced, including the RIF documents, indicating that Plaintiff was "targeted" for the RIF it is simply because he was not targeted. He was one of over 50 employees included in the RIF. There are no such documents or other explanations. Bonneville implemented a major restructuring of frequencies and sales forces in the DC Radio Group. Both National Sales Managers – Jeff Kessler and Leo

Thomas L. McCally, Esq.
April 8, 2008
Page 2



Donohoe -- were RIF'ed. A new position, Director of National Sales Sports Sales, was created that required selling four radio stations, sports sales experience, experience with the Nationals baseball team, and experience managing others. Mr. Spacciapolli was the superior candidate among the eleven candidates for the job; Mr. Donohoe was not. Mr. Donohoe had limited experience managing others, and had proven unprofessional at times, his supervisors and others questioned his interest or ability to work for four stations at once. Indeed, Mr. Donohoe himself even expressed doubt about his interest in selling that many stations. He had no experience with the Nationals. Further, notwithstanding the fact that your requests do not ask for documents comparing how Mr. Donohoe or other National Sales Managers perform as compared to other National Sales professionals locally, regionally or nationally, Bonneville does not maintain such files. Accordingly, there are no documents responsive to that request beyond those included in Mr. Donohoe's personnel file.

As to Request for Production No. 4 and Interrogatory 8, there is no file of documents relating to complaints about Mr. Mills. As disclosed, no formal or written complaints were ever filed. To the extent any employees complained about Mr. Mills, the complaints were oral. Only a few people made oral complaints, not uncommon of supervisors like Matt Mills who hold employees and themselves to high standards. As Mr. Oxley recalls, the substance of those complaints, in addition to those already disclosed, is as follows: Jean Fowler complained that it was easier at the office when Mr. Mills was on vacation, that it would be great if Mr. Mills lightened up and that he was too intense. She also complained that that she didn't feel she was treated fairly on certain accounts because the accounts were removed from her responsibilities, in response to which Mr. Oxley pointed out that other sales employees also had accounts pulled for business reasons, a decision supported both by Mr. Mills and Mr. Oxley. Ms. Lish complained to Mr. Oxley about Mr. Mills, but her complaints were more indirect. Mr. Donohoe complained to Mr. Oxley about Mr. Mills at greater length than did any other employee. For example, Mr. Donohoe complained that Mr. Mills asked him to prepare for calls and sales meetings.

As to Request for Production No. 6 and paragraph 2 page 5 of your March 12 letter, discovery into all complaints of discrimination against Bonneville during the period that Plaintiff was employed to the present, irrespective of the type of claim or geographic scope, is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence and not reasonably limited in scope. This is a single plaintiff, single market age discrimination claim, not a class action. Mr. Donohoe alleged discrimination on the basis of age alone – not race, gender or national origin. Discovery outside those parameters is wholly unwarranted. *See Carman v. McDonnell Douglas Corp.*, 114 F.3d 790, 792 (8th Cir. 1997) (plaintiff not entitled to company-wide discovery absent particularized showing of need, and concluding that, because decision was made locally, plaintiff was not entitled to discovery regarding decision makers in other divisions); *Kresefky v. Panasonic Commc'ns and Sys. Co.*, 169 F.R.D. 54, 64 (D.N.J. 1996) (limiting discovery to work unit); *Byers v. Illinois State Police*, 2002 WL 1264004, at *6, 53 Fed. R. Serv. 3d 740 (N.D. Ill. June 3, 2002) (observing that "[a]t a minimum, the requested discovery must relate to the particular claims of the case" and collecting cases); *EEOC v.*

Thomas L. McCally, Esq.
April 8, 2008
Page 3



*Packard Elec. Div., Gen. Motors Corp.*, 569 F.2d 315, 318 (5th Cir. 1978) (stating that "[i]n the context of an investigation of an individual complaint, it might well be most natural to focus on that employing unit or work unit from which came the decision of which the individual complainant complains"); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1084-85 (11th Cir. 1990) (holding that "a vague possibility that loose and sweeping discovery might turn up something suggesting . . . [discriminatory] motive does not show the particularized need and likely relevance that would require moving discovery beyond the natural focus of the inquiry"); *Heward v. Western Elec. Co.*, 35 Fair Empl. Prac. Cas. (BNA) 807, 811-812 (10th Cir. 1984) (affirming limitation of discovery to region where ADEA plaintiff worked, on grounds that case was not brought as class action or one in which company-wide allegations of discrimination were central to plaintiff's claim); *Hinton v. Entex Inc.*, 93 F.R.D. 336, 337-38 (E.D. Tex. 1981) (holding that scope of discovery should be limited to facility at which plaintiff is employed when "plaintiff has not made any specific factual allegations of discrimination that pertain to any facility of [defendant] other than the one [at which she physically worked]"). For the same reason, discovery relating to RIFs or layoffs in jurisdictions other than Washington DC will not lead to discoverable evidence.

