**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

LEO DONOHOE,                               :
                                           :
      Plaintiff,                     :
                                           :
v.                                         :          Civil Action No.: 07-949 (RWR)
                                           :
BONNEVILLE INT'L CORP.,                    :
                                           :
      Defendant.                     :


**PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE DEBORAH A. ROBINSON'S
ORDER OF 4/23/08 DENYING PLAINTIFF'S MOTION FOR LEAVE TO TAKE
ADDITIONAL DEPOSITIONS**


On April 23, 2008, Magistrate Judge Deborah Robinson entered an Order denying
Plaintiff's Motion for Leave to take more than the seven depositions that are permitted under the
current Scheduling Order of this Court.  The Magistrate Judge's Order does not set forth any
specific grounds for the denial, other than to refer to the arguments raised by Defendant.  The
Magistrate's Order, if allowed to stand, effectively precludes Plaintiff from being able to conduct
essential discovery by denying Plaintiff the opportunity to depose witnesses with critical
information, many of whom are under the control of Defendant.   Accordingly, Plaintiff files this
Objection to the Order pursuant to Local Rule 72.2.

Plaintiff's claims of age discrimination involve multiple facets of his employment
relationship with Defendant.  Plaintiff contends that multiple adverse employment actions were
motivated by discriminatory animus.  Plaintiff has asserted, and to date has obtained some evidence

to support his assertions, that the following discriminatory practices occurred during the course of his employment and termination from employment with Defendant:

1.     Defendant, through management level employees including Matt Mills, discriminated against older workers by treating them in a manner less favorably than younger workers. In addition to other evidence of discriminatory animus, verbal statements were routinely made by Mr. Mills that were clearly indicative of age discrimination.  For example, he routinely made statements such as "you can't teach an old dog new tricks."  Mr. Mills also made comments specifically about Plaintiff that were indicative of age discrimination, such as "He has been doing this too long…."  (See deposition testimony of former Bonneville employee Richard O'Brien, pp. 18 -20, attached as Exhibit A).

2.     The true intention behind the Reduction in Force that Defendant that was implemented by Defendant was to eliminate certain workers that were in protected classes, such as older workers.  Defendant's proffered reasons are pure pretext.  For example, one purported reason for the Reduction in Force was to enable Defendant to change the format of one of the radio stations (WGMS) that was impacted by the RIF.  However, WGMS did not change format for well over a year after the RIF was implemented.    Additionally, Defendant rehired mostly younger workers after the RIF, resulting in a much younger workforce.

3.     Plaintiff was improperly included in the RIF.  The vast majority of the work that he performed was with WTOP 9the radio station for which Plaintiff had worked for almost nineteen (19) years, a radio station that was not included in the RIF.  (See e.g. Deposition testimony of Mr. O'Brien, page 22, attached as Exhibit A).  Plaintiff's office was always with WTOP.  Plaintiff was improperly designated as being an employee of WGMS in RIF documents and was improperly

included in the RIF in an effort to disguise the true motivation behind his termination, which was age discrimination.

4.      After implanting the RIF and eliminating all workers of the impacted radio stations (and improperly including Plaintiff in that process), Defendant rehired and/or hired mostly younger workers resulting in a much younger work force.  Most of the individuals that Matt Mills hired younger people.  (Exhibit A, page 16).  Older workers who reapplied for open positions were either not rehired (such as in the case of Plaintiff) or were hired at lower level positions than those which they previously held.

5.      Plaintiff reapplied for a position with Defendant, but was not rehired.  A much younger, less qualified individual was hired to fill the position.  Defendant has proffered that the younger individual was hired in lieu of Plaintiff based upon the recommendations of several individuals employed by third parties.  Plaintiff contends (a) that the proffered reason is factually unsupported (and that the third party witnesses did not make such recommendations), (b) that it was not reasonable to rely on such statements because the third parties had a direct monetary interest in having their former employee hired for the position in lieu of Plaintiff, and (c) that the proffered reason is pretext for age discrimination.

The current limit of seven depositions is completely insufficient to enable Plaintiff to discover evidence regarding the multiple claims and defenses in this matter.  Indeed, Plaintiff has not even been permitted to take the ten depositions that are authorized under Rule 30 of the Federal Rules of Civil Procedure.  The Magistrate Judge's refusal to allow additional deposition under such circumstances constitutes an abuse of discretion, is clearly erroneous, and should be summarily reversed.  Holding otherwise would undermine the very purpose of discovery, would severely limit

Plaintiff's ability to obtain critical evidence that is directly relevant to Plaintiff's claims and Defendant's defenses, would be grossly unfair and would severely prejudice the Plaintiff in this matter.

At the outset of this litigation, Plaintiff requested that he be permitted to take a minimum of ten (10) depositions (the number permitted under Rule 30 of the Federal Rules of Civil Procedure). Despite this request, the parties were limited by virtue of the Scheduling Order that was entered to the taking of seven (7) depositions.

Initial Disclosures were subsequently filed, identified no less than 39 potential witnesses. This number did not include experts, which were identified at a later date. Responses to written discovery requests revealed additional witnesses with relevant information.

As is demonstrated in the Motion and Reply, and as is further demonstrated below, Plaintiff has noted and taken or is scheduled to take depositions of seven (7) witnesses that have information critical to the prosecution of Plaintiff's case or to an examination of Defendant's defenses. These witnesses include two of the individuals who were primarily responsible with the decisions that are at issue (Matt Mills and Joel Oxely), a 30(b)(6) representative (Defendant has designated Joel Oxely for this Deposition), two current employees at Bonneville who worked with Plaintiff and who voiced concerns about the manner in which older workers were treated (Jean Fowler and Jody Lish); a former employee of Bonneville (Richard O'Brien) who testified that he was aware that complaints had been made about Matt Mills and was aware of certain discriminatory statements that were made by Mr. Mills; and the younger individual who was selected and hired by Bonneville instead of the Plaintiff (Mike Spacciapoli).[1] Notably, although Mr. O'Brien testified that

---

[1] Plaintiff originally had noted the depositions of two individuals who were identified by Defendant as having participated in the employment decisions (Mr. John Hesano, Vice President and General Sales Manager of Eastmond

management level employees were aware of complaints and even kept a separate file documenting such complaints, Defendant's discovery responses are completely void of such evidence. (See pp. 11-16 of Exhibit A).

Based upon information that was provided during the course of written discovery and/or obtained by Plaintiff's counsel during investigative efforts, these seven depositions were taken or are scheduled to be taken, exhausting the current limit. The rationale behind the selection of each of these individuals for depositions appears below, and demonstrates that each deposition was essential and necessary to the investigation into Defendant's defenses and to the prosecution of Plaintiff's case. However, there remain many other witnesses who have yet to be deposed that have information that is vital to Plaintiff's ability to establish motive and pretext. Many of these individuals are either under the control of the Defendant or have indicated that they are unable to participate in this litigation absent the protection of subpoena. Those individuals, and the information that they are believed to possess appear in detail below.

As courts in this jurisdiction have consistently recognized, establishing discrimination is not often easy. Employers do not generally tell employees that they are being terminated because they are a certain race, ethnicity or a certain age. Often times, employers attempt to insulate themselves from legitimate claims of discrimination by disguising the true motivation for the termination. One way that employers sometimes attempt to conceal the true motivation behind termination is by characterizing such improperly motivated terminations as a "Reduction in Force."

