IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## CIVIL DIVISION

LEO DONOHOE,                          )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )          Civil Action No.: 07-949 (RWR)
                                      )
BONNEVILLE INT'L CORP.,               )
                                      )
        Defendant.                    )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER AND REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY

In its Opposition, Bonneville presents to this Court its interpretation of the facts in this case. The facts as presented by Bonneville, however, are contradicted by Bonneville's own representatives' testimony and its own documents. These contradictions demonstrate precisely why Mr. Donohoe is entitled to the discovery he seeks, and why his requests are not "inappropriate, duplicative or harassing," as Bonneville has erroneously represented.

Bonneville represents to this Court that after the RIF, Mr. Donohoe's position was eliminated. Opp. at p. 3, n.5. However, by Bonneville's own 30(b)(6) designee's admission, this is simply wrong. First, Mr. Donohoe's pre-RIF position consisted primarily of national sales for WTOP, followed by his responsibilities as the only national sales director for WGMS and WFED. *See* 30(b)(6) deposition, Exhibit 1, at p. 141:6-142:4; 185:6-8. Following the RIF, each of Mr. Donohoe's duties and responsibilities - national sales for WTOP, WGMS and WFED - continued. *Id.* at p. 140:15-20; 181:13-16. Aside from the effects of the strengths of the

stations' new signals, the only difference in the pre- and post- RIF National Sales position was the addition of national sales for WTWP, a long form news radio station, and oversight of the sports sales budget. In fact, the vast majority of the sales responsibility for the post-RIF position was WTOP ($8.6 million budget) and WGMS ($2.2 million budget). The smallest components of the position were sports sales ($1 million budget) and sales of WTWP ($700,000 budget).

Notwithstanding its position to the contrary, Bonneville has already admitted that Mr. Donohoe was qualified for the post-RIF National Sales Manager/Sports Sales position. *See* 30(b)(6) deposition at p. 286:7-289:13. Bonneville admits Mr. Donohoe was qualified for the post-RIF position because:

(a)    "He had been a national sales manager. So he had overseen national sales at WTOP and WGMS which was, WTOP was going to be continuing in a very similar vein."

(b)    "GMS would have less ratings, but he had been involved with WGMS."

(c)    "He had sold sports before, so he had sold Orioles baseball . . . like '86 through 2000. So he had, you know, he had some knowledge of baseball."

(d)    "He did the same position every year. He sold it every year . . . "

(e)    "I thought Leo was a good guy. I thought he was a good guy. He got along, a lot of people liked him. He got along with a lot of people. He was a good guy. Likable. Good personality.

(f)    "[L]eo did a solid job."

(g)    "His rates moved up over the years . . . "

(h)    "[H]e had a good relation with the Katz people.

*Id.*

Clearly faced with the fact that Mr. Donohoe was indisputably qualified for the post-RIF national sales position, Bonneville is forced to assert that the younger Spacciapolli was more

qualified. Opp. at p 3-4. The simple fact is: he was not. First, Bonneville's corporate designee admitted that Mr. Donohoe was more qualified than Mr. Spacciapolli to sell news (WTWP) and classical music (WGMS) formats. *See* 30(b)(6) deposition at p. 322:13-21. Second, prior to his being hired to fill the National Sports Director/Sports Sales position on January 18, 2006, Mr. Spacciapolli had **never** sold talk format, **never** sold news; **never** sold classical; **never** sold WFED; **never** sold WTWP; and, had **less than one year** of experience selling sports. *See* 30(b)(6) deposition at p. 112:1-4, 300:16-302:2, 389:2-4. Mr. Donohoe, on the other hand, successfully sold sports for twelve (12) years. He also had sold news/talk format for almost twenty (20) – experience that Bonneville's own corporate designee testified was "important" to the "new" National Sales Director/Sports Sales position. *See* 30(b)(6) deposition at p. 23:21-26:2; 75:2-13.

Running from the fact that Mr. Donohoe had extensive experience performing the actual essential functions of the job, Bonneville rests heavily on its assertion that Mr. Spacciapolli was more qualified to sell sports on a national level because he "had previous experience managing Account Executives for sports sales." *Id.* Bonneville's own Director of Sales, Matt Mills, who also directly supervised Mr. Spacciapolli testified, however, that it was **not** the duty or responsibility of the National Sales Director/Sports Sales to supervise the Account Executives. Account Executives (AEs) are local sales personnel at Bonneville and, therefore, are supervised by the Local Sales Manager. As Mr. Mills testified, Mr. Goldstein, *not Mr. Spacciapolli* supervised the daily activities of the AEs. The National Sales Director/Sports Sales merely supervised *the budget* for sports sales – a job Mr. Donohoe was also qualified to handle. *See* deposition of Matt Mills, Exhibit 2, p. 381 – 382.

Bonneville also relies on its assertion that, even though he had only sold sports for a matter of months, compared to Mr. Donohoe who sold the Orioles for 12 years, Mr. Spacciapolli was more qualified to sell sports because he had "a strong relationship with the Washington Nationals baseball team, and had been integral in Bonneville's negotiations with the Nationals to broadcast Nationals' baseball games." *Id.* at p. 4. What Bonneville does not inform the Court, however, is that Mr. Spacciapolli only had that experience because Bonneville handed it to him. Prior to this opportunity, Mr. Spacciapolli had never sold sports locally or nationally. *Id.* at 112:1-4. Bonneville handed Mr. Spacciapolli the opportunity to meet with the Nationals representatives only because the games were going to be carried on WWZZ, which is where Mr. Spacciapolli worked at the time. *See* 30(b)(6) deposition 111:4-8; 114:21-155:5. Furthermore, the corporate designee for Bonneville testified that it was he, Joel Oxley, who had primary responsibility for negotiating the Nationals contract in 2005. *See* 30(b)(6) deposition at p. 109:6-21; 110:1-18. Mr. Spacciapolli primary responsibility was drafting the contract with the attorneys. *Id.* at p. 110:6-12.

Bonneville goes on to claim that the younger Spacciapolli was hired to perform the same duties and responsibilities Mr. Donohoe had previously performed because "he had been employed by and was well regarded by representatives of Katz." *Id.* This reason is nothing more then a red herring. Bonneville's corporate designee testified, under oath that Katz' opinion regarding Mr. Spacciapolli over Mr. Donohoe, assuming it to be true, was "fairly irrelevant." *See* 30(b)(6) deposition at p. 350:12-351:3. Moreover, at the time its representatives allegedly made the recommendation for Mr. Spacciapolli over Mr. Donohoe, Katz had ***never even worked with Mr. Spacciapolli***. Katz had no basis for preferring Mr. Spacciapolli to Mr. Donohoe.

