**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CIVIL DIVISION**

| | | |
|---|---|---|
| LEO DONOHOE, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 07-949 (RWR) |
| | ) | Hearing Requested |
| BONNEVILLE INT'L CORP., | ) | |
| | ) | |
|     Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO OBJECTIONS TO**
**MAGISTRATE JUDGE DEBORAH A. ROBINSON'S ORDER OF APRIL 23, 2008,**
**DENYING PLAINTIFF'S MOTION FOR LEAVE TO TAKE ADDITIONAL**
**DEPOSITIONS**

      This matter comes before the Court on Plaintiff's Objections to Magistrate Judge Robinson's Order denying Plaintiff's Motion for Leave to take Additional Depositions. Plaintiff established both in his original Motion and Reply, as well as in the Objections to the Order denying Plaintiff's Motion, that the additional deposition are absolutely critical and necessary to Plaintiff's ability to effectively conduct discovery into the Defendant's purported reasons for the multiple employment decisions that are at issue in this matter.

      From the outset of this litigation, Plaintiff requested the opportunity to take more than the seven (7) depositions that are presently allowed under the Scheduling Order of this Court. As is evidenced by the joint submissions that were filed at the inception of this litigation, the parties were unable to agree on the amount of depositions that would need to be taken in this matter and Plaintiff has always maintained that, given the unique circumstances of this case, seven (7) depositions are insufficient. Notably, Plaintiff was not even given the opportunity under the current scheduling

order to take the ten (10) depositions that are permitted under Rule 30 of the Federal Rules of Civil Procedure.

Defendant's Opposition to the original Motion as well as Defendant's Opposition to Plaintiff's Objection is based primarily upon two (2) arguments. First, Defendant contends that the Motion and subsequent objection are premature, in light of the fact that some of the seven (7) depositions have yet to be taken (due to scheduling issues of attorneys for both sides, as well as witness availability). Second, Defendant asserts in general terms that this is a simple case that would render the taking of twenty-five (25) depositions unreasonable. It is Defendant's unreasonable contention that *every* deposition that has been taken or requested by Plaintiff is unnecessary *ad cumulative*. (Defendants Opposition, page 1).

Defendant's position is undermined by the record in this matter, and is premised entirely upon complete misstatements of evidence and testimony. Defendant, in its Opposition, consistently misstates the record and makes factual conclusions that are completely and absolutely inconsistent with the sworn testimony of its own witnesses. It is this type of misrepresentation that necessitates the taking of so many depositions to uncover the truth in this matter.

Defendant's statements in its Opposition regarding the inclusion of Plaintiff in the RIF serve as a clear example of how the misstatements of Defendant necessitate the taking of additional depositions.

One of Plaintiff's central contentions in this matter is that Plaintiff was improperly included in the RIF, as Plaintiff was primarily employed by WTOP, a radio station that was not impacted by the RIF. Indeed, Defendant has conceded through its corporate representative that "No positions were RIF'd at WTOP. (*See* testimony of Defendant's 30(b)(6) representative, Mr. Joel Oxley, pp

138 - 139, attached as Exhibit A).  Furthermore,  Defendant's own documentation regarding the inclusion of individuals within the RIF clearly states that  employees who worked at multiple stations but who worked a larger percentage of the time at WTOP were not included in the RIF. (*See* WWZZ and WGMS Reduction in Force Assessment dated January 4, 2006, Bates stamp page 6789, attached as Exhibit B).

It is undisputed that Plaintiff worked for WTOP and also performed services for WGMS.   It is also undisputed that Plaintiff worked a larger percentage of the time at WTOP.   Defendant's own 30(b)(6) designee, Mr. Joel  Oxley, testified that the larger percentage of Plaintiff's work was for WTOP, not WGMS.  (Exhibit A, pp. 139 – 143, 176 - 179).  According to Defendant's own assessment of the RIF, as well as the deposition testimony of Defendant's own corporate representative, Plaintiff should not have been included in the RIF.

Incredibly, Defendant makes factual assertions in its Opposition that are completely inconsistent with the sworn testimony of Defendant's own corporate designee.  In a weak attempt to justify the inclusion of Plaintiff in the RIF, Defendant states without any supporting documentation that "Mr. Donohoe was far more central to WGMS's sales efforts than WTOP's," and that "As WGMS National Sales Manager, he was naturally included in the RIF." (*See* page 3, footnote 2 of Defendant's Opposition).  This statement is a complete falsification of the facts.  As set forth with specificity above, Plaintiff's primary job duties were with WTOP and, according to Defendant's own documents, Plaintiff should not have been included in the RIF.  (*See* Exhibits A and B).

