**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

LEO DONOHOE,                       :

                              :

       Plaintiff,               :

                              :

v.                             :      Civil Action No.: 07-949 (RWR)

                              :

BONNEVILLE INT'L CORP.,       :

                              :

       Defendant.            :

**<u>PLAINTIFF'S REPLY TO DEFENDANT'S CONSOLIDATED OPPOSITION TO
PLAINTIFF'S SUPPLEMENTAL OBJECTIONS TO ORDER DENYING MOTION FOR
ADDITIONAL DEPOSITIONS AND OPPOSITION TO PLAINTIFF'S RENEWED
MOTION FOR ADDITIONAL DEPOSITIONS</u>**

Despite presenting a ten (10) point opposition to Plaintiff's supplemental objections and renewed motion for additional depositions, Defendant's consolidated opposition avoids addressing the real merits of Plaintiff's arguments, namely, that new information that was adduced during the course of the depositions already taken confirms that additional depositions are necessary in order to allow Plaintiff the opportunity to fully investigate and prepare his case in this matter. Unable to avoid the importance of the new evidence presented to this Court, Defendant chooses instead to downplay the importance of the newly received testimony and argue that Plaintiff's filings are procedurally defective and wholly meritless. Defendant's procedural arguments are completely without merit. All seven (7) depositions have been taken or have been scheduled. The Court has been provided with ample evidence to enable the Court to ascertain whether or not the seven (7) depositions that have been taken were in fact necessary. The remaining deposition (of the seven (7) permitted) that has yet to be taken is of Mr. Spacciapolli, a critical witness in this matter, as reflected in the arguments previously presented

1

to the court.[1] Defendant cannot credibly assert that the testimony of this witness is not relevant to this matter.

Nor can Defendant credibly object to the filing of the renewed motion for leave to take additional depositions. In fact, it was Defendant who argued in its Oppositions that Plaintiff should present the evidence that was contained in the Plaintiff's Objections to the Magistrate's Order for consideration only after all of the seven (7) depositions had been taken. Defendant cannot now object when Plaintiff does so.

The matters raised in the supplemental objections and renewed motion are not new arguments, but rather, newly obtained evidence that has been submitted to the Court because the testimony impacts on the arguments presented in Plaintiff's recent filings. Furthermore, the new evidence at issue bears significantly on the arguments currently pending before the Court and deserves consideration. Regardless of how Defendant tries to characterize these filings, Plaintiff has properly presented the Court with ample evidence that clearly illustrates leave to take additional depositions is warranted in this matter.

The Defendant's opposition to Plaintiff's motion to increase the number of depositions is essentially based on two (2) faulty grounds. First, it is based on an incorrect claim that the information is hearsay and unreliable, and as such, should not be considered by this Court. Secondly, Defendant incorrectly argues that the Plaintiff should be limited to seven (7) depositions because the other requested depositions would produce cumulative or irrelevant information. As is demonstrated in complete detail in Plaintiff's Objection to the Magistrate's Order and subsequent pleadings (which are incorporated and adopted by reference into the renewed motion for leave [Dkt#34] as well as in the present reply), each witnesses identified by

---

[1] In fact, this deposition was rescheduled to accommodate the witness, as well as counsel's schedules.

Plaintiff holds a unique piece of the overall puzzle, and it is critical that Plaintiff be permitted the opportunity to elicit testimony from each of the witnesses in order to establish that the partial picture that Defendant paints is inaccurate, incomplete and pure pretext for age discrimination. Far from being irrelevant and cumulative, the requested discovery goes to the heart of Plaintiff's claims. Actually, as the following paragraphs demonstrate, it is Defendant's opposition that is filled with cumulative and irrelevant objections and Plaintiff's renewed motion for additional depositions should be granted.

     A.    The Supplemental Objections and the Renewed Motions are not Surreplies but are Supplemental Filings Apprising the Court of Newly Obtained Evidence that is Relevant to its Review of the Plaintiff's Pending Motions Before this Court.

In its supplemental objections and renewed motion to conduct additional depositions, the Plaintiff is offering recently obtained testimony as supplemental grounds to be included in its pending motions requesting leave to conduct additional depositions. To answer Defendant's question about "[W]hat is the basis" for these filings, Plaintiff answers that the basis is information received in a June 4, 2008 deposition regarding a conversation that took place between Plaintiff's direct supervisor (Matt Mills, Director of Sales) and a management level employee of Defendant's company (Joel Oxley) involving a plan to eliminate all of Defendant's employees over the age of forty. One of those employees was Plaintiff. Throughout the course of this litigation, witnesses have also informally and formally advised that Matt Mills, who was Plaintiff's supervisor, was clearly trying to get rid of the "veteran" workers in order to replace them with a younger workforce. *See, e.g.,* Affidavit of Patricia Fears, attached as Exhibit A. Upon information and belief, other employees had raised concerns that Mr. Mills was discriminating against older workers during the time period surrounding the employment

decisions that are at issue. Former Bonneville management level employee Richard O'Brien has testified that there was a file maintained by Bonneville that contained evidence of complaints against Matt Mills. *See* Transcript of Deposition Testimony of Mark O'Brien, attached hereto as Exhibit B at pp. 11-12 and 14-16. This file has never been produced by Defendant, and Defendant has always taken the position that it had not received any complaints about Mr. Mills. Mr. O'Brien's testimony clearly refutes Defendant's statements regarding prior complaints.

In light of the testimony so far received on the record, the relevance of the newly obtained June 4, 2008 testimony is significant. Therefore, the need to present the evidence to a Court that is currently reviewing Plaintiff's Objections to Magistrate Judge Robinson's April 23, 2008 Order [Dkt#20] is crystal clear. In fact, Plaintiff offers the supplemental objections and the renewed motion or additional depositions for the simple reason that in light of the newly received evidence, together with the other grounds presented in Plaintiff's pending motion and objections, should be a part of the record properly before this Court as it considers those pending motions. Despite the damaging effect of this testimony for Bonneville's defense, these are not new arguments or new legal theories regarding the case and Defendant are not being surprised in any way by having the Court review the additional grounds.

B.    The Court Should Review the Newly Obtained Evidence as Part of the Record as it considers the Plaintiff's Currently Pending Motions and Objections.

Defendant's references to the recent deposition testimony of its executive employee as "exceptionally speculative" or "triple hearsay" is misguided and distracts from the importance of that testimony as an additional basis for conducting additional depositions. *See* Def. Con. Op. at 3. To the extent the Defendant has labeled the deposition testimony as "hearsay," the categorization is irrelevant because the testimony is not being offered at trial or being presented

4

to the jury. Because this is discovery, the rules deciding whether a party may obtain certain materials is more freely construed and trial courts have considerable discretion when handling discovery matters. *Food Lion Inc. v. United Food and Commercial Workers Int'l Union,* 103 F.3d 1007, 1012 (D.C.Cir.1997) (citing *Brune v. Internal Revenue Serv.,* 861 F.2d 1284, 1288 (D.C.Cir.1988)). The scope of discovery in civil actions is broad, allowing for discovery regarding any non-privileged matter that is relevant to a claim or defense. *See* Fed R. Civ. P. 26(b)(1). The term relevance at the discovery stage is broadly construed to include information which is not admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. *See id.* All discovery is subject, however, to the limitations imposed by Rule 26(b)(2)(C). *See id.* Therefore, while the evidentiary rules against hearsay may bar certain testimony from being presented at trial, the same theories does not apply to preclude information from being produced in discovery. This is especially true when the information is likely to lead to the discovery of evidence that would be admissible at trial.