As to Request for Production No. 7, we are confirming, but upon information and belief, all responsive documents have been produced.

As to Request for Production No. 18, there are no other responsive documents. Mr. Mills did not take notes at the majority of the interviews for the Director of National Sales/Sports Sales position, in part because most applicants, other than Mr. Donohoe and Mr. Spacciapolli, were interviewed outside of the office. Mr. Spacciapolli, unlike Mr. Donohoe, provided an impressive multi page Power Point presentation at his interview which answered most of Mr. Mills' questions. Mr Spacciapolli's Power Point has already been produced. Mr. Mills took a few notes during Mr. Donohoe's interview but wrote down the majority of his notes relating to Mr. Donohoe's interview after he learned that Mr. Donohoe was threatening to file suit. All such notes have been produced.

In addition, to the extent you seek documents responsive to an inquiry made by Mary Kay LeMay to Scarlett Pate, *see* para. 10 of your March 12 letter, your maximum document requests as agreed to by the parties in our October 19, 2007 Joint Report, have been exceeded. Furthermore, your objection to redaction of the attorney-client privileged material BIC 000282 is unwarranted. The redacted material in BIC 000282 reflects internal attorney-client communications and advice of counsel. In this vein, we still await a response from you to our February 28, 2008 email regarding why you have not produced any of Mr. Donohoe's calendars dating after January 4, 2006 or a privilege log. Your assertion of attorney-client privilege as to those documents is misguided. Please produce the remaining calendar and diary pages within seven days to avoid a motion to compel.

Thomas L. McCally, Esq.
April 8, 2008
Page 4



As to Interrogatory Nos. 10 and 23, Katz has been previously involved in Bonneville's employment decisions. Katz's opinion about applicants for National Sales positions and the Director of National Sales Sports Sales position matters because the NSMs and the Director of National Sales Sports Sales work directly with Katz. Bonneville has consulted Katz on a case by case basis. For example, Mr. O'Brien and Mr. Renzi asked Mr. Spacciapolli to present or "pitch" himself to Katz for the job of Z104's NSM when he applied for that position with Bonneville.

As to Interrogatory No. 21, Mr. Spacciapolli was extremely interested in the position of Local Sales Manager for WTOP in July 2006 and actively and enthusiastically pitched himself for the job. Because Mr. Spacciapolli was a superior performer and well suited for the position, it was awarded to him and Bonneville therefore did not need to advertise the position outside of the company. Mr. Spacciapolli has continued to perform in a superior manner and was since left Bonneville to become General Sales Manager at CBS Radio in Pittsburg, where he has already been promoted to Director of Sales, the equivalent position held by Mr. Donohoe's current supervisor.

As to Interrogatory No. 13, any investigation into plaintiff's allegations of age discrimination was conducted by counsel and the substance of that investigation is attorney-client privileged and attorney work product.

The response to Interrogatory Nos. 12 will be supplemented under separate cover. In addition, we will produce some further responsive documents that have come to our attention or upon which we intend to rely in this case.

Sincerely,

Constance Pendleton/jea

Constance M. Pendleton

# EXHIBIT 9

**Beydoun, Ali A**

| | |
|---|---|
| **From:** | Pendleton, Constance [conniependleton@dwt.com] |
| **Sent:** | Monday, April 14, 2008 5:22 PM |
| **To:** | McCally, Thomas L.; Maiolo, Tina M.; Ward, Denise A.; Beydoun, Ali A |
| **Cc:** | Cys, Richard |
| **Subject:** | RE: Donohoe v. Bonneville |
| | |
| **Attachments:** | Bonneville doc BIC 006837-6839.pdf |



Bonneville doc BIC
006837-6839...

      Tom:  Attached are BIC 6837-39.  We are reviewing your request for the 2000-2004 and 2006 Report Generation documents and will respond under separate cover.

Connie

---

**From:** McCally, Thomas L. [mailto:TLM@carrmaloney.com]
**Sent:** Friday, April 11, 2008 4:17 PM
**To:** Pendleton, Constance; Maiolo, Tina M.; Ward, Denise A.; Beydoun, Ali A
**Cc:** Cys, Richard
**Subject:** RE: Donohoe v. Bonneville

Connie,
    I will review your letter and respond next week. As for your other request regarding Mr. Donohoe's calendar, we will be producing the remainder of the calendar and redacting the attorney client privileged communications.
    Finally, please provide me with the missing documents from your supplemental production as outlined in the two emails I sent yesterday. Specifically, the 2000-2004 and 2006  Report Generation documents and documents BIC 006837-006839.
Tom

---

Thomas L. McCally
Carr Maloney P.C.
1615 L Street, N.W.
Suite 500
Washington, DC  20036
202-310-5500
202-310-5555 (Fax)
tlm@carrmaloney.com
http://www.carrmaloney.com

### Offices in Washington, DC | Maryland | Virginia

This message is intended for the individual(s) or entity(ies) named in the header that appears either at the beginning or at the conclusion of all material in this message (depending on your e-mail software). This message may contain material that is privileged or confidential. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also please notify the sender by replying to this message, and then delete it from your system. Thank you.