Such is the situation in the case at bar. This is not, as Defendant contends, a simple

---

Radio and Christine Travaligni, General Sales Manager of Christal). However, these depositions notices were withdrawn in light of the Magistrate Judge's ruling. As more fully set forth below, Plaintiff should be granted leave to take the depositions of these individuals, who the Defendant identified as rendering opinions upon which the Defendant purportedly relied.

employment discrimination case involving a straight-forward termination. In this case, Plaintiff challenges multiple employment decisions, including the Defendant's treatment of older workers, the implementation of the Reduction in Force itself, the decision to include the Plaintiff in the Reduction in Force even though Plaintiff was primarily performing services for WTOP (a radio station that was not impacted by the RIF), the rehiring process that was implemented after the Reduction in Force was imposed (in which a significantly younger workforce was re-hired) and the decision not to re-hire the Plaintiff after the RIF and to instead hire a much younger, much less experienced individual to take over the Plaintiff's job responsibilities.

Under the law of this jurisdiction, Plaintiff bears the ultimate burden of establishing that the motivation behind each of these decisions was improper and illegal, and that the reasons proffered by the Defendant are pretext for discrimination. In order to satisfy this burden and in order to fully investigate the Defendant's proffered reasons for each decision, Plaintiff must be given the opportunity during the course of discovery to investigate the decisions fully, and elicit testimony not only from the decision makers themselves (who most assuredly are not going to admit to the discrimination), but also from others who have insight and relevant information regarding how and why the decisions were made. This testimony will be critical to Plaintiff's ability to defend against dispositive motions, which the Defendant ultimately will file in this matter. Requiring Plaintiff to establish motive and then limiting the Plaintiff's ability to obtain evidence of motive and pretext would not only be unfair and prejudicial to the Plaintiff, but would also undermine the very purpose of the District of Columbia Human Rights Act (DCHRA).

The Magistrate's refusal to grant leave to take additional depositions constitutes an abuse of discretion is clearly erroneous and is severely prejudicial to the Plaintiff. In the case at bar, which

involves multiple decisions in which motive and intent are at issue, limiting Plaintiff to seven depositions effectively prohibits Plaintiff from obtaining evidence that is critical to establishing motive and pretext. Accordingly, the Magistrate's ruling should be overturned, and the Plaintiff should be permitted to take additional depositions.

**Depositions that have been scheduled and/or taken to date:**

Plaintiff has noted and taken the following depositions of critical witnesses:

1.    **Matt Mills**:

Mr. Mills was Plaintiff's direct supervisor, and was identified by the Defendant as being involved in all employment decisions that were made, including the decision to terminate Plaintiff from employment by way of inclusion in the Reduction in Force, the decision to terminate Plaintiff's employment, the decision not to rehire Plaintiff, and the decision to hire a much younger and less experienced individual instead of Plaintiff. Mr. Mills also controlled many other aspects central to Plaintiff's employment, and has knowledge regarding Plaintiff's performance, experience and qualifications. Mr. Mills was and is employed by the Defendant Corporation, and is under their direct control. He is a management level employee, and Plaintiff is prohibited from contacting him absent the consent of opposing counsel.

It is anticipated that Mr. Mill's will be called to testify on behalf of Bonneville, and that his testimony will be used in an effort to establish a legitimate, non-discriminatory reason for the decisions that are at issue. Absent the opportunity to fully explore Mr. Mills' proffered reasons and motivation, Plaintiff would not have the opportunity to adequately prepare for cross examination. Accordingly, this deposition was essential and necessary.

2.    **Richard O'Brien**:

Mr. O'Brien was previously employed by Defendant Corporation, and has information that is directly relevant to the motive behind the decision to terminate Plaintiff, as well as the decision to hire a younger, less experienced individual instead of Plaintiff. Mr. O'Brien also has information that is directly relevant to some of the discovery issues that are outstanding in this matter.

For example, Mr. O'Brien testified that while he was employed by Bonneville he became aware that a file was being kept by Bonneville documenting the many complaints that had been made about Matt Mills to Bonneville. (See pp. 11-12 and 14 - 16 of Exhibit A). This file has never been produced by Defendant, and Defendant has always taken the position that it had not received any complaints about Mr. Mills. Mr. O'Brien's testimony clearly refutes Defendant's statements

regarding prior complaints.

Mr. O'Brien further testified in detail about age based comments that Matt Mills routinely made, such as "you can't teach an old dog new tricks." (See pp. 18 - 19 of Exhibit A). Mr. O'Brien, who was at the time employed as a management level employee at Bonneville, personally was aware of complaints from older, veteran employees regarding the manner in which they were being treated by Mr. Mills. Those that had been with Bonneville for more than ten years felt as if they were being run out of Bonneville. Mr. O'Brien heard complaints form veteran employees including Jean Fowler, Jody Lish and Plaintiff. (See pp. 13 -14 of Exhibit A).

Mr. O'Brien also testified that Plaintiff's performance during the relevant time period was exemplary and that Plaintiff always made or exceeded budget. (See pp. 8 – 9 of Exhibit A). Mr. O'Brien noted that Plaintiff would always out perform the majority of the staff, that Plaintiff always made budget, and that making budget was everything. Id. Again, these observations directly contradict the proffered reasons for the employment decisions that were made.

Finally, Mr. O'Brien confirmed that he was instructed by his current employer not to voluntarily participate in this litigation, and he was only able to present his testimony under the protection of subpoena by way of deposition. (See page 27 of Exhibit A). Accordingly, the only option that Plaintiff had for securing this critical testimony was the taking of Mr. O'Brien's deposition.

     3.    **Jean Fowler**:

Jean Fowler is currently employed by Bonneville, and did not respond to requests to speak with Plaintiff's counsel absent subpoena.

Plaintiff has direct knowledge that Ms. Fowler had voiced concerns about the manner in which Matt Mills treated older workers. Other witnesses, including Mr. O'Brien, have testified or recalled that Ms. Fowler complained about the fact that accounts were taken away from her and given to the younger workers. (See, e.g. pp. 13 -14 of Exhibit A). The taking of her deposition was necessary in order to fully explore her complaints and the evidence that she had regarding discriminatory motive. Ms. Fowler confirmed that she had raised concerns about accounts that were being taken away from her. (See Deposition testimony of Jean Fowler, pp. 10 - 11, attached as Exhibit B).

     4.    **Joel Oxely (individually)**:

Joel Oxely is a current management level employee of Bonneville. As such, Plaintiff is prohibited from contacted Mr. Oxely directly to discuss this matter absent subpoena.

Mr. Oxely was (and is) the direct supervisor of Mr. Mills, and indirectly supervised Plaintiff during all relevant times. Mr. Oxely was directly involved in all employment decisions that are at issue. He has information regarding Plaintiff's performance, experience and reputation. Upon

information and belief, Mr. Oxely also has knowledge regarding complaints that were made by other employees about Mr. Mills. He also has knowledge of statements that Mr. Mills made that are indicative of age discrimination. He also may have knowledge regarding the file containing evidence of employee complaints about Mr. Mills (See pp. 11 – 19, of Exhibit A). Obviously, this testimony is directly relevant to establishing motive, intent and pretext.

     5.     **Joel Oxely (as 30(b)(6) Corporate Designee)**:

Plaintiff has also noted the deposition of a corporate designee to testify regarding certain specified matters that are directly relevant to Plaintiff's claims. (See Exhibit C). The only way that Plaintiff can obtain this information is by way of deposition. Defendants have designated Mr. Oxely to testify as the corporate representative.