To the contrary, it is undisputed that Mr. Donohoe was very well regarded by representatives of Katz. He was undeniably well regarded by Katz after having actual experience working with them on a daily basis for years.

Bonneville also neglects to tell the Court is that by Bonneville's own RIF plan, employees who worked primarily for WTOP, like Mr. Donohoe, were specifically *excluded* from the January 2006 RIF – that is, except Mr. Donohoe. *See* 30(b)(6) deposition at p. 174:1-21, 175:13-21. He was the **only** individual who worked primarily for WTOP who was included as part of the WGMS RIF.[1] *Id.*

Moreover, Bonneville is quick to point out that fifty-one employees were included in the RIF and only ten were re-hired. *Id.* at p. 3. What Bonneville does not explain is that fifty-one were included because all WWZZ positions were abolished. WGMS, on the other hand, continued to function and all ten employees were hired to sell, at least in part, WGMS (only twelve days following the RIF). Of the ten (10) employees re-hired following the RIF, nine (9) were under 40; and, the only over-40 individual re-hired following the RIF was re-hired into a lesser position from which she was RIF'd.

Mr. Donohoe has the right to discover all information necessary to discern the truth from the lies; the legitimate business reasons from the pretext. As the above clearly demonstrates, the only way Mr. Donohoe is going to be able to do this is if his motion to compel is granted.

## I. ARGUMENT

Mr. Donohoe is entitled to all documents reasonably calculated to lead to the discovery of admissible evidence in this case. In light of the fact that Bonneville is a major corporation and

---

[1] Mr. Kleiner, Donohoe's assistant, was also included in the RIF, but he was rehired 12 days later. Mr. Kleiner is in his twenties.

Mr. Donohoe is a single individual, Bonneville is in exclusive possession of most of those documents.

Throughout this discovery process, Bonneville has used its Goliath status to pick and choose what documents it believes Mr. Donohoe should have. Moreover, Bonneville has failed to produce documents in a timely fashion, leading to prejudice against Mr. Donohoe on more than one occasion.[2] Bonneville's attempts to cherry-pick what documents Mr. Donohoe should be able to use as evidence in this case continues through its Opposition to Mr. Donohoe's motion to compel and Motion for Protective Order.

### A.    Documents Regarding Bonneville's 2006 Reduction in Force

In response to Mr. Donohoe's motion to compel documents regarding Bonneville's reduction in force, Bonneville's response is that it is "even double-checking its search for relevant documents and will be produce (sic) any additional responsive, non-privileged documents." Opp. at p.7. This response simply is not good enough. Mr. Donohoe has been entitled to these documents for months, and discovery closed on May 16, 2008. All of its efforts to determine whether such documents exist should have been completed. Mr. Donohoe is being prejudiced by piecemeal document production.

Bonneville also calls Mr. Donohoe "absurd" for not believing their word that no other documents exist. Apparently, Bonneville is not certain itself, because it is still "double-checking" whether such documents exist. Furthermore, Mr. Donohoe has every right to question Bonneville's veracity in this regard. As set forth in Mr. Donohoe's motion for leave to depose Mr. Mills for additional time, this would not be the first time Bonneville represented that documents do not exist, only to have them surface after the critical witnesses are deposed.

---

[2] Mr. Donohoe refers to and incorporates his motion for leave to depose Mr. Mills for additional time.

**B.    Bonneville's Sales and Financial Documents**

With regard to Bonneville's sales documents, Bonneville acknowledges that Mr. Donohoe requested monthly Miller Kaplan reports. Bonneville also states that it "is in the process of collecting and producing" these documents. Again, this is not enough. Mr. Donohoe has a right to examine these documents and use them, where necessary, in deposition questioning. Bonneville is apparently waiting until all such depositions are over before it will produce this relevant, discoverable information. Moreover, Bonneville states that it would not have any "theoretical objection" to producing sales documents comparing Mr. Donohoe to Mr. Spacciapolli, but then goes on to argue that it would not produce such documents anyway. These documents are essential to Mr. Donohoe's argument that he was the more qualified individual for the post-RIF position, and the motion to compel this information should be granted.

As for the financial information regarding gross income generated from sales, Bonneville does not dispute Mr. Donohoe's argument that the information is relevant to his direct claims of discrimination. Mr. Donohoe was National Sales Director for WTOP, WGMS and WFED. His performance, therefore, is reflected by his budgets, his rates and his sales records. Mr. Spacciapolli was National Sales Director of WWZZ and then Local Sales Manager for WWZZ. His performance is also reflected by budgets, rates and sales records. As its legitimate nondiscriminatory reason for selecting Mr. Spacciapolli over Mr. Donohoe, Bonneville has asserted that Mr. Spacciapolli was more qualified for the National Sales Director/Sports Sales position. The financial information is directly relevant to this alleged defense. The information will demonstrate whether Mr. Donohoe or Mr. Spacciapolli was more productive to the companies, and whether Mr. Spacciapolli was truly more qualified for the NSD/SS position.

Bonneville limits its opposition to documents regarding its net worth and argues that because _it_ does not believe that Mr. Donohoe will be able to make a case for punitive damages, it should not have to produce such information.   It is undeniable that this jurisdiction has not definitively resolved the issue of whether pretrial discovery of  financial information is appropriate. *D'Onofrio v. SFX Sports Group, Inc.*, 247 F.R.D. 43 D.D.C.,2008.  This court should follow the majority of federal courts that permit pretrial discovery of financial information of the defendant without requiring plaintiff to establish a prima facie case on the issue of punitive damages. *Randall v. County of Wyandotte*, No. 87-2580, 1988 WL 139522 (D.Kan. Dec. 5, 1988) (O'Connor, C.J.); *Baker v. CNA Ins. Co.*, 123 F.R.D. 322, 329-30 (D.Mont.1988); *St. Joseph Hospital v. INA Underwriters Ins. Co.*, 117 F.R.D. 24, 25-26 (D.Me.1987); *Marsillo v. National Surety Corp. (In re Bergeson)*, 112 F.R.D. 692, 696 (D.Mont.1986); *Fretz v. Keltner*, 109 F.R.D. 303, 310-11 (D.Kan.1986); *Renshaw v. Ravert*, 82 F.R.D. 361, 363 (E.D.Pa.1979); *American Benefit Life Ins. Co. v. Ille*, 87 F.R.D. at 542-43; *Lackawanna Refuse Removal, Inc. v. Procter and Gamble Paper Products Co.*, 26 Fed.R.Serv.2d 375, 376 (M.D.Pa.1978); *Miller v. Doctor's General Hospital*, 76 F.R.D. 136, 140 (W.D.Okla.1977); *Vollert v. Summa Corp.*, 389 F.Supp. 1348, 1351 (D.Haw.1975); *Holliman v. Redman Development Corp.*, 61 F.R.D. 488, 490-91 (D.S.C.1973); *See* also Annotation, Pretrial Discovery of Defendant's Financial Worth on Issue of Damages, 27 A.L.R.3d 1375, 1377 (1969) (most state courts permit pretrial discovery of defendant's financial condition without requiring a prima facie showing of entitlement to punitive damages).