Additional evidence obtained by Plaintiff clearly demonstrates that the Defendant has completely misrepresented the facts in its Opposition.  Plaintiff in fact performed the vast amount of

his work for WTOP. The inclusion of Plaintiff in the RIF was improper and the true motivation behind Plaintiff's termination was age discrimination.

As indicated above, it is undisputed that Plaintiff, in addition to serving as National Sales Manager for WTOP, also provided national sales services to WGMS. At all times relevant to this litigation, Ms. Patricia Fears served as General Sales Manager for WGMS, and was Plaintiff's direct supervisor at WGMS. Accordingly, Ms. Fears would be in the best position to know what Plaintiff's job duties were at WGMS as compared to WTOP. She is also a completely unbiased and independent witness, having no interest in the outcome of this litigation.

In a sworn statement attached hereto, Ms. Fears states that she was "shocked" that Plaintiff was included in the RIF, as he was "primarily a WTOP guy" and as far as she could tell he was the only one included in the RIF from WTOP. Ms. Fears indicated that Plaintiff's primary job responsibilities at Bonneville were as NSM for WTOP. Plaintiff's office was always with WTOP and he only worked a very small percent of the time with WGMS. Ms. Fears further stated that it did not make any sense to include Plaintiff in the group of people who were being let go in the RIF, that she knew immediately that the younger workers would be rehired – and in fact they were, and that it was clear that Bonneville was simply using the RIF to clean house and to get rid of people that it would be risky to eliminate. The RIF, according to Ms. Fears, was a joke. (*See* Affidavit of Patricia Fears, attached as Exhibit C).

Ms. Fears also stated that she, a management level employee of Defendant's at the time, received complaints about the manner in which Mr. Mills was treating older, veteran workers. Ms. Fears specifically identified Ms. Fowler and Ms. Lish (two of the individuals that Plaintiff has

deposed or noticed for deposition) as voicing complaints and raising concerns about the manner in which Mr. Mills treated older workers.  (*See* Exhibit C).

With this evidence in mind, it is apparent that there are legitimate questions surrounding the decision to include Plaintiff in the RIF, and that there is ample evidence suggesting that decisions that Matt Mills participated in, which included decisions related to the RIF and subsequent rehiring of younger workers,  were tainted with discriminatory animus.

Defendant's consistent misstatement of the facts and the record makes it absolutely critical that Plaintiff be permitted to depose the individuals that  Defendant itself identified as making critical decision about the implementation of the RIF, as well as witnesses that may have additional information regarding the discriminatory treatment of older workers in general and Plaintiff in particular.

With respect to the implementation of the RIF, these individuals include Mr. Reese and Mr. Johnson.    Defendant  itself  identified  these  individuals  as  being  crucially  involved  in  the implementation of the RIF.  Having identified these individuals as being crucially involved in the decision  making  process,  Defendant  cannot  now  object  to  producing  these  individuals  for deposition.  Defendant should not be permitted to proffer absolutely false reasons for inclusion in the RIF and then preclude inquiry into the falsehood on the basis that such inquiry is "unnecessary" or "cumulative."

Plaintiff clearly has uncovered evidence that is indicative of discriminatory animus.  In addition to the information provided by Ms Fears in her Affidavit, testimony was elicited from another unbiased witness having no interest in the outcome of this litigation, Mr. O'Brien.  As set forth in the Objection, Mr. O'Brien was a former management  level employee of Defendant who

testified that Matt Mills constantly made negative statements about older workers, and specifically stated that the Plaintiff was "too old" and "had been doing this too long."

Defendant, incredibly, takes the position that such evidence is irrelevant to Plaintiff's claims.  In an effort to convince the Court that Plaintiff has taken depositions of non-essential witnesses, and, therefore, Plaintiff should not be permitted to take additional depositions, Defendant cites as an example Plaintiff's decision to take the deposition of Mr. O'Brien.  Defendant refers to the Plaintiff's decision to depose Mr. O'Brien as  a "glaring error" and points to that deposition as a reason to deny Plaintiff the opportunity to conduct any other deposition.