More importantly, Defendant's references to the new grounds as "hearsay" is a misnomer and deliberately done to create confusion. The statements between Mr. Mills and Mr. Oxley are not hearsay because they are admissions of party opponents. Because the statements of Mr. Mills and Mr. Oxley were made in the capacity as Defendant's executive officers, there statements are even considered hearsay, but are admissions of party opponents. *See* F.R.E 801 (d)(2)(C)-(D) (A statement is not hearsay if the statement is made by a person authorized by the party to make a statement concerning the subject, or a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship). A party's own statement is the classic example of an admission. If the person to whom the statement is attributed has a representative capacity and the statement is offered

against him in that capacity, no inquiry whether he was acting in the representative capacity in making the statement is required; the statement need only be relevant to represent affairs.  *See* Notes to Federal Rules of Evidence Rule 801.

Furthermore, the very reason that Plaintiff has filed his motion seeking leave to take additional depositions is to avoid the very objection that Defendant now makes during discovery. On the one hand, Defendant argues that additional depositions would be cumulative.  Defendant, however, also objects to the Court's consideration of the newly obtained testimony as constituting hearsay.  The Defendant cannot have it both ways.  In order to be able to prepare his case for trial, it is critical that Plaintiff be permitted to depose the individuals that have been identified, including the recently identified individual, so as to avoid the very same objections at trial that Plaintiff now attempts to make during discovery.

Finally, Defendant argues that the June 4, 2008 deposition testimony is unreliable and does not deserve this Court's attention when it reviews Plaintiff's pending objections and renewed motions.  Not surprisingly, Defendant asks this Court to not only wholly reject the sworn testimony of Defendant's own high ranking employee, but to also to ignore the significance of the implications that two (2) of Defendant's executive officers were overheard devising an illegal plan to fire the older workers. Rather than consider a fair and just approach by allowing further investigation, Defendant reacts by trying to discredit the sworn statements made at the June 4, 2008 deposition, to shut down and limit any further discovery, and request that the Plaintiff not be allowed to ever get to the truth of this crucial matter.  Like the ostrich that puts its head in the sand when facing danger, Defendant asks this Court to completely deny Plaintiff its valid right to present newly received evidence to this Court in support of its request to further depose Defendant's employees and other critical witnesses to uncover the truth behind these

matters.

      C.    Plaintiff has Presented Valid Grounds for this Court to Grant Leave to Conduct More Depositions, Including the Information Revealed at the Recently Conducted Depositions.

Defendant points to no legitimate reason to prevent Plaintiff from conducting full discovery in this matter. Defendant does not cite to a single case in this jurisdiction that supports the proposition that Plaintiff should be precluded from requesting or receiving this increase. In fact, the cases that Defendant cites are from other jurisdictions, and involve the application and interpretation of other local rules that are not at issues in this matter. These cases are irrelevant, and have no bearing on this case, which involves an age discrimination claim filed under the District of Columbia Human Rights Act ("DCHRA").

As has already been discussed in Plaintiff's Objections to Magistrate Judge Robinson's April 23, 2008 Order [Dkt#20], Plaintiff's Supplemental Objections to Magistrate Judge Robinson's April 23, 2008 Order [Dkt#33], and Plaintiff's Renewed Motion for Leave to Take Additional Depositions [Dkt#34], incorporated and adopted herein by reference, the witnesses identified by the parties possess crucial information regarding Defendant's discriminatory motivation for firing him and their testimony will have a significant impact regarding the claims and defenses at issue in this litigation. Plaintiff's need to obtain this vital information, and the impossibility of obtaining such information by any other means, justifies his request for this Court to reconsider its prior rulings and increase the number of depositions from the current limit of seven (7) to a new limit of twenty two (22). Despite Defendant's conduct which has prevented Plaintiff from informally gathering information from many of the critical fact witnesses that are still employed by Defendant, Plaintiff continues to discover new information that demonstrates Defendant acted wrongfully in terminating him. This newly obtained

testimony is a good example of the type of comments indicative of age discrimination that were made by senior level employees at or about the time that the decision was made to include Mr. Donohoe in the 2006 reduction in force. Moreover, as the clear language of the deposition testimony reveals, there are other potential witnesses known by Defendant who possess relevant information regarding the decision to hire a much younger, less experienced individual instead of Mr. Donohoe after the implementation of the reduction in force.

As has been discussed in great detail in Plaintiff's Supplemental Objections to Order Denying Motion for Additional Depositions [Dkt#33] and the Renewed Motion for Additional Depositions [Dkt#34], incorporated by referenced and adopted herein, at the June 4, 2008 deposition of Defendant's employee, Jody Lish, she testified that Mr. Martin claims to have heard a conversation between Defendant's executive officers regarding Defendant's plan to fire all the over-40 workers. In correspondence to Plaintiff, Defendant claims they have no contact information for Mr. Martin and have not indicated that they are planning any search to obtain it.[2] *See* Exhibit C, Letter from Defendant's counsel regarding Mr. Martin.

To be sure, Defendant continues to utilize its tactic of providing new and important information after the appropriate time to produce it has long passed. Case in point, on July 3, 2008, new deposition testimony from Mr. Joel Oxley demonstrates that Plaintiff will need to conduct an investigation into a conversation Mr. Oxley admitted having with Kevin Ulich, Chief Operating Officer of the National's Baseball group. Mr. Oxley's testimony that he discussed the reorganization with Mr. Ulich prior to the 2006 reduction in force taking effect cannot be taken lightly. *See* Exhibit D, Transcript of Deposition Testimony of Joel Oxley at pp. 137-141. Now

---

[2]  Plaintiff will need to take the records deposition of Cecil's last known employer to obtain contact information for his current whereabouts.

that Plaintiff knows Mr. Ulich was informed of the reduction in force and the changes before it happened, it is imperative that Plaintiff hear directly from Mr. Ulich what he learned from Mr. Oxley about the reduction in force and any details regarding how it would be implemented. Moreover, given Defendant's assertions that Mr. Spacciapolli was selected over Plaintiff because of Mr. Spacciapolli work with the National's group, it is necessary to depose a Corporate Designee of the National's group to obtain their view on this subject. *Id.* Plaintiff has a right (not to mention a dire need) to know about how the National's group viewed Mr. Spacciapolli's involvement with the National's group and then compare that testimony with the Defendant's prior assertions that Mr. Spacciapolli was selected over Plaintiff because of Mr. Spacciapolli work in negotiating the National's group contract. The advantage Defendant has in insuring that Plaintiff is not given such an opportunity is evident[3].

        D.  Pursuant to the Magistrate Judge's Request, Plaintiff is Willing to Amend its Request for Additional Depositions and Seek Only Leave to Take the Most Essential Witnesses.

In Defendant's opposition, it repeatedly cries out that regardless of what Plaintiff is presenting as grounds in support of additional depositions, that any request for more depositions is premature and meritless. In response, Plaintiff reiterates its arguments that the additional depositions are vital and to the prosecution of its claims and each one of the twenty two (22) requested is crucial. Limiting Plaintiff to the seven (7) depositions effectively prohibits Plaintiff from obtaining evidence that is critical to establishing motive and pretext. Nevertheless, in following the Court's suggestion that the parties attempt to resolve some of their differences in

---

[3] This information should have been provided in either Defendant's Initial Disclosures or in its answers to Plaintiff's Interrogatories. Not surprisingly, Defendant's failed to identify anyone from the Nation's group.

discovery[4], Plaintiff offers to minimize its request for additional depositions and seek only leave to take the most essential witnesses. This is Plaintiff's good faith gesture to offer a solution to this discovery deadlock.