## Beydoun, Ali A

| | |
|---|---|
| **From:** | Pendleton, Constance [conniependleton@dwt.com] |
| **Sent:** | Thursday, April 17, 2008 4:22 PM |
| **To:** | Maiolo, Tina M.; McCally, Thomas L.; Ward, Denise A. |
| **Cc:** | Cys, Richard; Beydoun, Ali A |
| **Subject:** | RE: Bonneville docs 7019-29 |

**Attachments:**        Bonneville docs 007030-34.pdf



Bonneville docs
007030-34.pdf ...

Attached are the reports for 2003. However, we maintain our objection. These documents were not requested in your original document requests before you exhausted your total number of agreed requests.

---

**From:** Maiolo, Tina M. [mailto:TM@carrmaloney.com]
**Sent:** Thursday, April 17, 2008 3:03 PM
**To:** Pendleton, Constance; McCally, Thomas L.; Ward, Denise A.
**Cc:** Cys, Richard; Beydoun, Ali A
**Subject:** RE: Bonneville docs 7019-29

These reports do not reflect "Plan" numbers for 2003. Please supplement for the deposition tomorrow. Thanks.

---

Tina Maiolo
Carr Maloney P.C.
1615 L Street, N.W.
Suite 500
Washington, DC  20036
202-310-5500
202-310-5555 (Fax)
tm@carrmaloney.com
http://www.carrmaloney.com

This message is intended for the individual(s) or entity(ies) named in the header that appears either at the beginning or at the conclusion of all material in this message (depending on your e-mail software). This message may contain material that is privileged or confidential. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also please notify the sender by replying to this message, and then delete it from your system.

Thank you.

---

**From:** Pendleton, Constance [mailto:conniependleton@dwt.com]
**Sent:** Thursday, April 17, 2008 2:01 PM
**To:** McCally, Thomas L.; Ward, Denise A.; Maiolo, Tina M.
**Cc:** Cys, Richard
**Subject:** Bonneville docs 7019-29

Tom: Attached are additional Report Generations reflecting National billing for 2006 to the present, the only years requested in your initial document requests (No. 21). We have lodged our objections to your supplemental document requests. We also produce 2004 and 2005 as documents we may rely on. These documents are Confidential and produced subject to the protective order.

<<Bonneville docs 7109-29.pdf>>

## Beydoun, Ali A

| | |
|---|---|
| **From:** | Maiolo, Tina M. |
| **Sent:** | Thursday, April 17, 2008 8:43 PM |
| **To:** | Beydoun, Ali A |
| **Subject:** | FW: Bonneville docs 7019-29 |

**Attachments:**    Bonneville docs 7109-29.pdf



Bonneville docs
7109-29.pdf (3...

---

**From:** Pendleton, Constance [mailto:conniependleton@dwt.com]
**Sent:** Thu 4/17/2008 2:01 PM
**To:** McCally, Thomas L.; Ward, Denise A.; Maiolo, Tina M.
**Cc:** Cys, Richard
**Subject:** Bonneville docs 7019-29

Tom:  Attached are additional Report Generations reflecting National billing for 2006 to the present, the only years requested in your initial document requests (No. 21).  We have lodged our objections to your supplemental document requests.  We also produce 2004 and 2005 as documents we may rely on.  These documents are Confidential and produced subject to the protective order.

<<Bonneville docs 7109-29.pdf>>

## Beydoun, Ali A

**From:**      Ward, Denise A.
**Sent:**      Friday, April 18, 2008 11:55 AM
**To:**        Beydoun, Ali A
**Subject:**   FW: Bonneville docs 7019-29

**Importance:**    High

---

**From:** Maiolo, Tina M.
**Sent:** Thursday, April 17, 2008 2:17 PM
**To:** Pendleton, Constance; McCally, Thomas L.; Ward, Denise A.
**Cc:** Cys, Richard
**Subject:** RE: Bonneville docs 7019-29
**Importance:** High

Constance:

We have also noticed that, although BIC 000751 refers to an attached "compensation package for 2006," for M. Spacciapoli, that attachment was not produced. Please send it to us.

Also, bates BIC 000206 refer to Miller Kaplan reports. We requested those reports and they were never produced. They are clearly responsive to our requests and need them for Mr. Mills' deposition.

There are also documents that are incomplete - e.g. BIC 000219 appears to have the bottom email cut off. Please send us the complete document.

---

Tina Maiolo
Carr Maloney P.C.
1615 L Street, N.W.
Suite 500
Washington, DC 20036
202-310-5500
202-310-5555 (Fax)
tm@carrmaloney.com
http://www.carrmaloney.com

This message is intended for the individual(s) or entity(ies) named in the header that appears either at the beginning or at the conclusion of all material in this message (depending on your e-mail software). This message may contain material that is privileged or confidential. If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also please notify the sender by replying to this message, and then delete it from your system.