     6.     **Jody Lish**:

Jody Lish is currently employed by Bonneville, and has advised counsel that she is unable to provide formal testimony absent the protection of a subpoena. She has been identified by Mr. O'Brien as having made complaints about the manner in which veteran workers were treated. (See pp. 13 – 14 of Exhibit A). Ms. Lish also has knowledge regarding Bonneville's employment practices, and has direct knowledge that Matt Mills treated younger workers more favorably than older workers. She has knowledge regarding the implementation of the Reduction in Force, and the fact that a younger workforce was rehired after the RIF was implemented. She has knowledge regarding the fact that Plaintiff was primarily working with WTOP and that Plaintiff's offices were with WTOP. She has knowledge that the Reduction in Force did not impact WTOP. She has knowledge regarding the experience and reputation of Plaintiff, and the experience and reputation of Mr. Spacciapoli.

The taking of her deposition is essential to Plaintiff's case.

     7.     **Matt Spacciapoli**:

Mr. Spacciapoli is the individual who was selected for the position of Director of National Sales/Sport Sales instead of the Plaintiff. It is Plaintiff's contention that Plaintiff was much more experienced and qualified for the position in question than Mr. Spacciapoli. Defendant has asserted that Mr. Spacciapoli was more experienced and qualified than Plaintiff. In order to fully evaluate Defendant's proffered reasons for the selection, it is necessary to depose the individual that was selected for the position.

Deposing each of these seven witnesses was essential to Plaintiff's ability to fully investigate Defendant's proffered reasons for the employment decisions, and to obtain information

relevant to establishing that the proffered reasons were pretext for discrimination.  Additionally, many of these witnesses are currently employed by Defendant or were unable to provide information to Plaintiff absent the protection of a subpoena.  By deposing each of these critical witnesses, Plaintiff has now exhausted the current limit of seven depositions.

However, there are many additional witnesses with critical information relevant to Plaintiff's claims, some of which are similarly not able to testify absent the protection of a subpoena.  As described below, these witnesses are believed to have evidence that clearly would establish that Defendant's decisions were motivated by age discrimination, and that the preferred reasons are pretext.  Prohibiting Plaintiff from having the opportunity to depose these individuals would defeat the intent of the DCHRA, would undermine the very purpose of discovery and will be severely prejudicial to Plaintiff's ability to prosecute this claim and to defend against summary judgment.

Accordingly, Plaintiff requests leave to depose the following individuals who are believed to have critical information regarding motive, intent, discriminatory animus and other issues that are relevant to Plaintiff's claims.

**Witnesses that Plaintiff Requests Leave to Depose:**

8. **Mr. John Hesano, Vice President and General Sales Manager of Eastmond Radio**

The deposition of Mr. Hesano is necessary in light of the position that Bonneville has taken in this matter.  In its Answers to Interrogatories, Bonneville attempts to deflect responsibility for the decision to hire an individual that was much younger and much less experienced than Mr. Donohoe by relying on statements made by Mr. Hesano as well as other Katz employees that it identified.  (See, e.g. Bonneville's Answer to Interrogatory number 9, attached as Exhibit D).  In fact, Bonneville stated that each of the individuals that Bonneville identified rendered opinions as to the qualifications of Mr. Donohoe as compared to Mr. Spacciapoli – and that Bonneville relied upon the opinion of each of these witnesses in making the employment decision at issue.  (See Exhibit D).  Defendant did not simply state that these individuals were present at the

meeting, but that these individuals each independently played a part in the employment decisions at issue.

Plaintiff is entitled to fully explore the statements and opinions of this witness.  The motivation behind the decision to hire Mr. Spacciapoli over Mr. Donohoe and the relative qualifications of each of these individuals are central issues to Mr. Donohoe's claim of age discrimination during the re-hiring process.  Defendant has indicated that it will try to hide behind the opinions of this witness as justifying the decision to hire an indisputably much younger, less experienced individual instead of the Plaintiff.  (See Exhibit D).  Defendant should not be permitted to insulate itself from liability by presenting evidence that it relied upon the opinions of the third-party witness, while at the same time preventing Plaintiff from deposing witnesses by taking the position that the witnesses were "not directly involved in the hiring decision."[2]

Plaintiff should be permitted to depose this individual in order to ascertain whether such opinions were actually held by and/or shared by the witness.  Plaintiff should also be permitted to depose the witness to determine whether Defendant's alleged reliance on the opinion was reasonable, in light of the fact that the witness may have had a financial interest in having a former Katz employee selected for the position.

9.    **Christine Travaligni, General Sales Manager of Christal**:

Ms. Travaligni was also identified by Defendant as expressing opinions about the relative qualifications of Plaintiff that allegedly impacted Defendant's decision to hire a younger, less qualified individual instead of Plaintiff.  For the reasons set forth above, it is essential that Plaintiff be permitted to fully explore what opinions were actually held and expressed by Ms. Travaligni.  Defendant should not be permitted to insulate itself from liability by presenting evidence that it relied upon the opinions of the third-party witnesses, while at the same time preventing Plaintiff from deposing witnesses by taking the position that the witnesses were "not directly involved in the hiring decision."

Plaintiff should be permitted to depose this individual in order to ascertain whether such opinions were actually held by and/or shared by the witness.  Plaintiff should also be permitted to depose the witness to determine whether Defendant's alleged reliance on the opinion was reasonable, in light of the fact that the witness may have had a financial interest in having a former Katz employee selected for the position.

10.    **Jory Steiber:**

Jory Steiber is a former employee of Bonneville, and is unable to provide formal testimony

---

[2] Notably, if Plaintiff proceeded to note the depositions of the individuals from Katz that Defendant identified as playing an important role in the decision making process, Plaintiff would have exhausted six out of the seven currently permitted depositions.

absent the protection of a subpoena.  Upon information and belief, Mr. Steiber is prohibited from discussing certain aspects of his experience as an employee of Bonneville, and he cannot discuss the reasons for his separation from employment, by virtue of the terms of a severance agreement between Mr. Steiber and Defendant.  Upon information and belief, Mr. Steiber may  have retained certain information that is relevant to Plaintiff's claims, such as e-mails and depictions of the Plaintiff that were created and/or distributed by Defendant's management level employees. He also may have information regarding the fact that Mr. Mills treated younger workers more favorable, that Mr. Mills targeted certain individuals for termination, and that Mr. Mills wanted to (and in fact did) bring in a new, younger workforce.

This testimony is critical to establishing pretext, motive and discriminatory animus.

11.    **Paul White, PhD.**:

Dr. While has been identified by Defendant as an expert statistician and economist who is expected to testify at the trial of this matter. Plaintiff should be permitted the opportunity to fully explore the nature and grounds of his opinions by way of deposition.

12.    **Ralph Renzi:**

Mr. Renzi was Mr. Spacciapoli's former supervisor while at Z104, and has information regarding Mr. Spacciapoli's experience, qualifications and reputation within the industry. Defendant has asserted as its proffered legitimate non-discriminatory reason for selecting Mr. Spacciapoli over Mr. Donohoe that Mr. Spacciapoli was more qualified than Plaintiff.  Mr. Spacciapoli's former supervisor has information that is directly relevant to Defendant's proffered reasons for the decision.

13.    **Skip Quast**:

Mr. Quast has been identified by Defendant as having direct knowledge of the reasons that Mr. Spacciapoli was transferred out of the position of Director of National Sales/Sport Sales shortly after he was selected for the position over Plaintiff.  Mr. Spacciapoli's performance and experience are directly at issues in this litigation, and plaintiff should be permitted to fully explore any performance deficiencies that resulted in the removal of Mr. Spacciapoli from the position in question.