Moreover, the requirement that claimant establish a prima facie case applies to the admissibility of evidence about financial status, not its discoverability. *Baker*, 123 F.R.D. at 330. Relevancy governs whether information is discoverable, not admissibility at trial. *St. Joseph*

*Hospital*, 117 F.R.D. at 25-26. "To require a prima facie showing of entitlement to punitive damages at this time, before the completion of discovery, could also be quite difficult for the plaintiff and would not be logical since the very purpose of discovery is to locate evidence to support a punitive damages claim. Furthermore, to deny discovery of net worth until plaintiff can make a showing of a prima facie case at trial would only lead to delay and confusion while plaintiff reviews the information for the first time." *See Mid Continent Cabinetry, Inc. v. George Koch Sons, Inc.* 130 F.R.D. 149 D.Kan., 1990 citing *St. Joseph Hospital*, 117 F.R.D. at 26.

### C.    Bonneville's File of Complaints of Harassment Against Matt Mills.

Bonneville attempts to minimize the admission by its former General Manager that a file of complaints of harassment against Matt Mills exists by stating Mr. Donohoe is relying on the faulty testimony of "a former employee." The General Manager, Mr. O'Brien, was the highest ranking individual at the station during his tenure.

Bonneville further asserts that it has searched Mr. Mills' *personnel file* and no information is contained within that file. As Mr. O'Brien testified, however, Mr. Mills' file was a separate file located at corporate headquarters. Bonneville has not represented that it has made a search for this *separate* file. Bonneville should be compelled to do so.

### D.    Donohoe's Supplemental Request for Documents and Request for Documents pursuant to 30(b)(6) Notice of Deposition

Bonneville continues to refuse to provide responses to any more than thirty (30) requests for production of documents including all of Mr. Donohoe's March 21, 2008, supplemental document requests, all documents requested pursuant to Donohoe's Rule 30(b)(6) notice of deposition and others. Bonneville, however, makes no mention of the fact that the Scheduling Order in this case does not limit requests for production of documents. Instead, it continues its baseless argument that the parties "stipulated" in their Rule 16.3 Statement that thirty (30)

requests per side would be sufficient. As set forth in the motion to compel, the parties did not make any such "stipulation." Instead, in their Rule 16.3 Statement, the parties indicated that, at the time they prepared the statement they "anticipated" that 30 requests per side would suffice. An "anticipation" is simply not equivalent to a "stipulation."

Neither this Court's order nor the Rules of this Court restrict Mr. Donohoe's ability to obtain the documentary evidence relevant to this case. Bonneville should not be allowed to unilaterally impose such restriction; instead, Bonneville should be compelled to provide all responsive documents.[3]

Alternatively, Donohoe continues to seek leave from this court to request the supplemental documents and documents pursuant to the 30(b)(6) Notice of Deposition to avoid undue prejudice and irreparable harm to him resulting from the arbitrary constraints placed on his ability to seek evidence and the truth as to why Bonneville terminated his employment in 2006.

### E.    Bonneville's RIF in San Francisco in 2006

Mr. Oxley testified on behalf of Bonneville that the decision to reorganize and RIF was not made exclusively by local managers. Instead, that decision was made with the knowledge, consent and approval of individuals at headquarters. *See* 30(b)(6) deposition at p. 152:11-15, 156:18-20; 157:7-158:12; 164:4-165:16. Based upon this testimony, Mr. Donohoe has the right to prove, both in his discrimination case and his claim for punitive damages, that the wrongful acts by the DC management was authorized and ratified by the corporation, not merely perpetrated by certain employees. *Lake Shore & Michigan Southern Railway v. Prentice*, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1883); *Franklin Investment Co., Inc. v. Smith*, D.C.App.,

---

[3] The validity of Bonneville's remaining objections to these requests will be determined by this Court's ruling on this motion to compel.

383 A.2d 355, 359 (1978); *Wardman-Justice Motors, Inc. v. Petrie*, 59 App.D.C. 262, 265, 39 F.2d 512, 515 (1930). One way to prove that the corporation was involved is to show that an executive officer of high rank participated in the misconduct or that Bonneville maintained a pattern and practice of terminating older workers and maintaining only the younger employees. *Wardman-Justice Motors, Inc. v. Petrie*, supra.

In his efforts to prove pattern and practice discrimination, Mr. Donohoe has reasonably limited his request to only the terminations resulting from the similar RIF in San Francisco. He has not requested data of all terminations in all jurisdictions in which Bonneville owns and operations stations across the nation. Mr. Donohoe's request for information regarding the San Francisco RIF is reasonably tailored, relevant and likely to lead to the discovery of admissible evidence. Bonneville, therefore, should be compelled to provide this information.

## II.    CONCLUSION

For the reasons set forth in Mr. Donohoe's motion to compel and this Reply, and to avoid undue prejudice and irreparable harm to Mr. Donohoe, Bonneville should be compelled to produce:

- Documents explaining Bonneville's 2006 "Reduction in Force;"

- Bonneville's Sales and Financial Documents;

- Bonneville's file containing harassment claims made against Matt Mills;

- All documents requested in Donohoe's Supplemental Requests for Production of Documents; and,

- The documents properly requested of Bonneville's corporate representative pursuant to Donohoe's Notice of 30(b)(6) Deposition, currently scheduled for May 5, 2008.

- Documents and information relating to Bonneville's similar "reduction in force" conducted in San Francisco, CA.

For the same reasons, Bonneville's Motion for Protective Order should be denied.

Respectfully submitted,

CARR MALONEY P.C.

By: _____

Thomas L. McCally, Esq., #391937
Tina M. Maiolo, Esq., #454987
1615 L Street, NW, Suite 500
Washington, DC 20036
(202) 310-5500/(202)310-5555 (fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th day of May, 2008, a copy of the foregoing was sent via first class mail, postage prepaid, to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC 20006, Attorney for Defendant.