In fact, Mr. O'Brien's testimony provides absolute and convincing evidence that Mr. Mill's not only acted with discriminatory motive, but that Defendant's management level employees were aware of Mr. Mill's attitude towards older workers and towards Plaintiff in particular.  It is absolutely incredible and outrageous for Defendant to take the position that this testimony is irrelevant.[1]

Defendant is similarly critical of Plaintiff's decision to depose Jean Fowler.  Defendant completely ignores the fact that Ms. Fowler had been identified as having raised complaints about the manner in which Matt Mills treated older workers.   Management level employees including Mr. O'Brien and Ms. Fears have identified Ms. Fowler as having raised concerns about the manner in which Mr. Mills treated older workers.  (*See* Exhibit A to Plaintiff's Objections, *See also* Exhibit C).  In fact, Ms. Fowler confirmed that she did complain about having accounts taken away from her

---

[1]   The Defendant's characterization of such critical testimony as being "irrelevant" demonstrates that Defendant's opinions regarding what witnesses have relevant testimony is completely incredible and should not serve as the basis for the denying the Plaintiff the opportunity to obtain additional evidence of discrimination.

and given to other, younger employees. (*See* Exhibit B to Plaintiff's Objections). This information is directly relevant and in fact serves as the foundation of Plaintiff's claims, as it demonstrates clearly that Defendant's employment decisions were motivated by discriminatory animus. Defendant's assertion that such testimony is irrelevant demonstrates a complete lack of respect for the prohibition against age discrimination that is contained in the District of Columbia Human Rights Act ("DCHRA") and should be summarily dismissed.

Defendant would have the Court allow Defendant to proffer inaccurate reasons for decisions and then prohibit Plaintiff from investigating the validity of the proffered reasons. Defendant essentially takes the position that Plaintiff may only depose the primary decision makers, but that any depositions into other witnesses with information would be cumulative, and, therefore, inquiry cannot be made to determine the validity of the positions taken by the Defendant.

This illogical and unreasonable position is most clearly illustrated by Defendant's position with respect to the third party witnesses associated with KATZ Radio Group ("Katz").

As noted in the Objections that were filed herein, one of the five decisions that are at issue in this matter is the Defendant's decision to hire Mr. Spacciapolli instead of Plaintiff for the position of Director of National Sales/Sport Sales. It is undisputed that Mr. Spacciapolli is much younger than Plaintiff. Defendant consistently takes the position that Mr. Spacciapolli was the most qualified candidate for the position. As Defendant clearly sets forth in its Opposition (as well as in discovery responses and deposition testimony), Defendant proffers as proof that Mr. Spacciapolli was more qualified several purported facts, including the following: (1) that Mr. Spacciapolli was previously employed by Katz, (2) that Mr. Spacciappolli was held in high regard by Katz and (3) that Katz

shared their opinion with Defendant that Mr. Spacciapolli was the superior candidate. (*See* Defendant's Opposition, page 3).

Information already obtained by Plaintiff from former management level employees of Defendant leads Plaintiff to have legitimate questions whether these statements are factually accurate, and suggests Defendant's position is pretext for discrimination. As is illustrated by the Affidavit of Ms. Fears, who was the former National Sales Manager at WGMS, Ms. Fears was aware of many complaints about Mr. Spacciapolli. According to Ms. Fears, Mr. Spacciapolli's reputation with the rep firms and within the industry was not good. Ms. Fears further indicated that she would be highly suspect of hiring someone at the recommendation of Katz because "if the rep firm loves you too much, you are giving things away which is not in the best interest of Bonneville." According to Ms. Fears, Plaintiff was much more qualified than Mr. Spacciapolli, and hiring Mr. Spacciapolli over the Plaintiff was a huge mistake. According to Ms. Fears, the age of the Plaintiff played a large part in the employment decisions that were made by Matt Mills and Bonneville regarding Plaintiff's employment, termination and non-selection. (*See* Affidavit of Patricia Fears, attached as Exhibit C).

Given the Defendant's position that it relied heavily on statements made from Katz employees in making the decision to hire a much younger candidate for the position, Plaintiff's request to examine Katz employees is reasonable and is necessary to fully evaluate the legitimacy of Defendant's assertion. The only way to determine if the Katz witnesses actually made such a recommendation, and to evaluate whether reliance on the recommendation was reasonable, is to depose those individuals that Defendant identified as having made such recommendations.

With respect to each deposition requested, and with respect to each deposition that has been taken or noticed, Plaintiff has identified with specificity the reasons that such depositions are necessary.  Although many cases do not involve multiple claims and defenses which would necessitate the taking of twenty-five (25) depositions, this case does.  The reason that so many depositions are necessary is directly related to the fact that Defendant has consistently attempted to misstate the facts in order to disguise and hide the true motivation for each of the decisions, which Plaintiff contends were motivated by age discrimination.