Information produced by the Defendant renders it necessary for Plaintiff to have leave to depose the following essential witnesses[5]:

1.    John Hensano (Vice President and General Sales Manager of Eastmond Radio)

2.    A 30(b)(6) deposition of the Corporate Designee of Katz Group

3.    Jory Steiber (Bonneville)

4.    Paul White, PhD (expert witness for Defendant)

5.    Ralph Renzi (Bonneville)

6.    Skip Quast (Bonneville)

7.    Bob Johnson (Bonneville)

8.    Bruce Reese (Bonneville)

9.    Scarlett Pate (Bonneville)

10.   Christine Travaligni (Katz or Affiliates)

11.   Daniel Kliener (Bonneville)

12.   Cecil Martin (Bonneville)[6]

13.   Kevin Ulich (National's Baseball Group)[7]

---

[4] On July 2, 2008 the parties appeared in the Courtroom of Magistrate Judge Robinson to present its Motion to Compel. The Court's law clerk, instead, lead the parties into a room and asked that they attempt to resolve their differences prior to presenting the motion to the Court. In an effort to move the litigation forward, and in the spirit of the Court's suggestion, Plaintiff offers an alternative prayer for relief suggesting that, as a compromise, it be allowed to conduct thirteen (13) essential depositions.

[5] The grounds in support of Plaintiff's request for these essential depositions have been explained in Plaintiff's Response to Order of the Court Dated 4/23/08 Denying Plaintiff's Motion for Leave to Take Additional Depositions [Dkt#20].

[6] Plaintiff will need to take the records deposition of Mr. Martin's last known employer to obtain contact information for his current whereabouts.

[7] Plaintiff may need to take the deposition of a 30(b)(6) representative of the National's group to obtain contact information for his current whereabouts if Mr. Ulich no longer works for the National's group. Plaintiff needs to explore Mr. Spacciapolli involvement with the National's group given Defendant's representation that Mr. Spacciapolli's involvement with the National's group was an important reason in selecting him over Plaintiff.

E. If Additional Depositions are not allowed, the Prejudicial Effect on Plaintiff will be irreversible.

Plaintiff has already experienced the prejudicial effects of having its depositions limited to a number below even that allotted by the Federal Rules of Civil Procedure.[8] There is no reason why Plaintiff should be confined to the discovery barriers set by Defendant when the Rules of Civil Procedure allows for at least ten (10) depositions to be taken without leave of court. It does not make any sense that a matter as highly complicated as this litigation, involving the reduction in force of over fifty (50) employees, would only be given the opportunity to depose seven (7) witnesses, when the federal rules allow for at least ten (10) depositions for any "run of the mill" case being tried in federal court. Moreover, and it is important to note, since the beginning of this lawsuit Plaintiff has always taken the position that seven (7) depositions would be insufficient. In the Joint Report Pursuant to Local Civil Rule 16.3 [Dkt#9], Plaintiff indicated that ten (10) depositions per party would be necessary while Defendant requested the parties be limited to only five (5) depositions each. *See* Exhibit E. Again, at the initial scheduling conference meeting on October 26, 2007 before this Court, Plaintiff's counsel voiced his concerns that imposition a limitation of seven (7) depositions was woefully inadequate and instead argued that twelve (12) to fifteen (15) depositions would be necessary. Acknowledging Plaintiff's counsel's concerns, and to the best of counsel's recollection, the Court imposed the limitation at seven (7) depositions with the understanding that the parties would be able to return to the Court and request additional deposition if they were needed[9]. That time has now come and

---

[8] *See* Federal Rule of Civil Procedure 30(a)(2)(A)(1)(allowing a party a maximum of ten (10) depositions without needing to seek leave of Court).

[9]  This conversation with the Court occurred at the October 26, 2007 initial scheduling conference.  As of the writing of the reply, a transcript of the proceeds could not be made available.  Plaintiff's counsel has ordered a copy and will deliver copies of the relevant portions of the referenced conversation with the Court once it is available.

Plaintiff begs this Court's assistance in removing these obstacles and allowing discovery to move more effectively toward a just spirit of cooperation and fairness as is contemplated by the rules. If these essential depositions are not taken, at the very least, the prejudicial effect to Plaintiff will be severe.   Unless Plaintiff is allowed to engage in complete discovery, the result will be Defendant achieving its goal of keeping important, relevant and vital information away from the trier of fact.

It is not only additional depositions that Defendant hopes to avoid, but Plaintiff has been prejudiced by Defendant's indolence in producing the relevant information as it is obligated to do under this Court's discovery rules.  Despite several attempts to resolve the issues informally, Defendant's refusal to provide the requested discovery or to submit to additional depositions has forced Plaintiff to seek this Court's assistance. If this Court refuses to help Plaintiff, the negative impact will be profound.  Defendant stands firm on its self drawn limitations on discovery and refusal to provide any information in response to any materials requested after Plaintiff's first 30 documents requests.  In doing so, Defendant has managed to tie Plaintiff's hands and effectually block him from preparing this case for trial.  Moreover, Plaintiff has been hamstrung by Defendant's self-given right to create objections based on relevancy (which should not apply to discovery) or admissibility (which should only apply to trial evidence).  Clearly such behavior is wrong as Defendant's conduct does not even comport with this Court's rules on the number of document requests allowed to a party[10].  Defendant's tactics have prevented Plaintiff from effectively conducting discovery and preparing its case for trial.

WHEREFORE, Plaintiff Leo Donohoe respectfully requests the Court modify the

---

[10] *See* Federal Rule of Civil Procedure 34 (no set limit of requests a party may propound during discovery).

provisions of the October 26, 2007, Scheduling Order by increasing the number of depositions that Plaintiff is allowed to take from seven (7) to twenty-two (22).  In the alternative, and to comport with this Court's request that the parties reduce their discovery differences to the bare minimum, Plaintiff request this Court allow them to conduct the thirteen (13) most essential depositions, as referenced in this reply.

Respectfully submitted,

CARR MALONEY, P.C.

By:  /s/ Ali Beydoun
Ali A. Beydoun, Esquire
1615 L Street, NW, Suite 500
Washington, DC  20036
(202) 310-5500/(202) 310-5555 (FAX)
Attorney for Plaintiff
aab@carrmaloney.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of July, 2008, a copy of the foregoing was sent via the Court's electronic filing system to Richard Cys, Esquire, Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC  20006, Attorney for Defendant.

 /s/ Ali Beydoun
Ali A. Beydoun

# EXHIBIT A

## AFFIDAVIT OF PATTI FEARS

1.    I am over twenty-one years of age and of sound mind. At all relevant times hereto, I was employed by Bonneville Corporation. I have personal knowledge of all facts contained in this affidavit.

2.    I was hired by Bonneville in 1998 as the National Sales Manager (NSM) at WGMS, a radio station owned by Bonneville that had a classical music format.

3.    Prior to my being hired for the full time position as NSM for WGMS, Leo Donohoe performed the duties along with the same responsibilities at WTOP.

4.    As a National Sales Manager, my primary responsibility was to make sure that the rep firms and agency buyers were up to date on WGMS – its programming, inventory and pricing.

5.    Availability of inventory and pricing of air time was generally set by the General Sales Manager. As a National Sales Manager, I passed on this information to the rep firms. There was often a "battle" between Local and National Sales regarding inventory, as local sales often brought in higher rates. The local rate was more controllable than the national rate which was dictated primarily by the station rating.

6.    Local and national sales are generally vying for the same air time to sell to clients, and it is up to the GSM to determine who gets what and how much time to sell.