Thank you.

---

**From:** Pendleton, Constance [mailto:conniependleton@dwt.com]

**Sent:** Thursday, April 17, 2008 2:01 PM
**To:** McCally, Thomas L.; Ward, Denise A.; Maiolo, Tina M.
**Cc:** Cys, Richard
**Subject:** Bonneville docs 7019-29

Tom: Attached are additional Report Generations reflecting National billing for 2006 to the present, the only years requested in your initial document requests (No. 21). We have lodged our objections to your supplemental document requests. We also produce 2004 and 2005 as documents we may rely on. These documents are Confidential and produced subject to the protective order.

<<Bonneville docs 7109-29.pdf>>

**Beydoun, Ali A**

| | |
|---|---|
| **From:** | Ward, Denise A. |
| **Sent:** | Friday, April 18, 2008 11:54 AM |
| **To:** | Beydoun, Ali A |
| **Subject:** | FW: Bonneville docs 7019-29 |

---

**From:** Pendleton, Constance [mailto:conniependleton@dwt.com]
**Sent:** Thursday, April 17, 2008 4:48 PM
**To:** Maiolo, Tina M.
**Cc:** McCally, Thomas L.; Ward, Denise A.; Cys, Richard
**Subject:** FW: Bonneville docs 7019-29

Tina:  As far as we can tell, BIC 219 is complete as is; nothing was cut off.

The Miller Kaplan reports were requested in your supplemental document requests, which we have objected to, *inter alia*, because they exceed the number of agreed upon requests.

BIC 000751 contained no attachment as it was contained in Mr. Spacciapoli's personnel file.  We will investigate, but there was no attachment to the original..

Connie

---

**From:** Maiolo, Tina M. [mailto:TM@carrmaloney.com]
**Sent:** Thursday, April 17, 2008 2:17 PM
**To:** Pendleton, Constance; McCally, Thomas L.; Ward, Denise A.
**Cc:** Cys, Richard
**Subject:** RE: Bonneville docs 7019-29
**Importance:** High

Constance:

We have also noticed that, although BIC 000751 refers to an attached "compensation package for 2006," for M. Spacciapoli, that attachment was not produced.  Please send it to us.

Also, bates BIC 000206 refer to Miller Kaplan reports.  We requested those reports and they were never produced.  They are clearly responsive to our requests and need them for Mr. Mills' deposition.

There are also documents that are incomplete - e.g. BIC 000219 appears to have the bottom email cut off.  Please send us the complete document.

---

Tina Maiolo
Carr Maloney P.C.
1615 L Street, N.W.
Suite 500

Washington, DC  20036

202-310-5500

202-310-5555 (Fax)

tm@carrmaloney.com

http://www.carrmaloney.com

This message is intended for the individual(s) or entity(ies) named in the header that appears either at the beginning or at the conclusion of all material in this message (depending on your e-mail software).  This message may contain material that is privileged or confidential.  If you are not the intended recipient, please do not read, copy, use or disclose this communication to others; also please notify the sender by replying to this message, and then delete it from your system.

Thank you.

---

**From:** Pendleton, Constance [mailto:conniependleton@dwt.com]
**Sent:** Thursday, April 17, 2008 2:01 PM
**To:** McCally, Thomas L.; Ward, Denise A.; Maiolo, Tina M.
**Cc:** Cys, Richard
**Subject:** Bonneville docs 7019-29

Tom:  Attached are additional Report Generations reflecting National billing for 2006 to the present, the only years requested in your initial document requests (No. 21).  We have lodged our objections to your supplemental document requests.  We also produce 2004 and 2005 as documents we may rely on.  These documents are Confidential and produced subject to the protective order.

<<Bonneville docs 7109-29.pdf>>

# EXHIBIT 10

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

### DISTRICT OF COLUMBIA

LEO DONOHOE, Plaintiff

V.

BONNEVILLE INT'L CORP., Defendant

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]     07-949 (RWR)

TO:  Bonneville Int'l Corp.
     c/o Corporation Service Company
     1090 Vermont Avenue, NW
     Washington, DC  20005

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Carr Maloney P.C.<br>1615 L Street, NW, Washington, DC  20036 | DATE AND TIME<br>4/29/2008 10:00 am |
|---|---|

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE<br>3/21/08 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Thomas L. McCally, Esq.
Carr Maloney P.C., 1615 L Street, NW, Suite 500, Washingotn, DC  20036   202-310-5506

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

| | | |
|---|---|---|
| LEO DONOHOE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 07-949 (RWR) |
| | : | |
| BONNEVILLE INT'L CORP., | : | |
| | : | |
| Defendant. | : | |

## NOTICE OF 30(b)(6) DEPOSITION

PLEASE TAKE NOTICE that on the 29th day of April, 2008, at 10:00 a.m., pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Plaintiff, Leo Donohoe, by counsel, will take the deposition of the Defendant, Bonneville Int'l Corp., through one or more of its designated officers, directors, partners, managing agents, or other persons who consent to testify on its behalf, by oral examination, before a Notary Public or anyone authorized to administer oath and due form of law, in the law offices of CARR MALONEY P.C., 1615 L Street, NW, Suite 500, Washington, DC 20036.