14.    **Bob Johnson:**

Defendants identified Mr. Johnson as having knowledge regarding the reorganization of the radio stations and the implementation of the Reduction in Force that occurred in January 2006 in the Washington D.C. area. (See  Exhibit D).

12

It is Plaintiff's contention that he was improperly included in the RIF and the RIF was implemented as a means of getting rid of employees that it would otherwise be risky to terminate, including older workers such as Plaintiff. Plaintiff should be permitted to depose the very individuals that Defendant designated as being involved with and having knowledge of the implementation of the Reduction in Force.

15.    **Bruce Reese:**

Defendants identified Mr. Reese as having knowledge regarding the reorganization of the radio stations and the implementation of the Reduction in Force that occurred in January 2006 in the Washington D.C. area. (See Exhibit D).

It is Plaintiff's contention that he was improperly included in the RIF and the RIF was implemented as a means of getting rid of employees that it would otherwise be risky to terminate, including older workers such as Plaintiff. Plaintiff should be permitted to depose the very individuals that Defendant designated as being involved with and having knowledge of the implementation of the Reduction in Force.

16.    **Scarlett Pate** :

Defendants identified Ms. Pate  as having knowledge regarding the reorganization of the radio stations and the implementation of the Reduction in Force that occurred in January 2006 in the Washington D.C. area. (See Exhibit D).

It is Plaintiff's contention that he was improperly included in the RIF and the RIF was implemented as a means of getting rid of employees that it would otherwise be risky to terminate, including older workers such as Plaintiff. Plaintiff should be permitted to depose the very individuals that Defendant designated as being involved with and having knowledge of the implementation of the Reduction in Force.

Defendants have also identified Ms. Pate as having participated in meetings with Katz and Bonneville employees in which the qualifications of Plaintiff and Mr. Spacciapoli were discussed.  Ms. Pate also has information relevant to Plaintiff's performance, Plaintiff's experience and reputation within the industry, and his qualifications for the position of Director of National Sales/Sports Sales.  Her testimony on all of these areas is critical and relevant to the Plaintiff's claims in this matter.

17.    **Matt Kluft - New York Sales Manager of Katz Radio**

Defendant contends that it relied upon the opinions of Mr. Kluft in making the decision to hire Mr. Spacciapoli instead of Plaintiff in this action.  (See Exhibit D).

Plaintiff is entitled to fully explore the statements and opinions of this witness.  The motivation behind the decision to hire Mr. Spacciapoli over Mr. Donohoe and the relative

qualifications of each of these individuals are central issues to Mr. Donohoe's claim of age discrimination during the re-hiring process. Defendant has indicated that it will try to hide behind the opinions of this witness as justifying the decision to hire an indisputably much younger, less experienced individual instead of the Plaintiff. (See Exhibit D). Defendant should not be permitted to insulate itself from liability by presenting evidence that it relied upon the opinions of the third-party witness, while at the same time preventing Plaintiff from deposing witnesses by taking the position that the witnesses were "not directly involved in the hiring decision.

Plaintiff should be permitted to depose this individual in order to ascertain whether such opinions were actually held by and/or shared by the witness. Plaintiff should also be permitted to depose the witness to determine whether Defendant's alleged reliance on the opinion was reasonable, in light of the fact that the witness may have had a financial interest in having a former Katz employee selected for the position.

18.    **Scott Porretti - VP Sales Manager, Katz Radio:**

Defendant contends that it relied upon the opinions of Mr. Porretti in making the decision to hire Mr. Spacciaploi instead of Plaintiff in this action. (See Exhibit D).

Plaintiff is entitled to fully explore the statements and opinions of this witness. The motivation behind the decision to hire Mr. Spacciapoli over Mr. Donohoe and the relative qualifications of each of these individuals are central issues to Mr. Donohoe's claim of age discrimination during the re-hiring process. Defendant has indicated that it will try to hide behind the opinions of this witness as justifying the decision to hire an indisputably much younger, less experienced individual instead of the Plaintiff. (See Exhibit D). Defendant should not be permitted to insulate itself from liability by presenting evidence that it relied upon the opinions of the third-party witness, while at the same time preventing Plaintiff from deposing witnesses by taking the position that the witnesses were "not directly involved in the hiring decision.

Plaintiff should be permitted to depose this individual in order to ascertain whether such opinions were actually held by and/or shared by the witness. Plaintiff should also be permitted to depose the witness to determine whether Defendant's alleged reliance on the opinion was reasonable, in light of the fact that the witness may have had a financial interest in having a former Katz employee selected for the position.

19.    **Mark Clowers - NY Manager, Christal Radio:**

Defendant contends that it relied upon the opinions of Mr. Clowers in making the decision to hire Mr. Spacciaploi instead of Plaintiff in this action. (See Exhibit D).

Plaintiff is entitled to fully explore the statements and opinions of this witness. The motivation behind the decision to hire Mr. Spacciapoli over Mr. Donohoe and the relative qualifications of each of these individuals are central issues to Mr. Donohoe's claim of age

discrimination during the re-hiring process. Defendant has indicated that it will try to hide behind the opinions of this witness as justifying the decision to hire an indisputably much younger, less experienced individual instead of the Plaintiff. (See Exhibit D). Defendant should not be permitted to insulate itself from liability by presenting evidence that it relied upon the opinions of the third-party witness, while at the same time preventing Plaintiff from deposing witnesses by taking the position that the witnesses were "not directly involved in the hiring decision.

Plaintiff should be permitted to depose this individual in order to ascertain whether such opinions were actually held by and/or shared by the witness. Plaintiff should also be permitted to depose the witness to determine whether Defendant's alleged reliance on the opinion was reasonable, in light of the fact that the witness may have had a financial interest in having a former Katz employee selected for the position.

20.     **Mark Grey, President of Katz Radio (FORMER):**

Defendant contends that it relied upon the opinions of Mr. Grey in making the decision to hire Mr. Spacciaploi instead of Plaintiff in this action. (See Exhibit D).

Plaintiff is entitled to fully explore the statements and opinions of this witness. The motivation behind the decision to hire Mr. Spacciapoli over Mr. Donohoe and the relative qualifications of each of these individuals are central issues to Mr. Donohoe's claim of age discrimination during the re-hiring process. Defendant has indicated that it will try to hide behind the opinions of this witness as justifying the decision to hire an indisputably much younger, less experienced individual instead of the Plaintiff. (See Exhibit D). Defendant should not be permitted to insulate itself from liability by presenting evidence that it relied upon the opinions of the third-party witness, while at the same time preventing Plaintiff from deposing witnesses by taking the position that the witnesses were "not directly involved in the hiring decision.

Plaintiff should be permitted to depose this individual in order to ascertain whether such opinions were actually held by and/or shared by the witness. Plaintiff should also be permitted to depose the witness to determine whether Defendant's alleged reliance on the opinion was reasonable, in light of the fact that the witness may have had a financial interest in having a former Katz employee selected for the position.

21.     **Sari Fruitbine, Senior Account Manager for Katz:**

Defendant contends that it relied upon the opinions of Mr. Fruitbine in making the decision to hire Mr. Spacciaploi instead of Plaintiff in this action. (See Exhibit D).