By: _____

Thomas L. McCally

141

```
1       employed by WGMS impact his greater percentage of
2       employment at WTOP --
3                   MR. CYS:  Objection to form.
4          Q.    -- leading to his termination from WTOP?
5                   MR. CYS:  Objection to form.
6          Q.    What is the relationship?  You'll agree
7       before 2002 he sold strictly for WTOP, GMS and FED?
8          A.    Before 2002?
9          Q.    Yes.
10         A.    Before 2002?  WFED didn't exist in 2002.
11      Mr. Donohoe -- I'll have to try to remember the
12      exact dates.  He became national sales manager for
13      WTOP in 1996.  He took on responsibility for GMS
14      from, I believe 1999 through 2000 -- he had a period
15      where he was, did just WTOP national sales manager.

16      Then he had another period where he became national
17      sales manager for both TOP and GMS.  And another
18      period where he was just WTOP.
19         Q.    Someone else did GMS?
20         A.    Someone did GMS.  Then it reverted back to
21      him to do both WTOP and GMS.  Two stints as --
```

142

1          Q.    Assume for me it was around, it was either

2     2003, 2002 or '03 that he took GMS again?

3          A.    Okay.  Yes.  2002, I believe.  May-June of

4     2002 he took on GMS again, correct.

5          Q.    So my question is, how does the fact that

6     his position at GMS was eliminated in any way

7     correlate to the elimination of his job selling WTOP

8     and WFED national sales?

9          A.    He was part of the WGMS sales department.

10         Q.    He was always --

11               MR. CYS:  Let him finish.

12         A.    So that's why he was part of the reduction

13    of force.

14         Q.    So he left that position.  But he was also

15    part of the WTOP sales force, correct, sir, and WFED

16    sales force?

17         A.    Yes, he was.

18         Q.    Shows sales forces were not affected in

19    the RIF, correct?

20         A.    Correct.

21         Q.    So I ask you again, how did his WTOP

185

```
1              A.   He was the only one who fell in the

2     category of being in the GMS sales department but

3     also having other responsibilities.

4              Q.   What were those other responsibilities?

5              A.   WTOP.

6              Q.   Those were his primary responsibilities?

7              A.   Two-thirds of his responsibility in my

8     opinion was WTOP.  One-third GMS.

9              Q.   What do you base that opinion on?

10             A.   His compensation.

11             Q.   Only compensation?

12             A.   Also how much work it took to do the job.

13             Q.   How do you know how much work it took for

14    him to do the job?

15             A.   Observation.  Having done the job myself

16    split between two stations.

17             Q.   You did national sales for GMS and TOP?

18             A.   I did national sales for TOP and WASH.

19             Q.   You never did classical?

20             A.   I did not do classical.

21             Q.   You were not his direct supervisor?
```

1          A.   He was part of the WGMS sales staff.

2          Q.   That's the only reason?

3          A.   We let three departments -- three

4     departments were involved in the RIF.  He was, a

5     third of his responsibility was for WGMS and Mr.

6     Kleiner and Mr. Donohoe were part of the GMS sales

7     department.

8          Q.   So his employment at Bonneville was

9     terminated strictly because he worked, part of his

10    job, by your estimates, one-third at WGMS.  Is that

11    correct?

12         A.   Yes, he was part of the GMS sales

13    department and the entire GMS sales department was

14    part of the RIF.

15         Q.   You'll agree with me that the job

16    requirements of national sales for WTOP, WGMS and

17    WFED continued after the RIF and reorganization,

18    correct?

19         A.   The responsibility for those stations to

20    still have national sales, yes, correct.

181

1    department was looked at differently.

2        Q.    Doesn't say that here.  It list corporate

3    management.

4        A.    It was looked at differently.

5        Q.    Why was it looked at differently?

6        A.    Because it had different responsibilities.

7        Q.    What were those?

8        A.    The responsibilities were much broader and

9    the responsibilities were not changing as a result

10   of our reorganization anywhere near to the extent

11   that Z104 programming, Z104 sales and GMS sales

12   would be changing.

13       Q.    Let's look as how national sales for GMS,

14   TOP and FED changed.  They all continued, didn't

15   they?

16       A.    Yes.

17       Q.    They didn't change at all as terms of

18   national sales requirements, correct?

19       A.    They changed quite a bit.

20       Q.    No.  For TOP, GMS and FED.

21       A.    GMS changed.

286

1    force.  It might have been then as well.  I can't

2    recall which one it was.  I remember saying

3    something to that effect.

4         Q.    What did you mean by close him hard?

5         A.    I meant to close him, meaning that's a

6    sales term for get the job.

7         Q.    Do you feel Mr. Donohoe was qualified for

8    the position?

9         A.    I feel he had some of the qualifications

10   for the position.

11        Q.    Was he qualified for the position or not?

12        A.    Yes.

13        Q.    Why?

14        A.    Because he had done certain aspects of the

15   job that were important.

16        Q.    What aspects?

17        A.    He had -- well, he had been a national

18   sales manager.  So he had overseen national sales at

19   WTOP and WGMS which was, WTOP was going to be

20   continuing in a very similar vein.  GMS would have

21   less ratings, but he had been involved with WGMS.

287

1        Q.  What else?

2        A.  He had sold sports before, so he had sold

3    Orioles baseball, like we discussed earlier, from

4    like '86 through 2000.  So he had, you know, he had

5    some knowledge of baseball.

6        Q.  14 years?

7        A.  Yes.

8        Q.  That's a lot of knowledge.

9        A.  He did the same position every year.  He

10    sold it every year, yes.

11        Q.  What else?

12        A.  What were his other qualifications?  I

13    thought Leo was a good guy.  I thought he was a good

14    guy.  He got along, a lot of people liked him.  He

15    got along with a lot of people.  He was a good guy.

16    Likable.  Good personality.

17        Q.  Anything else?

18        A.  I think Leo was a solid guy.  That sums it

19    up pretty well.

20        Q.  How about been there, done that in

21    terms of TOP, GMS budgets, hit his budgets in the

288

1      past -- exceeded his budgets.

2            A.   He's done a good job.  He missed budgets

3      in maybe 2002 and then again 2005.  Leo had done a

4      good job making budgets.

5            Q.   You want to go over 2002.  We can go

6      through those the reason why the budget wasn't made,

7      because of inventory?

8            A.   There were a couple reasons -- inventory

9      and also it was a tough year after 9/11.

10           Q.   Right.  That wasn't his fault.

11           A.   No, I think Leo did a solid job.  No, I'm

12     not going to say that.

13           Q.   He got higher rates than expected almost

14     every year, correct?

15           A.   His rates moved up over the years, yes.

16           Q.   In fact, you've written him some memos

17     about his good relationship with the Katz people,

18     correct?  Did you read his file before this

19     deposition?

20           A.   Yes, I did.

21           Q.   Do you recall seeing memos, if not from

289

1          you, from Matt Mills, about his strong relationship

2          with the people from Katz?