Plaintiff has demonstrated good cause to take the additional depositions as set forth in the original Motion and Objection to the Magistrate's order.  Plaintiff raised these issues in a timely manner in an attempt to avoid unnecessary delay and in an effort to complete discovery within the specified time period.  Plaintiff should not be penalized for these efforts.

Defendant's procedural challenges to Plaintiff's Motion for Leave to Take Additional Depositions are similarly without merit.

As of the time of the filing of the Motion for Leave to Take Additional Depositions, the parties were in the process of scheduling depositions and Plaintiff was aware, based upon discovery responses, that seven (7) depositions would not be sufficient to adequately conduct discovery.  In an attempt to alert the Court to the problem in a timely manner so as not to impede the discovery process, and in an effort to resolve the matter so that discovery could be completed prior to the close of discovery, Plaintiff filed the Motion with the Court before such time as all depositions had been noticed or taken.  Had Plaintiff waited until all depositions had been completed, there would be no opportunity to have the motion filed, resolved, and conduct additional discovery within the time

period specified for completion of discovery.  In fact, Defendant certainly would have objected to the Motion as being untimely.

Although it is true that many federal courts have required that all depositions be completed before a request to take additional depositions may be filed, it is unclear whether these courts are operating under discovery deadlines such as those that are imposed by this Court.  Furthermore, many courts have allowed additional depositions even though none have been taken at the time the Motion was filed, allowing additional depositions even while recognizing the holdings of the cases cited by Defendant.  (*See e.g., U.S. v. Brooks,* 1995 WL 555271, 2 (D.Or., 1995).  Other courts have allowed additional depositions even though all depositions that are allowed have not been taken, but have been scheduled.  (*Cunningham v. Smithkline Beecham,* 2008 WL 1994865, 2 (N.D.Ind.) (N.D.Ind.,2008)

As these cases reflect, the holdings of the decisions cited by Defendant are not absolute. The Court retains the discretion at all times to allow additional depositions when warranted.[2]  As is set forth by Plaintiff in the original Motion as well as the Objection, this case clearly warrants additional depositions.

The parties to this action have submitted numerous and lengthy discovery motions to the Court for resolution.  The sheer number of issues that have been raised in this matter demonstrate the complexity of the multiple issues that are relevant to the claims and defenses in this matter. Although Defendant consistently asserts that his is a simple age discrimination case, these assertions

---

[2]  In many cases, strict interpretation and adherence to the procedural requirements set forth in the decisions cited by the Defendant will not simplify the discovery process, but will in fact make it more cumbersome, time consuming and expensive for all parties.

are undermined by Defendants own pleadings and the unsupported positions taken by the Defendant therein. Defendant has proffered multiple inaccurate and misleading reasons for the employment decisions at issue, and Plaintiff should be permitted to conduct discovery so as to be able to establish that the proffered reasons are pure pretext for discrimination. Anything less would severely prejudice the Plaintiff, and would serve to undermine the very purpose of the DCHRA.

This Court maintains the power and the discretion to allow additional depositions. As demonstrated in the Motion, the Reply, the Objection and this Reply, these additional depositions are critical to Plaintiff's ability to fully investigate the reasons proffered for each of the many decisions that are at issue in this matter.

For these reasons, as well as the reasons set forth in the Objection, the Motion for Leave to take additional depositions and the Reply to Defendant's original Opposition to the Motion, Plaintiff respectfully requests that leave be granted to conduct additional depositions in this matter. Plaintiff further requests a hearing with respect to the matters raised in this Objection.

Respectfully submitted,

CARR MALONEY, P.C.

By: _____
    Thomas L. McCally, Esq., #391937
    1615 L Street, NW, Suite 500
    Washington, DC  20036
    (202) 310-5500/(202) 310-5555 (FAX)
    Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on  the 22nd day of May, 2008, a copy of the foregoing was sent via the Court's electronic filing system and via e-mail to Richard Cys, Esquire, and Constance Pendleton, Esquire, Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC  20006, Attorney for Defendant.

_____

Thomas L. McCally

# EXHIBIT A

Joel Oxley
Overnite Court Reporters

Friday, May 9, 2008

Leo Donohoe v. Bonneville Int'l Corp.
301-593-0671

 1      A.    At that point -- well, are you talking

 2  about what is the next step in the sales process,

 3  regarding the sales or just overall?

 4      Q.    The RIF in the reorganization.

 5      A.    In the reorganization.

 6      Q.    Let me back up.  Let me ask you another

 7  question.  Do you view the RIF in the reorganization

 8  as one in the same?