7.    The rep firms may get upset about inventory and pricing, but the rep firms were not always aware of the mandate of the GSM -- and could blame the NSM when in fact the NSM was only doing what the GSM instructed or allowed.

8.    In 2001 I became the Local Sales Manager for WGMS.

9.    In 2002, I became the General Sales Manage (GSM) for WGMS. At or about this time, Leo Donohoe again began performing the duties of NSM for WGMS as well as WTOP.

10.    Leo Donohoe's primary job responsibilities, based on compensation, at Bonneville were as NSM for WTOP, another radio station owned by Bonneville Corporation. Leo Donohoe's office was always with WTOP and he only worked a very small percent of the time with WGMS. I believe that WGMS paid less than 20% of Leo Donohoe's salary.

11.    WGMS was successful and profitable while I was GSM, and I met or exceeded budget.

12.    When Leo Donohoe first returned to WGMS his performance was very strong.

13.    I was competing with the GSM for WTOP, Matt Mills, for Leo Donohoe's time.

14.     My management style was much different than Matt Mills' management style. I would let Leo Donohoe participate in and contribute at sales meetings, and I was told that Matt Mills did not.

15.     I would encourage Leo Donohoe to become more proactive and discuss ways that Leo Donohoe could improve, but Matt Mills simply demanded that things be done a certain way.

16.     Leo Donohoe's performance as NSM for WGMS was generally good and his evaluations were generally positive.

17.     Leo Donohoe had a very good relationship with the rep firms, and the reps generally liked Leo Donohoe.

18.     Matt Mills was not supportive of Leo Donohoe, and treated Leo Donohoe and the more senior members of the WTOP staff differently than the younger employees.

19.     Although I did not work directly for or with Matt Mills, I had the opportunity to interact with him at management meetings and I interacted with his staff frequently.

20.     Many of those who worked for Matt Mills voiced complaints about Matt Mills – particularly the veterans. Those that were older than Matt Mills were the most upset. The joke used to be that you had to be young with long legs for Matt Mills to pay any attention to you.

21.     Older women and men had the most problems with Matt Mills. I heard complaints from Jody Lish and Jean Fowler about the fact that Matt Mills was giving accounts to the younger – less experienced women. The mature staff really felt that Mills didn't give them a fair shake.

22.     Matt Mills made comments and exhibited an attitude of "you can't teach an old dog new tricks." He made comments about Leo Donohoe doing things the "old" way. Matt Mills said that Leo Donohoe was "too set in his ways" and that Leo Donohoe had been doing this for "too long."

23.     Joel Oxley made comments to me about Leo Donohoe in which Joel Oxley indicated that he was frustrated with Leo Donohoe based upon information received from Matt Mills.

24.     As GSM of WTOP, Matt Mills was in control of air time and the distribution of accounts for that station. Matt Mills controlled who got what at WTOP. Matt Mills treated the younger workers more favorably, and made exceptions to rules for some of the younger workers. For example, a younger worker was allowed to directly book business without going through a rep firm · which was against the contract with our rep firm and took business from Leo Donohoe.

25.     The Reduction in Force that was implemented in January of 2006 was a joke.

26.    It was immediately apparent to me that Bonneville implemented the Reduction in Force (RIF) as a means of getting rid of employees that would be to risky to terminate – such as myself, an African American female who was over forty (40) and who had performed well for Bonneville for many years.

27.    I was shocked that Leo Donohoe was included in the RIF.  Leo Donohoe was primarily a WTOP employee, and we were told that the RIF was being done because Bonneville was changing the format of WGMS.  It did not make any sense to include Leo Donohoe in the group of people who were being let go.

28.    In fact, Bonneville did not change the format of WGMS for at least another year, further indicating that the purported reason for the RIF was pretext.

29.    I knew immediately that the younger workers would be rehired – and in fact they were.

30.    It was clear that Bonneville was simply using the RIF to clean house and to get rid of people that it would be risky to eliminate.

31.    Bonneville informed the group that the RIF was being made because they were taking WGMS in a different direction.  The station continued on – so it made no sense to have a RIF.  Ultimately, they rehired all the younger workers.  The only exception was the former LSM of WGMS, Patti Cochran (50), was rehired as a sales person.

32.    I was also shocked by the callousness in which the RIF was conducted.  Those that were let go were given 15 minutes to gather their belongings and leave. Boxes were on our desk when we got back to our desk from the staff meeting and our computer access had been terminated.  As we were doing so, the caterers were coming in to set up for a big celebration to kick off the start of the "new" station (WTWP).  In fact, the frequency changed but the format did not change for over a year.

33.    Although everyone was invited to reapply, we were informed that not all would be rehired.

34.    I did reapply for my position – and interviewed with Matt Mills.  Matt Mills did not conduct any real interview, instead mainly asking questions about my position as an ordained minister.  It was apparent that Matt Mills never seriously considered rehiring me.

35.    I heard that a similar RIF/reorganization occurred in San Francisco - in which they got rid of a lot of senior people, including Annie Block.

36.    While I was employed with Bonneville, I was generally aware of Mike Spacciapoli's performance and reputation within the industry.  Hiring him over Leo Donohoe was a huge mistake.

37.     Leo Donohoe was much more qualified to perform the essential job duties of the position than Mike Spacciapoli.

38.     Mike Spacciapoli is very friendly with Matt Mills. They were young guys who used to party a lot.

39.     Mike Spacciapoli used to drive the advertisers crazy. I was aware of many complaints about his performance when he was a sales person for the national rep firm and as NSM.

40.     As a GSM, I would be highly suspect of Katz (a rep firm) actively recommending their prior employee, because if a rep firm loves you too much, you are giving things away, which is not in the best interest of Bonneville.

41.     Matt Mills had a problem with Leo Donohoe, and it appeared that the problem was based in large part with Leo Donohoe's age.

42.     Based upon information and belief, Leo Donohoe's age played a large part in the employment decisions that were made by Matt Mills and Bonneville regarding Leo Donohoe's employment, termination and non-selection.

43.     I seriously considered pursuing an action against Bonneville myself. However, due to personal reasons, including the fact that my father died shortly after the RIF occurred, I did not pursue legal action.

44.     I believe that Bonneville discriminated against me and others, including Leo Donohoe, on the basis of age.

I HEREBY SWEAR UNDER THE PENALTIES OF PERJURY THAT THE STATEMENTS MADE HEREIN ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

PATTI FEARS

# EXHIBIT B

Page 10

1  those two years.
2      Q.   Up to 1990, 1991?
3      A.   Approximately 1991. I'm not sure of the
4  date.
5      Q.   Then what?
6      A.   I became the director of sales for both
7  those stations, WTOP and WASH. I believe that was
8  in mid-1992 to 1994.
9      Q.   Then what?
10     A.   Became the vice-president, general manager
11 of WASH some time in 1994.
12     Q.   How long did you hold that position?
13     A.   Held that position until 2000.
14     Q.   What was your next?
15     A.   Included in that position I ran WASH, also
16 had a station called DC 101 where I was a VP/GM,
17 WGAY FM where I was in the same position during
18 those six years.
19     Q.   VP, general manager, all those stations
20 were under you?
21     A.   Correct.