Defendant Bonneville Int'l Corp., is required to designate one or more of its officers, directors, partners, managing agents, or other persons who consent to testify on its behalf, in each of the following areas:

## SEE ATTACHMENT A

PLEASE TAKE FURTHER NOTICE, pursuant to Rule 30(b)(5) of the Federal Rules of Civil Procedure, that each corporate designee or designees shall be required to bring with him the originals of all documents specified in Attachment A herein, to be  inspected and copied by counsel

for Plaintiff, Leo Donohoe. The deposition will be taken for the purpose of discovery, or as evidence in the captioned cause, or both, and shall continue from day to day until complete. The deposition may be recorded by videotape and/or audiotape.

Respectfully submitted,

CARR MALONEY P.C.

By: _____

Thomas L. McCally, #391937
1615 L Street, NW, Suite 500
Washington, DC 20036
Attorney for Plaintiff
(202) 310-5506/(202) 310-5500 (FAX)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of March, 2008, a copy of the foregoing was sent via first class mail, postage prepaid and via e-mail to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC 20006 Attorney for Defendant.

_____
Thomas L. McCally

## ATTACHMENT A

1.      Reasons for which Bonneville decided to implement a Reduction in Force, both locally and nationally in 2006.

2.      How Bonneville determined who would be affected by the Reduction in Force, and who would be exempted from the Reduction in Force, in Washington, DC, in 2006.

3.      The names of individuals affected by the Reduction in Force in Washington, DC, in 2006 and their ages.

4.      The reasons for which WGMS employees were affected by the Reduction in Force when WGMS continued to broadcast after the 2006 Reduction in Force.

5.      The names and ages of all individuals who worked for WTOP who were included in the Reduction of Force in January 2006.

6.      The names and ages of all individuals whose employment was terminated as a result of the Reduction in Force, both locally and nationally, in 2006.

7.      The names and ages of all individuals whose employment was terminated as a result of the Reduction in Force, both locally and nationally, in 2006, but who were ultimately rehired by Bonneville.

8.      All complaints made against Matt Mills, whether formal or informal, alleging unlawful business practices.

9.      All complaints made against Bonneville Int'l Ltd. and/or any of its management level employees for unlawful employment practices.

10.     Katz Radio Group and/or its employees' roles in Bonneville's decisions who to hire/rehire following the Reduction in Force in 2006.

11.     Katz Radio Groups and/or its employees' roles in all other employment decisions made by Bonneville Int'l Ltd.

12.     Mike Spacciapolli's work performance prior and subsequent to the Reduction in Force in 2006.

13.     Leo Donohoe's work performance prior and subsequent to the Reduction in Force in 2006.

14.    The decision to rehire Mike Spacciapolli over Leo Donohoe subsequent to the Reduction in Force in 2006.

15.    The changes and similarities between the National Sales Director position prior and subsequent to the Reduction in Force in 2006.

16.    The decision to transfer Mike Spacciapolli from National Sales Director/Sports Sales to Local Sales Manager in July 2006.

17.    Any and all complaints of discrimination received following the January 2006 Reduction in Force.

18.    The investigation into Mr. Donohoe's complaints of discrimination.

19.    Bonneville's total net financial worth for the years 2003 through the present.

# EXHIBIT 11

# Carr Maloney P.C.

1615 L Street, NW
Suite 500
Washington, DC 20036
(202) 310-5500
FAX (202) 310-5555
www.carrmaloney.com

Tycon Towers
8000 Towers Crescent Drive
Suite 1350
Vienna, VA 22182
(703) 691-8818

The World Trade Center
401 East Pratt Street
Suite 1622
Baltimore, MD 21202
(410) 752-1570

8120 Woodmont Avenue
Suite 650
Bethesda, MD 20814
(301) 424-7024

**Thomas L. McCally**
**(202)310-5506**
Admitted in DC, MD & GA
tlm@carrmaloney.com

April 22, 2008

**VIA E-MAIL ONLY**

Constance Pendleton, Esq.
Davis, Wright, Tremaine, LLP
1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
cpendleton@dwt.com

        RE:    Donohoe/Bonneville
               Our File No.: 10506DC001

Dear Constance:

        I have received your letter dated April 21, 2008, in which you again refuse to produce discoverable documents relating to the above referenced case, as well as refuse to allow your corporate designee to testify regarding discoverable information. Rather than rehash arguments that we have made through our several letters back and forth regarding Bonneville's refusal to cooperate fully in the discovery process, we have decided we have no option but to proceed with filing a motion to compel. My repeated efforts to enlighten you as to why the information we requested is clearly discoverable have gone unsuccessful rendering the motion unavoidable.