Plaintiff is entitled to fully explore the statements and opinions of this witness. The motivation behind the decision to hire Mr. Spacciapoli over Mr. Donohoe and the relative qualifications of each of these individuals are central issues to Mr. Donohoe's claim of age discrimination during the re-hiring process. Defendant has indicated that it will try to hide behind the opinions of this witness as justifying the decision to hire an indisputably much younger, less

experienced individual instead of the Plaintiff.  (See  Exhibit D).  Defendant should not be permitted to insulate itself from liability by presenting evidence that it relied upon the opinions of the third-party witness, while at the same time preventing Plaintiff from deposing witnesses by taking the position that the witnesses were "not directly involved in the hiring decision.

Plaintiff should be permitted to depose this individual in order to ascertain whether such opinions were actually held by and/or shared by the witness.  Plaintiff should also be permitted to depose the witness to determine whether Defendant's alleged reliance on the opinion was reasonable, in light of the fact that the witness may have had a financial interest in having a former Katz employee selected for the position.

22.    **Daniel Kliener**[3]:

Mr. Kliener is a current employee of Bonneville.  Mr. Kliener has information regarding Plaintiff's employment with Bonneville and  Plaintiff's experience and reputation within the industry.  Upon information and belief Mr. Kliener may have information regarding complaints about the manner in which Matt Mills treated older employees, comments that Matt Mills may have made that are indicative of discriminatory intent, and other information relevant to motive and pretext.

Plaintiff should be granted leave to take the deposition of each of the witnesses identified above.

Many of the witnesses that have been identified are in the control of the Defendant and/or are unable to voluntarily execute affidavits for fear of retaliation.  Witnesses such as Mr. O'Brien were not willing to voluntarily formally participate in this law suit absent the protection of a subpoena.  (See page 27 of Exhibit A).  Other witnesses such as Ms. Lish and Mr. Steiber  were unwilling to provide formal testimony absent the protection of a subpoena.  This leaves Plaintiff in the untenable position of having no way to produce additional formal evidence that clearly will establish motive and pretext absent the ability to depose these individuals.

The Defendant objects to the increase based almost exclusively on an unfounded assertion

---

[3] Although only 22 witnesses are identified, Plaintiff requests that he be permitted to take a total of 25 depositions. There are several other former employees of Bonneville that may have relevant information, such as Patty Cochran, Patti Fears, Annie Block, Eric Stenberg and Maribeth Doran.  Depending on the deposition testimony that is elicited, their testimony may be necessary.  Furthermore, it is possible that additional witnesses with relevant information

that the witnesses listed by Plaintiff have cumulative or irrelevant information. This assertion is completely unsupported by Defendant's own discovery responses and is absolutely incorrect. In fact, each of the witnesses identified is expected to render testimony that is directly relevant to the Plaintiff's claims or the Defendant's defenses, and is essential to establishing that the Defendant's proffered reasons for the employment decisions at issue were and are pretext

It is Defendant's position that Plaintiff should be limited to deposing the individuals it contends were the principle decision makers as well as Plaintiff's expert. As illustrated above, it is unlikely that evidence of pretext and motive will be elicited from the testimony of the decision makers themselves. However, it is necessary to take the depositions of these individuals so that the Plaintiff can fully investigate what the proffered reasons for each employment decision are, so that Plaintiff can establish through other testimony and evidence that each of the proffered reasons for each of the employment decisions was pretext. Plaintiff should not be precluded from conducting discovery into the very areas which are required by law in order to establish a claim of discrimination under the DCHRA.

Furthermore, Plaintiff should be permitted to conduct discovery into issues related to the qualifications and reputation of Mr. Spacciapoli, as compared to Mr. Donohoe.

The number of witnesses that Plaintiff has requested to depose is not unreasonable given the complexity of the issues, the number of employment decisions involved, and the number of witnesses that have been identified as having participated in or as having relevant information regarding those decisions. Contrary to Defendant's assertion, Plaintiff has not requested a threefold increase from fourteen to fifty depositions (Defendant Opposition, page 9) and Plaintiff has not requested the opportunity to depose all of the individuals that were involved in the Reduction in

---

may be identified during the course of discovery.        17

Force (Defendant's Opposition, pp. 7 and 9).  Plaintiff has focused on those witnesses that Plaintiff believes, in good faith, have knowledge that is directly relevant to the critical issues of this case.

The Magistrate's refusal to grant leave to take additional depositions constitutes an abuse of discretion is clearly erroneous and is severely prejudicial to the Plaintiff.  In the case at bar, which involves multiple decisions in which motive and intent are at issue, limiting Plaintiff to seven depositions effectively prohibits Plaintiff from obtaining evidence that is critical to establishing motive and pretext.  Accordingly, the Magistrate's ruling should be overturned, and the Plaintiff should be permitted to take additional depositions.

WHEREFORE, Plaintiff Leo Donohoe respectfully requests the Court to reverse the Order of the Magistrate Judge, and modify the provisions of the October 26, 2007, Scheduling Order by increasing the number of depositions that Plaintiff is allowed to take in this matter from seven (7) to twenty-five (25)..

Respectfully submitted,

CARR MALONEY, P.C.

By: _____

Thomas L. McCally,#391937
1615 L Street, NW
Suite 500
Washington, D.C.  20036
(202) 310-5500 - phone
(202) 310-5555 - fax

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this <u>2nd day of May, 2008</u>, a copy of the foregoing was sent via electronic filing to Richard Cys, Esquire, Davis, Wright, Tremaine, LLP, 1500 K Street, NW, Suite 450, Washington, DC 20005, Attorney for Defendant.


_____
Thomas L. McCally

# EXHIBIT A

exhibits

1

2                    In the U.S. District Court

                For the District of Columbia

3

            --------------------------------x

4                                           :

Leo Donohoe                                 :

5                                           :

                        v.          : NO. 07-949

6                                           :

Bonneville International            :

7    Corp.                                  :

                                            :

8           --------------------------------x

9                        April 22, 2008

10    DEPOSITION OF:

11                        Mark O'Brien,

12    a witness, called by counsel pursuant to notice,

      commencing at 10:00 a.m. which was taken at Carr

13    Maloney, 1615 L Street, NW, Washington, DC

14

15

16

17

18

19

20

21

Page 8

```
 1    Maryland 20878.

 2         Q.    What's your age?

 3         A.    50.

 4         Q.    Would you give me a rundown of your

 5    educational background?

 6         A.    Went to the University of Maryland for two

 7    years, did not finish.

 8         Q.    Would you give me a rundown of your

 9    employment background?

10         A.    Starting when?

11         Q.    Why don't we start when you got out of

12    college?

13              Let me ask it this way.  Have you been in

14    radio or radio sales your entire career?

15         A.    I've been in radio since 1986.

16         Q.    Why don't we take it from there?

17         A.    Okay.  Started in sales at DC 101 in the

18    early part of 1986.  It was for a year; went to work

19    for WTOP in a sales capacity, was promoted to sales

20    manager in a year and stayed sales manager there for

21    approximately a couple of years, was moved over to
```

1    be a sales manager at WASH FM.

2        Q.    When you say moved on to be a sales

3    manager --

4        A.    Same company owned the two stations.

5        Q.    Who owned that?

6        A.    At that time it was Outlet Communications,

7    I believe.  There's been a lot of companies, a lot

8    of mergers but I believe it was Outlook

9    Communications.

10        Q.    WTOP sales and sales manager was from 1987

11    through what date?

12        A.    Approximately up to late 1988, and 1989 I

13    went to WASH.

14        Q.    As a sales manager?

15        A.    Sales manager role.

16        Q.    How long did you stay at WASH?

17        A.    I was there approximately a year and then

18    moved back over to WTOP, again same company owned

19    both radio stations, in a sales management role.