3               A.   I certainly remember seeing them from Matt

4          Mills.  And sometimes I would make a written comment

5          or two on there, great job, Leo or good job, Leo.

6               Q.   Do you disagree with the statement that he

7          had a very good relationship with the Katz people?

8               A.   I think he had a good relation with thy

9          Katz people, yes.

10              Q.   If he didn't, that should have been in his

11         evaluations, correct?

12              A.   Yes, it should have been in his

13         evaluation.

14              Q.   Are you aware of the 2000 Katz survey that

15         was done?

16              A.   Yes.

17              Q.   Did that in any way have any impact on the

18         decision whether or not to hire Mr. Donohoe for the

19         director of national sales sports sales?

20              A.   Say it could be a slightly contributing

21         factor.

322

1      people that I count here?

2          A.    Actually in his evaluations I did talk in

3      there some about, I did write down some about that

4      he needed to ease up a little bit and show the

5      lighter side of him.  I did put that in there.  I

6      talked to him about it repeatedly.

7          Q.    Did he ever receive criticisms in his

8      evaluations about the way he treated older workers

9      or workers who had been there longer than him?

10         A.    No.

11         Q.    Any other complaints from people?

12         A.    Not that I recall at this time.

13         Q.    Were there any areas in which Mr. Donohoe

14     was more qualified than Mr. Spacciapoli for the

15     position of director of national sales, sports

16     sales, more or better qualified?

17         A.    He had more experience selling news and

18     more experience selling classical.  So in those two

19     respects.

20         Q.    Classical?

21         A.    Classical.  Yes.

112

1          Q.   So Mr. Spacciapoli had no prior experience
2     in selling sports for a radio station locally or
3     nationally, correct?
4          A.   Not to my knowledge.
5          Q.   The only two people at WTOP, that were in
6     the Bonneville Radio Group at that time who had such

7     sports sales experience were you and Mr. Donohoe,
8     correct?
9          A.   Selling sports?
10         Q.   Yes.
11         A.   No, there were a number of other people
12    that sold sports as well.
13         Q.   There were.  Who were they?
14         A.   Jodi Lisch sold sports.
15         Q.   When did she sell and for who?
16         A.   For the orioles.  With WTOP.
17         Q.   Who else?
18         A.   Jean Fowler sold the Orioles.  Sandy
19    Waxler would have sold the Orioles.  William Bryant
20    would have sold the Orioles.
21         Q.   Mr. Donohoe?

300

1    significant difference in our revenues, what he was

2    going to do specifically was to do a good job, how

3    he was going to manage the sellers, and how he was

4    going to deal with the sports teams, what other

5    sports teams he was going to pursue.

6                    How he would deal with the rep firm.

7    And how he would deal with a new station, with the

8    rep firm.  And how he would deal with a lower rated

9    station with the rep firm.  How he would maximize

10   the opportunity on WTOP.

11        Q.    How long was your interview?

12        A.    Probably 35-40 minutes.

13        Q.    Did he show you a PowerPoint presentation?

14        A.    He had a written presentation.  He had a

15   bound presentation that he showed me, yes.

16        Q.    Was he qualified for the position?

17        A.    Yes.

18        Q.    Why?

19        A.    Well, Mr. Spacciapoli had been at the rep

20   firm.  He had been in local sales.  He had been a

21   national sales manager.  He had been a local sales

301

1      manager.

2                              He had overseen an entire sales

3      department.  He had a lot of experience dealing with

4      the Washington Nationals, dealing with them on the

5      highest level, with the CEO, the COO putting a

6      presentation together, putting a proposal together,

7      working on the contract, implementing that contract,

8      working internally at our station with programming,

9      with sales.  So he had a lot of experience.

10             Q.   Okay.  He had never sold news format,

11     correct?

12             A.   No, he had not.

13             Q.   He never sold classical format, correct?

14             A.   That is true.

15             Q.   He had never sold FED?

16             A.   Correct.

17             Q.   He never sold Post Radio, correct?

18             A.   No one had.

19             Q.   No one had.  He had less than one year of

20     experience selling the Nationals baseball team

21     sports sales, correct?

302

```
 1        A.   Yes.

 2        Q.   The Nationals contract, when did it come

 3   due?  When was it over for '05.

 4        A.   End of the season.

 5        Q.   When was that?

 6        A.   Approximately October 2nd, October 3rd.

 7        Q.   When did the new contract come into place?

 8        A.   It was January or February.  January

 9   maybe.  February.

10        Q.   Did you handle primary negotiations on

11   that contract?

12        A.   Yes.

13        Q.   Anyone else assist?

14        A.   Michael Spacciapoli.

15        Q.   What were your responsibilities?

16        A.   My responsibilities were to try to figure

17   out what the right combination of -- what the right

18   compensation would be, what the right money deal

19   points would be.

20        Q.   It was a different deal in '06, when they

21   paid you a larger lump sum and they kept the air
```

389

```
 1          A.   Yes.
 2          Q.   Mr. Spacciapoli had not sold the spoken
 3   word format, correct?
 4          A.   No, he had not.
 5          Q.   Did he have five years of sales
 6   experience?
 7          A.   Yes.
 8          Q.   Had he ever sold AM to your knowledge?
 9          A.   No.  I don't believe he had.
10          Q.   Mr. Oxley, did you receive any complaints
11   or did Bonneville of discrimination following the
12   January RIF other than Mr. Donohoe's?
13          A.   No.

14               MR. McCALLY:  I would ask this nationally
15   as well.  Based on our --
16               MR. CYS:  Understood.  Same response.
17   BY MR. McCALLY:
18          Q.   Were any investigations done into Mr.
19   Donohoe's complaints of discriminatory treatment?
20          A.   No.
21          Q.   Why not?
```

23

```
 1        in sales for a time before you went into management?

 2             A.   Yes.

 3             Q.   Did you ever sell with him?  Were you all

 4        ever in the same AE position together?

 5             A.   I'm not sure I understand the question.

 6        Do you mean did we sell the same accounts together

 7        or --

 8             Q.   Were you all in the same position at

 9        anytime?  For example, local sales you said is sold

10        by AE's?

11             A.   Yes.

12             Q.   You were an AE and he was an AE at some

13        point?

14             A.   Yes.

15             Q.   And then you sold national sales and he

16        sold it at a later point in time I take it?

17             A.   Yes.

18             Q.   Any other overlap in the types of sales

19        that you did?

20             A.   No.

21             Q.   Now did there come a time when Mr. Donohoe
```

24

1     sold the Orioles?

2          A.   Yes.

3          Q.   When was that?

4          A.   I believe -- I do know he sold the Orioles

5     the entire time that we had the Orioles.