 9      A.    In terms of how they are defined?

10      Q.    Sure.

11      A.    I guess I look at the reorganization as

12  the reorganization of the signals in the way you're

13  doing business and the reduction in force was the

14  actual -- we were then letting people go.  We were

15  letting departments go.  So I guess I view them a

16  little bit differently.

17      Q.    Let me ask you.  Where do you characterize

18  the elimination of Mr. Donohoe's job from national

19  sales of WTOP, GMS and WFED?  There were no

20  positions RIF'd at WTOP, correct?

21      A.    At WTOP?

1       Q.    Yes.

2       A.    What we did in the RIF was, we let three

3    departments go -- Z104 sales, Z104 programming and

4    GMS programming.   That's what the RIF involved.

5       Q.    Z104 and GMS?

6       A.    Z104 programming, Z104 sales, GMS sales.

7       Q.    Did not involve WTOP sales, correct?

8       A.    Other than -- no, it did not.

9       Q.    Other than Mr. Donohoe?

10       A.    No, Mr. Donohoe and Mr. Kleiner had WTOP

11    sales responsibilities.

12       Q.    Mr. Kleiner was rehired?

13       A.    Mr. Kleiner rehired.

14       Q.    He's under 40?

15       A.    Mr. Kleiner is under 40.

16       Q.    How did you come to eliminate Mr.

17    Donohoe's position?   He didn't -- the RIF did not

18    involve WTOP.   How was his position at WTOP for

19    national sales manager, for TOP, GMS, and WFED,

20    three stations that continued after the

21    reorganization, how did that come about?

Page 140

1        A.    He was part of the WGMS sales staff.

2        Q.    That's the only reason?

3        A.    We let three departments -- three

4    departments were involved in the RIF.  He was, a

5    third of his responsibility was for WGMS and Mr.

6    Kleiner and Mr. Donohoe were part of the GMS sales

7    department.

8        Q.    So his employment at Bonneville was

9    terminated strictly because he worked, part of his

10    job, by your estimates, one-third at WGMS.  Is that

11    correct?

12        A.    Yes, he was part of the GMS sales

13    department and the entire GMS sales department was

14    part of the RIF.

15        Q.    You'll agree with me that the job

16    requirements of national sales for WTOP, WGMS and

17    WFED continued after the RIF and reorganization,

18    correct?

19        A.    The responsibility for those stations to

20    still have national sales, yes, correct.

21        Q.    How did the fact that he was partially

Page 141

1    employed by WGMS impact his greater percentage of

2    employment at WTOP --

3              MR. CYS:   Objection to form.

4         Q.   -- leading to his termination from WTOP?

5              MR. CYS:   Objection to form.

6         Q.   What is the relationship?  You'll agree

7    before 2002 he sold strictly for WTOP, GMS and FED?

8         A.   Before 2002?

9         Q.   Yes.

10        A.   Before 2002?  WFED didn't exist in 2002.

11   Mr. Donohoe -- I'll have to try to remember the

12   exact dates.  He became national sales manager for

13   WTOP in 1996.  He took on responsibility for GMS

14   from, I believe 1999 through 2000 -- he had a period

15   where he was, did just WTOP national sales manager.

16   Then he had another period where he became national

17   sales manager for both TOP and GMS.  And another

18   period where he was just WTOP.

19        Q.   Someone else did GMS?

20        A.   Someone did GMS.  Then it reverted back to

21   him to do both WTOP and GMS.  Two stints as --

Page 142

1       Q.    Assume for me it was around, it was either

2   2003, 2002 or '03 that he took GMS again?

3       A.    Okay.  Yes.  2002, I believe.  May-June of

4   2002 he took on GMS again, correct.

5       Q.    So my question is, how does the fact that

6   his position at GMS was eliminated in any way

7   correlate to the elimination of his job selling WTOP

8   and WFED national sales?

9       A.    He was part of the WGMS sales department.

10      Q.    He was always --

11            MR. CYS:  Let him finish.

12      A.    So that's why he was part of the reduction

13   of force.

14      Q.    So he left that position.  But he was also

15   part of the WTOP sales force, correct, sir, and WFED

16   sales force?

17      A.    Yes, he was.

18      Q.    Shows sales forces were not affected in

19   the RIF, correct?

20      A.    Correct.

21      Q.    So I ask you again, how did his WTOP

Joel Oxley
Overnite Court Reporters

Friday, May 9, 2008

Leo Donohoe v. Bonneville Int'l Corp.
301-593-0671

Page 143

 1    position get eliminated?