Page 11

1          Left on my own accord some time in March of
2  2000.
3      Q.   For what reason?
4      A.   The company just merged with a large
5  company. I didn't agree with their philosophy.
6      Q.   What company did it merge with?
7      A.   Clear Channel Communications.
8      Q.   Outlet Communications merged with Clear
9  Channel or was it --
10     A.   I'll try to give you the best recollection
11 I can on that beginning with that 1986 date.
12         I believe it went from Outlet
13 Communications -- this is tough. Outlet to -- there
14 was a company in Rhode Island, another company. I'm
15 drawing a blank.
16     Q.   Was Bonneville in that chain of ownership
17 at any time?
18     A.   No. Well, I never worked for Bonneville
19 during that time period.
20         They purchased WTOP with a few other
21 stations I want to say in the late nineties. I

Page 12

1  don't remember when. But I never worked for them
2  during that time period.
3      Q.   Who was the merger partner with Clear
4  Channel in 2000 when you left?
5      A.   That was a company called AM/FM
6  Communications that was merged into Clear Channel
7  with some other companies. It was a large merger.
8      Q.   You left because you didn't agree with
9  what?
10     A.   Clear Channel ran their stations based on
11 a market philosophy and not an individual basis
12 where there was one market manager for the entire
13 group of radio stations within a given market and I
14 didn't think that was the right way to do it.
15     Q.   Why not?
16     A.   I thought that companies, if they did
17 that, would cut their expenses so much that stations
18 wouldn't be run properly and the larger stations
19 would end up doing very well and the mediocre and
20 smaller ones would never have a chance to get out of
21 that position.

Page 13

1      Q.   That would be across the formats as well?
2      A.   Yes.
3      Q.   Any problem with that, all formats being
4  sold under one management scheme, so to speak?
5      A.   I think it eliminates individuality and
6  creativeness. I think it's difficult for even one
7  talented person to pull that off.
8      Q.   What about the sales of stations with
9  different formats, say news format versus talk
10 versus music versus classical, did those require
11 different types of approaches to the sales?
12     A.   All formats would take different talents.
13 Some are easier than others to sell. Some are not.
14         To be specific, the best formats to sell if
15 you are in sales and broadcasting traditionally have
16 been the news or news talk type formats.
17     Q.   What are the harder ones?
18     A.   The harder ones are the formats that have
19 multiple competitors. That would be most music
20 formats.
21         Generally news and news talk stations don't

Page 14

1  have as many competitors as the music stations
2  would.
3      Q.   What about classical music?
4      A.   Classical music had been a dying format
5  when I got in the business and continued to die off
6  and I don't believe there was many left even in the
7  nineties around the country.
8          It was a difficult sale, mostly because the
9  people that listen to the station are a little on
10  the older end of the demographic that is out there
11  for advertisers.
12         So it's a challenging sale.
13     Q.   When you left in 2000 where did you go?
14     A.   Left in 2000.  I didn't go anywhere until
15  some time in I guess late November of 2000 at which
16  point I took a position as VP/GM with Bonneville
17  International.
18     Q.   What stations did they have at the time?
19     A.   At that time I was assigned to what was
20  then known as Z 104.  I'm drawing a blank on the
21  call letters.  WWBZ and WWZZ FM I believe were the

Page 15

1  call letters.
2      Q.   During these time periods did you ever
3  work with Mr. Donohoe?
4      A.   Yes.
5      Q.   What time periods would those be?
6      A.   Leo and I started working together at
7  DC 101 back in 1986.  That's when I first met him.
8  He actually went over to WTOP I believe before me
9  when I moved over there or right after me.  We were
10  close.
11     Q.   Is that around 1987?
12     A.   1987 I guess was the number, right around
13  there.  We missed each other by a couple of months
14  one way or the other.
15         We worked together on the same staff and he
16  ended up working for me.
17     Q.   That was when you became sales manager at
18  WTOP from 1989 to 1991?
19     A.   Whatever year it was, the late eighties
20  some time.
21     Q.   You were above Leo when you were sales

Page 16

1  manager at TOP?
2      A.   Yes.
3      Q.   What was Leo selling in 1989, in that
4  timeframe when you were sales manager at TOP?
5      A.   My experience with Leo was he was an
6  account executive which meant he would call on local
7  accounts.
8          Primarily at that time in his career most of
9  them would be direct accounts.  To specify, that's a
10  non-advertising agency account.
11     Q.   When you say non-advertising agency, you
12  mean -- is that the equivalent of a rep firm?
13     A.   It's the equivalent of calling on an
14  individual car dealer as an example instead of going
15  through the advertising agency who works for that
16  individual car dealer.
17     Q.   Is an advertising agency known as a rep
18  firm?
19     A.   No, two different things.
20     Q.   Explain that difference for me.
21     A.   A rep firm is just that.  It's a

Page 17

1  representative firm that is hired by radio stations
2  that has offices throughout the country, primarily
3  in New York, the major markets, that represent that
4  radio station for national sales.
5      Q.   That would be a Katz or Crystal?
6      A.   Katz, Crystal, now today Clear Channel has
7  their own rep firm, CBS has their own rep firm.
8          In those days there was a lot more rep
9  firms.  Thinking back, I think Katz was one of our
10  clients back them, probably Crystal, probably all of
11  them, because you did go through them based on
12  performance.
13     Q.   Based on their performance?
14     A.   Yes.
15     Q.   That relationship between the rep firm and
16  the station, explain that for me if you would.
17     A.   The relationship is the rep firm as a
18  sales force.  Usually in New York, Los Angeles,
19  Chicago, Boston, Atlanta, Dallas, the larger
20  markets, those salespeople could be selling 3, 400
21  stations for different companies.

5 (Pages 14 to 17)

# EXHIBIT C

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE  BELLEVUE  LOS ANGELES   NEW YORK  PORTLAND  SAN FRANCISCO   SEATTLE    SHANGHAI    WASHINGTON, D.C.

RICHARD L. CYS              SUITE 200                     TEL (202) 973-4200
DIRECT (202) 973-4217       1919 PENNSYLVANIA AVE NW      FAX (202) 973-4499
rickcys@dwt.com             WASHINGTON, DC 20006          www.dwt.com

June 30, 2008

Thomas L. McCally, Esq.
Carr Maloney P.C.
1615 L Street, NW
Suite 500
Washington, D.C. 20036

**Re:**  *Leo Donohoe v. Bonneville International Corp.,*
        **U.S. District Court for D.C., CA No. 07-949 (RWR)**

Dear Tom:

Subject to and without waiving our prior objections to your discovery requests, I am writing to provide you with information regarding "Cecil," the IT contractor identified in the Jody Lish deposition. This individual, named Cecil Martin, was not a Bonnville employee. He was an independent contractor employed by TMSI, a company based in Rockville, Maryland. He worked on-site for a short period of time (not more than 90 days) in early 2003. This is all the information that we have been able to obtain regarding this individual.

Very truly yours,

Richard L. Cys

cc: Ali A. Beydoun, Esq.