        With this said, absent a protective order instructing us otherwise, we intend to depose Bonneville's corporate designee on May 5, 2008. We also intend on pursuing all lines of questioning set forth in Attachment A to the 30(b)(6) notice of deposition. This includes Bonneville's financial information. This information, particularly the sales information, is directly relevant to Mr. Donohoe's claims of discrimination. Moreover, no motion to bifurcate the trial has been granted. As such, we are entitled to present evidence to support our claim of punitive damages throughout trial in this matter. All information, therefore, is discoverable at this time. We do not have to wait until we prove a prima facie case.

Constance Pendleton, Esq.
April 22, 2008
Page 2 of 2

     Again, while I appreciate your communications reasserting your client's objections and refusal to produce clearly discoverable information, we have reached an impasse and will proceed with filing a motion to compel.

     If you disagree and your client is willing to produce the information requested, please let me know. Otherwise, I will proceed as set forth.

                  Sincerely,

                  Thomas L. McCally

TLM:daw

# EXHIBIT 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

LEO DONOHOE,      :

    Plaintiff,    :

          :

v.           :   Civil Action No.: 07-949 (RWR)

          :

BONNEVILLE INT'L CORP.,   :

          :

    Defendant.   :

### JOINT REPORT PURSUANT TO LOCAL CIVIL RULE 16.3

Pursuant to Local Civil Rule 16.3 and this Court's Order of August 27, 2007, the parties' respective counsel conferred by telephone on October 15, 2007, and discussed the matters outlined in LCvR 16.3(c) and the matters required to be addressed in the Court's August 27, 2007, Order.  The following is a summary of that meeting:

### A.  Plaintiff Donohoe's Statement of the Case.

Plaintiff, Leo Donohoe, filed this action seeking to recover damages he sustained as the direct result of the Defendant, Bonneville Corporation's, wrongful termination of and refusal to rehire Mr. Donohoe on the basis of his age.  Mr. Donohoe, who is and was over forty at the time of termination, was terminated from employment with Defendant after nearly twenty years of employment with WTOP and related radio stations.  Mr. Donohoe's termination was improperly motivated by age discrimination, and was part of a pattern and practice employed by Defendant to eliminate older members if its workforce, particularly in the area of sales and marketing.

1

After wrongfully terminating Mr. Donohoe and others, Defendant hired/rehired only the younger members of the workforce, particularly in the area of sales and marketing. Mr. Donohoe was again discriminated against by Defendant on the basis of age when Defendant refused to rehire Plaintiff, instead selecting a much younger, much less qualified individual to assume the position of Director of National Sales/Sport Sales Manager and the job duties previously held by Mr. Donohoe.

Mr. Donohoe has suffered losses in the form of front and back pay and benefits, has suffered emotional and mental anguish, and has suffered other damages.

Defendant improperly discriminated against Mr. Donohoe on the basis of his age, in violation of the District of Columbia Human Rights Act (DCHRA), D.C. Code §2-1401, *et. seq.*

Plaintiff disagrees completely with the Defendant's factual assertions and legal conclusions that are set forth below.

It is Plaintiff's position that it is not appropriate in the context of this preliminary statement of issues to provide a full legal and factual analysis of this matter. Plaintiff is confident that he will be able to establish a prima facie case of age discrimination, and that he will be able to establish that the proffered reasons for the employment decisions were mere pretext for age discrimination. In the event that the Court would like further briefing of the issues at this time, Plaintiff would be happy to provide extensive briefing of the undisputed facts currently known and the legal issues that impact this matter. Furthermore, it is anticipated that discovery, which has yet to be conducted, will reveal further evidence of discriminatory animus.

**B.    Defendant Bonneville's Statement of the Case.**

Pursuant to the Court's August 27, 2007, Order for Initial Scheduling Conference, Defendant Bonneville International Corporation ("Bonneville") submits this statement of the

case. This case involves allegations of age discrimination brought against Bonneville by a former sales employee of Bonneville's Washington DC Radio Group, Leo Donohoe. Mr. Donohoe alleges that Bonneville discriminated against him on the basis of age when it terminated him from employment in connection with a major restructuring of the operations of Bonneville's Washington DC Radio Group and an attendant reduction-in-force ("RIF") and subsequently failed to rehire him.

## 1.    Factual Background

Bonneville is an award-winning broadcasting company that currently owns, *inter alia*, 23 radio stations throughout the country, including four (4) radio stations in Washington, DC: WTOP, WTPW, WGMS and WFED. In January 2006, after a very successful year for Bonneville's Washington, DC stations, Bonneville restructured its operations and programming in its Washington DC Radio Group as part of a company-wide strategic initiative to acquire new "news/talk formats" and to bolster existing "news/talk formats." The restructuring of Bonneville's Washington Radio Group and overall efforts to improve operational efficiency necessitated personnel changes.