20        Q.    1989 until what in that role?

21        A.    Probably a couple of years total between

Page 11

1              Left on my own accord some time in March of

2     2000.

3          Q.    For what reason?

4          A.    The company just merged with a large

5     company.   I didn't agree with their philosophy.

6          Q.    What company did it merge with?

7          A.    Clear Channel Communications.

8          Q.    Outlet Communications merged with Clear

9     Channel or was it --

10         A.    I'll try to give you the best recollection

11    I can on that beginning with that 1986 date.

12              I believe it went from Outlet

13    Communications -- this is tough.   Outlet to -- there

14    was a company in Rhode Island, another company.   I'm

15    drawing a blank.

16         Q.    Was Bonneville in that chain of ownership

17    at any time?

18         A.    No.   Well, I never worked for Bonneville

19    during that time period.

20              They purchased WTOP with a few other

21    stations I want to say in the late nineties.   I

Page 12

```
 1    don't remember when.  But I never worked for them

 2    during that time period.

 3         Q.   Who was the merger partner with Clear

 4    Channel in 2000 when you left?

 5         A.   That was a company called AM/FM

 6    Communications that was merged into Clear Channel

 7    with some other companies.  It was a large merger.

 8         Q.   You left because you didn't agree with

 9    what?

10         A.   Clear Channel ran their stations based on

11    a market philosophy and not an individual basis

12    where there was one market manager for the entire

13    group of radio stations within a given market and I

14    didn't think that was the right way to do it.

15         Q.   Why not?

16         A.   I thought that companies, if they did

17    that, would cut their expenses so much that stations

18    wouldn't be run properly and the larger stations

19    would end up doing very well and the mediocre and

20    smaller ones would never have a chance to get out of

21    that position.
```

1    Q.    That would be across the formats as well?

2    A.    Yes.

3    Q.    Any problem with that, all formats being

4    sold under one management scheme, so to speak?

5    A.    I think it eliminates individuality and

6    creativeness.  I think it's difficult for even one

7    talented person to pull that off.

8    Q.    What about the sales of stations with

9    different formats, say news format versus talk

10    versus music versus classical, did those require

11    different types of approaches to the sales?

12    A.    All formats would take different talents.

13    Some are easier than others to sell.  Some are not.

14    To be specific, the best formats to sell if

15    you are in sales and broadcasting traditionally have

16    been the news or news talk type formats.

17    Q.    What are the harder ones?

18    A.    The harder ones are the formats that have

19    multiple competitors.  That would be most music

20    formats.

21    Generally news and news talk stations don't

Page 14

1    have as many competitors as the music stations

2    would.

3        Q.    What about classical music?

4        A.    Classical music had been a dying format

5    when I got in the business and continued to die off

6    and I don't believe there was many left even in the

7    nineties around the country.

8            It was a difficult sale, mostly because the

9    people that listen to the station are a little on

10   the older end of the demographic that is out there

11   for advertisers.

12           So it's a challenging sale.

13       Q.    When you left in 2000 where did you go?

14       A.    Left in 2000.  I didn't go anywhere until

15   some time in I guess late November of 2000 at which

16   point I took a position as VP/GM with Bonneville

17   International.

18       Q.    What stations did they have at the time?

19       A.    At that time I was assigned to what was

20   then known as Z 104.  I'm drawing a blank on the

21   call letters.  WWBZ and WWZZ FM I believe were the

1   call letters.

2        Q.   During these time periods did you ever

3   work with Mr. Donohoe?

4        A.   Yes.

5        Q.   What time periods would those be?

6        A.   Leo and I started working together at

7   DC 101 back in 1986.  That's when I first met him.

8   He actually went over to WTOP I believe before me

9   when I moved over there or right after me.  We were

10  close.

11       Q.   Is that around 1987?

12       A.   1987 I guess was the number, right around

13  there.  We missed each other by a couple of months

14  one way or the other.

15            We worked together on the same staff and he

16  ended up working for me.

17       Q.   That was when you became sales manager at

18  WTOP from 1989 to 1991?

19       A.   Whatever year it was, the late eighties

20  some time.

21       Q.   You were above Leo when you were sales

1    manager at TOP?

2        A.    Yes.

3        Q.    What was Leo selling in 1989, in that

4    timeframe when you were sales manager at TOP?

5        A.    My experience with Leo was he was an

6    account executive which meant he would call on local

7    accounts.

8             Primarily at that time in his career most of

9    them would be direct accounts.  To specify, that's a

10   non-advertising agency account.

11       Q.    When you say non-advertising agency, you

12   mean -- is that the equivalent of a rep firm?

13       A.    It's the equivalent of calling on an

14   individual car dealer as an example instead of going

15   through the advertising agency who works for that

16   individual car dealer.

17       Q.    Is an advertising agency known as a rep

18   firm?

19       A.    No, two different things.

20       Q.    Explain that difference for me.

21       A.    A rep firm is just that.  It's a

MARK O'BRIEN DEPOSITION          April 22, 2008          Donohoe v. Bonneville
Case 1:07-cv-00949-RWR-DAR          Document 20-2          Filed 05/02/2008          Page 11 of 16

Page 17

 1    representative firm that is hired by radio stations

 2    that has offices throughout the country, primarily

 3    in New York, the major markets, that represent that

 4    radio station for national sales.

 5         Q.    That would be a Katz or Crystal?

 6         A.    Katz, Crystal, now today Clear Channel has

 7    their own rep firm, CBS has their own rep firm.

 8         In those days there was a lot more rep

 9    firms.  Thinking back, I think Katz was one of our

10    clients back them, probably Crystal, probably all of

11    them, because you did go through them based on

12    performance.

13         Q.    Based on their performance?

14         A.    Yes.

15         Q.    That relationship between the rep firm and

16    the station, explain that for me if you would.

17         A.    The relationship is the rep firm as a

18    sales force.  Usually in New York, Los Angeles,

19    Chicago, Boston, Atlanta, Dallas, the larger

20    markets, those salespeople could be selling 3, 400

21    stations for different companies.

Page 18

1        They also represent you on what is called a

2   veiled business.   A veiled business comes from an

3   advertising agency.   It is literally veiled.

4        They come to you and say we're going to be

5   on the air in May in Washington.   Here are our

6   demographics.   We're trying to reach this group of

7   people.   Here is the name of the client.   Here is

8   the cost basis we're looking for.   You are entitled

9   at that point to bid on the business.

10       That salesperson in New York, Chicago, LA,

11  wherever they are, is representing you to that ad

12  agency.

13       Q.   That rep firm is representing the local

14  station?

15       A.   Correct.

16       Q.   To the ad agency?

17       A.   Correct.   They work with, usually, a

18  national sales manager at the individual radio

19  station who guides them through the process, gives

20  them the rates, whatever else they may need or

21  require to get that deal done.

Page 19

1      Q.    From the late eighties until early

2   nineties when you were sales manager at WTOP and

3   Mr. Donohoe was working under you, did that ever

4   change?

5      A.    When I went to WASH in a management role

6   Leo did not work for me.  He was still with WTOP.

7      Q.    That was 1994 through about 2000?

8      A.    I went there in a sales management role

9   which was some time in 1989.  At that point he did

10  not work for me.  We still worked in the same office

11  and the same company but he didn't work for me at

12  that point.

13     Q.    I have 1989 to 1991 you went back to TOP

14  as sales manager?

15     A.    After my WASH management role I went back

16  over to TOP.

17     Q.    Was Mr. Donohoe underneath you then in the

18  management chain?