6          Q.   What years was that?

7          A.   I'm pretty sure he did start in 1986.  And

8     then we made the decision to no longer carry the

9     Orioles in 2000.  So he would have sold them locally

10    up until 1996, when he became national sales

11    manager.  Then he would have been selling them

12    nationally, when he was local sales manager, from

13    1996 through 2000.

14         Q.   Say that one more time so I could get that

15    down.  From '86 to 2000 you all carried the Orioles,

16    correct?

17         A.   Yes.  Actually I think the station carried

18    it for longer than that.  That was the period he

19    started at.  I believe that we started -- actually

20    having the Orioles on WTOP maybe in 1980.  But Mr.

21    Donohoe, having started in 1986, from 1986 through

25

```
 1     1996, would have sold the Orioles as a local account
 2     executive.  Then from 1996 through 2000 would have
 3     been involved selling them as the national sales
 4     capacity.
 5              Q.   At any of those times, some of those times
 6     you were his supervisor, correct?
 7              A.   When he was national sales, when he was
 8     promoted to national sales yes, I was his
 9     supervisor.  Before that no.
10              Q.   You were the general sales manager in
11     1996, correct?
12              A.   I became the general sales manager in
13     1996, yes.
14              Q.   That's when you were supervising him?
15              A.   Yes.
16              Q.   How did he do selling the Orioles?
17              A.   I think he did well.
18              Q.   Did he meet his budgets?
19              A.   As I remember, he made most of his
20     budgets.
21              Q.   Were there any problems with him selling
```

26

1          the Orioles?

2          A.   Not that I recall.

3          Q.   From '96 to 2000 you were his supervisor

4     while he was selling them nationally, correct?

5          A.   No.

6          Q.   Who was?  You were above him in the chain

7     of command?

8          A.   I was above him in the chain of command.

9     His direct supervisor changed when I became general

10    manager in 1998.

11         Q.   Who was his direct supervisor?

12         A.   Michael Hamer.

13         Q.   Do you know if Mr. Hamer has any issues

14    with Mr. Donohoe sale of the Orioles?

15         A.   Not that I recall.

16         Q.   Mr. Hamer reported to you?

17         A.   Right.

18         Q.   What was his title?

19         A.   General sales manager.

20         Q.   As general sales manager, he was superior

21    to the local sales manager and the national sales

75

```
1        something that does not have ratings.
2              Q.   You are saying someone with prior news
3        selling news experience, if it was on an established
4        station, that would be irrelevant?
5              A.   I think it would be relevant.
6              Q.   How would it be relevant?
7              A.   They would have experience selling news.
8              Q.   That's important?
9              A.   Yes.
10             Q.   For something like Post Radio?
11             A.   It would be helpful.
12             Q.   Would you consider it important?
13             A.   Important?  Yes.
14             Q.   Were there any other discussions you had
15       about skill sets in sales?
16             A.   Jim Farley was in charge of programming so
17       we would have had very few discussions about sales.
18             Q.   Who did you have these discussions with
19       about the sales skill sets?
20             A.   Eventually Matt Mills.
21             Q.   When did Mr. Mills come into the picture?
```

111

```
 1              MR. CYS:  When?

 2         Q.   In '05.

 3         A.   No, he did not work with Z104.

 4         Q.   That's the only reason Mr. Spacciapoli got

 5    in it, because they were being carried on Z104,

 6    correct?

 7         A.   Mr. Spacciapoli was involved because they

 8    were being carried on Z104.

 9         Q.   He had no prior sports sales experience,

10    correct?

11         A.   He had sold sports at the national rep

12    firm.

13         Q.   For a radio station?

14         A.   Directly for a radio station?

15         Q.   Let's make sure we understand that

16    distinction.  The national rep firm, such as Katz or

17    Crystal, is just that, a rep firm.  It's not a radio

18    station, correct?

19         A.   Absolutely.

20         Q.   Rep firms don't sell local sales, correct?

21         A.   They do not.
```

114

| | | |
|---|---|---|
| 1 | Q. | What station did they express an interest |
| 2 | in? | |
| 3 | A. | They at that point were interested in |

being anywhere that we could place them.  They

didn't have a specific interest.

6       Q.    You were at that meeting?

7       A.    Yes.

8       Q.    Who did you meet with from the Nationals?

9       A.    Kevin Uhlich, U-H-L-I-C-H.  His title at

the time, I believe, was vice president of

operations maybe.  I don't remember his title.

Something to that effect.  Tony Taveras, who was

their president.

14       Q.    Anyone else?

15       A.    No.

16       Q.    Who from Bonneville?

17       A.    I met them --

18       Q.    Just you?

19       A.    No.  I met them with Michael Spacciapoli

and I believe Ralph Renzi.

21       Q.    Why did you take Mr. Spacciapoli and Mr.

115

```
1      Renzi?
2            A.   Because we thought that 104.1 was the most
3      likely station that we would be able to put this on,
4      put the Nationals on.  And that the reason to put it
5      on would be that we could increase our revenue.
6            Q.   At that time Mr. Spacciapoli held what
7      position as Z104?
8            A.   He was local and national sales manager.
9            Q.   He was local and national sales manager?
10           A.   I believe so.  I would have to
11     double-check back on that.  I think he was still
12     handling both at that time.
13           Q.   What was Mr. Renzi's position?
14           A.   Actually Spacciapoli would be overseeing
15     the sales department by then.  I don't recall.
16     Ralph was -- Ralph was moved into essentially a
17     station manager position.
18           Q.   What happened after that first meeting?
19           A.   They asked for a proposal -- well, we
20     went -- the first meeting, we asked them what type
21     of terms that they would be possibly willing to do.
```

109

1       Q.    '06?

2       A.    '06.

3       Q.    Who negotiated the '05?

4       A.    Myself and Michael Spacciapoli and -- were

5    the main people negotiating.

6       Q.    Who had the primary responsibility for

7    negotiating the Nationals 2005 contract?  You, as

8    head of the Bonneville Washington, D.C. group or

9    Michael Spacciapoli, who I believe at the time was

10    local sales manager?

11       A.    The main responsibility?  Meaning?

12       Q.    Do you understand what that means?

13       A.    The main responsibility of the ultimate

14    decision to do a deal or not do a deal with the

15    Washington Nationals would have been mine.

16       Q.    Who had the primary responsibility for

17    negotiating the terms and conditions of the deal?

18    You, as vice president of Bonneville for the

19    Washington, D.C. group or the local sales manager,

20    Michael Spacciapoli for Z104?

21       A.    In 2005 it was me.

110

1          Q.   Okay.  How would you break down the

2     percentage of responsibility of the negotiations for

3     the Nationals baseball contract between you and Mr.