 2         A.    His WTOP position was continued.  We ended

 3    up having a new position that was created because we

 4    felt the needs had changed of the restructure and we

 5    had an entirely new position created.

 6         Q.    Because the needs changed with the

 7    restructure, the only position affected at WTOP was

 8    national sales, correct?

 9         A.    And the Daniel Kleiner position.

10         Q.    National sales?

11         A.    National sales, correct.

12         Q.    No other sales positions at WTOP were

13    impacted?

14         A.    Correct.

15         Q.    Where we left off, we were

16    August-September timeframe.  You, Mr. Mills, Farley

17    and Pfluger have been discussing these three

18    structures and the pros and cons, because Mr.

19    Johnson asked you to do that, correct?

20         A.    Correct.

21         Q.    What was the next step in this process?

Joel Oxley
Overnite Court Reporters

Friday, May 9, 2008

Leo Donohoe v. Bonneville Int'l Corp.
301-593-0671

Page 176

1    Q.   Right in the front.

2    A.   Yes.

3    Q.   See corporate management.   You're

4    corporate management, right?

5    A.   Yes.

6    Q.   Henson is corporate management, right?

7    A.   Yes.

8    Q.   Pfluger?

9    A.   Yes.

10   Q.   Garner?

11   A.   Yes.

12   Q.   Okay.   All of you worked for GMS and Z104,

13   had responsibilities there, as corporate management,

14   correct?

15   A.   Yes.

16   Q.   You are nowhere listed in here, are you?

17   A.   Correct.

18   Q.   You were not terminated because the --

19   I'll use your words -- a larger percentage of your

20   position was to WTOP?

21   A.   Yes.

Page 177

1      Q.   The same applied to Mr. Donohoe, didn't

2   it?  The larger percentage of his job was WTOP?

3      A.   Yes.

4      Q.   What does the word larger percentage mean,

5   what's the cut-off?

6      A.   I don't have a particular percentage.

7      Q.   Why wasn't Mr. Donohoe kept on, much like

8   you all were kept on.  In fact, you all weren't even

9   listed.  Why was Mr. Donohoe not kept on?

10      A.   Because he was part of the WGMS sales

11   department.  That department was let go in its

12   entirety.

13      Q.   The larger part of his responsibilities

14   were for WTOP, as defined in your own document here.

15   And, as you just testified to.

16      A.   Yes.

17      Q.   So why didn't he fall under the category

18   of people who were retained?

19      A.   Because the entirely GMS sales department

20   was let go.

21      Q.   So was corporate management Z104.

Page 178

1      A.    Z104 -- what was the question?

2      Q.    Why wasn't he kept?  Z104 was shut down.

3      A.    Because the entire GMS -- our reasoning

4    there was, the entire GMS was let go.

5      Q.    That's all you got?

6      A.    That's what I got.

7      Q.    You weren't included or these other people

8    because a larger percentage of the job was for TOP?

9      A.    We were not part of the GMS sales

10   department or part of --

11     Q.    Corporate management.  Let's not mince

12   words.  Corporate management.  Is that the only

13   reason you weren't included in it?

14     A.    The reason I was not included in it was --

15   what's your question again?

16     Q.    Why weren't you all included?  Mr. Donohoe

17   was included, although the larger percentage of his

18   job was TOP.

19     A.    Because he was part of the GMS sales

20   department and we were not.  That business unit was

21   let go.

Page 179

1          Q.    So was the corporate management group of

2     GMS and WWZZ.  See right there, right in the front

3     page?

4          A.    Yes.

5          Q.    That group is listed as well.  The people

6     you just named you said were part of that group.

7     Yet they weren't let go.  And the reason being -- is

8     this the only reason, because a larger percentage of

9     their job was with TOP.  Is there any other reason

10    you all weren't let go?

11         A.    It was simply because, like I said, it was

12    different departments, what department you fell

13    under.

14         Q.    Answer my question, sir.

15         A.    WGMS, the decision was made that

16    department would be let go in its entirety.  So

17    would Z104's programming staff and so was Z104 sales

18    staff.  Corporate management the decision was not to

19    let go everyone in that department.

20         Q.    But this, sir, BIC6789 doesn't limit it to

21    corporate management.  It says --

# EXHIBIT B

**Purpose or reason for the reduction:**
Restructuring and reorganizing the DC market and the ability to reach more listeners with stronger frequency signals.

**Expected outcome:**
Good communication so that all parties involved both internally and externally would know the purpose and reason with as little as possible confusion or disturbance.