# EXHIBIT D

Page 130

1    A.   No.  It occurred at 3400 Idaho Avenue.
2    Q.   That is all you recall about it?
3    A.   Yes.
4    Q.   I mean its location?
5    A.   Yes.
6    Q.   You don't recall specifically where in the
7    building?
8    A.   No.
9    Q.   And what exactly did you all discuss?
10   A.   He said that he was convinced there were
11   big changes coming up.  And by talking to some of
12   the people at the Nationals baseball, and some
13   things that he had pieced together, he felt there
14   were big changes coming up.  I said there was a
15   possibility of that, and just hang tight, and we'll
16   see what happens.
17   Q.   Who asked for this meeting?
18   A.   He did.
19   Q.   How?
20   A.   We were at a promotion for Z104.  He came
21   to me and said, I just feel like there are a lot of

Page 131

1    changes coming up.  I said, this isn't the right
2    time to talk about it.  We can talk about it next
3    week.
4    Q.   Did you discuss anything with him at the
5    Z104 promotion about the changes that were coming,
6    or the new position of director of national
7    sales/sports sales?
8    A.   No.
9    Q.   At your meeting with him what did you
10   discuss about the new position?
11   A.   There were no specifics about any new
12   position.
13   Q.   Did you discuss the title of the new
14   position?
15   A.   No.
16   Q.   Did you discuss a job was going to be
17   eliminated and a new one created?
18   A.   No.
19   Q.   What else did you discuss with him that
20   you recall?
21   A.   Nothing else that I recall.  That there

Page 132

1    were strong chances there could be changes, and to
2    sit tight.
3    Q.   What did he say in response?
4    A.   That he would sit tight, but I remember
5    him saying that he was nervous.  I said, to stay
6    calm, let's let -- see what happens here.
7    Q.   What else was said?
8    A.   I do not recall anything else.
9    Q.   You don't recall anything else?
10   A.   There wasn't much else to say.
11   Q.   You just told one of your salespeople that
12   there's a strong chance there is going to be big
13   changes at the station.  And he didn't pry anymore,
14   ask you any other questions?
15   A.   He asked me specifics and I said I really
16   couldn't talk about exactly what might be happening.
17   We were looking at a lot of options.
18   Q.   Did specifics did he ask you?
19   A.   I do not recall.
20   Q.   Did he ask you whether his job was going
21   to be eliminated?

Page 133

1    A.   I do not recall.
2    Q.   Did he ask you if a new director of
3    national sales or sports sales and/or sports sales
4    would be created?
5    A.   Not that I recall.
6    Q.   You said you couldn't tell him any
7    specifics?
8    A.   I do not recall telling him any specifics.
9    Q.   Did you?
10   A.   I told him, I remember telling him that I
11   couldn't go into a lot of things, that there were
12   some options we were looking at.
13   Q.   All right.  That's a little more than you
14   remember in the discussion.  What else do you
15   remember?
16   A.   Nothing else.
17   Q.   It's your testimony under oath you didn't
18   mention anything to him about positions being
19   eliminated?
20   A.   I do not recall doing that.
21   Q.   Is it your testimony under oath you didn't

34 (Pages 130 to 133)

Page 134

1   mention to him anything about new positions being
2   created?
3      A.  Not that I remember.  Certainly with
4   changes, I think that would have been implied.
5      Q.  Did you discuss anything about the
6   changes?
7      A.  Not that I remember.
8      Q.  I would like to know under oath everything
9   you recall that you said or Mr. Spacciapoli said at
10  this meeting?
11     A.  I have told you.
12     Q.  Did you have any other meetings with him?
13     A.  He came to see me a couple more times in
14  the subsequent weeks.
15     Q.  When did the next meeting occur?
16     A.  A few weeks later.
17     Q.  What date?
18     A.  I do not remember.
19     Q.  You don't remember?
20     A.  No.
21     Q.  This meeting was in, you said, early

Page 135

1   November?
2      A.  Yes.
3      Q.  How much later -- days, a week, what?
4      A.  Maybe two weeks.
5      Q.  Where did you meet?
6      A.  I do not recall.  Other than it was in our
7   offices.
8      Q.  Did he ask for the meeting or did you go
9   to him?
10     A.  I remember him coming up to my office to
11  talk about it.  Maybe it was at my office that one,
12  by that point.  He came to my office a couple of
13  times over the next couple of weeks to try to get an
14  update on what was going on.
15     Q.  All right.  At the second meeting who was
16  present?
17     A.  Would have been just me and him.
18     Q.  Tell me exactly what was discussed.
19     A.  Similar to what we discussed before.
20     Q.  I want to know exactly what was said.
21     A.  I do not recall.

Page 136

1      Q.  You have no recollection of what was
2   discussed when, for a second time someone comes to
3   you and says --
4      A.  I remember talking about that we were
5   still evaluating our options, and that we had not
6   settled on things, and just sit type.  I remember
7   trying to calm him down, because he was, it seemed
8   to me, getting a little bit nervous about what was
9   going on.
10     Q.  What did he say to you?
11     A.  I remember him -- I remember him talking
12  about at that point talking to me, he felt like he
13  was a good employee, and he would be somebody who
14  would be a good fit for whatever it is we were
15  trying to do.  I remember him, it felt like maybe he
16  was trying to sell me a little bit on him.  I don't
17  recall any specifics.
18     Q.  Did he say what position he would be a
19  good fit for?
20     A.  I don't recall talking about a certain
21  position, no.

Page 137

1      Q.  What did you say in response?
2      A.  Sit tight.  We have got to see what
3   happens here.  There was still a lot of debate about
4   what we were going to do.
5      Q.  How did Mr. Spacciapoli indicate that he
6   had knowledge of the pending changes?
7      A.  He had talked to people at the Nationals.
8      Q.  Who?
9      A.  I do not recall him telling me which ones
10  he talked to.  But I had to inform the people at
11  Nationals what we were contemplating, because it
12  would affect my contract negotiations with them.
13     Q.  Who did you talk to at the Nationals?
14     A.  Kevin Uhlich.
15     Q.  What did you tell Mr. Uhlich?
16     A.  I told him about our possible plan with
17  the Washington Post.
18     Q.  Who is Mr. Uhlich?
19     A.  He was, I believe, their chief operating
20  officer at the time.
21     Q.  Is he still there?

35 (Pages 134 to 137)

Joel Oxley
Beta Court Reporters

Wednesday, July 2, 2008

Leo Donohoe v. Bonneville, Inc.

Page 138

1    A.  No.
2    Q.  Where is he now?
3    A.  I do not know.
4    Q.  Do you have any contact with him?
5    A.  No.
6    Q.  What did you tell him?
7    A.  I told him that we might be starting a new
8  radio station, Washington Post Radio.  That we were
9  going -- I told him about the possible signal
10  switches.  But the main thing was, that I talked to
11  him about, we were contemplating starting Washington
12  Post Radio, and that that would be a good fit for
13  Nationals baseball.
14    Q.  Did you tell him you were contemplating
15  getting rid of Z104?
16    A.  Not that I recall, no.
17    Q.  Why would Mr. Spacciapoli have any
18  concerns?
19    A.  Mr. Spacciapoli would have had concerns
20  because he knew changes were coming up.  So he was
21  thinking, I would guess he was thinking those

Page 139

1  changes could involve him.
2    Q.  What else did you tell Mr. Uhlich?  How do
3  you spell it?
4    A.  I believe it's U-H-L-I-C-H.
5    Q.  So it's your testimony under oath you told
6  him only that we are starting a new station,
7  Washington Post Radio, there may be signal changes,
8  and that the Post Radio would be a good fit for him?
9    A.  The bottom line he would be on 1500 and
10  107.7, if we made those changes, and that would a
11  good thing by him by increasing his distribution.
12    Q.  What did he say to you?
13    A.  He liked the idea.
14    Q.  When did you have this meeting?
15    A.  It would have been October.  I don't think
16  it was a meeting.  I think it was over the phone.
17    Q.  October '05?
18    A.  Yes.
19    Q.  Did you have any other meetings or
20  discussions with him about this, about the
21  "changes", or anyone else at the Nationals?