On January 4, 2006, Bonneville instituted a reduction in force to coincide with the format changes. Fifty-one full-time, part-time and on-call employees -- including Mr. Donohoe, an at-will employee -- were terminated. All but one of the sales persons and sales managers laid off in the RIF reapplied for a new position with Bonneville. Bonneville was able to rehire only ten of the former fifty-one employees.

Mr. Donohoe began his employment with Bonneville when he was over 40 years of age. He was serving as National Sales Manager of WTOP and as National Sales Manager for WGMS

when the reorganization went into effect. At the time of the RIF, Mr. Donohoe was 51 years old. Fifteen (15) candidates, including Mr. Donohoe, applied for the new position of Director of National Sales/Sports Sales for WTOP, WTWP, WGMS and WFED, a position that differed in duties from the position previously held by Mr. Donohoe, which was eliminated in the restructuring. Many of the applicants were very well qualified for the position. At no time was the age of any candidate a consideration.

Bonneville determined that Michael Spacciapolli, age 28, who had been with Bonneville for six years as an Account Executive, a National Sales Manager, a Local Sales Manager, and General Sales Manager, was the most qualified candidate for the position. Between the two, Mr. Spacciapolli was without a doubt the superior candidate. For example, Mr. Donohoe openly complained about his supervisor and other aspects of his job. Mr. Donohoe's supervisors had reservations about his commitment and productivity.

Mr. Donohoe filed suit against Bonneville in D.C. Superior Court on April 26, 2007, under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §2-1401 *et seq.* Mr. Donohoe claims Bonneville discriminated against him on the basis of age in terminating him from employment and refusing to rehire him, instead selecting a younger and, allegedly, less qualified individual. Compl. ¶¶ 35, 37. Mr. Donohoe claims he has suffered damages, including past and future loss of income in the form of wages, prospective retirement benefits, social security and other benefits, severe emotional pain and suffering, mental anguish, and loss of enjoyment of life. Compl. ¶ 44.

Mr. Donohoe seeks a declaratory judgment and an injunction against Bonneville. He also requests to be placed in the new position of Director of National Sales/Sports Sales Manager or,

4

in the alternative, front salary and benefits in the amount of $5 million for the period remaining until normal retirement. Compl. In addition, Mr. Donohoe seeks back salary and fringe benefits up to the date of judgment or instatement in the new position, plus prejudgment interest, as well as compensatory and punitive damages under the DCHRA, including damages for humiliation, pain, embarrassment, fees, costs and expenses, attorneys' and expert fees. Bonneville removed the case to United States District Court for the District of Columbia on May 22, 2007, and filed its Answer on May 30, 2007.

### 2.     Summary of Legal Issues

The DCHRA provides that "It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including but not limited to discrimination by reason of ... age ... " DCHRA §2-1401.01 (2005). Mr. Donohoe cannot prove age discrimination based on any direct evidence because he simply has no direct evidence that Bonneville acted with discriminatory animus. Nor is there indirect evidence of discrimination. District of Columbia courts have adopted United States Supreme Court's the *McDonnell Douglas* evidentiary standard for age discrimination suits under the DCHRA. *See, e.g., Paquin v. Federal National Mortgage Ass'n,* 119 F.3d 23, 26 (D.C. Cir. 1997). First, the terminated employee must establish a *prima facie* case of age discrimination. If the four (4) necessary *prima facie* elements are met, the burden of proof then shifts to the employer to show some legitimate, nondiscriminatory reason for the employee's dismissal or failure to rehire. If the employer sufficiently rebuts the presumption of discrimination, the burden shifts back to the employee to proffer evidence that that the employer's stated reasons for the dismissal/failure to rehire were in

fact pretextual in that they are unworthy of credence and that discrimination was the motivating factor for the employee's dismissal. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1993); *Schoen*, 670 F. Supp. 370-71.

Mr. Donohoe cannot make out a *prima facie* case of age discrimination. While Mr. Donohoe falls within the protected class and was terminated pursuant to a RIF and not rehired, he cannot show he was performing his job according to Bonneville's legitimate expectations or, in the case of the alleged failure to rehire, was qualified for the new position. Nor can Mr. Donohoe show that he was disadvantaged in favor of younger employees. While the candidate Bonneville selected for the new position was 28, he was more highly qualified than Mr. Donohoe. In addition, a significantly greater number of employees under the age of 40 than over the age of 40 were terminated in the RIF. And, as many employees over the age of 40 as under age 40 were retained in the restructuring. What is more, 15 employees age 40 and above were hired and three (3) employees age 40 and above were promoted after the RIF. There is simply no evidence that Bonneville even considered Mr. Donohoe's age when they discharged him and declined to rehire him for the new position. Accordingly, Mr. Donohoe cannot even make out a *prima facie* case of age discrimination.