19     A.    He was.

20     Q.    Still an account executive?

21     A.    Still as an account exec.

Page 20

```
 1          Q.    Then you became director of sales for both

 2    stations, TOP and WASH?

 3          A.    Yes.

 4          Q.    Was he still underneath you in that

 5    capacity?

 6          A.    Yes.

 7          Q.    Did that end in 1994 when you became VP

 8    general manager of WASH?

 9          A.    Yes.

10          Q.    Was Mr. Oxley working in any of those

11    stations at that time?

12          A.    Joel worked for WASH and WTOP when we

13    combined the sales force some time in the early

14    nineties.

15          Q.    What was his role?

16          A.    He was originally an account executive and

17    then was promoted to national sales manager.  I do

18    not recall the year.  That was for both of those

19    stations.

20          Q.    During that time was Mr. Donohoe selling

21    sports for the stations?
```

Page 22

1      four years during that mixture of time period.

2          Q.    That would be the late eighties through

3      the early nineties?

4          A.    Correct.

5          Q.    How did he do in sales in general under

6      you?

7          A.    Leo was always a good performer, very

8      budget, goal oriented.

9              He would always outperform the majority of

10     the staff and you could count on him to reach his

11     annual goal.

12         Q.    Is hitting budget an important thing in

13     sales?

14         A.    In my opinion, it's the only thing.

15         Q.    In 2000, November of 2000 VP/general

16     manager of Bonneville at the Z 104 station, I'm

17     going to call it Z 104 rather than all the call

18     numbers, in that role, how long did you stay in that

19     role?

20         A.    Approximately three years.

21         Q.    Why did you leave that role?

```
 1   time limit, a couple of years in that role, maybe

 2   three years, and then was promoted at some point in

 3   the latter nineties to the national sales manager

 4   role at WASH.

 5          So he never worked directly for me.  I was

 6   the general manager.

 7      Q.   You were the head person?

 8      A.   Yes, but I did recruit him over to the

 9   company.

10      Q.   As the general manager, the top person in

11   the management chain, I understand he didn't work

12   directly for you but he was under your management

13   chain, is that correct?

14      A.   Correct.

15      Q.   Did you work with him anywhere else?

16      A.   No.

17      Q.   That was the WASH time period?

18      A.   Yes.

19      Q.   Now --

20      A.   He did, just to correct that, he did come

21   over to work for Bonneville but did not work with me
```

# EXHIBIT B

exhibits

```
 1
 2                In the U.S. District Court
                 For the District of Columbia
 3
      --------------------------------x
 4                                    :
      Leo Donohoe                     :
 5                                    :
                   v.                 : NO. 07-949
 6                                    :
      Bonneville International        :
 7    Corp.                           :
                                      :
 8    --------------------------------x
 9                   April 22, 2008
10    DEPOSITION OF:
11                      Jean Fowler,
12    a witness, called by counsel pursuant to notice,
      commencing at 12:45 p.m. which was taken at Carr
13    Maloney, 1615 L Street, NW, Washington, DC
14
15
16
17
18
19
20
21
```

Page 10

1    opportunities as well as I go out and get new

2    business for the station.

3              So I cold call, look for leads, prospects,

4    make appointments and try to get people to be on

5    air, to be on line to brand their companies or

6    whatever they are trying to do.

7         Q.   When you talked about on line, that's

8    sales of on line advertising on the WTOP website?

9         A.   WTOP and Federal News Radio as well.

10        Q.   Who do you sell for, WTOP --

11        A.   WTOP, Federal News Radio and now 3WT.

12        Q.   Those are all Bonneville stations in this

13   market?

14        A.   Yes.

15        Q.   When you talked about on line, that's for

16   ad sales on the website?

17        A.   Yes.

18        Q.   Scheduling of air time you said as well,

19   that's for ads on the air, on the radio waves,

20   correct?

21        A.   Yes.

1          Q.    You are in local sales?

2          A.    Yes.

3          Q.    What's the difference between local sales

4     and what you do and national sales?

5          A.    National sales, I believe they work with a

6     rep firm and I just go around locally mostly to a

7     lot of the local people around here in town to get

8     new business and with the advertising agencies

9     mostly that are locally here.

10         Q.    Your compensation package, how does that

11    work?  What is your pay scale or compensation

12    package?  I take it you get a commission?

13         A.    Yes.

14         Q.    What is your compensation package made up

15    of?

16         A.    It's made up of advertising agencies, what

17    you get if you sell to an advertising agency, if

18    it's a 60 second commercial or a 30 second

19    commercial, if it's internet.

20              Each station is priced differently.  Well,

21    priced differently, but also you are compensated

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

LEO DONOHOE,                          :
                                      :
     Plaintiff,        :
                                      :
v.                                    :    Civil Action No.: 07-949 (RWR)
                                      :
BONNEVILLE INT'L CORP.,               :
                                      :
     Defendant.        :

### AMENDED NOTICE OF 30(b)(6) DEPOSITION

PLEASE TAKE NOTICE that on the 5th day of May, 2008, at 10:00 a.m., pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Plaintiff, Leo Donohoe, by counsel, will take the deposition of the Defendant, Bonneville Int'l Corp., through one or more of its designated officers, directors, partners, managing agents, or other persons who consent to testify on its behalf, by oral examination, before a Notary Public or anyone authorized to administer oath and due form of law, in the law offices of CARR MALONEY P.C., 1615 L Street, NW, Suite 500, Washington, DC 20036.

Defendant Bonneville Int'l Corp., is required to designate one or more of its officers, directors, partners, managing agents, or other persons who consent to testify on its behalf, in each of the following areas:

### SEE AMENDED ATTACHMENT A

PLEASE TAKE FURTHER NOTICE, pursuant to Rule 30(b)(5) of the Federal Rules of Civil Procedure, that each corporate designee or designees shall be required to bring with him the originals of all documents specified in Amended Attachment A herein, to be inspected and copied

by counsel for Plaintiff, Leo Donohoe.  The deposition will be taken for the purpose of discovery

or as evidence in the captioned cause, or both, and shall continue from day to day until complete.

The deposition may be recorded by videotape and/or audiotape.

Respectfully submitted,

CARR MALONEY P.C.

By:_____

Thomas L. McCally, #391937
1615 L Street, NW, Suite 500
Washington, DC 20036
Attorney for Plaintiff
(202) 310-5506/(202) 310-5500 (FAX)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of  April, 2008, a copy of the foregoing was
sent via e-mail to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue,
NW, Suite 200, Washington, DC  20006 Attorney for Defendant.

_____

Thomas L. McCally

## AMENDED ATTACHMENT A

1.    Reasons for which Bonneville decided to implement a Reduction in Force, both locally and nationally in 2006.

2.    How Bonneville determined who would be affected by the Reduction in Force, and who would be exempted from the Reduction in Force, in Washington, DC, in 2006.

3.    The names of individuals affected by the Reduction in Force in Washington, DC, in 2006 and their ages.

4.    The reasons for which WGMS employees were affected by the Reduction in Force when WGMS continued to broadcast after the 2006 Reduction in Force.

5.    The names, ages and salary of all individuals who worked for WTOP who were included in the Reduction of Force in January 2006 and why they were included.

6.    The names, ages and salary of all individuals whose employment was terminated as a result of the Reduction in Force, both locally and nationally, in 2006.

7.    The names, ages and salary at the time of rehire, of all individuals whose employment was terminated as a result of the Reduction in Force, both locally and nationally, in 2006, but who were ultimately rehired by Bonneville.