4     Spacciapoli?

5          A.   In 2005 or 2006?

6          Q.   '05.

7          A.   '05.  What I did there was, he did a good

8     job of putting the proposal together.  And he worked

9     with our attorneys and worked with their attorneys

10    to put together a contract.  I certainly had final

11    decision on whether or not we would do that

12    contract.

13         Q.   Who had primary responsibility for those

14    negotiations?  You, as vice president --

15         A.   I had primary responsibility.

16         Q.   Break down the percentage for me.

17         A.   I would say maybe two-thirds, one-third.

18    Me being two-thirds.  Him one-third.

19         Q.   Did you offer Mr. Donohoe the opportunity

20    to get involved in the Nationals contract

21    negotiations?

110

```
 1          Q.   Okay.  How would you break down the

 2     percentage of responsibility of the negotiations for

 3     the Nationals baseball contract between you and Mr.

 4     Spacciapoli?

 5          A.   In 2005 or 2006?

 6          Q.   '05.

 7          A.   '05.  What I did there was, he did a good

 8     job of putting the proposal together.  And he worked

 9     with our attorneys and worked with their attorneys

10     to put together a contract.  I certainly had final

11     decision on whether or not we would do that

12     contract.

13          Q.   Who had primary responsibility for those

14     negotiations?  You, as vice president --

15          A.   I had primary responsibility.

16          Q.   Break down the percentage for me.

17          A.   I would say maybe two-thirds, one-third.

18     Me being two-thirds.  Him one-third.

19          Q.   Did you offer Mr. Donohoe the opportunity

20     to get involved in the Nationals contract

21     negotiations?
```

350

1               MR. CYS:  Objection.  Asked and answered.

2          Q.   Go ahead.

3          A.   I do not remember asking them the basis,

4     no.

5          Q.   Was that the end of the meeting?

6          A.   Pretty much, yes.

7          Q.   Anything else transpire that you recall?

8          A.   All I can recall, there were a few

9     comments why they felt Spacciapoli was good.

10         Q.   You don't remember what they were though?

11         A.   Not precisely, no.

12         Q.   How much did this go into your decision

13    process to select Spacciapoli over Donohoe?

14         A.   Not much.

15         Q.   Ballpark it for me percentage wise.

16         A.   Rep firm's input on who we would hire at

17    our station?  10 percent.

18         Q.   Pretty irrelevant?

19         A.   Not a big factor.

20         Q.   Pretty irrelevant?

21         A.   Pretty irrelevant.  Not totally

351

1          irrelevant.

2                Q.    But pretty irrelevant?

3                A.    Fairly irrelevant, yes.

4                Q.    Have you ever sought the input from a rep

5          firm regarding the selection of a national sales

6          manager?

7                A.    Yes.

8                Q.    When?  And for who?

9                A.    For Leo Donohoe, when he was put in the

10         position in 1996, talked to the rep firm about it.

11               Q.    You did?

12               A.    Yes.

13               Q.    Who did you talk to?

14               A.    Oh, boy.  I think his name was Billy

15         Froid.

16               Q.    Who was he with?

17               A.    Banner.

18               Q.    What did he say about Mr. Donohoe?

19               A.    I more informed him -- he did not know Mr.

20         Donohoe.  I gave him Mr. Donohoe's background.  He

21         thought that would make a good background for any

174

```
 1                Q.   Turn to Bates stamp 789.  Bottom of the

 2        page, under keeping key employees, it reads,

 3        management decided that WWZZ business manager needed

 4        to be retained because of the strong skill set,

 5        strong leadership abilities and strong ability to

 6        function with minimal supervision.

 7                         Other employees work for all stations

 8        with a larger percentage from WTOP, therefore, they

 9        were not included in the reduction.  Traffic

10        employees were not affected because there will

11        continued to be traffic needs.

12                         Who were these other employees who

13        worked a larger percentage for WTOP and, therefore,

14        were not included in the reduction?

15                A.   Would have been people such as myself,

16        Joan Henson, Linda Pfluger, Mary Kay LeMay,

17        department heads essentially.

18                Q.   Is that it?

19                A.   Dave Garner.

20                Q.   What did he do?

21                A.   He was our chief engineer.
```

175

1        Q.   So because you had part of your job and

2     Ms. Henson had part of her job, Pfluger and Garner,

3     all with GMS and Z104, you technically should have

4     been RIF'd as well?

5        A.   No, we were not part of the one of the

6     departments that was part of the RIF.

7        Q.   All of Z104 was RIF'd, correct?

8        A.   Z104?

9        Q.   The whole station was shut down.

10    Everybody was let go.

11       A.   Everybody who was in programming and

12    sales.  Those two departments.

13       Q.   Corporate management was also involved.

14    You would consider yourself corporate management,

15    wouldn't you?

16       A.   Yes.

17       Q.   Look at the first page of Exhibit 1A.

18    Corporate management was affected in this RIF,

19    correct?

20           MR. CYS:  Is there a particular part of

21    the page?

152

```
 1          A.   I would think.

 2          Q.   Talking about early September?

 3          A.   But we were also still debating what would

 4     be -- there was still a debate about what would make

 5     more sense, keeping Z104 on its signals or moving

 6     GMS to its signal.  We were going back and forth a

 7     lot on that.

 8          Q.   Who is we?

 9          A.   That group.  On the merits of what made

10     more sense, to eliminate Z104 or put GMS on 104.1.

11          Q.   How did that decision get made?

12          A.   Eventually that decision got made by our

13     CEO, Bruce Reece.

14          Q.   That is at Bonneville Corporate?

15          A.   Yes.

16          Q.   Tell me about that process.

17          A.   By this time we had started to -- we had

18     developed our plan, submitted it and submitted to

19     them for their review.

20          Q.   You had a final plan that you submitted to

21     Reece?
```

156

```
 1          Q.   No Post?

 2          A.   No Post.  Nothing changed.  Another option

 3     was to have FED, to do Post Radio, to put 103.5, put

 4     TOP on 103.5 and then after FED on 104.1.

 5          Q.   The best financial option was to keep Z104

 6     and eliminate GMS and move TOP to 103.  The next you

 7     said was TOP to 103.  Post Radio and GMS goes to

 8     104.  What was the third best financial option?

 9     Would it stay the same without the Post?

10          A.   Yes.

11          Q.   And the last one?

12          A.   FED option was the, to my best

13     recollection, the FED option was the least

14     attractive.

15          Q.   That is the fourth one, where you move FED

16     to 104?

17          A.   Right.

18          Q.   You presented this to Mr. Reece?

19          A.   I presented it to Mr. Johnson, who talked

20     about it to Mr. Reece.

21          Q.   I thought the decision was made by
```

157

1      Mr. Reece?

2           A.   Mr. Reece ultimately decided what lineup

3      of stations --

4           Q.   You tell me the process.  What happened

5      once you presented these four options?