**Plan for advancing:**
Several versions of the transition time table were prepared, distributed, or redistributed. Managers worked on their assignments. Continued meetings, phone call, and emails took place to make sure that all parties were on the same page and that assignments were being accomplished as well as addressing new issues.

**The part managers would play in making the changes successful:**
Managers discussed department needs. Managers not involved in Final meeting were asked to assist other departments. Managers were asked to be present and to be resourceful as well as knowledgeable regarding the situation. Everyone knew the time table. There were no boundaries in this effort, everyone worked as one.

**Termination of WWZZ staff:**
Management reviewed every employee. Discussing reactions and/or reason for concern. Management understood that the positions were being eliminated.

**Termination of the Sales Department for WGMS:**
Management discussed the reason for including the WGMS sales staff with this reduction. There would be a significant loss of inventory for the staff to sale. Inventory would be different with the new station development. Positions needed to be eliminated.

**Termination of the National Sales employees:**
Focus, inventory, and methods would be changing from the current method.

**Termination of WGMS Business Manager:**
Position was being eliminated, skill set not strong enough for new needs, lacks leadership abilities, lacks the ability to function w/out minimal supervision.

**Keeping key employees:**
Management decided that WWZZ Business Manager needed to be retained because of the strong skill set, strong leadership abilities, and strong ability to function with minimal supervision.

Other employees worked for all stations with a larger percentage for WTOP, therefore they were not included in the reduction. Traffic employees were not affected because there will continue to be traffic needs.

BIC 006789

# EXHIBIT C

# AFFIDAVIT OF PATTI FEARS

1. I am over twenty-one years of age and of sound mind. At all relevant times hereto, I was employed by Bonneville Corporation. I have personal knowledge of all facts contained in this affidavit.

2. I was hired by Bonneville in 1998 as the National Sales Manager (NSM) at WGMS, a radio station owned by Bonneville that had a classical music format.

3. Prior to my being hired for the full time position as NSM for WGMS, Leo Donohoe performed the duties along with the same responsibilities at WTOP.

4. As a National Sales Manager, my primary responsibility was to make sure that the rep firms and agency buyers were up to date on WGMS – its programming, inventory and pricing.

5. Availability of inventory and pricing of air time was generally set by the General Sales Manager. As a National Sales Manager, I passed on this information to the rep firms. There was often a "battle" between Local and National Sales regarding inventory, as local sales often brought in higher rates. The local rate was more controllable than the national rate which was dictated primarily by the station rating.

6. Local and national sales are generally vying for the same air time to sell to clients, and it is up to the GSM to determine who gets what and how much time to sell.

7. The rep firms may get upset about inventory and pricing, but the rep firms were not always aware of the mandate of the GSM – and could blame the NSM when in fact the NSM was only doing what the GSM instructed or allowed.

8. In 2001 I became the Local Sales Manager for WGMS.

9. In 2002, I became the General Sales Manage (GSM) for WGMS. At or about this time, Leo Donohoe again began performing the duties of NSM for WGMS as well as WTOP.

10. Leo Donohoe's primary job responsibilities, based on compensation, at Bonneville were as NSM for WTOP, another radio station owned by Bonneville Corporation. Leo Donohoe's office was always with WTOP and he only worked a very small percent of the time with WGMS. I believe that WGMS paid less than 20% of Leo Donohoe's salary.

11. WGMS was successful and profitable while I was GSM, and I met or exceeded budget.

12. When Leo Donohoe first returned to WGMS his performance was very strong.

13. I was competing with the GSM for WTOP, Matt Mills, for Leo Donohoe's time.

14.    My management style was much different than Matt Mills' management style. I would let Leo Donohoe participate in and contribute at sales meetings, and I was told that Matt Mills did not.

15.    I would encourage Leo Donohoe to become more proactive and discuss ways that Leo Donohoe could improve, but Matt Mills simply demanded that things be done a certain way.

16.    Leo Donohoe's performance as NSM for WGMS was generally good and his evaluations were generally positive.

17.    Leo Donohoe had a very good relationship with the rep firms, and the reps generally liked Leo Donohoe.

18.    Matt Mills was not supportive of Leo Donohoe, and treated Leo Donohoe and the more senior members of the WTOP staff differently than the younger employees.

19.    Although I did not work directly for or with Matt Mills, I had the opportunity to interact with him at management meetings and I interacted with his staff frequently.

20.    Many of those who worked for Matt Mills voiced complaints about Matt Mills - particularly the veterans. Those that were older than Matt Mills were the most upset. The joke used to be that you had to be young with long legs for Matt Mills to pay any attention to you.