Page 140

1    A.  He was the one I dealt with.  I would have
2  talked to him on the phone maybe once or twice more,
3  as the deal approached being done with the
4  Washington Post, to give him updates.
5    Q.  So one or two other meetings?
6    A.  Phone calls.
7    Q.  Prior to the RIF?
8    A.  With Mr. Uhlich, yes.
9    Q.  Have you told me everything that occurred
10  in your discussions with him during the first phone
11  call?
12    A.  That's all I can recall, yes.
13    Q.  Second phone call.  When did that occur?
14    A.  Maybe a month later.  Maybe mid November.
15    Q.  Did you call him or he call you?
16    A.  I would have called him.
17    Q.  What did you discuss?  I want to know
18  exactly what was said by you and him.
19    A.  What I recall is, gave him an update to
20  say that we were still moving forward with it and
21  still wanted the Nationals to be part of it.

Page 141

1    Q.  Moving forward with what?
2    A.  The deal with the Washington Post.
3    Q.  What did he say?
4    A.  As I remember, he thought that was a good
5  thing.  Very brief conversation.
6    Q.  That's all he said?
7    A.  That's all I recall.
8    Q.  Did you at anytime during either of these
9  two calls discuss with him elimination of positions?
10    A.  No.
11    Q.  Did you at anytime discuss with him who
12  would be selling the sports or the Nationals?
13    A.  Not that I recall.
14    MR. CYS:  At a point that's convenient for
15  you, I really have to make sure my office knows
16  about this.
17    MR. McCALLY:  Give me about five more
18  minutes.
19    MR. CYS:  That's fine.
20  BY MR. McCALLY:
21    Q.  Do you recall discussing during either of

36 (Pages 138 to 141)

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

| | | |
|---|---|---|
| LEO DONOHOE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 07-949 (RWR) |
| | : | |
| BONNEVILLE INT'L CORP., | : | |
| | : | |
| Defendant. | : | |

### JOINT REPORT PURSUANT TO LOCAL CIVIL RULE 16.3

Pursuant to Local Civil Rule 16.3 and this Court's Order of August 27, 2007, the parties' respective counsel conferred by telephone on October 15, 2007, and discussed the matters outlined in LCvR 16.3(c) and the matters required to be addressed in the Court's August 27, 2007, Order. The following is a summary of that meeting:

**A.    Plaintiff Donohoe's Statement of the Case.**

Plaintiff, Leo Donohoe, filed this action seeking to recover damages he sustained as the direct result of the Defendant, Bonneville Corporation's, wrongful termination of and refusal to rehire Mr. Donohoe on the basis of his age. Mr. Donohoe, who is and was over forty at the time of termination, was terminated from employment with Defendant after nearly twenty years of employment with WTOP and related radio stations. Mr. Donohoe's termination was improperly motivated by age discrimination, and was part of a pattern and practice employed by Defendant to eliminate older members if its workforce, particularly in the area of sales and marketing.

After wrongfully terminating Mr. Donohoe and others, Defendant hired/rehired only the younger members of the workforce, particularly in the area of sales and marketing. Mr. Donohoe was again discriminated against by Defendant on the basis of age when Defendant refused to rehire Plaintiff, instead selecting a much younger, much less qualified individual to assume the position of Director of National Sales/Sport Sales Manager and the job duties previously held by Mr. Donohoe.

Mr. Donohoe has suffered losses in the form of front and back pay and benefits, has suffered emotional and mental anguish, and has suffered other damages.

Defendant improperly discriminated against Mr. Donohoe on the basis of his age, in violation of the District of Columbia Human Rights Act (DCHRA), D.C. Code §2-1401, *et. seq.*

Plaintiff disagrees completely with the Defendant's factual assertions and legal conclusions that are set forth below.

It is Plaintiff's position that it is not appropriate in the context of this preliminary statement of issues to provide a full legal and factual analysis of this matter. Plaintiff is confident that he will be able to establish a prima facie case of age discrimination, and that he will be able to establish that the proffered reasons for the employment decisions were mere pretext for age discrimination. In the event that the Court would like further briefing of the issues at this time, Plaintiff would be happy to provide extensive briefing of the undisputed facts currently known and the legal issues that impact this matter. Furthermore, it is anticipated that discovery, which has yet to be conducted, will reveal further evidence of discriminatory animus.

**B.     Defendant Bonneville's Statement of the Case.**

Pursuant to the Court's August 27, 2007, Order for Initial Scheduling Conference, Defendant Bonneville International Corporation ("Bonneville") submits this statement of the

case.  This case involves allegations of age discrimination brought against Bonneville by a former sales employee of Bonneville's Washington DC Radio Group, Leo Donohoe.  Mr. Donohoe alleges that Bonneville discriminated against him on the basis of age when it terminated him from employment in connection with a major restructuring of the operations of Bonneville's Washington DC Radio Group and an attendant reduction-in-force ("RIF") and subsequently failed to rehire him.

### 1.    Factual Background

Bonneville is an award-winning broadcasting company that currently owns, *inter alia*, 23 radio stations throughout the country, including four (4) radio stations in Washington, DC: WTOP, WTPW, WGMS and WFED.  In January 2006, after a very successful year for Bonneville's Washington, DC stations, Bonneville restructured its operations and programming in its Washington DC Radio Group as part of a company-wide strategic initiative to acquire new "news/talk formats" and to bolster existing "news/talk formats."   The restructuring of Bonneville's Washington Radio Group and overall efforts to improve operational efficiency necessitated personnel changes.

On January 4, 2006, Bonneville instituted a reduction in force to coincide with the format changes.  Fifty-one full-time, part-time and on-call employees -- including Mr. Donohoe, an at-will employee -- were terminated.  All but one of the sales persons and sales managers laid off in the RIF reapplied for a new position with Bonneville.  Bonneville was able to rehire only ten of the former fifty-one employees.

Mr. Donohoe began his employment with Bonneville when he was over 40 years of age. He was serving as National Sales Manager of WTOP and as National Sales Manager for WGMS

when the reorganization went into effect. At the time of the RIF, Mr. Donohoe was 51 years old. Fifteen (15) candidates, including Mr. Donohoe, applied for the new position of Director of National Sales/Sports Sales for WTOP, WTWP, WGMS and WFED, a position that differed in duties from the position previously held by Mr. Donohoe, which was eliminated in the restructuring. Many of the applicants were very well qualified for the position. At no time was the age of any candidate a consideration.

Bonneville determined that Michael Spacciapolli, age 28, who had been with Bonneville for six years as an Account Executive, a National Sales Manager, a Local Sales Manager, and General Sales Manager, was the most qualified candidate for the position. Between the two, Mr. Spacciapolli was without a doubt the superior candidate. For example, Mr. Donohoe openly complained about his supervisor and other aspects of his job. Mr. Donohoe's supervisors had reservations about his commitment and productivity.

Mr. Donohoe filed suit against Bonneville in D.C. Superior Court on April 26, 2007, under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §2-1401 *et seq*. Mr. Donohoe claims Bonneville discriminated against him on the basis of age in terminating him from employment and refusing to rehire him, instead selecting a younger and, allegedly, less qualified individual. Compl. ¶¶ 35, 37. Mr. Donohoe claims he has suffered damages, including past and future loss of income in the form of wages, prospective retirement benefits, social security and other benefits, severe emotional pain and suffering, mental anguish, and loss of enjoyment of life. Compl. ¶ 44.

Mr. Donohoe seeks a declaratory judgment and an injunction against Bonneville. He also requests to be placed in the new position of Director of National Sales/Sports Sales Manager or,

in the alternative, front salary and benefits in the amount of $5 million for the period remaining

until normal retirement. Compl. In addition, Mr. Donohoe seeks back salary and fringe benefits

up to the date of judgment or instatement in the new position, plus prejudgment interest, as well

as compensatory and punitive damages under the DCHRA, including damages for humiliation,

pain, embarrassment, fees, costs and expenses, attorneys' and expert fees. Bonneville removed

the case to United States District Court for the District of Columbia on May 22, 2007, and filed

its Answer on May 30, 2007.