Moreover, Bonneville can articulate legitimate, nondiscriminatory reasons for the dismissal. Mr. Donohoe was dismissed pursuant to an across-the board restructuring for business reasons that necessitated a reduction-in-force policy. *Paquin*, 119 F.3d at 29 (when employer comes forward with legitimate non-discriminatory reasons for the termination, the presumption that arises from the *prima facie* case "simply drops out of the picture") (citations omitted).

6

Finally, Mr. Donohoe has no evidence that Bonneville's reasons for its employment actions were pretextual. As plaintiff, Mr. Donohoe must show not only that the defendant's proffered reasons are false, but also that actual age discrimination was the basis for the dismissal, or failure to rehire. *St. Mary's Hospital v. Hicks*, 509 U.S. 502, 515 (1995). Although Mr. Donohoe's supervisors generally gave him good reviews, his supervisors also had concerns about his judgment, professionalism and behavior on the job. Mr. Donohoe claims he was the only displaced employee who had responsibilities for WTOP. However, the restructuring included termination of the entire WGMS sales department – a station for which Mr. Donohoe also worked – due to the significant loss of and change to inventory accompanying the restructuring. Further, the RIF included both national sales employees – Mr. Donohoe (age 51) and another employee (age 27) – because of the change of focus and advertising inventory. Finally, budget performance and percent of station billing and national market performance increased after the restructure and RIF as compared to 2005, demonstrating that Bonneville's articulated business goals for the restructuring and RIF were achieved.

In sum, Bonneville denies any liability and, alternatively, asserts that Mr. Donohoe cannot demonstrate any damages attributable to Bonneville's allegedly wrongful actions.

### C.    Statutory Basis for All Causes of Action.

Plaintiff Donohoe brings this action pursuant to the DCHRA D.C. Code §2-1401 *et seq*.

### D.    16.3(c) Topics.

#### 1.    Dispositive Motions.

Bonneville believes that the case may be disposed of by a summary judgment motions at some point during the proceedings. Regardless of any other recitations herein, Bonneville reserves the right to file such motion at anytime it sees fit.

7

### 2.    Joinder of Parties.

The deadline for amending the pleadings or joining additional parties shall be November 19, 2007.

### 3.    Assignment to Magistrate Judge.

The parties do not agree to have this matter tried by a magistrate but do agree that a magistrate may resolve discovery disputes.

### 4.    Settlement.

The parties engaged in unsuccessful mediation on December 11, 2006, with JAMS mediator, Honorable Richard Levie (Ret.), but were unable to reach resolution due to their disagreements as to Bonneville's liability and the existence and extent of damages, if any.

### 5.    ADR.

The parties do not believe that further mediation would be helpful.

### 6.    Summary Judgment.

As set forth in item 8 below, the parties suggest that discovery close on March 31, 2008. If that date is accepted by the Court, the parties agree that summary judgment motions will be due not later than April 30, 2008, oppositions on May 30, 2008, and replies on June 18, 2008. The proposed date for a decision on the motions is July 18, 2008.

### 7.    Initial Disclosures.

The parties propose that the initial disclosures required by Rule 26.1 of the Federal Rules be exchanged on November 26, 2007.

### 8.    Discovery Schedule.

The parties agree that the discovery schedule for standard cases should apply. December 17, 2007, is an acceptable deadline for Post Rule 26(a) discovery requests. March 31, 2008, is an

acceptable deadline for the completion of all discovery (including answers to interrogatories, document production, requests for admissions and depositions). The parties anticipate that 30 interrogatories and 30 document requests per party should be adequate. Plaintiff anticipates that ten depositions per party will be necessary. Defendant believes that five (5) depositions per party will be adequate.

> **9.    Expert Witnesses.**

The parties agree that the provisions of Rule 26(a)(2) should apply to expert witness disclosures. If discovery closes on March 31, 2007, disclosures from all experts will be due December 21, 2007. Disclosures from rebuttal experts will be due January 22, 2008. Expert witness discovery will close March 31, 2008.

> **10.    Class Action Issues.**

Not applicable.

> **11.    Bifurcation.**

The parties agree that this case should not be bifurcated or managed in phases.

> **12.    Pretrial conference.**

Given the possibility of filing dispositive motions, the parties suggest that the pretrial conference should occur on or about July 21, 2008.

> **13.    Trial Date.**

The parties agree that the Court should set a trial date at the pretrial conference.

> **14.    Other Matters.**

The parties agree that there are no other matters for the Court's consideration at this time.

DATED this 19th day of October, 2007.

Respectfully submitted,

CARR MALONEY P.C.                                    DAVIS WRIGHT TREMAINE LLP


/s/

_____          _____
Thomas L. McCally, Esq. #391937               Richard L. Cys, Esq., # 087536
1615 L Street, NW                             Constance M. Pendleton, Esq., #456919
Suite 500                                     1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20036                          Washington, DC 20006-3402
(202) 310-5500/(202) 310-5555 (FAX)           (202) 973-4200/(202) 973-4499 (FAX)
Attorneys for Plaintiff Leo Donohoe           Attorneys for Defendant Bonneville
                                              International Corporation