8.    All complaints made against Matt Mills, whether formal or informal, alleging unlawful business practices.

9.    All complaints made against Bonneville Int'l Ltd. and/or any of its management level employees for unlawful employment practices.

10.    Katz Radio Group and/or its employees' roles in Bonneville's decisions who to hire/rehire following the Reduction in Force in 2006.

11.    Katz Radio Groups and/or its employees' roles in all other employment decisions made by Bonneville Int'l Ltd.

12.    Mike Spacciapolli's work performance prior and subsequent to the Reduction in Force in 2006.

13.    Leo Donohoe's work performance prior and subsequent to the Reduction in Force in 2006.

14.    The decision to rehire Mike Spacciapolli over Leo Donohoe subsequent to the Reduction in Force in 2006.

15.    The changes and similarities between the National Sales Director position prior and subsequent to the Reduction in Force in 2006.

16.    The decision to transfer Mike Spacciapolli from National Sales Director/Sports Sales to Local Sales Manager in July 2006.

17.    Any and all complaints of discrimination received following the January 2006 Reduction in Force.

18.    The investigation into Mr. Donohoe's complaints of discrimination.

19.    Bonneville's total net financial worth for the years 2003 through the present.

20.    Michael Spacciapoli's involvement with the negotiation and finalization of the terms and conditions of Bonneville's contract with the Nationals baseball team.

21.    All budget information for Bonneville's sale of sports from 1997 through 2007, including who was responsible for selling, how such sales were made, whether those individuals made their budgets, what the budgets were and how this number was determined.

22.    The identity of the author of BIC 006786-6796 produced by Bonneville in response to Plaintiff's request for production of documents, the meaning of each paragraph of the document, the source of the information based upon which the document was created; the identities of persons referred to in the provision referring to employees who worked predominantly for WTOP and the meaning of that provision.

23.    The salary structure of the Local Sales Manager position from 2002–2007.

24.    The salary structure of the National Sales Manager position from 2002-2007.

25.    The budgets for all sales between 2002 and 2007, including budgets for National Sales, Local Sales and Sports Sales, and whether individuals responsible for such sales made their budgets.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| LEO DONOHOE, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | Civil Action No.: 07-949 (RWR) |
| | : | |
| BONNEVILLE INT'L CORP., | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S RESPONSES AND OBJECTIONS TO
### PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Local Rule 26(C), defendant Bonneville International Corporation ("Bonneville"), by its undersigned counsel, hereby submits its responses and objections to Plaintiff Leo Donohoe's First Set of Interrogatories.

By responding to Plaintiff's Interrogatories, Defendant does not waive any objections to the relevance, materiality, authenticity, or admissibility of any of the interrogatories. Defendant expressly reserves all objections to the use, at hearing or otherwise, of information provided in these responses.

### GENERAL OBJECTIONS

Defendant makes the following general objections to Plaintiff's Interrogatories on the ground that they require Defendant to furnish Plaintiff with information beyond what is required by Fed. R. Civ. P. 26 and 33. Where appropriate, the General Objections are specifically incorporated into individual objections but are intended to apply to all Interrogatories.

1.    Defendant objects to the definitions and instructions provided in pages 1-3 of Plaintiff's Interrogatories to the extent they purport to impose upon Defendant duties and/or responsibilities greater than those imposed by the Federal Rules of Civil Procedure.

written or oral.

ANSWER: Defendant incorporates by reference the foregoing general objections.
Defendant also objects to Interrogatory No. 8 because the request is not reasonably limited in
scope, not reasonably calculated to lead to the discovery of admissible evidence in this case, and
is overbroad and unduly burdensome. Subject to and without waiving these objections,
Defendant states that Joel Oxley has heard the occasional informal complaint from employees
about Matt Mills, as he does any manager, and none have been out of the ordinary. For example,
Patrick Puglisi complained orally to Bonneville HR manager that Mr. Mills was not specific in
one area of critique during Mr. Puglisi's annual review.


9.      Please describe in detail all facts, identify all documents, and identify all
witnesses having knowledge of such facts or documents, which pertain, relate or refer in any way
to the involvement of Katz Radio Group, in any employment decisions made by Bonneville from
January 1, 2003 through the present time, including but not limited to employment decisions
regarding the 2006 RIF referred to in your Answer to paragraph 18 of the Complaint and the
selection of individuals to fill open positions after the implementation of the RIF.

ANSWER: Defendant incorporates by reference the foregoing general objections.
Defendant also objects to Interrogatory No. 9 because the term "involvement" is vague.
Defendant further objects to the extent Interrogatory No. 9 seeks information outside the scope,
geographic or otherwise, of the DC Radio Group, *i.e.*, WTOP, WGMS, WTWP, and WFED, and
because the request is not reasonably limited in scope, not reasonably calculated to lead to the
discovery of admissible evidence in this case, and is overbroad and unduly burdensome.

Subject to and without waiving these objections, Defendant states that Joel Oxley and

10

Matt Mills attended a meeting in January 2006 with John Hesano, currently Vice President, General Sales Manager of Eastmond Radio, Christine Travaligni, General Sales Manager of Christal, Matt Kluft, New York Sales Manager of Katz Radio, Scott Porretti, Vice President, Sales Manager, Katz Radio and Mark Clowers, New York Manager, Christal Radio. The Katz and Christal representatives at the meeting held the opinion that Michael Spacciapolli was the superior candidate over Leo Donohoe for the newly created Bonneville position of Director of National Sales/Sports Sales, based on prior experience with Messrs. Spacciapolli and Donohoe. Mark Grey, then President of Katz Radio, also shared his opinion with Joel Oxley and Matt Mills that Mr. Spacciapolli was better organized and more effective than Mr. Donohoe. Sari Fruitbine, Senior Account Manager for Katz, shared the opinion that Mr. Spacciapolli was the better candidate. Defendant also will produce, subject to a protective order, e-mails between Katz and Defendant, post-RIF and offer, which reflect Katz's support for the decision to hire Mr. Spacciapolli for the new position, BIC 000711, 713-15, as well as a 2000 Katz survey of Northeast National Sales Managers, BIC 000186-189.

10.    Please identify all instance in which Bonneville has relied on any third party, including but not limited to Katz Radio Group, in making decisions related to recruiting, selection, interview, employment and/or the termination of employment of any person seeking employment or employee(s) employed by at Bonneville during the time period that Mr. Donohoe was employed by Bonneville up through the present time. Please include in your answer a detailed description of the involvement of the third party, identify the position(s) that were involved, identify all persons involved including applicants, employees of Bonneville and/or employees of the third party, and identify all documents that relate or refer in any way to the

11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| LEO DONOHOE, | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 07-949 (RWR) |
| | : | |
| BONNEVILLE INT'L CORP., | : | |
| | : | |
|     Defendant. | : | |

**O R D E R**

UPON CONSIDERATION of Plaintiff's Objection to Magistrate Judge Deborah Robinson's Order of 4/23/08 Denying Plaintiff's Motion for Leave to Take Additional Depositions, it is by this Honorable Court on this ___ day of _____, 2008

ORDERED that plaintiff's Motion for Leave to Take Additional Depositions be GRANTED.

_____
Judge

cc:   Thomas L. McCally, Esquire
      Carr Maloney P.C.
      1615 L Street, N.W., Suite 500
      Washington, D.C.  20036

      Richard Cys, Esquire
      Davis Wright Tremaine LLP
      1500 K Street, N.W.
      Suite 450
      Washington, DC  20005