6           A.   Well --

7           Q.   How did it work?  I want to know who you

8      talked to, I want to know when, I want to know who

9      was involved and what was said?

10          A.   When would have been somewhere in

11     September would be when I would have sent it to Bob.

12          Q.   That is Bob Johnson?

13          A.   Bob Johnson.  And there actually was --

14     Bruce Reece went back and forth a number of times to

15     try to determine what he thought was the best

16     option.

17          Q.   With who?

18          A.   He talked to me once or twice.  But my

19     understanding was, from talking to Bob, that they

20     had discussed it a couple of times about what would

21     be the best thing to do in D.C.  And went back and

158

1       forth quite a bit.

2                            It wasn't until December that Bruce

3       made the final decision that, yes, let's go ahead,

4       if we can strike a deal with the Post, let's go

5       ahead and do the option to put TOP on 103.5, start

6       Washington Post Radio and put GMS on 104.1.

7            Q.   It's your testimony that decision wasn't

8       made by Mr. Johnson until December?

9                 MR. CYS:  Objection.

10           Q.   You just said Johnson.

11           A.   No, I said Reece.  Just to clarify, it was

12      Reece who made the decision in December.

13           Q.   It wasn't until December.  Have you

14      related to me all the discussions and conversations

15      you were involved in with that decision?

16           A.   To my best recollection, yes.

17           Q.   You only had one or two calls with

18      Johnson?

19           A.   Maybe a couple more than that where we

20      discussed this.  Not much.

21           Q.   Was anybody else involved from D.C.?

157

1       Mr. Reece?

2            A.   Mr. Reece ultimately decided what lineup

3       of stations --

4            Q.   You tell me the process.  What happened

5       once you presented these four options?

6            A.   Well --

```
7              Q.   How did it work?  I want to know who you

8        talked to, I want to know when, I want to know who

9        was involved and what was said?

10             A.   When would have been somewhere in

11       September would be when I would have sent it to Bob.

12             Q.   That is Bob Johnson?

13             A.   Bob Johnson.  And there actually was --

14       Bruce Reece went back and forth a number of times to

15       try to determine what he thought was the best

16       option.

17             Q.   With who?

18             A.   He talked to me once or twice.  But my

19       understanding was, from talking to Bob, that they

20       had discussed it a couple of times about what would

21       be the best thing to do in D.C.  And went back and
```

158

1          forth quite a bit.

2                              It wasn't until December that Bruce

3          made the final decision that, yes, let's go ahead,

4          if we can strike a deal with the Post, let's go

5          ahead and do the option to put TOP on 103.5, start

6          Washington Post Radio and put GMS on 104.1.

7                    Q.   It's your testimony that decision wasn't

8          made by Mr. Johnson until December?

9                         MR. CYS:  Objection.

10                   Q.   You just said Johnson.

11                   A.   No, I said Reece.  Just to clarify, it was

12         Reece who made the decision in December.

13                   Q.   It wasn't until December.  Have you

14         related to me all the discussions and conversations

15         you were involved in with that decision?

16                   A.   To my best recollection, yes.

17                   Q.   You only had one or two calls with

18         Johnson?

19                   A.   Maybe a couple more than that where we

20         discussed this.  Not much.

21                   Q.   Was anybody else involved from D.C.?

164

1      decision from Bruce Reece as to what type of lineup

2      he wanted to have.  And Bruce Reece changed his mind

3      a couple of times.

4              Q.    Between September and December, when

5      Mr. Reece made up his mind about what to do, did you

6      have discussions concerning personnel?

7                   MR. CYS:  With him?

8              Q.    Did he have, you or Bonneville Corporate,

9      have discussions regarding personnel, who would go,

10     who would stay?

11             A.    We had discussions about the structure and

12     what departments but not about individual personnel.

13             Q.    Did you discuss the national sales of WTOP

14     or GMS?

15             A.    No.

16             Q.    Did you discuss Leo Donohoe?

17             A.    Between September and December?

18             Q.    Yes.

19             A.    Yes.

20             Q.    What did you talk about and with who?

21             A.    We talked about --

165

1          Q.   Who?

2               A.   With who?  We did -- another question.

3          Did we talk about national sales with corporate

4          between September and December?

5          Q.   No, sir.  Don't limit my question.

6               A.   I'll answer both of them.  I said no.  The

7          answer is yes, we did.  We did talk about the

8          national sales department.  So we did.  We talked

9          and we had a meeting out in Salt Lake, where I was

10         there with Bob Johnson, David Red, Scarlett Pate and

11         Jim Farley.

12                   And we talked about what would be --

13         what would happen in the RIF.  And we discussed the

14         three departments that we would let go.  They asked

15         if national sales would be included in GMS sales.

16         And yes, I said yes, there would be.

17         Q.   Why?

18              A.   Because that was part of -- the national

19         sales was part of the WGMS sales department.

20         Q.   That's the only reason?

21              A.   Yes.

**381**

```
1        A    Yes, this is.
2        Q    Did you create that?
3        A    Yes, I did.
4        Q    With anybody else's help?
5        A    With Joel Oxley and Joan Henson for
6    involvement and review.
7        Q    Show me in there where it says he'll be
8    managing account executives?
9        A    Number 11.

10       Q    That doesn't say you're managing account
11   executives, correct?
12       A    It says create effective actions plan to
13   motivate --
14       Q    Doesn't say anything about managing,
15   correct?
16       A    No.
17       Q    Second page, 754 bates stamp.  Look at
18   item four.  Other functions.  It says work with
19   local sales manager to develop group and individual
20   sales goals for the local account executives,
21   correct?
22       A    Yes.
```

**382**

```
1        Q    Doesn't say anything about that being
2    sports sales, correct?
3        A    It doesn't say anything about sports
4    sales, no.
5        Q    The local sales manager supervises the
6    account executives, correct?
7        A    There was no local sales manager.
8        Q    This is your job description?
9        A    Well, there was a general sales manager,
10   Steve Goldstein.
11       Q    The general sales manager would manage the
12   account execs, correct?
13       A    He was ultimately responsible for hiring
14   and firing them, yes.
15       Q    Who managed them?
16       A    Steve Goldstein managed them.  Mr.
17   Spacciapolli was responsible for managing their
18   sports sales budget, the independent budget.
19       Q    The day-to-day management of those
20   individuals was management of those individuals was
21   Goldstein, correct.
22       A    Yes.
```