21.    Older women and men had the most problems with Matt Mills. I heard complaints from Jody Lish and Jean Fowler about the fact that Matt Mills was giving accounts to the younger – less experienced women. The mature staff really felt that Mills didn't give them a fair shake.

22.    Matt Mills made comments and exhibited an attitude of "you can't teach an old dog new tricks." He made comments about Leo Donohoe doing things the "old" way. Matt Mills said that Leo Donohoe was "too set in his ways" and that Leo Donohoe had been doing this for "too long."

23.    Joel Oxley made comments to me about Leo Donohoe in which Joel Oxley indicated that he was frustrated with Leo Donohoe based upon information received from Matt Mills.

24.    As GSM of WTOP, Matt Mills was in control of air time and the distribution of accounts for that station. Matt Mills controlled who got what at WTOP. Matt Mills treated the younger workers more favorably, and made exceptions to rules for some of the younger workers. For example, a younger worker was allowed to directly book business without going through a rep firm · which was against the contract with our rep firm and took business from Leo Donohoe.

25.    The Reduction in Force that was implemented in January of 2006 was a joke.

26.    It was immediately apparent to me that Bonneville implemented the Reduction in Force (RIF) as a means of getting rid of employees that would be to risky to terminate – such as myself, an African American female who was over forty (40) and who had performed well for Bonneville for many years.

27.    I was shocked that Leo Donohoe was included in the RIF. Leo Donohoe was primarily a WTOP employee, and we were told that the RIF was being done because Bonneville was changing the format of WGMS. It did not make any sense to include Leo Donohoe in the group of people who were being let go.

28.    In fact, Bonneville did not change the format of WGMS for at least another year, further indicating that the purported reason for the RIF was pretext.

29.    I knew immediately that the younger workers would be rehired – and in fact they were.

30.    It was clear that Bonneville was simply using the RIF to clean house and to get rid of people that it would be risky to eliminate.

31.    Bonneville informed the group that the RIF was being made because they were taking WGMS in a different direction. The station continued on – so it made no sense to have a RIF. Ultimately, they rehired all the younger workers. The only exception was the former LSM of WGMS, Patti Cochran (50), was rehired as a sales person.

32.    I was also shocked by the callousness in which the RIF was conducted. Those that were let go were given 15 minutes to gather their belongings and leave. Boxes were on our desk when we got back to our desk from the staff meeting and our computer access had been terminated. As we were doing so, the caterers were coming in to set up for a big celebration to kick off the start of the "new" station (WTWP). In fact, the frequency changed but the format did not change for over a year.

33.    Although everyone was invited to reapply, we were informed that not all would be rehired.

34.    I did reapply for my position – and interviewed with Matt Mills. Matt Mills did not conduct any real interview, instead mainly asking questions about my position as an ordained minister. It was apparent that Matt Mills never seriously considered rehiring me.

35.    I heard that a similar RIF/reorganization occurred in San Francisco - in which they got rid of a lot of senior people, including Annie Block.

36.    While I was employed with Bonneville, I was generally aware of Mike Spacciapoli's performance and reputation within the industry. Hiring him over Leo Donohoe was a huge mistake.

37.    Leo Donohoe was much more qualified to perform the essential job duties of the position than Mike Spacciapoli.

38.    Mike Spacciapoli is very friendly with Matt Mills. They were young guys who used to party a lot.

39.    Mike Spacciapoli used to drive the advertisers crazy. I was aware of many complaints about his performance when he was a sales person for the national rep firm and as NSM.

40.    As a GSM, I would be highly suspect of Katz (a rep firm) actively recommending their prior employee, because if a rep firm loves you too much, you are giving things away, which is not in the best interest of Bonneville.

41.    Matt Mills had a problem with Leo Donohoe, and it appeared that the problem was based in large part with Leo Donohoe's age.

42.    Based upon information and belief, Leo Donohoe's age played a large part in the employment decisions that were made by Matt Mills and Bonneville regarding Leo Donohoe's employment, termination and non-selection.

43.    I seriously considered pursuing an action against Bonneville myself. However, due to personal reasons, including the fact that my father died shortly after the RIF occurred, I did not pursue legal action.

44.    I believe that Bonneville discriminated against me and others, including Leo Donohoe, on the basis of age.

I HEREBY SWEAR UNDER THE PENALTIES OF PERJURY THAT THE STATEMENTS MADE HEREIN ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

PATTI FEARS