### 2.    Summary of Legal Issues

The DCHRA provides that "It is the intent of the Council of the District of Columbia, in

enacting this chapter, to secure an end in the District of Columbia to discrimination for any

reason other than that of individual merit, including but not limited to discrimination by reason

of . . . age . . . " DCHRA §2-1401.01 (2005). Mr. Donohoe cannot prove age discrimination

based on any direct evidence because he simply has no direct evidence that Bonneville acted

with discriminatory animus. Nor is there indirect evidence of discrimination. District of

Columbia courts have adopted United States Supreme Court's the *McDonnell Douglas*

evidentiary standard for age discrimination suits under the DCHRA. *See, e.g., Paquin v. Federal

National Mortgage Ass'n,* 119 F.3d 23, 26 (D.C. Cir. 1997). First, the terminated employee must

establish a *prima facie* case of age discrimination. If the four (4) necessary *prima facie* elements

are met, the burden of proof then shifts to the employer to show some legitimate,

nondiscriminatory reason for the employee's dismissal or failure to rehire. If the employer

sufficiently rebuts the presumption of discrimination, the burden shifts back to the employee to

proffer evidence that that the employer's stated reasons for the dismissal/failure to rehire were in

fact pretextual in that they are unworthy of credence and that discrimination was the motivating factor for the employee's dismissal. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1993); *Schoen*, 670 F. Supp. 370-71.

Mr. Donohoe cannot make out a *prima facie* case of age discrimination. While Mr. Donohoe falls within the protected class and was terminated pursuant to a RIF and not rehired, he cannot show he was performing his job according to Bonneville's legitimate expectations or, in the case of the alleged failure to rehire, was qualified for the new position. Nor can Mr. Donohoe show that he was disadvantaged in favor of younger employees. While the candidate Bonneville selected for the new position was 28, he was more highly qualified than Mr. Donohoe. In addition, a significantly greater number of employees under the age of 40 than over the age of 40 were terminated in the RIF. And, as many employees over the age of 40 as under age 40 were retained in the restructuring. What is more, 15 employees age 40 and above were hired and three (3) employees age 40 and above were promoted after the RIF. There is simply no evidence that Bonneville even considered Mr. Donohoe's age when they discharged him and declined to rehire him for the new position. Accordingly, Mr. Donohoe cannot even make out a *prima facie* case of age discrimination.

Moreover, Bonneville can articulate legitimate, nondiscriminatory reasons for the dismissal. Mr. Donohoe was dismissed pursuant to an across-the board restructuring for business reasons that necessitated a reduction-in-force policy. *Paquin*, 119 F.3d at 29 (when employer comes forward with legitimate non-discriminatory reasons for the termination, the presumption that arises from the *prima facie* case "simply drops out of the picture") (citations omitted).

Finally, Mr. Donohoe has no evidence that Bonneville's reasons for its employment actions were pretextual. As plaintiff, Mr. Donohoe must show not only that the defendant's proffered reasons are false, but also that actual age discrimination was the basis for the dismissal, or failure to rehire. *St. Mary's Hospital v. Hicks*, 509 U.S. 502, 515 (1995). Although Mr. Donohoe's supervisors generally gave him good reviews, his supervisors also had concerns about his judgment, professionalism and behavior on the job. Mr. Donohoe claims he was the only displaced employee who had responsibilities for WTOP. However, the restructuring included termination of the entire WGMS sales department – a station for which Mr. Donohoe also worked – due to the significant loss of and change to inventory accompanying the restructuring. Further, the RIF included <u>both</u> national sales employees – Mr. Donohoe (age 51) and another employee (age 27) – because of the change of focus and advertising inventory. Finally, budget performance and percent of station billing and national market performance increased after the restructure and RIF as compared to 2005, demonstrating that Bonneville's articulated business goals for the restructuring and RIF were achieved.

In sum, Bonneville denies any liability and, alternatively, asserts that Mr. Donohoe cannot demonstrate any damages attributable to Bonneville's allegedly wrongful actions.

C.    **Statutory Basis for All Causes of Action.**

Plaintiff Donohoe brings this action pursuant to the DCHRA D.C. Code §2-1401 *et seq*.

D.    **16.3(c) Topics.**

1.    **Dispositive Motions.**

Bonneville believes that the case may be disposed of by a summary judgment motions at some point during the proceedings. Regardless of any other recitations herein, Bonneville reserves the right to file such motion at anytime it sees fit.

### 2.    Joinder of Parties.

The deadline for amending the pleadings or joining additional parties shall be November 19, 2007.

### 3.    Assignment to Magistrate Judge.

The parties do not agree to have this matter tried by a magistrate but do agree that a magistrate may resolve discovery disputes.

### 4.    Settlement.

The parties engaged in unsuccessful mediation on December 11, 2006, with JAMS mediator, Honorable Richard Levie (Ret.), but were unable to reach resolution due to their disagreements as to Bonneville's liability and the existence and extent of damages, if any.

### 5.    ADR.

The parties do not believe that further mediation would be helpful.

### 6.    Summary Judgment.

As set forth in item 8 below, the parties suggest that discovery close on March 31, 2008. If that date is accepted by the Court, the parties agree that summary judgment motions will be due not later than April 30, 2008, oppositions on May 30, 2008, and replies on June 18, 2008. The proposed date for a decision on the motions is July 18, 2008.

### 7.    Initial Disclosures.

The parties propose that the initial disclosures required by Rule 26.1 of the Federal Rules be exchanged on November 26, 2007.

### 8.    Discovery Schedule.

The parties agree that the discovery schedule for standard cases should apply.  December 17, 2007, is an acceptable deadline for Post Rule 26(a) discovery requests.  March 31, 2008, is an

acceptable deadline for the completion of all discovery (including answers to interrogatories, document production, requests for admissions and depositions). The parties anticipate that 30 interrogatories and 30 document requests per party should be adequate. Plaintiff anticipates that ten depositions per party will be necessary. Defendant believes that five (5) depositions per party will be adequate.

### 9. Expert Witnesses.

The parties agree that the provisions of Rule 26(a)(2) should apply to expert witness disclosures. If discovery closes on March 31, 2007, disclosures from all experts will be due December 21, 2007. Disclosures from rebuttal experts will be due January 22, 2008. Expert witness discovery will close March 31, 2008.

### 10. Class Action Issues.

Not applicable.

### 11. Bifurcation.

The parties agree that this case should not be bifurcated or managed in phases.

### 12. Pretrial conference.

Given the possibility of filing dispositive motions, the parties suggest that the pretrial conference should occur on or about July 21, 2008.

### 13. Trial Date.

The parties agree that the Court should set a trial date at the pretrial conference.

### 14. Other Matters.

The parties agree that there are no other matters for the Court's consideration at this time.

DATED this 19th day of October, 2007.

Respectfully submitted,

CARR MALONEY P.C.                          DAVIS WRIGHT TREMAINE LLP

*/s/*

/s/

_____              _____
Thomas L. McCally, Esq. #391937          Richard L. Cys, Esq., # 087536
1615 L Street, NW                        Constance M. Pendleton, Esq., #456919
Suite 500                                1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20036                     Washington, DC 20006-3402
(202) 310-5500/(202) 310-5555 (FAX)      (202) 973-4200/(202) 973-4499 (FAX)
Attorneys for Plaintiff Leo Donohoe      Attorneys for Defendant Bonneville
                                          International Corporation