## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

| | |
|---|---|
| LEO DONOHOE, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No.: 07-949 (RWR) |
| | : **(HEARING REQUESTED BY PLAINTIFF)** |
| BONNEVILLE INT'L CORP., | : |
| | : |
| Defendant. | : |
| | : |

### JOINT SUPPLEMENTAL HEARING MEMORANDUM

### OPENING STATEMENT

Pursuant to Magistrate Judge Robinson's instructions at the July 29, 2008 hearing and the Court's Minute Order of July 31, 2008, the parties hereby respectfully submit a Joint Supplemental Hearing Memorandum regarding the involvement, if any, of Defendant Bonneville's headquarters in Bonneville's January 4, 2006 Reduction in Force in Washington, DC.

On July 28, 2008, following a hearing on Plaintiff Leo Donohoe's Motion To Compel Discovery [#19] and Defendant Bonneville's Motion For A Protective Order [#21], Magistrate Robinson granted Defendant's motion and denied Plaintiff's motion, "except with respect to Plaintiff's request for discovery regarding the role, if any of Defendant's headquarters in the DC RIF." July 31, 2008 Minute Order. The Court ruled that "as to that issue, the parties shall jointly file a supplemental hearing memorandum with the relevant portions of the transcript of the deposition in which counsel inquired about this issue. " July 31, 2008 Minute Order.

Accordingly, the parties set forth their positions as follows and attach the relevant portions of the deposition transcript of Joel Oxley, Senior Regional Vice President at Bonneville, at which Plaintiff's counsel inquired about the issue. Mr. Oxley was deposed as Bonneville's 30(b)(6) corporate designee on May 9, 2008, and in his individual capacity on July 2, 2008.

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM

This year, the United States Supreme Court held that, in an ADEA case, evidence of other employees' age-based discrimination by supervisors other than the ones involved in this case cannot be held to be *per se* inadmissible. Instead, the trial court must engage in a proper analysis of the probative value of the evidence pursuant to Federal Rule of Civil Procedures 401 and 403. This analysis, the Supreme Court explained, is fact-intensive and context-specific. *Sprint/United Management Co. v. Mendelsohn,* 522 U.S. ____ (2008).

It defies logic for Bonneville to think that this court can conduct a proper analysis under Federal Rules of Civil Procedures 401 and 403 if it does not have any evidence (obtained through discovery) to analyze. Instead, to conduct the proper analysis the highest Court of this land requires the trial court must allow the parties to gather necessary facts and information. The only way the parties can accomplish this task is through proper discovery.

In this case, through his motion to compel, Leo Donohoe is simply asking permission to conduct reasonable and appropriate discovery to gather the necessary facts and information this court needs to determine if evidence of discrimination arising out of Bonneville's San Francisco Reduction in Force (RIF) (conducted only months before the Washington D.C. RIF) is admissible to prove Bonneville's discriminatory animus in his case. Denial of Mr. Donohoe's motion to compel discovery as to the San Francisco RIF would amount to nothing less than a ruling by this court that evidence of other employees' age-based discrimination by supervisors

2

other than the ones involved in this case is *per se* inadmissible – the exact result the Supreme Court has prohibited and found to be reversible error.

Mr. Donohoe soundly believes evidence surrounding the San Francisco RIF will be admissible in his case for many reasons. Counsel for Mr. Donohoe has spoken directly with at least one former Bonneville employee whose employment was terminated as a result of the RIF in San Francisco.[1] That individual specifically stated that she believes her employment was terminated as a result of age-based discrimination. The RIF in San Francisco was conducted in close proximity to the RIF in DC based upon a corporate decision to decrease costs and increase revenue. Mr. Donohoe has cause to believe this was accomplished by Bonneville's plan to eliminate the older, more highly compensated employees. Mr. Donohoe is entitled to demonstrate to this court that this witness' testimony is relevant and probative to his case. Mr. Donohoe is also entitled to demonstrate to this court, and ultimately the jury, that Bonneville International's practice was to conduct sham Reductions in Force to eliminate older workers. To achieve this, Mr. Donohoe must be able to demonstrate that, like the RIF that resulted in his termination in Washington, DC, the RIF in San Francisco resulted in a disproportionate amount of terminations of older workers' employment, while younger employees were spared from the Reduction. Evidence of this practice is directly relevant to, and probative of, Bonneville's discriminatory animus, which spans from Bonneville's Corporate level employees down to the individual managers in each geographic area.

To accomplish this, Mr. Donohoe must be allowed to conduct necessary discovery. As argued by counsel for Mr. Donohoe in open court on Tuesday, July 29, 2008, Bonneville should be required to provide Mr. Donohoe with the information requested in written discovery requests

---

[1] In light of this court's firm restriction on the number of depositions that Mr. Donohoe can conduct, this was merely an interview and no transcript of the conversation can be provided at this time.

and in depositions regarding the San Francisco RIF in 2005, shortly before the Reduction in Force conducted in Washington, DC that resulted in the discriminatory termination of Mr. Donohoe's employment and discriminatory failure to hire. Mr. Donohoe should also be allowed to conduct a 30(b)(6) deposition to gather relevant information regarding the San Francisco Reduction in Force, and Bonneville should be required to produce all information/documents Mr. Donohoe requested regarding that San Francisco Reduction in Force in Attachment A to the 30(b)(6) Notice of Deposition.[2] *See* Exhibit 1.

To make a determination as to whether Mr. Donohoe should be allowed to conduct discovery into the San Francisco RIF, this court ordered Mr. Donohoe to demonstrate how Bonneville's Corporate management was involved in each of those processes and the personnel decisions and ramifications. Mr. Donohoe establishes Corporate management's involvement as follows:

## I.    CORPORATE INVOLVEMENT IN WASHINGTON, DC REDUCTION IN FORCE

In spite of the Supreme Court's ruling in *Mendlesohn, supra*, Bonneville argues, in effect, that discovery into the San Francisco RIF should be denied because evidence of the San Francisco Reduction in Force is ***per se*** irrelevant. In support of its argument, Bonneville asserts that Corporate level management played no role in the personnel decisions resulting from the Washington D.C. RIF. Bonneville has completely misrepresented the testimony and evidence to this court. The truth is: Bonneville's Corporate level managers were **directly** involved not only

---

[2] Bonneville's answering interrogatories and responding to Mr. Donohoe's request for production of documents regarding the San Francisco RIF in advance is vital to Mr. Donohoe's ability to conduct an exhaustive 30(b)(6) deposition on this issue. Without prior access to Bonneville's interrogatory answers and responsive documents, Mr. Donohoe will be prohibited from properly preparing for the 30(b)(6) deposition and questioning the deponent regarding the relevant issues. As such, Donohoe seeks, through this supplement and his motion to compel, an order compelling Bonneville to provide the information and documents requested in Mr. Donohoe's interrogatories, request for production of documents, witness depositions and 30(b)(6) deposition notice about the San Francisco RIF at least 10 days before counsel for Mr. Donohoe conducts a 30(b)(6) deposition regarding the San Francisco RIF. To the extent this court deems the applicable discovery requests subject to another provision of court's order denying Mr. Donohoe's motion to compel, Mr. Donohoe respectfully asks this court reconsider its ruling as to those applicable discovery requests in light of the demonstrated need for the information requested and the prejudice to Mr. Donohoe that will result should he be denied this discovery.

in the Washington, DC Reduction in Force, **but also the specific employment decision relating**

**directly to Mr. Leo Donohoe**.

    As Bonneville's Corporate designee testified in his 30(b)(6) deposition:

164

  4    Q.  Between September and December, when
  5  Mr. Reece made up his mind about what to do, did you
  6  have discussions concerning personnel?
  7      MR. CYS:  With him?
  8    Q.  Did he have, you or Bonneville Corporate,
  9  have discussions regarding personnel, who would go,
10  who would stay?
11    A.  We had discussions about the structure and
12  what departments but not about individual personnel.
13    Q.  Did you discuss the national sales of WTOP
14  or GMS?
15    A.  No.
**16    Q.  Did you discuss Leo Donohoe?**
**17    A.  Between September and December?**
**18    Q.  Yes.**
**19    A.  Yes.**
**20    Q.  What did you talk about and with who?**
**21    A.  We talked about --**

165

** 1    Q.  Who?**
** 2    A.  With who?  We did -- another question.**
** 3  Did we talk about national sales with corporate**
** 4  between September and December?**
** 5    Q.  No, sir.  Don't limit my question.**
** 6    A.  I'll answer both of them.  I said no.  The**
** 7  answer is yes, we did.  We did talk about the**
** 8  national sales department.  So we did.  We talked**
** 9  and we had a meeting out in Salt Lake, where I was**
**10  there with <u>Bob Johnson, David Red, Scarlett Pate and</u>**
**11  <u>Jim Farley</u>.**
**12    And we talked about what would be --**
**13  what would happen in the RIF.  And we discussed the**
**14  three departments that we would let go.  They asked**
**15  if national sales would be included in GMS sales.**
**16  And yes, I said yes, there would be.**

*See* 30(b)(6) Deposition Transcript at p. 164-165, attached as Exhibit 2 (emphasis added).

In addition to discussing the national sales department in general, Corporate management also discussed, and had final say in, the decision to include Mr. Donohoe's national sales director in the WGMS RIF even though Mr. Donohoe's employment was undeniably primarily for WTOP – a position NOT affected by the RIF – and even though Mr. Donohoe was the ONLY individual terminated, and not rehired, from WTOP as part of that RIF. *Id.* at p. 207:2-209:17.

**By Bonneville's own admission, therefore, the following members of Corporate management, from headquarters in Salt Lake City, Utah, were directly involved <u>not only</u> with the decision to conduct the RIF in Washington, DC, but also with the <u>specific decision to terminate Mr. Donohoe's employment</u> in conjunction with that RIF, and, accordingly, to unlawfully include his position in the alleged RIF to terminate his employment on the basis of his age:**

- Bob Johnson, Chief Operating Officer COO, Salt Lake City, Utah
- David Red, Corporate Counsel, Salt Lake City, Utah
- Scarlett Pate, Corporate Human Resources Director, Salt Lake City, Utah; and
- Jim Farley, Vice President of News and Programming, Washington, DC

Bonneville's oral admission as to Corporate management's involvement in the Washington, DC RIF, and its specific employment implications, is corroborated by the documentary evidence provided by Bonneville. Bonneville cannot argue otherwise.

A.    <u>Scarlett Pate, Corporate Director of Human Resources</u>

Bonneville's Corporate Human Resources Manager (Scarlett Pate) was a key player in the decisions leading to the RIF, the details surrounding its execution and the execution of the RIF itself. She was physically present for the January 4, 2006, RIF and even met one-on-one

with RIF'd employees. *See* Exhibit 3, BIC 006786-006800, at 006791 and 006792[3] "Management involved in RIF meeting," "Joan & Scarlett will handout severance packet to RIF employees." (Exhibit filed under seal). Scarlett Pate is specifically identified as a key player in the RIF through the "Transition Timetable," *see* BIC 00273-4 at Exhibit 4. She was personally responsible for:

- Finalizing all Severance Packages
- Participating in the final PR strategy meeting
- Determining the final details of the RIF
- Announcing the RIF to management level DC employees
- Discussing the details of the RIF to employees
- Explaining why Bonneville was posting new openings for the positions RIF'd
- Handing out severance agreements and final checks
- Contacting those affected who were not present for the meeting.

In fact, Scarlett Pate was so intricately involved in the RIF and the personnel decisions related to that RIF, **Matt Mills (Mr. Donohoe's direct supervisor) asked her how to handle Mr. Donohoe specifically.** *See* BIC 000288, Exhibit 5. Moreover, Ms. Pate held a meeting in which she addressed questions such as:

- How long before we can rehire for each position?
- How many interviews or candidates need to be seen?
- Is there a suggested script for what we say to the other employees?
- How soon can we post? (that day, next day?)[4]

*See* BIC 000291-000292 at Exhibit 6.

    B.   <u>Bob Johnson, COO</u>

Ms. Pate was not the only individual from Corporate directly involved with the Washington, DC Reduction in Force. As Mr. Oxley testified as Bonneville's Corporate

---

[3] Due to the operative Protective Order agreed to by the parties to this matter, Exhibit 3 will be filed with this Court, under protective seal, on Monday, August 11, 2008.

[4] Each of these questions gives rise to an inference that the RIF was not legitimate, but instead was pretext for discrimination; *e.g.* Why would Bonneville need to rehire for positions that were just eliminated in a Reduction in Force? Why would Bonneville post for positions the day or the day after they were just eliminated in a Reduction in Force? Why would Bonneville be concerned about how many candidates need to be seen? Mr. Donohoe must be allowed to explore these questions through discovery.

designee, Mr. Johnson and Mr. Reece were the individuals responsible for the ultimate decision whether to implement the RIF and whether to terminate Mr. Donohoe's employment as a result of that RIF. Bob Johnson, Chief Operating Officer, was also physically present for the execution of the Reduction in Force. He met with management level employees to notify them that their employment was terminated. *See* Exhibit 3, at p. 006792 "Management involved in RIF meeting." (Exhibit filed under seal). Mr. Johnson actually offered his telephone number to each employee affected by the RIF. *Id.* at p. 006793. (Exhibit filed under seal).

    C.    <u>Bruce Reece, CEO</u>

As Mr. Joel Oxley, Bonneville's Corporate Designee also testified, the Washington, DC RIF could not have taken place without Mr. Reece's approval. Exhibit 2, at p. 152:11-16. Mr. Reece was not only involved on a global level, however, he was intricately involved in the execution of the Washington, DC RIF. In fact, he was responsible for:

- Contacting WGTS about broadcasting G;
- Participating in the final PR strategy meeting;
- **Determining the final details of the RIF;**
- Announcing the RIF to Washington, DC management level employees;

*See* Exhibit 4.

There can be no genuine dispute that Bonneville Corporate was not only intricately involved in the decisions surrounding, and the execution of, the Washington, DC RIF, they were active participants in the discriminatory decision to improperly include Mr. Donohoe's WTOP position in the WGMS positions being "eliminated,"[5] in an attempt to disguise his unlawful termination on the basis of his age.

---

[5] These positions were not, in fact, eliminated. As the evidence demonstrates, Bonneville posted openings to fill those positions the day of the RIF.

## II.    CORPORATE INVOLVEMENT IN THE SAN FRANCISCO REDUCTION IN FORCE

In addition to ordering Mr. Donohoe to show how Bonneville's Corporate level management was involved in the Washington, DC RIF, which he has done effectively above, this court instructed Mr. Donohoe, through counsel, to demonstrate in this brief, how Bonneville's Corporate level management was involved in the San Francisco Reduction in Force. The court's instruction to Mr. Donohoe to prove who was involved in the San Francisco RIF without allowing him a reasonable opportunity to conduct discovery into those very facts[6] places Mr. Donohoe in a challenging position. The challenge created by this court's ruling, however, is not one that Mr. Donohoe could not overcome through the testimony of Bonneville's own 30(b)(6) designee.

As Mr. Oxley testified in his capacity as Corporate designee, Bonneville's protocol for implementing a Reduction in Force (such as those implemented in Washington, DC and San Francisco, CA), is to involve Corporate management and get final approval from the CEO, Bruce Reece. *See* Exhibit 2, *e.g.* 209:10-17; 156:18-158:12.

---

[6] Counsel for Mr. Donohoe has been continuously denied the opportunity to address the very issues this court is demanding he now address. First, Mr. Donohoe has been denied the opportunity to conduct the minimum number of depositions allowed for by the Federal Rules of Civil Procedure, Rule 30. This inexplicable and arbitrary limitation on the number of depositions Mr. Donohoe can conduct has prejudiced Mr. Donohoe by precluding him from obtaining all of the testimony and information pertinent to the issues in his case, including the San Francisco RIF. Counsel for Mr. Donohoe has not been able to get the necessary information regarding the San Francisco RIF because of opposing counsel's continuing instruction for each witness and their client not to respond to any written or oral inquiries regarding the RIF. *See* Exhibit 2, at 271:21-272:15.

271
21        MR. McCALLY: Rick, I would have gone into

272
1    all the national, what happened nationally using
2    that descriptor, I know you object to it, you know
3    what I'm talking about. I would have gone into all
4    that now about the national RIF, San Francisco RIF,
5    what happened there, how it was handled differently,
6    the ages of the people, et cetera.
7        But based on your objection, not wanting
8    to raise it every single time, I'm just nothing this
9    for the record, we have that same agreement. I'm
10   not waiving my right to go into that pending the
11   outcome of the protective order.
12       **MR. CYS: No, that is understood. Of**
13   **course, we should also state that I would have**
14   **instructed the witness not to answer on those**
15   **questions**.

Mr. Oxley testified that he notified his supervisor, Bob Johnson, COO, of the options for the RIF, who in turn involved Mr. Bruce Reece, Bonneville's CEO. The RIF could not have taken effect without the prior approval of Corporate management. *Id.*

Moreover, it is indisputable that Corporate Human Resources is intricately involved with each Reduction in Force. In an email to Ms. Pate dated December 21, 2005, Mr. Oxley himself asks Ms. Pate how she has done this (RIFs) in the past. *See* Exhibit 7, BIC 000279. Moreover, the "Scarlett Meeting – Topics for Agenda" demonstrate Ms. Pate's instruction to the individuals in Washington, DC as to how the RIF will be implemented with specific detail. Obviously, she is involved in Bonneville's RIF processes.

If this court determines that more information is needed to assess Bonneville's Corporate involvement in the San Francisco RIF, Mr. Donohoe respectfully renews his request to obtain responses to his discovery with regard to the San Francisco RIF and to conducted his properly noticed 30(b)(6) deposition with regard to this issue. Otherwise, Mr. Donohoe will suffer irreparable harm and prejudice by the burden this court has placed on him to prove his case before he is allowed the opportunity to conduct reasonable discovery into the very issues he is being required to prove.

In sum, Mr. Donohoe must be allowed to conduct necessary discovery into the San Francisco RIF. Bonneville should be required to provide Mr. Donohoe with the information requested in written discovery requests and in depositions regarding the San Francisco RIF in 2005, shortly before the Reduction in Force conducted in Washington, DC that resulted in the discriminatory termination of Mr. Donohoe's employment and discriminatory failure to hire. Mr. Donohoe should also be allowed to conduct a 30(b)(6) deposition to gather relevant information regarding the San Francisco Reduction in Force, and Bonneville should be required

to produce all information/documents Mr. Donohoe requested regarding that San Francisco Reduction in Force in Attachment A to the 30(b)(6) Notice of Deposition.

Denial of Mr. Donohoe's motion to compel this discovery will result in this court's making a determination that evidence of age based discrimination in San Francisco is *per se* irrelevant to the age based discrimination in Washington, DC. Because many of the same decision makers were involved in the two RIFs, the discrimination based upon age in San Francisco is probative of the discriminatory animus and pretext in Washington, DC. Therefore, Mr. Donohoe's motion to compel must be granted.

## DEFENDANT'S SUPPLEMENTAL MEMORANDUM

Plaintiff's claims arise from his inclusion in the January 4, 2006, reduction in force ("RIF") of 51 employees in Bonneville's Washington DC Radio Group. The RIF was a consequence of local decisions to restructure the DC Radio Group, to bolster Bonneville DC's existing news station, WTOP, to partner with the *Washington Post* to create Washington Post Radio, and to achieve greater efficiencies. At the time of the RIF, Bonneville, a broadcasting company headquartered in Salt Lake City, Utah, owned over twenty radio stations around the country, including four in Washington, DC.

Plaintiff's demands for discovery into Bonneville's headquarters is completely unwarranted because Bonneville headquarters did not dictate, provide, require or supervise the Washington, DC RIF. Headquarters had no role in individual personnel decisions. The Washington, DC RIF emanated from Washington, DC alone, and specifically from Joel Oxley, Bonneville's Senior Regional Vice President in Washington, DC. All personnel decisions were limited to DC.

As Mr. Oxley testified in his deposition:

> Q. When did you first learn of the 2006 RIF?
>
> A.   Well, in my capacity I was involved in determining this was something that was right move for the market.  So we first began discussions with the Washington Post about possibly creating a format with them in [May or] June [2005]."

* * *

> A.   . . . I was the market manager.  And it was my responsibility to try to maximize the operations for our market.
>
> **Q.  Where did the idea to even consider a RIF come from?**
>
> **A.   That was from me, when I saw that our business situation would be changing dramatically.**

* * *

> **Q.   Is it your testimony that the idea for a potential RIF was your idea, as opposed to Corporate's?**
>
> **A. Yes.**
>
> **Q.   Did Bonneville have any input into this, the Corporate Bonneville in Salt Lake City?**
>
> **A. Define what you mean?**
>
> **Q.   Any involvement whatsoever in this initial phase?**
>
> **A. No.**

Oxley Dep. 32:19-34:13 (emphasis added).

As Mr. Oxley testified, Bonneville headquarters had no idea about the proposed RIF until Mr. Oxley brought it to the attention of Bob Johnson, Bonneville's COO, in July or August of 2005.   Oxley Dep. 36:3-8.   *See also* Oxley Dep. at   47:6-49:2 (concerning Mr. Oxley's

12

discussions with the *Washington Post* to form Washington Post Radio: Q. Did you seek any approval from Bonneville Corporate beginning prior to May or June, when you started looking into this? A. No. * * * A. I would have been able to do that on my own. Q. Did you? Or did you seek approval? A. I did not seek approval. Q. So you did it on your own? A. I did.)

Bonneville's DC restructure and RIF was not part of any alleged "national RIF"; it had zero connection with the RIF in San Francisco in 2005, as Plaintiff claims. It was conceived of in Washington, DC and driven by local DC market forces: rumors of a possible new competitor in the news format (Oxley Dep. 36:19-37:5; 38:15-20; 39:5-41:10; 47:6-8), concerns that the *Washington Post* would launch a news/talk radio station (Oxley Dep. 38:21-39:4), the desire to bolster Bonneville's DC's existing news/talk format, WTOP, a market-leading 24-hour international, sports and business news, traffic and weather information station, by moving it to a stronger radio frequency on the FM dial (Oxley Dep. 41:11-42:7; 47:11-48:1), and the decision to acquire new long form news/talk radio formats through partnership with the *Washington Post* (Oxley Dep. 36:10-18; 38:13-14; 47:8-10; 56:9-59:1).

The role of Bonneville's Salt Lake City headquarters in the DC restructure and RIF was circumscribed at best. In May or June 2005, Bonneville DC began discussions with the *Washington Post* to create a joint news/talk station. Oxley Dep. 32:19- 33:6. In March 2006, in partnership with the Post, Bonneville launched Washington Post Radio, featured news from *Washington Post* reporters, columnists and editors and play-by-play sports coverage of George Washington University Mens' basketball, Navy Football and the Washington Nationals. Joel Oxley in Bonneville's DC office was the primary Bonneville employee responsible for Bonneville's negotiations with the Post. Oxley Dep. 143:21-145:9. The agreement with the *Washington Post*, finalized in December 2005, permitted the DC office to proceed that same

month with the reorganization and RIF as it provided a format for the remaining frequency allowing WTOP to be moved to 103.5. *Id.*

The new news/talk station necessitated a restructure of the DC radio group. One of Bonneville DC's existing radio stations would have to be sacrificed to free up radio frequency for Washington Post Radio. Two stations in the DC Radio Group were in contention for elimination: WGMS "Washington's Classical Station," the first and longest running FM signal in Washington, DC, which had broadcast in the same format for over 57 years and received nationals awards for its commitment to public service and numerous local broadcasting awards, and WWZZ (aka Z104) a newer modern rock station. Because eliminating WGMS would have serious public relations ramifications for Bonneville in Washington (Oxley Dep. at 66:7-15), in the course of Bonneville DC's review of the options, Bonneville's CEO, Bruce Reese, became involved. Oxley Dep. 152:11-158:12. His role was to make the final decision as to which of the two stations to eliminate in light of the DC office's assessment of the options, a decision which determined the new station lineup. Oxley Dep. 152:11-158:12; 157:2-3; 163:21-164:3; 209:12-210:16. Mr. Reese ultimately selected Z104 because of the PR ramifications of eliminating WGMS, the long standing classical station. Oxley Dep. at 66:7-15; 159:3-10; 205:18-206:1; 242:18-243:6; 365:14-16. Bonneville DC "shared information" with Bonneville headquarters about the RIF to keep headquarters apprised (Oxley Dep. 208:20-209:5) and because the RIF emanated from a reorganization that involved PR and financial considerations in DC (Oxley Dep. 204:1-209:5; 212:12-213:8).

Naturally, the restructure and efforts to increase operational efficiencies necessitated certain personnel changes. Beyond the high level determination of which station to eliminate in the restructure to address PR and financial concerns, Bonneville headquarters was <u>not</u> involved

in the DC RIF's personnel changes, including in the decision to RIF Mr. Donohoe. (Oxley Dep.

77:1-79:18; 157:18-158:8; 164:4-18). As Mr. Oxley testified:

> Q. Between September and December, when Mr. Reese made up his mind about what to do, did you have discussions concerning personnel?
>
> MR. CYS: With him?
>
> Q. Did he have, you or Bonneville Corporate, have discussions regarding personnel, who would go, who would stay?
>
> **A. We had discussions about the structure and what departments but not about individual personnel.**

Oxley Dep. 164:4-12 (emphasis added).

* * *

> Q. Did you have a specific discussion about Mr. Leo Donohoe and Mr. Kleiner, about what their fate would be because the vast majority of their job was with WTOP national sales, as opposed to the smaller percentage of GMS?
>
> **A. Not with the corporate people, I do not recall having that.**

Oxley Dep. 166:10-18 (emphasis added). With regard to the elimination of Mr.

Donohoe's position, Mr. Oxley testified that the decision was his alone:

> **A. We were creating an entirely new position.**
>
> **Q. Where did that idea come from?**
>
> **A. That idea came from me.**

Oxley Dep. 168:14-16 (emphasis added).

* * *

> **A. Ultimately it was my decision.**

Oxley Dep. 252:5-256:13 (emphasis added).

15

Bonneville DC personnel[7] alone decided which departments and positions to cut and create (Oxley Dep. 85:21-88:7; 93:20-94:18; 102:7-104:1; 244:21-248:9; 252:5-256:13) and which personnel to terminate (Oxley Dep. 72:3-7; 139:17-143:14; 150:6-151:8). And Bonneville DC alone decided who to rehire into the new positions available after the restructure and RIF. Oxley Dep. 278:20-280:20; 283:5-286:6; 297:3-310:10. Bonneville headquarters played no role in these personnel decisions.

As a result of the restructure, Z104's sales and programming departments were eliminated. Oxley Dep. 139:2-3. In addition, DC management eliminated WGMS's sales force (which included Mr. Donohoe) and rebuilt the DC sales force. Oxley Dep. 139:6; 139:16-140:14. 51 employees were terminated on January 4, 2006 in connection with the DC restructure and RIF and invited to reapply for new positions (Oxley Dep. 217:10-12). Bonneville was able to rehire only ten of the RIFed former employees.

Just as there only was limited high level involvement by headquarters in the DC restructure, there was no connection between the 2006 RIF in Washington, DC and the 2005 RIF in San Francisco.[8] As stated, DC's RIF arose due to local DC market conditions and the desire to bolster and create new news/talk radio formats. Accordingly, discovery into Bonneville's headquarters -- and certainly into Bonneville's former operations in San Francisco -- is wholly

---

[7] Joel Oxley, Jim Farley, Matt Mills and Linda Pfluger, referenced in Mr. Oxley's May 9, 2008 deposition as having attended seminal meetings concerning the restructure and RIF, and Joan Henson who attended later meetings, are all Bonneville Washington, DC employees.

[8] Bonneville's position is that the Court requested a supplemental memorandum and relevant excerpts of Joel Oxley's deposition relating to the role, if any, of Bonneville's headquarters in the DC RIF. Bonneville objects to all of plaintiff's argument herein relating to San Francisco because it is irrelevant to the case and beyond the scope of the Court's July 31, 2008 minute order.

unwarranted as it would be irrelevant, unduly burdensome and far beyond the scope of matters at issue in this case.

## REQUEST FOR HEARING

Mr. Donohoe respectfully requests oral argument on the issues contained within the Joint Supplemental Hearing Memorandum.

Bonneville objects to the request for oral argument. Plaintiff has had ample opportunity to present his positions in his motion to compel and related papers, at oral argument on July 29 and in this Joint Supplemental Memorandum. Additional oral argument is unnecessary and beyond the scope of the Court's request for supplementation concerning Mr. Oxley's deposition.

Respectfully submitted,

CARR MALONEY P.C.                        DAVIS WRIGHT TREMAINE LLP

_____          ___/s/ Constance M. Pendleton___
Thomas L. McCally, Esq., #391937         Richard L. Cys (D.C. Bar No. 087536)
Tina M. Maiolo, Esq., #454987            Constance M. Pendleton (D.C. Bar No. 456919)
Ali Beydoun, Esq., #475413               1919 Pennsylvania Avenue, NW, Suite 200
1615 L Street, NW, Suite 500             Washington, DC  20006-3402
Washington, DC 20036                     (202) 973-4200/(202) 973-4499 (FAX)
(202) 310-5500/(202)310-5555 (FAX)       Counsel for Defendant Bonneville International
Attorney for Plaintiff                   Corporation
tlm@carrmaloney.com                      richardcys@dwt.com
                                         conniependleton@dwt.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 8th day of August, 2008, a copy of the foregoing was sent via the court's electronic filing to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC  20006, Attorney for Defendant.

_____
Thomas L. McCally

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CIVIL DIVISION**

LEO DONOHOE,                          :
                                      :
      Plaintiff,                :
                                      :
v.                                    :        Civil Action No.: 07-949 (RWR)
                                      :
BONNEVILLE INT'L CORP.,               :
                                      :
      Defendant.                :

**<u>AMENDED NOTICE OF 30(b)(6) DEPOSITION</u>**

PLEASE TAKE NOTICE that on the 5th day of May, 2008, at 10:00 a.m., pursuant to Rule

30(b)(6) of the Federal Rules of Civil Procedure, the Plaintiff, Leo Donohoe, by counsel, will take

the deposition of the Defendant, Bonneville Int'l Corp., through one or more of its designated

officers, directors, partners, managing agents, or other persons who consent to testify on its behalf,

by oral examination, before a Notary Public or anyone authorized to administer oath and due form

of law, in the law offices of CARR MALONEY P.C., 1615 L Street, NW, Suite 500, Washington,

DC 20036.

Defendant Bonneville Int'l Corp., is required to designate one or more of its officers,

directors, partners, managing agents, or other persons who consent to testify on its behalf, in

each of the following areas:

**SEE AMENDED ATTACHMENT A**

PLEASE TAKE FURTHER NOTICE, pursuant to Rule 30(b)(5) of the Federal Rules of

Civil Procedure, that each corporate designee or designees shall be required to bring with him the

originals of all documents specified in Amended Attachment A herein, to be  inspected and copied

by counsel for Plaintiff, Leo Donohoe.  The deposition will be taken for the purpose of discovery or as evidence in the captioned cause, or both, and shall continue from day to day until complete. The deposition may be recorded by videotape and/or audiotape.

Respectfully submitted,

CARR MALONEY P.C.

By:_____

Thomas L. McCally, #391937
1615 L Street, NW, Suite 500
Washington, DC 20036
Attorney for Plaintiff
(202) 310-5506/(202) 310-5500 (FAX)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of April, 2008, a copy of the foregoing was sent via e-mail to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC 20006 Attorney for Defendant.

_____

Thomas L. McCally

## AMENDED ATTACHMENT A

1.      Reasons for which Bonneville decided to implement a Reduction in Force, both locally and nationally in 2006.

2.      How Bonneville determined who would be affected by the Reduction in Force, and who would be exempted from the Reduction in Force, in Washington, DC, in 2006.

3.      The names of individuals affected by the Reduction in Force in Washington, DC, in 2006 and their ages.

4.      The reasons for which WGMS employees were affected by the Reduction in Force when WGMS continued to broadcast after the 2006 Reduction in Force.

5.      The names, ages and salary of all individuals who worked for WTOP who were included in the Reduction of Force in January 2006 and why they were included.

6.      The names, ages and salary of all individuals whose employment was terminated as a result of the Reduction in Force, both locally and nationally, in 2006.

7.      The names, ages and salary at the time of rehire, of all individuals whose employment was terminated as a result of the Reduction in Force, both locally and nationally, in 2006, but who were ultimately rehired by Bonneville.

8.      All complaints made against Matt Mills, whether formal or informal, alleging unlawful business practices.

9.      All complaints made against Bonneville Int'l Ltd. and/or any of its management level employees for unlawful employment practices.

10.      Katz Radio Group and/or its employees' roles in Bonneville's decisions who to hire/rehire following the Reduction in Force in 2006.

11.      Katz Radio Groups and/or its employees' roles in all other employment decisions made by Bonneville Int'l Ltd.

12.      Mike Spacciapolli's work performance prior and subsequent to the Reduction in Force in 2006.

13.      Leo Donohoe's work performance prior and subsequent to the Reduction in Force in 2006.

14.      The decision to rehire Mike Spacciapolli over Leo Donohoe subsequent to the Reduction in Force in 2006.

15.   The changes and similarities between the National Sales Director position prior and subsequent to the Reduction in Force in 2006.

16.   The decision to transfer Mike Spacciapolli from National Sales Director/Sports Sales to Local Sales Manager in July 2006.

17.   Any and all complaints of discrimination received following the January 2006 Reduction in Force.

18.   The investigation into Mr. Donohoe's complaints of discrimination.

19.   Bonneville's total net financial worth for the years 2003 through the present.

20.   Michael Spacciapoli's involvement with the negotiation and finalization of the terms and conditions of Bonneville's contract with the Nationals baseball team.

21.   All budget information for Bonneville's sale of sports from 1997 through 2007, including who was responsible for selling, how such sales were made, whether those individuals made their budgets, what the budgets were and how this number was determined.

22.   The identity of the author of BIC 006786-6796 produced by Bonneville in response to Plaintiff's request for production of documents, the meaning of each paragraph of the document, the source of the information based upon which the document was created; the identities of persons referred to in the provision referring to employees who worked predominantly for WTOP and the meaning of that provision.

23.   The salary structure of the Local Sales Manager position from 2002–2007.

24.   The salary structure of the National Sales Manager position from 2002-2007.

25.   The budgets for all sales between 2002 and 2007, including budgets for National Sales, Local Sales and Sports Sales, and whether individuals responsible for such sales made their budgets.

# EXHIBIT 2

1

In The United States District Court

For The District of Columbia

Civil Division

-------------------------------x
Leo Donohoe,                    :
                                :
        Plaintiff               :
                                :
            v.                  :   NO. 07-949 (RWR)
                                :
Bonneville International        :
Corp.,                          :
                                :
        Defendant               :
-------------------------------x

                        Friday, May 9, 2008

VIDEOTAPED DEPOSITION OF:

                    Joel Oxley,

a witness, called by counsel pursuant to notice,

commencing at 10:00 a.m., which was taken at Carr

Maloney P.C., 1615 L Street, N.W., Suite 500,

Washington, D.C. 20036.

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

**Page 1**

1  In The United States District Court

2  For The District of Columbia

3  Civil Division

4  ------------------------------x

5  Leo Donohoe,                :

6      Plaintiff    :

7      v.        : NO. 07-949 (RWR)

8  Bonneville International    :

9  Corp.,        :

10  Defendant    :

------------------------------x

11      Friday, May 9, 2008

12  VIDEOTAPED DEPOSITION OF:

13      Joel Oxley,

14  a witness, called by counsel pursuant to notice,

15  commencing at 10:00 a.m., which was taken at Carr

16  Maloney P.C., 1615 L Street, N.W., Suite 500,

17  Washington, D.C. 20036.

**Page 2**

1      Appearances

2

3  Thomas L. McCally, Esquire

4  Tina M. Maiolo, Esquire

5  Carr Maloney P.C.

6  1615 L Street, N.W.

7  Suite 500

8  Washington, D.c. 20036

9  (202) 310-5585

10  for Plaintiff

11

12  Richard L. Cys, Esquire

13  Davis Wright Tremaine LLP

14  Suite 200

15  1919 Pennsylvania Avenue, N.W.

16  Washington, D.C. 20006-3402

17  (202) 973-4200

18  for Defendant

19

20  Also Present: Videographer

**Page 3**

1          INDEX

2      Deposition of Joel Oxley

3          May 9, 2008

4  Examination by:                Page

5

6      Mr. McCally                4

7

8  No.        Description        Marked

9

10  A    Notice                    4

11  1A    RIF Document            172

12  85    RIF            173

13  91    Blowfish            147

14  106D    Job Posting            380

15  110    E.mail            330

16  117    E.mail            355

17  120    Memo            368

18  122    Memo            97

19

20  Certified Portion - Page 105

**Page 4**

1      - - - - - - -

2      (Deposition Exhibit Number A marked for

3      purposes of identification.)

4  Whereupon,

5      Joel Oxley,

6  called as a witness, having been first duly sworn to

7  tell the truth, the whole truth, and nothing but the

8  truth, was examined and testified as follows:

9      EXAMINATION BY COUNSEL FOR PLAINTIFF

10  BY MR. McCALLY:

11      Q. Good-morning, Mr. Oxley. Before we get

12  started I want to get a few housekeeping matters on

13  the record that I discussed with counsel for

14  Bonneville, Mr. Cys.

15      This is a 30(b)(6) corporate designee

16  deposition. There are certain areas we have

17  requested information about. One is the national

18  RIF as opposed to just the RIF that occurred in the

19  Washington Metropolitan area. That is laid out in

20  Exhibit A, which we'll show the witness now. Mr.

21  Cys, you have a copy of that.

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 29

1       A. National sales of sports would generally
2   be more dependent on the numbers, meaning the
3   Arbitron numbers that you would receive.
4       Q. And the Arbitron, is that the ratings
5   numbers?
6       A. That is the rating system that radio uses.
7       Q. Why is that, why are national sales more
8   dependent on that?
9       A. National relies more on the numeric
10  information. Most of national sales is based on how
11  you are doing numerically. So they almost
12  exclusively will look at the Arbitron numbers.
13  Whereas, locally they might not look at the numbers
14  as hard and just be enticed by the opportunity to be
15  associated with a team.
16      Q. Okay. When you say the numbers, are you
17  talking rankings, are you talking listenership,
18  what?
19      A. Yes. It could be rankings, it could be
20  listenership, it could be ratings.
21      Q. How are ratings different? What do you

Page 30

1   mean by ratings?
2       A. Ratings are -- ratings are determined by
3   looking at how long somebody listens, how many
4   people listen and how long they listen.
5       Q. Okay. Is that different than rank?
6       A. You can be ranked on ratings. You can
7   also be ranked on how long people listen. You can
8   also be ranked on how many people listen. So there
9   are three ways essentially that you can be ranked in
10  our business.
11      Q. Is there one universal ranking that's used
12  or are they all broken down in three different
13  rankings?
14      A. There are a lot of different ones that are
15  used.
16      Q. Okay. And the Orioles, even though they
17  were located in Baltimore, that's where their
18  stadium was, still is, they still sold locally
19  around the Washington Metropolitan area, is that
20  correct?
21      A. Yes.

Page 31

1       Q. Turning to Exhibit A that's in front of
2   you, in the first area of inquiry. The item reads,
3   the reasons for which Bonneville decided to
4   implement a reduction in force, both locally and
5   nationally in 2006.
6       We have already put the objection on
7   the record about the national reduction of force,
8   quote unquote.
9       What did you do to prepare for your
10  deposition today to answer questions about this
11  topic?
12      A. I looked at this amendment, amended
13  Attachment A and thought through what -- my
14  recollection of the -- of all of these items.
15      Q. Did you look at any documents?
16      A. Yes, I did look at documents.
17      Q. What documents?
18      A. I looked at what we produced to your firm.
19      Q. The official production of documents to
20  our firm. Is that what you're referring to?
21      A. Yes.

Page 32

1       Q. Did you look at anything that has not been
2   produced to my law firm?
3       A. No.
4       Q. Did you look at any notes?
5       A. No.
6       Q. Did you meet with your attorney to discuss
7   this deposition at all?
8       A. Yes.
9       Q. Did you discuss your testimony at the
10  deposition?
11      A. Yes.
12      Q. Are you relying on that meeting with
13  counsel in rendering your testimony today?
14      A. No.
15      Q. You are not. Did you do anything else
16  other than think about it and then look at the
17  documents from the production?
18      A. No.
19      Q. When did you first learn of the 2006 RIF?
20      A. Well, in my capacity I was involved in
21  determining if this was something that was the right

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 33

1  move for the market. So we first began discussions
2  with the Washington Post about possibly creating a
3  format with them in June of that year.
4      Q. June '05?
5      A. June of '05, correct. Actually, May '05.
6  It was either May or June.
7      Q. When you say in your capacity, what do you
8  mean by that?
9      A. Meaning I was the market manager. And it
10  is my responsibility to try to maximize the
11  operations for our market.
12      Q. Where did the idea to even consider a RIF
13  come from?
14      A. That was from me, when I saw that our
15  business situation would be changing dramatically.
16      Q. And why would it be changing dramatically?
17      A. If we were going to go ahead and move WTOP
18  to 103.5 FM, and the reason for that is putting your
19  best product on your best distribution, 103.5 FM was
20  where WGMS was. So WGMS would have to either -- we
21  would have to either close down the format or move

Page 34

1  it to other signals. And therefore, then
2  accommodate Washington Post Radio being able to go
3  on 1500 and 1077 and 820 AM.
4      Q. Is it your testimony that the idea for a
5  potential RIF was your idea, as opposed to
6  Corporate's?
7      A. Yes.
8      Q. Did Bonneville have any input into this,
9  the Corporate Bonneville in Salt Lake City?
10      A. Define what you mean?
11      Q. Any involvement whatsoever at this initial
12  phase?
13      A. No.
14      Q. How did you propose this to Bonneville?
15      A. After I had put together a lot of
16  information, trying to project how we thought this
17  would work out, I talked to my supervisor at the
18  time about this idea.
19      Q. Who was that?
20      A. Bob Johnson.
21      Q. What is his title?

Page 35

1      A. Chief operating officer.
2      Q. And where is he located?
3      A. Salt Lake City.
4      Q. When did you talk to him?
5      A. That probably would have been August.
6      Q. Of '05?
7      A. Yes.
8      Q. So prior to August of '05 Bonneville had
9  no idea about your ideas?
10      MR. CYS: Again, when you say Bonneville,
11  Bonneville Corporate Management in Salt Lake?
12      MR. McCALLY: Even if they are not in Salt
13  Lake, but Bonneville Corporate Management. The
14  difficulty here is, Mr. Oxley is the corporate
15  designee. So trying to separate the two out.
16      You're speaking here today as the
17  corporate designee. Now you are telling me about
18  something that was your idea. That's why I'm trying
19  to separate the entities.
20      THE WITNESS: Correct.
21      Q. I'll refer to it as Bonneville Corporate.

Page 36

1  Is that acceptable to you?
2      A. Fine.
3      Q. Is it my understanding then that
4  Bonneville Corporate had no idea about this proposed
5  RIF until you brought it to Mr. Johnson in August of
6  '05?
7      A. It could have been July. Could have been
8  July or August. I do not recall the exact date.
9      Q. All right. And what caused you to
10  start -- let's back up. Post Radio. Where did that
11  idea come from?
12      A. Post Radio came out of an idea that we
13  felt -- we, meaning me and Jim Farley, our vice
14  president of news and programming, felt that the
15  Washington Post could be a good partner -- we
16  already were partnering with them on a number of
17  things in terms of getting news from them. We felt
18  we might be able to expand or partnership.
19      We also were concerned, there had
20  been many rumors that WTOP would get a competitor.
21  And what we were concerned about was that a company

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 37

1  could come into the market and take us on by going
2  on a full market FM. Our weakness was our
3  distribution for WTOP. We had 1077 FM and 1500, but
4  even between the two of them we did not have great
5  distribution.
6      Q. When you say distribution, for the
7  layperson, does that mean the signal wasn't as good?
8      A. Yes, exactly. The signal for, the
9  combination of signals for 1500 and 1077 is not
10  nearly as good as 103.5's or other full market FM
11  radio stations.
12      Q. Easier to sell a product on a stronger
13  signal?
14      A. You should be able to sell it more easily,
15  because you should be able to get more audience.
16      Q. Assuming you have a decent product, it
17  would be fair to say it's easier to sell it on a
18  stronger signal as opposed to a weaker signal?
19      A. Yes.
20      Q. What goes into that thought process for
21  advertisers?

Page 38

1      A. Well, for advertisers, I believe it just
2  means that your numbers will be better.
3      Q. What do you mean by that?
4      A. That you will be able to reach more people
5  and have them listen longer by having superior
6  distribution.
7      Q. Because you have a better signal?
8      A. Right.
9      Q. It's not going to cut in and out as you
10  are driving around?
11      A. Not going to cut in and out. You also
12  don't have to switch signals.
13      Q. Jim Farley is local here in D.C., correct?
14      A. Yes.
15      Q. When you said you were concerned there may
16  be a competitor, is that to the news format?
17      A. Yes.
18      Q. That was the only competitor you were
19  worried about?
20      A. For WTOP, yes.
21      Q. Any other competitors you were worried

Page 39

1  about?
2      A. We were concerned that the Washington Post
3  could possibly start a news station as well. But,
4  once again, in the news category.
5      Q. Where did these rumors come from that you
6  are referring to?
7      A. The rumors were quite persistent over the
8  years, but they would come verbally.
9      Q. From?
10      A. From different people in the industry.
11      Q. Who?
12      A. Certainly we would hear them from other
13  general managers, other program directors, other
14  people in management around the market.
15      Q. Who?
16      A. Who? I do not recall specifically names
17  of people I talked to about it.
18      Q. What stations or owners did they work for?
19      A. I remember rumors -- also rumors would
20  come to me second and thirdhand. I would have, for
21  example, Mr. Farley tell me that he might have

Page 40

1  caught wind of some rumors that say, for example,
2  CBS was considering moving news to 94.7 FM. That
3  was a persistent rumor.
4      Q. You're saying Mr. Farley told you that?
5      A. He would have been one of the ones I
6  discussed it with.
7      Q. Do you know where he got that information
8  from?
9      A. No, I don't.
10      Q. Who do you know directly this type of
11  information to come from?
12      A. I do not recall at this point.
13      (Brief Recess.)
14  BY MR. McCALLY:
15      Q. We are back on, Mr. Oxley. So you don't
16  recall who you heard these rumors from?
17      A. I just remember them being talked about in
18  the office.
19      Q. Do you recall who?
20      A. I remember primarily having these
21  discussions with Jim Farley.

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 41

1    Q. You don't know where he heard these rumors
2    from?
3        A. I do not recall.
4    Q. Yet it was -- apparently you gave them
5    enough credence to start looking at a total
6    reorganization of the Washington market for
7    Bonneville?
8        A. That would have been only one part of why
9    we would have considered that someone might come in
10   and be a full market FM.
11   Q. What were the other reasons?
12       A. Well, we felt that our ratings would go up
13   because we would be on superior distribution.
14   Q. Whose ratings?
15       A. WTOP.
16   Q. Anyone else's?
17       A. No. That was what we were thinking when
18   we were thinking about moving.
19   Q. Did that happen?
20       A. Over time, yes.
21   Q. In lay terms, because you moved to the

Page 42

1    strongest signal that you had, the ratings of WTOP
2    went up. Is that what you're saying?
3        A. Yes. We saw them move up, it was quite a
4    transition, when we saw them move up, especially in
5    the last ratings period. We saw quite a jump. And
6    we feel that certainly that the signal is part of
7    that.
8    Q. Okay. And that is GMS's old signal?
9        A. Correct.
10   Q. After the RIF GMS stayed on the air for
11   about a year?
12       A. Correct.
13   Q. Did GMS's ratings go down by virtue of
14   moving to a weaker signal?
15       A. Yes.
16   Q. And whose signal did they move to?
17       A. Z104. 104.1 and 103.9.
18   Q. In lay terms those are two FM signals?
19       A. Correct.
20   Q. And why do you have two FM signals for the
21   same station?

Page 43

1        A. 104.1 is located to the southeast of the
2    city and does not reach well north and west of the
3    city. 103.9 is in Frederick, Maryland. So it's
4    north and west of the city. And the hope is the two
5    of them cover the area. But, unfortunately, with
6    those signals there is an area that is not covered
7    particularly well, which is northwest D.C. and a
8    good bit of Montgomery County.
9    Q. This is the problem you referred to
10   earlier as having to switch channels as being not as
11   favorable as having a stronger signal where you
12   don't have to switch challenges to maintain
13   listening?
14       A. That is one issue. The other issue being
15   that the signal itself, 104.1 was not strong enough
16   in some of the areas to be able to listen to very
17   well in a car and particularly a home.
18   Q. Okay.
19       A. Or in an office.
20   Q. Okay. Did the move of WTOP to 103.5, with
21   the increased ratings, did that equate into

Page 44

1    increased revenues as well?
2        A. I think that they will. It didn't
3    immediately.
4    Q. Has it since the move?
5        A. We feel with this latest ratings book that
6    this will help us in that area. We have seen
7    ratings go up exponentially in the last two ratings
8    periods. We feel that now we have gone through this
9    transition, and we have gotten people much more used
10   to where our new address is, we feel that the
11   ratings are certainly moving in a positive direction
12   because of the switch that we made.
13   Q. My question is, I understand -- we have
14   talked about ratings are.
15       A. Ratings, listenership.
16   Q. As those go up, have you seen an increase
17   in revenues attendant with that increase in ratings?
18       A. Our revenues have been going up, yes.
19   Q. Do you attribute that to the move?
20       A. Some of it.
21   Q. The revenue increase?

Joel Oxley                                                     Leo Donohoe v. Bonneville Int'l Corp.

Page 45

1    A. Some of the revenue increase would be
2    attributed to it.
3    Q. What else do you attribute it to?
4    A. I think that we are continuing to do a
5    better job of putting on a quality product. We are
6    continuing to do a better job of selling that
7    product.
8    Q. Anything else?
9    A. Certainly I think that we have continued
10   to get better people in the organization in all
11   aspects of the organization to continually improve
12   it so we can continue to move the revenue and the
13   profit up.
14   Q. Do you think it was a good idea to make
15   the move, to move WTOP to the 103.5 signal
16   considering the ratings and the revenues that you
17   have seen since the move in '06?
18   A. Considering the ratings and the revenue
19   moves. Well, overall, yes, I think it's a good move
20   for WTOP to have gone on to 103.5 FM.
21   Q. With GMS going to the weaker signals, 104

Page 46

1    and 103, did you see anything happen with its
2    ratings or revenue?
3    A. Yes.
4    Q. What happened?
5    A. They dropped.
6    Q. Why was that?
7    A. The distribution wasn't as strong. The
8    radio signals were not as strong.
9    Q. Did that equate to decrease in
10   listnership?
11   A. Yes.
12   Q. Did it equate to decrease in ratings?
13   A. Yes.
14   Q. Did it equate to decrease in revenues?
15   A. Yes.
16   Q. The revenues for a radio station come
17   from, for WTOP predominantly from advertising?
18   A. Yes.
19   Q. And that can be on the radio, as well as
20   your internet site?
21   A. Yes.

Page 47

1    Q. Break down the percentage for me of the
2    radio advertising compared to the internet
3    advertising, total numbers?
4    A. About 97 percent would come from radio.
5    About 3 percent would come from internet.
6    Q. You said you had this idea because you
7    were concerned of competitors to WTOP coming into
8    the market. And then you looked at the possibility
9    of a Post Radio, correct?
10   A. Correct.
11   Q. And you were looking into this prior to
12   your July-August meeting with Bob Johnson?
13   A. It was something that we had considered
14   for quite some time, just the basic idea of putting
15   our most successful product on our best signal.
16   Q. Who is we?
17   A. Meaning me and Jim Farley had discussed
18   this.
19   Q. Did you seek any approval from Bonneville
20   Corporate beginning prior to May or June, when you
21   started looking into this?

Page 48

1    A. No.
2    Q. Did Bob Johnson or Bonneville Corporate
3    have any knowledge of your ideas prior to your
4    meeting with them in July or August of '05?
5    A. About what in particular?
6    Q. This whole idea of moving the signals,
7    possibly a RIF?
8    A. The idea of moving the signals had been
9    discussed over time.
10   Q. When?
11   A. I do not recall.
12   Q. What I'm trying to get at here is, did you
13   just go out on your own and start talking to the
14   Washington Post about, hey, what about a radio
15   station with us or show on our airwaves or did you
16   have authority from Bonneville Corporate to begin
17   those inquiries?
18   A. I would have been able to do that on my
19   own.
20   Q. Did you? Or did you seek approval?
21   A. I did not seek approval.

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 49

1     Q. So you did it on your own?

2     A. I did.

3     Q. That, separate from moving signals, you

4 seem to be making a distinction there. I may be

5 wrong on that. That's the way it sounded to me.

6 What's the difference between talking to Post Radio

7 and/or moving the WTOP signal to 103.5?

8     A. Rephrase the question.

9     Q. You indicated that Bonneville had been, it

10 seemed -- let me ask it this way. Had you had any

11 discussions with Bonneville Corporate about moving

12 the TOP signal prior to your efforts to talk about

13 Post Radio in May or June of 2005?

14     A. Yes.

15     Q. Tell me about that.

16     A. That was something that would be brought

17 up every once in a while, should we consider putting

18 our most successful product on our best

19 distribution.

20     Q. So putting TOP on --

21     A. The idea of considering putting TOP on

Page 50

1 103.5 had been discussed and had been talked about.

2     Q. When did that start?

3     A. I believe that that might have even

4 started when WTOP and WGMS, not that far after when

5 WTOP and WGMS were bought in 1997. I think that it

6 was something that was a consideration for a long

7 time, to put -- and it was a consideration for a

8 long time, is there a good enough business reasons

9 to put our best product on our best distribution.

10     Q. Who were those discussions with in 1997?

11     A. I do not remember in my capacity having

12 those discussions at that point. This would have

13 been more after I would have become general manager.

14     Q. When was that, that you first recall

15 having such discussions with Bonneville Corporate?

16     A. First that I can definitely recall that,

17 maybe 2002.

18     Q. Who were those discussions with?

19     A. Bob Johnson --

20     Q. Anyone else?

21     A. I started at that period reporting to Drew

Page 51

1 Horowitz. So I believe I would have had brief

2 discussions with him about that as well.

3     Q. Who is Drew Horowitz?

4     A. Drew Horowitz is now my boss. I do not

5 know what his official new title is. He's a

6 corporate -- I think he's senior vice president of

7 operations.

8     Q. Those discussions in '02, were they simply

9 to move signals, move TOP to the 103 signal or was

10 there anything else?

11     A. Well, at that point we would be talking

12 about what is the best way to maximize the

13 opportunity in Washington, D.C., what products

14 should go on what signals.

15     Q. Tell me about those discussions, as you

16 recall them?

17     A. The discussion would have been do we

18 consider putting WTOP on 103.5, do we consider

19 putting Z104 on 103.5. Do we consider, what do we

20 consider is going to maximize our revenue and

21 profit, therefore, profit for the group.

Page 52

1     Q. There was serious consideration of putting

2 Z104 on 103.5 signal as opposed to WTOP?

3     A. Yes.

4     Q. Tell me about that.

5     A. Well, Mark O'Brien tried very hard, he was

6 the general manager of Z104, he tried very hard to

7 convince corporate that they should move Z104 on to

8 130.5. Therefore, make it a much higher rated radio

9 station.

10     Q. Did that go anywhere?

11     A. Ultimately no.

12     Q. Tell me how did these discussions about

13 moving signals proceed?

14     A. There was -- Mark O'Brien tried to

15 convince Drew Horowitz and Bob Johnson that this

16 would be a good financial move for the company to

17 move Z104 on to 103.5 FM.

18     Q. I don't mean just that. I mean all the

19 discussions about the changing of stations to

20 signals. Tell me how they progressed up to the time

21 of the decision to do that?

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 53

1    MR. CYS: Do you mean starting in 2002?
2    MR. MCCALLY: I want to know how these
3 progressed.
4    A. I was not involved in Mark lobbying to be
5 on 103.5 FM. When it was told to me that Mark was
6 lobbying to put Z104 on 103.5 FM by Bob Johnson to
7 Drew Horowitz, then I talked to them about how I
8 thought that, if we were going to move any signal to
9 103.5 FM, it should, if we are going to move any
10 product to 103.5 FM, it should be WTOP. Or, and
11 also, that WGMS was doing okay on 103.5 FM. And I
12 did not believe Z104 would do better than WGMS on
13 103.5 FM. So I did not see that it was going to be
14 a positive move for the company.
15    Q. Did these discussions progress beyond
16 2002?
17    A. They went into 2003. It was an ongoing
18 process where Mark O'Brien was lobbying to make this
19 happen. But at some point, if I remember -- what I
20 can remember is, somewhere in 2003 corporate,
21 meaning Bob and Drew, made the decision, no.

Page 54

1 Certainly at that time was when it became a point,
2 well, what should we do about our signals? What is
3 the way to maximize our ratings and revenue. And,
4 therefore, profit. So the idea of possibly moving
5 103.5 FM for WTOP was, I think at that point was
6 first discussed.
7    Q. When was that, what date?
8    A. Like I said, somewhere in 2002 is my
9 recollection. Because Mark O'Brien pushed to get
10 Z104 on to 103.5.
11    Q. I thought you said those discussions kind
12 of came to an end in '03?
13    A. The idea of --
14    Q. 104?
15    A. 104, of that format being moved onto 103.5
16 that part came to an end. The debate would, maybe
17 come up once or twice a year for the next couple of
18 years, should we consider moving to 103.5 FM.
19    Now Jim Farley, WTOP news of WTOP, he
20 felt, started to feel more strongly over time that
21 103.5's FM, that WTOP's ratings would benefit by

Page 55

1 going to 103.5 FM. So he was an advocate of why, we
2 should be on a full market effort. We should move
3 to 103.5. That would make us better.
4    Q. You are saying these conversations
5 continued a couple times during each year, from '03
6 forward?
7    A. Yes.
8    Q. Who were the discussions with?
9    A. Between Jim and myself. And they would
10 also be raised with Drew and sometimes Bob.
11    Q. How were these discussions -- were they
12 over e.mail, in person, both, what?
13    A. In person.
14    Q. Are there any memos or notes of those
15 discussions?
16    A. Not that I know of.
17    Q. You didn't make any move in '04, correct?
18    A. No.
19    Q. But then '05, at some point in '05 a
20 decision was made to make the move?
21    A. Yes.

Page 56

1    Q. When was that?
2    A. The final decision to do this occurred in
3 very late '05, when we came to an agreement with the
4 Washington Post that we would partner to start
5 Washington Post Radio.
6    Q. When in '05?
7    A. Late December.
8    Q. Understanding that was when the decision
9 was made, when did the discussions about doing this
10 begin?
11    A. May or June, when Jim Farley and I visited
12 the Washington Post and found out that they had an
13 interest in starting a radio station, partnering to
14 start up a radio station.
15    Q. Who did you meet with at the Post?
16    A. Steve Hills.
17    Q. What was his title?
18    A. President and COO I believe.
19    Q. He's here locally, correct?
20    A. Yes.
21    Q. Is it your testimony that you had this

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 57

1 meeting without the knowledge of Bonneville
2 Corporate?
3 A. No, I had told Bonneville Corporate that I
4 was going to go talk to the Post about ways that we
5 might be able to increase our relationship with the
6 Post. I had no idea that I was going down there and
7 start talking about having a radio station, starting
8 up a radio station with them.
9 Q. Is that something that just came up at the
10 discussion?
11 A. They had been looking at the idea and had
12 had discussions. They did not tell us that they had
13 these discussions. They did tell us they had
14 discussions with other groups.
15 Q. Meaning other radio groups?
16 A. Yes.
17 Q. You first learned that when you went to
18 meet with them in May or June of '05?
19 A. Yes.
20 Q. What knowledge did Bonneville Corporate
21 have of your going to meet with them at that time?

Page 58

1 Any?
2 A. That I was going to go meet with them?
3 Q. Yes.
4 A. Yes, they would have known I was going to
5 meet with them. I do remember mentioning to them
6 that I was going to go talk to the Post about
7 expanding our partnership.
8 Q. Meaning getting more of their people on
9 air, as opposed to starting a separate radio
10 station?
11 A. Right. We also were hoping to do more
12 marketing efforts in conjunction with them.
13 Q. Okay. At that time, in May or June of
14 '05, that's all that was under consideration?
15 A. Yes. As Jim and I went down to talk to
16 the Post, that was all that was under consideration.
17 Q. No RIF was being talked about at that
18 time?
19 A. No.
20 Q. No moving of signals was being talked
21 about at that time?

Page 59

1 A. No.
2 Q. Tell me what happened next.
3 A. At the meeting, when they brought up that
4 other groups had approached them about starting a
5 radio station, we found that to be a innovative idea
6 and started to consider is this something that we
7 should take a look at doing.
8 Q. Who is we?
9 A. Me and Jim Farley.
10 Q. What happened next?
11 A. Jim and I had a number of discussions
12 about the viability of this and decided that there
13 could be something there and we should meet with
14 them again.
15 Q. Did you meet with them again?
16 A. Yes.
17 Q. When?
18 A. Would have been a couple weeks after the
19 first meeting.
20 Q. Who was at that meeting?
21 A. It would have once again been Steve Hills.

Page 60

1 Also there was another person at the meeting, in
2 both of these meetings. Her name was Tina T-I-N-A,
3 Gulland, G-U-L-L-A-N-D.
4 Q. That meeting was in what time in '05, what
5 month or date, as best you can recall?
6 A. It was either May or June. The next
7 meeting would have been a couple weeks thereafter.
8 Q. So you had two meetings in the May or June
9 timeframe?
10 A. Yes, as I recall.
11 Q. What happened after the second meeting?
12 A. We felt that it was time to try to put our
13 thoughts more together, to make this more concrete
14 so --
15 Q. Make what more concrete?
16 A. The idea of starting a radio station with
17 them.
18 Q. Tell me what happened next.
19 A. At that point I think Jim and I continued
20 to talk about what would be the best way to do this.
21 I believe we met with them again to go through it

Page 61

1  again.
2      Q. You and Farley?
3      A. Yes.
4      Q. What happened there?
5      A. At some point we -- both sides decided
6  that this was truly worth pursuing. So we started
7  looking at exactly how we would do this, what
8  signals we would use, what options for those
9  signals.
10     Q. Who is we?
11     A. Me and Jim Farley. We would consider,
12 would we move, could we do this on 104.1. Could we
13 move WTOP to 103.5 FM. Could we then do it on 1500
14 or 1077. What type of people would we need to hire
15 to start a radio station like this? What would --
16     Q. Meaning the Post?
17     A. Meaning the Post Radio. What would that
18 radio station sound like? How would it be
19 successful? What type of ratings might you get? So
20 we were looking at every aspect of the radio station
21 to consider if it would be a viable option for us.

Page 62

1      Q. These discussions were only with you and
2  Farley?
3      A. At some point we brought in our controller
4  to start considering this as well, Linda Pfluger.
5      Q. When did you do that?
6      A. Probably around the timeframe of the third
7  meeting. So that would have been maybe late June,
8  maybe early July. I don't remember the exact date.
9      Q. What happened at that time, at that
10 meeting with her?
11     A. I think at that time we would start
12 weighing the positives and negatives and the
13 financial effects of those positives and negatives.
14     Q. What were the positives and negatives?
15     A. Well, the positives would be that WTOP
16 would be on 103.5 FM, putting your best product on
17 your best distribution. Over time that we would
18 receive more ratings, more revenue and, therefore,
19 more profit.
20         Another positive would be that we
21 would be starting something that, the more we talked

Page 63

1  we felt it could be a very lucrative new format,
2  Washington Post Radio, which we felt would be a good
3  way to be in between what WTOP does and what NPR
4  does. So it would be longer form news.
5          We also felt that this would also,
6  like I talked about earlier, block a potential
7  competitor from coming in. Because we would be,
8  have WTOP solely on the FM dial. And have, it would
9  be then, in our estimation, very unlikely that some
10 other competitor would come in and try to challenge
11 us on the news format. Because we would be on
12 better destruction, but also there would be another
13 news product on the market, meaning Washington Post
14 radio.
15     Q. What were the negatives?
16     A. The negatives would be that anytime that
17 you were starting something new, you don't know if
18 it's going to work. So that was a concern about
19 Washington Post Radio. Another concern would be the
20 transition to get listeners to move from being used
21 to being on 1500/1077 with WTOP to get them move

Page 64

1  over to 103.5 FM. So could we move our audience to
2  a new address. That certainly was a concern as
3  well.
4      Q. Anything else?
5      A. Certainly what to do about the WGMS
6  format, what to do about the Z104 format. And how
7  to, how would we structure our business now that we
8  would have much different needs.
9      Q. These were all in that discussion with
10 you, Farley and Pfluger?
11     A. By that time, yes, we would have been
12 starting to really talk about that.
13     Q. What were the discussions about GMS and
14 Z104?
15     A. The viability of GMS possibly moving to
16 weaker signals. The viability of the format,
17 Washington Post Radio, the viability of 103.5 FM,
18 moving WTOP to 103.5 FM and getting listeners to
19 move over there.
20     Q. What were the issues about viability of
21 Z104 and WGMS? I don't want to know just the

Page 65

1 general topics. I want to know what you all
2 discussed?
3     A. The concern with WGMS would be that, if
4 you moved it to, from 103.5 FM to 104.1, or 103.9
5 that we would undoubtedly see a ratings decline and,
6 therefore, revenue decline and, therefore, profit
7 decline.
8     Q. That is because of your move to a weaker
9 signal?
10     A. Correct.
11     Q. What about Z104?
12     A. Z104 -- one, the option would be, we could
13 also have kept Z104 on 104.1 and 103.9 and shut WGMS
14 down. But the feeling was that WGMS was a slightly
15 more profitable radio station. But Z104 also, what
16 we would have considered there, did Z104 have any
17 more upside potential. Was it going to be stronger
18 in ratings? Could it do better than it was already
19 doing? So we would have certainly discussed that as
20 well.
21     Q. I take it the answer to that was no?

Page 66

1     A. The answer to that was maybe. I had
2 just -- I had been overseeing Z104 for a little over
3 a year. I was still thinking that Z104 had upside,
4 it could perform better.
5     Q. Ultimately you made a decision that it
6 wouldn't though. Is that correct?
7     A. Ultimately we made the decision that WGMS,
8 for a number of reasons, would be moved over to
9 104.1 and 104.9.
10     Q. What were those reasons?
11     A. WGMS had a long heritage in classical
12 music in the market since 1946 or 1948. And we felt
13 that we could damage the reputation of Bonneville
14 and WTOP by eliminating WGMS. So we had a concern
15 about that.
16     Q. Any other concerns with WGMS?
17     A. About moving it over?
18     Q. Any concerns you were discussing at this
19 time period, which is the June of '05?
20     A. No, not that I can recall.
21     Q. So you had the meeting with Pfluger,

Page 67

1 Farley and yourself. I take it -- was there more
2 than one meeting when you discussed these issues?
3     A. Yes.
4     Q. How many were there before you went to see
5 Bob Johnson?
6     A. I do not recall.
7     Q. We are now in the June time period. Is
8 that correct?
9     A. June-July.
10     Q. All right. We know you went to see
11 Johnson in July or August, correct?
12     A. I guess it was August.
13     Q. You earlier testified July-August. You
14 tell me.
15     A. When I said see him, I meant talk to him.
16     Q. Okay.
17     A. I do not recall seeing him in July or
18 August.
19     Q. Talking to him?
20     A. Talking to him.
21     Q. That was July or August timeframe,

Page 68

1 correct?
2     A. I think August.
3     Q. All right. What I'm focusing on now is
4 the period between you meeting, talking to him in
5 August of '05 and this meeting between you and
6 Pfluger and Farley in the June time period.
7     How many additional meetings did you
8 have locally about these issues prior to discussing
9 it with Bob Johnson?
10     A. I do not recall.
11     Q. Was anyone else involved in the meetings
12 locally?
13     A. Not that I remember.
14     Q. Was Matt Mills involved in them?
15     A. He would have been by August.
16     Q. Before or after you spoke to Bob Johnson
17 about this?
18     A. I cannot recall.
19     Q. What other discussions were there prior to
20 your talking to Bob Johnson about this in August of
21 '05?

Joel Oxley                                          Leo Donohoe v. Bonneville Int'l Corp.

Page 69

1     A. I think I have given them to you.
2     Q. Did you seek input from any third parties?
3     A. No.
4     Q. So it was strictly you, Farley and Pfluger
5  discussing this locally prior to going to see Bob
6  Johnson, talking to Bob Johnson?
7     A. As I remember, yes.
8     Q. Were any documents generated about this
9  prior to talking to Bob Johnson?
10    A. I do not think so.
11    Q. Did you come to any decisions or
12 recommendations prior to talking to Bob Johnson
13 about this idea?
14    A. No.
15    Q. What did you take to Bob Johnson?
16    A. I remember calling him and talking to him
17 about the idea.
18    Q. What exactly did you all discuss?
19    A. I do not recall.
20    Q. Give me your best recollection.
21    A. What I just gave you pretty much, that the

Page 70

1  Post was interested in possibly partnering with us
2  in a radio station and that talking to him about the
3  pros and cons of considering making this move.
4     Q. Was there any discussion of a RIF at this
5  time?
6     A. Yes, there would have been.
7     Q. When did that first start?
8     A. Well, in the discussions certainly with,
9  by the time Jim Farley and I had talked to Linda
10 Pfluger in, I guess late June-July timeframe. We
11 would have talked to Bob in July-August timeframe.
12 We certainly had talked about that we would have to
13 look at reconfiguring the way we do business. So
14 somewhere in that time.
15    Q. I'm not sure I follow what timeframe. Is
16 this before the meeting with Pfluger, you and
17 Farley?
18    A. No. No, certainly Jim and I would have
19 talked about that we would have to look at doing
20 things differently.
21    Q. What do you mean by doing things

Page 71

1  differently?
2     A. Well, if we were starting a new radio
3  station and changing formats on another, then there
4  wouldn't be much doubt that there would be some
5  people that we would have to let go.
6     Q. What do you mean by changing formats on
7  another?
8     A. Well --
9     Q. You are keeping the format. You are just
10 moving one.
11    A. What I meant was, that we were definitely,
12 if we were going to do Washington Post Radio, one
13 format was going to change.
14    Q. You would have a new format?
15    A. Yes.
16    Q. When did discussions about letting people
17 go start?
18    A. As I remember, either maybe in the
19 second -- after the second meeting with the Post or
20 certainly by the time we were talking to Linda
21 Pfluger.

Page 72

1     Q. Do you recall?
2     A. No.
3     Q. Who was involved in the discussions about
4  letting people go?
5     A. Farley and Pfluger and myself.
6     Q. Anyone else?
7     A. Not that I recall.
8     Q. Tell me what those discussions were.
9     A. That since we would be starting this new
10 format, that we would need different skill sets, a
11 different way of doing our business.
12    Q. The new format was a talk format, correct?
13    A. A news, a long -- we were trying to create
14 a different type of format, a long form news format.
15    Q. As opposed to, how do you characterize
16 WTOP?
17    A. News.
18    Q. All right. Clearly not a music format?
19    A. No.
20    Q. What did you discuss about needing new
21 skills?

Joel Oxley                                    Leo Donohoe v. Bonneville Int'l Corp.

Page 73

1    A. That a music station would have a
2    different skill set that a news station.
3    Q. Different skill sets in what areas?
4    A. Certainly programming, sales.
5    Q. Anything else?
6    A. Those would be the two primary
7    departments.
8    Q. What are the different skill sets that are
9    needed for a long format news as opposed to music?
10   A. Well, long format news --
11   Q. Let's keep it limited to sales.
12   A. Sales. In long format news, one of the
13   most important distinctions would be that we would
14   be, we would be starting a brand new radio station.
15   So you would have to have people in sales who were
16   used to selling a new product.
17   Q. Anything else?
18   A. It would also be -- you would need people
19   who would be able to go directly to advertisers, any
20   station that starts up new does not have ratings
21   history. So, therefore, you need people who are

Page 74

1    going directly to advertisers. Because advertising
2    agencies are generally going to wait for the ratings
3    to come out. Particularly at the beginning, for the
4    first year or two, you're going to need people who
5    really are going to be able to go out and go
6    directly to the advertisers. Because your business
7    from agencies, whether they are local or national,
8    is just not going to be anywhere near as significant
9    as it can be from getting local direct advertisers.
10   Q. Anything else?
11   A. Not that I can think of.
12   Q. How about prior experience selling news?
13   Would you find that of benefit?
14   A. Possibly.
15   Q. What do you mean possibly?
16   A. It would depend on the person.
17   Q. What do you mean by that?
18   A. It would depend on, if they had been able
19   to sell something that news, that was a little bit
20   more difficult to sell. If the station already had
21   ratings, that's a very different sell than selling

Page 75

1    something that does not have ratings.
2    Q. You are saying someone with prior news
3    selling news experience, if it was on an established
4    station, that would be irrelevant?
5    A. I think it would be relevant.
6    Q. How would it be relevant?
7    A. They would have experience selling news.
8    Q. That's important?
9    A. Yes.
10   Q. For something like Post Radio?
11   A. It would be helpful.
12   Q. Would you consider it important?
13   A. Important? Yes.
14   Q. Were there any other discussions you had
15   about skill sets in sales?
16   A. Jim Farley was in charge of programming so
17   we would have had very few discussions about sales.
18   Q. Who did you have these discussions with
19   about the sales skill sets?
20   A. Eventually Matt Mills.
21   Q. When did Mr. Mills come into the picture?

Page 76

1    A. Probably August.
2    Q. Was that before or after your talking to
3    Bob Johnson about this?
4    A. I do not recall.
5    Q. Prior to Mr. Mills coming into the
6    picture, did you ever discuss Leo Donohoe?
7    A. Not that I recall.
8    Q. Did you discuss any individuals
9    specifically?
10   A. Not that I recall.
11   Q. Those meetings would have been you,
12   Pfluger and Farley?
13   A. Yes.
14   Q. What was the next step in the process?
15   What was the result of your and Bob Johnson's
16   discussion in July, August of '05? I think you said
17   August of '05. Is that correct?
18   A. I don't remember.
19   Q. You tell me and I'll use your time
20   reference. Whatever you are comfortable with.
21   A. July/August.

Joel Oxley                                    Leo Donohoe v. Bonneville Int'l Corp.

Page 77

1    Q. Okay. What was the result of your
2  discussion with Johnson in July-August of '05?
3    A. Bob at that point wanted us to consider
4  the financial ramifications of making the move. So
5  he wanted us to put together a proposal on how this
6  would affect the finances of the radio stations.
7    Q. You say the financial ramification of
8  making the move. Had a decision been made after
9  your discussion with Johnson about what moves would
10 be made?
11   A. No. We had a number of different
12 scenarios.
13   Q. What were the scenarios?
14   A. Well, it all depended on what signals
15 moved where. So we looked at a number of different
16 options.
17   Q. What were they?
18   A. One, we would have said what will happen
19 if we leave everything the same. There was one
20 scenario to look at for the future. Another
21 scenario would be to 103.5 FM, put WTOP on 103.5 FM,

Page 78

1  put Washington Post Radio on 104.1, 103.9, eliminate
2  WGMS. Start a new station on 1500 and 1077.
3    Q. What would that new station be?
4    A. We had considered possibly moving WFED
5  over there. Which is another station that we own.
6  It does Federal news.
7         We had looked at Washington Post
8  Radio being on 1500, TOP being on 103.5, 1500/1077
9  being Washington Post Radio and WGMS going to 104.1
10 and 103.9. We had looked at WTOP being on 103.5,
11 Washington Post being on 1500/1077, Z104 staying --
12   Q. You said that.
13   A. Z104 staying on.
14   Q. Slow down here. Post 1500, 1077. But
15 Z104 staying around.
16   A. 104 staying around. Or GMS moving to
17 104.1-103.9 signals. I think those were the four
18 scenarios we really looked at.
19   Q. All right.
20   A. We might have even looked at, at one point
21 we even looked at saying, okay, 103.5 FM would be

Page 79

1  TOP, Post Radio would be 1500 and 1077, and WFED
2  would go on 104.1 and 103.9. We also considered
3  some of the outlying signals and exactly where they
4  would go. Meaning, would you still pair 103.9, if
5  you did Washington Post Radio, would you still need
6  it? Would you not. What would you do with 820. So
7  there was a lot of different smaller variations that
8  we could have looked at well.
9    Q. Every one of these scenarios you have
10 given me except the first one, leaving everything
11 the same, WTOP was to move to 103.5?
12   A. Right.
13   Q. Why was that?
14   A. Put your best performing product on your
15 best distribution.
16   Q. Your best performing products means the
17 product that brings in the most revenue?
18   A. Yes.
19   Q. I want to make sure I have it correct.
20 First one was leave everything the same. Second one
21 was WTOP at 103.5. Put post on 104 and 103.

Page 80

1  Eliminate GMS. Start a new station at 1500/10767.
2  Possibly move FED there?
3    A. Yes.
4    Q. Third, Post 103.5, sorry, WTOP on 103.5,
5  Washington Post on 1500/1077, GMS at 104, 103. I
6  take it that would mean eliminating Z104?
7    A. Right.
8    Q. The next one was WTOP at 103. Post at
9  1500/1077. Z104 staying on the air. GMS either
10 going away or moving?
11   A. No. Going away.
12   Q. Going away?
13   A. Yes.
14   Q. Fifth you said TOP would stay on 103.5.
15 WFED would go to 104. What was the rest of that
16 one?
17   A. Post Radio 1500/1077.
18   Q. Again, z104 would go away?
19   A. Uh-huh.
20   Q. The final one you said where to put or
21 what to put on the 103.9?

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 81

1    A. Well, for example, if you put WFED on
2    104.1, there wouldn't be a lot of reason to have
3    WFED in Frederick, Maryland. So WFED would probably
4    at that point then have been married to 103.5 FM, as
5    it eventually was.
6        Q. So 103.5 carrying both WFED and WTOP?
7        A. No. 103.5 being on 103.9, TOP being on
8    103.9 and 103.5.
9        Q. I see. These were the scenarios that Mr.
10   Johnson said give me the financial breakdown for?
11       A. Yes.
12       Q. This was July or August of '05, when you
13   had this discussion?
14       A. Yes. July or August.
15       Q. Was anybody else in corporate involved?
16       A. No.
17       Q. What happened next?
18       A. We started weighing out the different --
19   worked with Linda Pfluger and Jim Farley. And at
20   that point into August-September would have involved
21   Matt Mills as well to look at the different

Page 82

1    scenarios to try to determine what would be the best
2    scenario for the Washington market.
3        Q. Did you all create a document of any type
4    concerning these various scenarios?
5        A. Yes. Eventually we did.
6        Q. What is that document called?
7        A. Linda Pfluger named it. I want to say she
8    named it, I think Blowfish.
9        Q. Who has possession of that?
10       A. It's been produced.
11       Q. Who keeps possession of it?
12       A. Who keeps possession of it?
13       Q. Is it still around with the various
14   scenarios?
15       A. We produced it to you so, yes, it was I
16   think on Linda's computer.
17       Q. Who had input into that document?
18       A. Myself, Linda Pfluger, Jim Farley and Matt
19   Mills.
20       Q. So by this point, when the various
21   scenarios were put to writing, Matt Mills was

Page 83

1    involved?
2        A. As I remember, yes.
3        Q. Why was he involved?
4        A. Because the revenues was the key piece of
5    determining your success. So we felt that it was
6    important to involve him in these discussions.
7        Q. Because of his position?
8        A. Because he was general sales manager of
9    WTOP and in all these situations WTOP was going to
10   be part of the situation.
11       Q. It was main part of the situation,
12   correct, your number one revenue generator?
13       A. It was the number 1 revenue generator,
14   yes.
15       Q. Prior to Mr. Mills coming in, did you have
16   any discussions regarding Leo Donohoe?
17       A. Not that I recall.
18       Q. After Mr. Mills came into the meeting, you
19   said sometime in August-September, tell me what the
20   discussions, what happened then? Had the scenarios
21   memo already been prepared or was he involved in

Page 84

1    that?
2        A. I believe that he was involved in giving
3    us some ideas about what kind of revenue.
4        Q. What kind of revenue?
5        A. What kind of revenue we would come up with
6    in the different scenarios.
7        Q. Had he talked -- was there any discussion
8    at that point of people in specific places or
9    positions?
10       A. Somewhere in that timeframe we would have
11   started to talk about, probably in September, about
12   what structure for the market should be.
13       Q. Do you recall that?
14       A. I do not recall what date it would have
15   been.
16       Q. When you say structure for the market, you
17   mean which people would go in what positions?
18       A. Which departments that you would have.
19       Q. What do you mean by that?
20       A. Meaning that, at that point we had, in
21   sales we had TOP sales department that sold WTOP and

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 85

1  WFED. And we had a WGMS sales department that sold
2  WGMS. And a Z104 sales department that sold Z104.
3      Q. You couldn't really make a determination
4  of who would go where until you knew what your final
5  product was going to be, correct?
6      A. Right.
7      Q. When did that come about?
8      A. When the final product would be?
9      Q. Which scenario you chose.
10     A. The final decision on the scenario came
11  later in the year. So it would have been -- final
12  decision probably, absolute final decision was made
13  in maybe December, as to what scenario we picked.
14     Q. I don't want to jump to December yet. We
15  are now in August-September timeframe. In
16  generating this Blowfish memo, are you saying Matt
17  Mills had input into that regarding sales revenue?
18     A. I believe he would have input into what he
19  thought the revenue, how the revenues would be
20  affected by the various changes.
21     Q. When were the first discussions concerning

Page 86

1  people and places or structure, as you put it?
2      A. Somewhere in that timeframe.
3      Q. Did you come up with different structures
4  for each one of the six scenarios?
5      A. I do not recall.
6      Q. Tell me what you recall.
7      A. I remember that we talked about what our
8  sales structure should be for the different
9  scenarios.
10     Q. Who did you discuss that with?
11     A. Mills, Pfluger, Farley.
12     Q. When you say what the sales structure
13  should be, do you mean which people in which jobs?
14     A. Not which people in which jobs. Which
15  departments.
16     Q. What do you mean?
17     A. Which departments do you keep. Do you
18  sell all the products together. So do you have one
19  big sales department. Do you have two sales
20  departments. Do you have three sales departments.
21     Q. Tell me about those discussions?

Page 87

1      A. We discussed the various merits of what
2  would be the most effective.
3      Q. Pros and cons?
4      A. Pros and cons.
5      Q. What were the pros and cons of one big
6  sales department? Before we get to that, had you
7  decided at this point, when you were talking
8  structures of the sales departments, which stations
9  were going to survive, which were going to go away
10  and what signals --
11     A. Had not made a final decision.
12     Q. Had you narrowed it down at all?
13     A. We narrowed it down by -- September
14  certainly we narrowed it down.
15     Q. What was it narrowed to?
16     A. The scenarios were keeping things all the
17  same, so not making any changes. Another scenario
18  was to start Washington Post, put TOP on 103.5,
19  start Washington Post on 1500/1077 and put GMS on
20  104.1 and 103.9. And the third scenario was put TOP
21  on 103.5 FM, start Washington Post Radio on

Page 88

1  1500/1077 and leave Z104 on 104.1 and 103.9.
2      Q. And get rid of GMS?
3      A. And get rid of GMS.
4      Q. So with those three structures you then
5  discussed specific structures of the sales
6  department under these three scenarios?
7      A. Correct.
8      Q. All right. What were the pros and cons of
9  option one of one big sales department, as you
10  called it?
11     A. If everyone sold everything, advantage to
12  that is that everyone has -- if you walk into an
13  advertiser, you can talk about multiple products.
14  You have multiple products that you can talk about.
15  There are some advertisers who like to buy combo
16  packages.
17          You can sometimes help out an
18  advertiser by putting more volume together so you
19  have got one-stop shopping essentially. Also you
20  have all of the people doing the same thing.
21  Meaning all the salespeople. So those are some of

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 89

1  the pros.

2      The cons would be, can all the people

3  focus enough on each product? Can they really focus

4  on each product? And, when they are in front of

5  advertisers, can they get enough time with the

6  advertiser to fully explain all the products they

7  have.

8      Q. Anything else?

9      A. Those would be the major pros and cons.

10     Q. Option 2, two sales departments. What

11 would the two sales departments be?

12     A. Two sales departments would be, you would

13 be leaving WTOP and WFED. You would be leaving

14 those people pretty much in place.

15     Q. Untouched. They would continue on?

16     A. The salespeople, the local salespeople,

17 yes.

18     Q. What about national salespeople?

19     A. National was already two stations. So

20 national would be, more and more had gone to where

21 the national sales manager represented multiple

Page 90

1  stations.

2      Q. National would stay the same as well?

3      A. We had —

4      Q. Yes or no?

5          MR. CYS: Let him answer the question.

6      A. Can you rephrase the question.

7      Q. You said under the two sales departments

8  theory you would have, WTOP and FED would continue

9  to be sold. You said locally by the same people. I

10 asked what about nationally?

11     A. Well, at that point we started to feel

12 that maybe nationally should be looked at

13 differently. That we should create possibly a new

14 job, if we had the two sales departments scenario.

15     Q. Well, at that time national sales for TOP

16 was also responsible for FED sales, correct?

17     A. For national FED sales?

18     Q. Yes. And for GMS.

19     A. Would have been very minimal, incredibly

20 minimal.

21     Q. And for GMS sales?

Page 91

1      A. Correct.

2      Q. So tell me about the two sales

3  departments. One you said was WTOP/FED?

4      A. Yes.

5      Q. What was the other?

6      A. And the other would be Washington Post

7  Radio in combination with either GMS or Z104. That

8  would be another way to look at it. We could have

9  gone to two sales departments.

10     Q. Depending on which survived, GMS or Z104?

11     A. Correct. Our feeling though was that, if

12 you were going to have two sales departments, WTOP

13 and then you could have GMS and Washington Post

14 Radio. And because they were similar demographics,

15 it could make sense to put the two of those

16 together.

17     Q. Which two?

18     A. WGMS, when it would reside at 104.1 and

19 103.9 and Washington Post Radio. You would be going

20 after many of the same type of advertisers because

21 of the demographics.

Page 92

1      Q. That would apply to national sales force

2  as well?

3      A. Yes.

4      Q. GMS was classical, Post is long news?

5      A. Long formats.

6      Q. What, if any, discussions were there

7  regarding national sales under the two sales

8  department structure?

9      A. At that point we realized a very important

10 part of Washington Post Radio was going to be its

11 sports would be involved with Washington Post Radio.

12 Z104 had the Nationals, the baseball team. And we

13 felt that it would make sense, if we started

14 Washington Post Radio, to move the Washington

15 Nationals with Washington Post Radio.

16     It was a logical fit to be able to

17 have a long form news station be with sports. We

18 also felt that sports was going to be a very big

19 part of what Washington Post Radio was going to be

20 doing. Because we already had the Washington

21 Nationals in-house.

Joel Oxley                                             Leo Donohoe v. Bonneville Int'l Corp.

Page 93

1    We knew that we could probably get
2  money from the Washington Capitals, we felt we could
3  get money from one of the college basketball teams.
4  We felt we could get money from one of the college
5  football teams.  So we felt that it was a
6  significant part of programming, but also a
7  significant part of sales.
8        Q. At that time you hadn't made a decision
9  whether Z104 or GMS would survive?
10       A. Right.  That's why the consideration was,
11 do you think about having three sales departments.
12       Q. Let's stick on the two sales departments
13 scenario.  That's where we are right now.
14       (Brief Recess.)
15 BY MR. McCALLY:
16       Q. We are back on the record and you are
17 still under oath.  Did you have any discussions with
18 your counsel during the break?
19       A. No.
20       Q. We are talking about the second possible
21 scenario for restructuring the sales department.

Page 94

1  You were just saying that at this time you were
2  talking about possibly restructuring national sales
3  too because of selling the national baseball on
4  WTOP, I'm sorry, on Post Radio?
5        A. Correct.
6        Q. Post Radio -- what were its call letters?
7        A. WTWP.
8        Q. And who raised this idea?
9        A. I remember thinking about it.
10       Q. Who else?
11       A. I remember it being mine.
12       Q. It was your idea?
13       A. Yes.
14       Q. And your idea was that because national
15 sports sales would be such a big component of the
16 potentially reorganized station that you would
17 combine it into the national sales?
18       A. That was part of it.
19       Q. What were the other reasons?
20       A. With the new configuration we would have
21 much lower ratings on WGMS, because of the decreased

Page 95

1  distribution and, therefore, less opportunities for
2  national sales.  We would also be starting a brand
3  new radio station in Washington Post Radio which
4  would have not as much opportunity for ratings at
5  the beginning.  We felt over time it could be very
6  successful.  We also realized that WTOP, certainly
7  in the short-term we were going to try to move the
8  listeners to a new address.
9        So short-term we did not see there
10 being significant increase in responsibility for
11 national sales at WTOP.  So, therefore, we felt that
12 there was capacity here to include what we felt was
13 an extremely vital part for Washington Post Radio to
14 be taken on by this position.
15       There was going to be sports sales
16 for the nationals, which meant that somebody would
17 need to oversee all the details of working with the
18 team, from the top levels of management with the
19 team to the day-to-day operations of the
20 operations people of the team, also dealing with
21 everything that was going on at the station about

Page 96

1  the team in terms of dealing with programming, in
2  terms of dealing with the sales department, in
3  particular managing the local sales department.
4        So we felt that this was going to be
5  a very different and new job that needed to be
6  created in the structure, if we were going to go to
7  two sales departments and have WGMS and Washington
8  Post Radio together as one sales department and have
9  WTOP and WFED together as another sales department.
10       Q. I don't understand how, when you say GMS
11 would have less opportunity for sales, because it
12 was moving to a weaker signal.  Are you saying that,
13 therefore, national sales would be reduced?
14       A. Yes.
15       Q. That's what you are saying.  So that would
16 give you more opportunity to do something else with
17 that time, of the national salesperson's time?
18       A. It would be much less revenue
19 responsibility, because of the ratings.  And the
20 distribution was going to be changed dramatically
21 so, therefore, the ratings would go down.

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 97

1  Q. And your feeling is also based on the fact
2  that sports sales was going to be such a major
3  component of the reorganized station. Is that the
4  other reason?
5  **A. The management of the sports sales**
6  **operations would be a very key component to**
7  **Washington Post Radio and managing the local**
8  **salespeople to sell as much sports as possible would**
9  **be a very important of this.**
10  Q. Did sports represent a significant part of
11  the budget, the national sports sales?
12  **A. Meaning the baseball team?**
13  Q. The team.
14  A. Yes.
15  Q. Let me show you what we will mark as
16  Exhibit 122.
17  (Deposition Exhibit Number 122 marked for
18  purposes of identification.)
19  BY MR. McCALLY:
20  Q. I'm showing you a memo from Matt Mills,
21  you're cc'd on it, to Michael Spacciapoli, dated

Page 98

1  January 16, 2006, regarding compensation package for
2  director of national/sports sales. Do you recognize
3  that document?
4  A. Yes.
5  Q. If you will look down at the overrides and
6  budgets section in the middle of the page. Do you
7  see that?
8  A. Yes.
9  Q. You'll agree with me, will you not, that
10  the vast majority of sales responsibility for this
11  position was for the WTOP/WFED component, correct?
12  A. Yes.
13  Q. 8.6 million?
14  A. Yes.
15  Q. The next largest component of the budget
16  responsibility for the director of national sales
17  sports sales was WGMS at 2.2 million, correct?
18  A. Yes.
19  Q. The smallest component of the budgetary
20  responsibilities for that position was Post Radio
21  identified as WTWP at $700,000, correct?

Page 99

1  A. Yes.
2  Q. And the next smallest component of
3  budgetary responsibility was sports sales at one
4  million dollars, correct?
5  A. Yes.
6  Q. Isn't it fair to say, that under this new
7  organization and position that the smallest aspect
8  of budgetary responsibility was sports sales and
9  sales of Post Radio?
10  A. Yes.
11  Q. By a long shot, correct?
12  A. Yes.
13  Q. Combining Post and sports at 1.7 million
14  versus WTOP/WFED, WGMS at 10.8 million, correct?
15  A. Yes.
16  Q. Very large percentage of your overall
17  budget. Would you agree?
18  A. Yes.
19  Q. So sports sales really wasn't that big a
20  component in terms of budgetary responsibility for
21  this new reorganized position. Is that right?

Page 100

1  **A. It was a big part of the component in**
2  **terms of how much time was spent to get the money**
3  **in.**
4  Q. Just time?
5  A. To get the time -- yes.
6  Q. You would agree with me that, if the sales
7  of WTOP national sales and WFED and WGMS national
8  sales failed to hit budget, that would have a
9  significant monetary impact on the Washington, D.C.
10  radio group for Bonneville?
11  **A. It would depend on how much and by what**
12  **percentage.**
13  Q. Would you agree with me, you would rather
14  see them hit their numbers for budget in national
15  sales in WTOP, WFED, GMS as opposed to sports?
16  **A. No.**
17  Q. Why not?
18  **A. I think that all budgets are important.**
19  Q. Other than thinking all budgets are
20  important, if you had to rank them, which would you
21  rank as most priority based on this document for the

Joel Oxley                                              Leo Donohoe v. Bonneville Int'l Corp.

Page 101

1  national sales responsibility and sports sales for
2  you as head of the station, which budget is of
3  greatest importance?
4      A. WTOP.
5      Q. And why is that?
6      A. Biggest number.
7      Q. What's the second most important?
8      A. I would put the other three as equal.
9      Q. All three equal?
10     A. Yes.
11     Q. But if you don't -- I don't want you to
12  lump them together.
13     A. No.
14     Q. You are saying you just lump them all
15  together?
16     A. I would think that they are all very
17  important.
18     Q. Okay. Even though Post is only 700,000
19  and GMS is triple that. Is that your testimony?
20     A. I think all the budgets were very
21  important.

Page 102

1      Q. That's not my question, sir. You're
2  ranking GMS's budget the same as WTWP budget, when
3  the GMS is three times the Post budget. Is that
4  correct?
5      A. I looked at them with equal importance,
6  yes.
7      Q. Who was in these discussions, when you had
8  this idea about possibly combining sports sales into
9  the national sales position?
10     A. Discussions about?
11     Q. You said this was your idea. What we are
12  talking about, keeping in mind where we are in this
13  deposition. There were three options for the
14  restructuring the sports sales. You were having
15  discussions with Matt Mills, Farley and Pfluger?
16     A. Mr. Mills And Ms. Pfluger.
17     Q. Did they chime in or add anything to your
18  idea about the possible reorganization of the
19  national sales position to include Post Radio and
20  sports?
21     A. Not that I recall.

Page 103

1      Q. Did you discuss it with anybody?
2      A. I discussed it with Ms. Pfluger and Mr.
3  Mills.
4      Q. They didn't respond. They sat there
5  silently?
6      A. I do not recall what they would have said
7  about it.
8      Q. Do you recall them saying something?
9      A. Eventually, yes. When I first brought it
10  up, I do not remember them -- I don't remember it
11  being much of a topic of discussion. We were
12  focused on what sales structure would make the most
13  sense for each station. Talking about national
14  sales was a very, very small part of the discussion.
15     Q. Even though sports was so terribly
16  significant to the reorganized station?
17     A. I was talking about national sales.
18  Sports we talked about at length about how we would
19  be able to get more sports revenue. And we were
20  trying to determine a way to get as much sports
21  revenue as possible. We felt that could impactful,

Page 104

1  especially long-term for the radio station.
2      Q. And in 2005 you already had a deal done
3  with the Nationals, correct?
4      A. We did a one-year deal for them in 2005.
5      Q. What were the terms of that deal?
6      A. Approximately the Nationals paid us, I
7  believe, somewhere a little under REDACTED to carry
8  the games and also gave us some inventory to sell
9  within the games.
10     Q. How much inventory?
11     MR. CYS: Before we go forward, let me
12  just emphasize that any discussion about terms and
13  conditions or the agreements with the Nationals are
14  very sensitive. Of course, we are under protective
15  order anyway. I just want to point out, that as to
16  these it is particularly important that the
17  confidentiality provisions of the protective order
18  kick in.
19     Q. How much did they give you to sell, how
20  much inventory?
21     A. I do not recall.

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 133

1 to national sales manager?
2     A. Okay.
3     Q. I'm just looking at your documents.
4     A. If that's what it says, yes. I don't
5 recall the exact date. If that's what it says, I'm
6 sure that's what it was.
7     Q. He was brought in -- you were going to
8 sell the Nationals through Z104, correct? That was
9 the idea?
10     A. Yes.
11     Q. And he was the local sales manager for
12 Z104. So his staff would be selling them, the
13 account execs?
14     A. Meaning Spacciapoli?
15     Q. Yes.
16     A. Yes.
17     Q. Okay. Did Mr. Kessler in national sales
18 every get involved with the sales of the Nationals
19 baseball team?
20     A. Yes.
21     Q. He did. That was because he was at Z104?

Page 134

1     A. Yes.
2     Q. So he had the responsibility for selling
3 the Nationals baseball team nationally?
4     A. Yes.
5     Q. But he wasn't brought into the meetings?
6     A. No.
7     Q. The negotiations, correct?
8     A. Correct.
9     Q. During the process. And most of the sales
10 for the Nationals came through the local sales by
11 the account execs?
12     A. Yes.
13     Q. Once Mr. Spacciapoli got the director of
14 national sports sales position -- do you recall
15 that? That was after the RIF he got the job?
16     A. Yes.
17     Q. He was responsibility for supervising
18 Mr. Goldstein, who was the general sales manager,
19 correct, for the sports sales?
20     A. He was overseeing the sports sales, yes.
21     Q. Mr. Goldstein oversaw the account execs

Page 135

1 who were selling the sports sales?
2     A. The account executives went to Mr.
3 Spacciapoli for the sports sales. For other things
4 they went to Mr. Goldstein.
5     Q. Did you read Mr. Mills's deposition?
6     A. No, I did not.
7     Q. Isn't it true that Mr. Goldstein actually
8 oversaw the account execs and managed them after the
9 RIF for sports sales?
10     A. In conjunction with Mr. Spacciapoli, yes.
11     Q. But the pecking order was -- hang on --
12 let me ask the question. Pecking order was, account
13 exec at the bottom. Mr. Goldstein as general sales
14 manager overseeing the account execs and then Mr.
15 Spacciapoli dealing with Mr. Goldstein, correct?
16     A. Mr. Spacciapoli -- Mr. Goldstein did not
17 report to Spacciapoli.
18     Q. Spacciapoli dealt with Mr. Goldstein
19 regarding sports sales at the local level, correct?
20     A. He dealt with him, yes.
21     Q. Okay. And then Mr. Goldstein had

Page 136

1 responsibility over the account execs for their
2 sales?
3     A. They both did, yes.
4     Q. They both did?
5     A. Yeah. Mr. Spacciapoli was responsible for
6 the sports budget.
7     Q. For the budget. I get that.
8     A. And oversaw the local salespeople about
9 the sports sales. And Mr. Goldstein was overseeing
10 the sales of WTWP.
11     Q. Would you disagree with me, if I were to
12 say that Mr. Goldstein was responsible for the
13 day-to-day management of the account execs and all
14 they did after the RIF? Let's give it a year.
15 2006.
16     A. Yes.
17     Q. You would disagree with that?
18     A. Yes.
19     Q. How would you disagree?
20     A. Mr. Spacciapoli was responsible for their
21 sports sales. Mr. Goldstein -- and dealt with the

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 137

1  sellers on sports sales. Mr. Goldstein was
2  overseeing the other parts of the sales efforts.
3      When they had a question about sports
4  sales or there was a concern about sports sale or
5  they wanted to do some kind of proposal on sports
6  sales, they went to Mr. Spacciapoli. On other
7  things they went to Mr. Goldstein.
8      Q. Is it your testimony that Mr. Goldstein
9  did not manage them in all their activities on a
10  day-to-day basis?
11      A. Yes, he did not manage all of their
12  activities. Mr. Spacciapoli managed their sports
13  activities.
14      Q. Is it your testimony that Mr. Spacciapoli
15  had direct hands on, day-to-day management with the
16  account execs regarding the sales of Nationals
17  baseball locally?
18      A. Yes.
19      Q. What was the next step in the process
20  after you all discussed the pros and cons of the
21  three structures?

Page 138

1      A. At that point -- well, are you talking
2  about what is the next step in the sales process,
3  regarding the sales or just overall?
4      Q. The RIF in the reorganization.
5      A. In the reorganization.
6      Q. Let me back up. Let me ask you another
7  question. Do you view the RIF in the reorganization
8  as one in the same?
9      A. In terms of how they are defined?
10      Q. Sure.
11      A. I guess I look at the reorganization as
12  the reorganization of the signals in the way you're
13  doing business and the reduction in force was the
14  actual -- we were then letting people go. We were
15  letting departments go. So I guess I view them a
16  little bit differently.
17      Q. Let me ask you. Where do you characterize
18  the elimination of Mr. Donohoe's job from national
19  sales of WTOP, GMS and WFED? There were no
20  positions RIF'd at WTOP, correct?
21      A. At WTOP?

Page 139

1      Q. Yes.
2      A. What we did in the RIF was, we let three
3  departments go -- Z104 sales, Z104 programming and
4  GMS programming. That's what the RIF involved.
5      Q. Z104 and GMS?
6      A. Z104 programming, Z104 sales, GMS sales.
7      Q. Did not involve WTOP sales, correct?
8      A. Other than -- no, it did not.
9      Q. Other than Mr. Donohoe?
10      A. No, Mr. Donohoe and Mr. Kleiner had WTOP
11  sales responsibilities.
12      Q. Mr. Kleiner was rehired?
13      A. Mr. Kleiner rehired.
14      Q. He's under 40?
15      A. Mr. Kleiner is under 40.
16      Q. How did you come to eliminate Mr.
17  Donohoe's position? He didn't -- the RIF did not
18  involve WTOP. How was his position at WTOP for
19  national sales manager, for TOP, GMS, and WFED,
20  three stations that continued after the
21  reorganization, how did that come about?

Page 140

1      A. He was part of the WGMS sales staff.
2      Q. That's the only reason?
3      A. We let three departments -- three
4  departments were involved in the RIF. He was, a
5  third of his responsibility was for WGMS and Mr.
6  Kleiner and Mr. Donohoe were part of the GMS sales
7  department.
8      Q. So his employment at Bonneville was
9  terminated strictly because he worked, part of his
10  job, by your estimates, one-third at WGMS. Is that
11  correct?
12      A. Yes, he was part of the GMS sales
13  department and the entire GMS sales department was
14  part of the RIF.
15      Q. You'll agree with me that the job
16  requirements of national sales for WTOP, WGMS and
17  WFED continued after the RIF and reorganization,
18  correct?
19      A. The responsibility for those stations to
20  still have national sales, yes, correct.
21      Q. How did the fact that he was partially

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 141

1  employed by WGMS impact his greater percentage of
2  employment at WTOP --
3         MR. CYS:  Objection to form.
4     Q. -- leading to his termination from WTOP?
5         MR. CYS:  Objection to form.
6     Q. What is the relationship?  You'll agree
7  before 2002 he sold strictly for WTOP, GMS and FED?
8     A. Before 2002?
9     Q. Yes.
10    A. Before 2002?  WFED didn't exist in 2002.
11 Mr. Donohoe -- I'll have to try to remember the
12 exact dates.  He became national sales manager for
13 WTOP in 1996.  He took on responsibility for GMS
14 from, I believe 1999 through 2000 -- he had a period
15 where he was, did just WTOP national sales manager.
16 Then he had another period where he became national
17 sales manager for both TOP and GMS.  And another
18 period where he was just WTOP.
19    Q. Someone else did GMS?
20    A. Someone did GMS.  Then it reverted back to
21 him to do both WTOP and GMS.  Two stints as --

Page 142

1     Q. Assume for me it was around, it was either
2  2003, 2002 or '03 that he took GMS again?
3     A. Okay.  Yes.  2002, I believe.  May-June of
4  2002 he took on GMS again, correct.
5     Q. So my question is, how does the fact that
6  his position at GMS was eliminated in any way
7  correlate to the elimination of his job selling WTOP
8  and WFED national sales?
9     A. He was part of the WGMS sales department.
10    Q. He was always --
11        MR. CYS:  Let him finish.
12    A. So that's why he was part of the reduction
13 of force.
14    Q. So he left that position.  But he was also
15 part of the WTOP sales force, correct, sir, and WFED
16 sales force?
17    A. Yes, he was.
18    Q. Shows sales forces were not affected in
19 the RIF, correct?
20    A. Correct.
21    Q. So I ask you again, how did his WTOP

Page 143

1  position get eliminated?
2     A. His WTOP position was continued.  We ended
3  up having a new position that was created because we
4  felt the needs had changed of the restructure and we
5  had an entirely new position created.
6     Q. Because the needs changed with the
7  restructure, the only position affected at WTOP was
8  national sales, correct?
9     A. And the Daniel Kleiner position.
10    Q. National sales?
11    A. National sales, correct.
12    Q. No other sales positions at WTOP were
13 impacted?
14    A. Correct.
15    Q. Where we left off, we were
16 August-September timeframe.  You, Mr. Mills, Farley
17 and Pfluger have been discussing these three
18 structures and the pros and cons, because Mr.
19 Johnson asked you to do that, correct?
20    A. Correct.
21    Q. What was the next step in this process?

Page 144

1     A. We were also at the same time continuing
2  to negotiate with the Washington Post to determine
3  if we could work out something with them that would
4  be mutually beneficial for us to start this new
5  radio station.  So that was taking up a lot of time
6  and effort to determine if we could figure out a
7  deal that would work between the two of us.
8     Q. What was the next step in the process of
9  the RIF and reorganization?
10    A. It was to determine if we had looked -- by
11 that time we had looked at the different financial
12 scenarios.  We also wanted to see then what would
13 happen with this Washington Post deal.
14    Q. You already said that.
15    A. Right.  Would we be able to make it a good
16 enough deal where we felt we should go forward.
17    Q. When did the decision get made to go
18 forward with the RIF and reorganization?
19    A. Late December of 2005.  That was when the
20 final decision was made.
21    Q. You keep saying final.  What do you mean

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 145

1  by final?
2      A. That's when we agreed with the Washington
3  Post literally -- after Christmas of 2005 is when we
4  came to an agreement with the Washington Post that
5  we were going to be able to strike a deal and,
6  therefore, have a format for 1500 and 1077, when we
7  moved 103.5 FM to, move TOP to 103.5 FM.
8      Q. Who negotiated the deal with the Post?
9      A. Primarily I did.
10     Q. Anyone else?
11     A. Well, certainly our lawyers were involved
12  at the corporate level. And we retained an
13  attorney, a law firm also to represent us on the
14  negotiation points.
15     Q. Who did you deal with at the Post?
16     A. Steve Hills primarily.
17     Q. When was the first contract draft
18  exchanged?
19     A. I do not recall.
20     Q. When did you get to the point of
21  exchanging contracts or having number terms that you

Page 146

1  thought you had a deal to reduce to a contract?
2      A. I'm not remembering. Sometime in the
3  fall. I don't remember.
4      Q. Was it before December of 2005?
5      A. Oh, certainly before December. Because we
6  were negotiating back and forth on the contract. I
7  would have thought maybe November or, yeah, I would
8  think November. Maybe October. October-November.
9  I don't recall.
10     Q. So you had a done deal with the Post
11  October or November of '05?
12     A. We had a done deal with the Post in
13  December.
14     Q. You are saying two different things. I'm
15  not understanding you. Done deal. Does that mean
16  you signed the contract?
17     A. That means we negotiated all the points.
18  We literally were negotiating points on Christmas
19  Eve and the day after Christmas before we were
20  finished with the Post.
21     Q. Was there a time prior to December the day

Page 147

1  after Christmas of 2005, when you thought you had
2  reached a deal with the Washington Post?
3      A. No.
4      Q. Let me show you what we'll mark as Exhibit
5  91.
6      (Deposition Exhibit Number 91 marked for
7      purposes of identification.)
8  BY MR. McCALLY:
9      Q. I'm showing you Exhibit 91, which is
10  BIC306 entitled Blowfish Action Plan-Chronological.
11  Is this a document you were referring to earlier in
12  your deposition prepared by Mrs. Henson?
13     A. Henson? No.
14     Q. Who prepared it?
15     A. Pfluger.
16     Q. Look at the bottom of the page. See it
17  says Henson in the header?
18     MR. CYS: Where are you looking?
19     MR. McCALLY: Look at the bottom of the
20  page. The file number name.
21     MR. CYS: Documents and setting/Henson.

Page 148

1      THE WITNESS: I see it, yes.
2  BY MR. McCALLY:
3      Q. Did Mrs. Henson have any involvement with
4  this?
5      A. Eventually, yes. Because she was Human
6  Resources director.
7      Q. This is the document you were talking
8  about?
9      A. Yes, but Ms. Pfluger was the one who
10  prepared this. Now Ms. Henson would have, by this
11  point, had a copy of it.
12     Q. Look at the date on the right-hand corner
13  of the first page. September 23, 2005?
14     A. Yes.
15     Q. If you will look to the third page,
16  BIC308?
17     A. Yes.
18     Q. Five entries down. It reads, on
19  November 5, 2005, called department head meeting and
20  tell them 15 minutes before the big meetings.
21  That's your responsibility, correct?

Joel Oxley                                                        Leo Donohoe v. Bonneville Int'l Corp.

Page 149

1    MR. CYS: I think the date is the 15th.
2    Q. I'm sorry. November 15th, 2005.
3    A. Yes.
4    Q. JOX is you?
5    A. Right.
6    Q. Were you going to terminate people on
7    November 15th?
8    A. Our original plan was November 15th, but
9    we could not reach, even come close to reaching a
10   deal with the Post. So we still were trying to get
11   that contract done.
12   Q. So by September, when this document was
13   created, you thought you were going to be able to do
14   the RIF by November. Is that correct?
15   A. Yes.
16   Q. And is the only reason this was held up
17   because you didn't have an inked deal with the Post?
18   A. Post. But also we felt that we wanted
19   some more time to analyze the situation as well.
20   Q. What do you mean by that?
21   A. Well, we looked at it and we wanted to

Page 150

1    make sure that we had time to get all of this done,
2    because we wanted to make sure that we had a quality
3    radio station on the air when we moved over to Post
4    Radio. We were still working on our timelines.
5    Q. We'll use this as our marker,
6    September 23, 2005. Okay. Between this document
7    and your meetings with Mills, Farley and Pfluger,
8    what happened towards this process specifically?
9    MR. CYS: Objection to form.
10   MR. McCALLY: Go ahead.
11   BY THE WITNESS:
12   Q. You already said the Post was being
13   negotiated. What about restructuring, the
14   reorganization, termination of people. What
15   discussions were had and by whom?
16   A. The discussions were had by -- by that
17   time we had brought in Joan Henson to talk about
18   this.
19   Q. What time was that?
20   A. I would say she would be brought in by
21   late August or early September.

Page 151

1    Q. So it's you, Mills, Henson, Farley and
2    Pfluger?
3    A. Yes.
4    Q. When was your first meeting with these
5    people?
6    A. I do not recall.
7    Q. What month?
8    A. Like I said, late August, early September.
9    Q. At this time was a final decision made as
10   to the structure?
11   A. As of late August, early September?
12   Q. Yes.
13   A. No.
14   Q. Exhibit 91 was created on September 23rd,
15   2005?
16   A. Right.
17   Q. I take it a final decision was made at
18   some point prior to September 23rd?
19   A. Things were moving pretty fast. I would
20   say within a week or two before that somewhere, yes.
21   Q. A week or two before that?

Page 152

1    A. I would think.
2    Q. Talking about early September?
3    A. But we were also still debating what would
4    be -- there was still a debate about what would make
5    more sense, keeping Z104 on its signals or moving
6    GMS to its signal. We were going back and forth a
7    lot on that.
8    Q. Who is we?
9    A. That group. On the merits of what made
10   more sense, to eliminate Z104 or put GMS on 104.1.
11   Q. How did that decision get made?
12   A. Eventually that decision got made by our
13   CEO, Bruce Reece.
14   Q. That is at Bonneville Corporate?
15   A. Yes.
16   Q. Tell me about that process.
17   A. By this time we had started to -- we had
18   developed our plan, submitted it and submitted to
19   them for their review.
20   Q. You had a final plan that you submitted to
21   Reece?

Joel Oxley                                                    Leo Donohoe v. Bonneville Int'l Corp.

Page 153

1    A. Not a final plan as much as ideas of the
2  different options.
3    Q. The three options we have discussed?
4    A. We were down to the three major options,
5  yes.
6    Q. And you submitted a written plan?
7    A. I think we talked about it. I do not
8  remember submitting an actual plan.
9       MR. McCALLY: Counsel, if a plan was
10  submitted, I request it be produced. What is your
11  best --
12    A. I believe it was produced. If there was
13  anything that would have been relevant -- that is
14  what these were and numbers to back them up.
15    Q. You're point to Exhibit 91, the Blowfish
16  memo?
17    A. Yes. Actually, we would not have
18  submitted this. Would not have gotten that. He
19  would have gotten the different, the way the
20  different financial options would play out.
21    Q. Did you reduce to writing that issue,

Page 154

1  those issues?
2    A. We sent --
3    Q. Or E.mail, memo?
4    A. We sent along the financial of how the
5  different things would look, yeah.
6    Q. There's a document that has a financial
7  breakdown of how the different proposals would work?
8    A. Going out in the future, yes.
9       MR. McCALLY: Counsel, I don't believe we
10  have ever received that.
11       MR. CYS: I think you have. But I will go
12  back and check.
13       MR. McCALLY: I would request a copy of
14  it.
15       How long was this document?
16    A. A couple of pages maybe.
17    Q. Who authored it?
18    A. Combination of myself and Linda Pfluger.
19  It was numbers.
20    Q. What were the results? What was the best
21  financial option?

Page 155

1    A. The best financial option was to keep Z104
2  in place.
3    Q. What was the next best?
4    A. Best financial option was to keep --
5  meaning moving TOP to 103.5 FM. Starting up
6  Washington Post Radio and keeping Z104 in place.
7    Q. Eliminating GMS?
8    A. Eliminating GMS.
9    Q. What was the second best financial?
10    A. Second best financial option was to move
11  TOP to 103.5, start Washington Post Radio and move
12  GMS to 104.1.
13    Q. Were those the only two options or was
14  there another?
15    A. There was another option of, we also
16  looked at -- we also looked at staying the same,
17  what it would look like if we stayed the same.
18    Q. Just add in Post?
19    A. No. Stayed the same completely. Leave
20  TOP on 1500/1077, leave GMS on 103.5, leave Z104 the
21  way it was.

Page 156

1    Q. No Post?
2    A. No Post. Nothing changed. Another option
3  was to have FED, to do Post Radio, to put 103.5, put
4  TOP on 103.5 and then after FED on 104.1.
5    Q. The best financial option was to keep Z104
6  and eliminate GMS and move TOP to 103. The next you
7  said was TOP to 103. Post Radio and GMS goes to
8  104. What was the third best financial option?
9  Would it stay the same without the Post?
10    A. Yes.
11    Q. And the last one?
12    A. FED option was the, to my best
13  recollection, the FED option was the least
14  attractive.
15    Q. That is the fourth one, where you move FED
16  to 104?
17    A. Right.
18    Q. You presented this to Mr. Reece?
19    A. I presented it to Mr. Johnson, who talked
20  about it to Mr. Reece.
21    Q. I thought the decision was made by

Joel Oxley                                    Leo Donohoe v. Bonneville Int'l Corp.

Page 157

1    Mr. Reece?
2        A. Mr. Reece ultimately decided what lineup
3    of stations --
4        Q. You tell me the process. What happened
5    once you presented these four options?
6        A. Well --
7        Q. How did it work? I want to know who you
8    talked to, I want to know when, I want to know who
9    was involved and what was said?
10       A. When would have been somewhere in
11   September would be when I would have sent it to Bob.
12       Q. That is Bob Johnson?
13       A. Bob Johnson. And there actually was --
14   Bruce Reece went back and forth a number of times to
15   try to determine what he thought was the best
16   option.
17       Q. With who?
18       A. He talked to me once or twice. But my
19   understanding was, from talking to Bob, that they
20   had discussed it a couple of times about what would
21   be the best thing to do in D.C. And went back and

Page 158

1    forth quite a bit.
2            It wasn't until December that Bruce
3    made the final decision that, yes, let's go ahead,
4    if we can strike a deal with the Post, let's go
5    ahead and do the option to put TOP on 103.5, start
6    Washington Post Radio and put GMS on 104.1.
7        Q. It's your testimony that decision wasn't
8    made by Mr. Johnson until December?
9        MR. CYS: Objection.
10       Q. You just said Johnson.
11       A. No, I said Reece. Just to clarify, it was
12   Reece who made the decision in December.
13       Q. It wasn't until December. Have you
14   related to me all the discussions and conversations
15   you were involved in with that decision?
16       A. To my best recollection, yes.
17       Q. You only had one or two calls with
18   Johnson?
19       A. Maybe a couple more than that where we
20   discussed this. Not much.
21       Q. Was anybody else involved from D.C.?

Page 159

1        A. In talking to Bob?
2        Q. Either of them.
3        A. I can't recall to be certain. I remember
4    that Bruce did come in once to talk about -- we met
5    with Bruce to talk about it on one occasion. Gosh,
6    was that November or was that December? I don't
7    recall. He did come in once where we talked with
8    him about some of the details about what we were
9    thinking and what the PR ramifications of those
10   moves would be.
11       Q. Do you have any documents that you can
12   review that would refresh your recollection so you
13   know the exact dates of these meetings?
14       A. No, I don't.
15       Q. Not in your calendar or anything like
16   that?
17       A. Might be in my calendar. I could take a
18   look.
19       MR. McCALLY: I would ask that you produce
20   those, Counselor.
21       MR. CYS: We'll consider it.

Page 160

1        MR. McCALLY: Or produce him again for
2    another deposition. He was to be prepared to
3    testify about these item areas.
4        MR. CYS: He is prepared to testify. And
5    he's not prepared to go into the level of detail
6    that an individual employee would. That's the way
7    30(b)(6) process works.
8        MR. McCALLY: I could not disagree with
9    you more. He's a 30(b)(6) corporate designee. He
10   was required to review the documents to testify
11   about these areas. What documents I can't predict
12   or control but he has them at his disposal. The
13   best we are getting are dates sometime floating
14   around, I'm not sure. But there's a calendar he
15   could have looked at or brought with him to refresh
16   his memory.
17       MR. CYS: There are a lot of subjects here
18   and this one was very general. If you had wanted
19   something that specific, you should have said so.
20   And, we asked you to produce in advance of the
21   depositions the documents you were going to ask him

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 161

1  about.

2  　MR. McCALLY: That has nothing to do with

3  this, Counsel. I'm not showing him a document he's

4  not familiar with. I'm asking him to remember dates

5  of a meeting in which they reorganized the

6  Bonneville Radio Group, a major undertaking by his

7  own admission. He can't even remember the dates.

8  But apparently they are in the calendar.

9  　A 30(b)(6) requires the witness to review

10  documents available to them in order to testify

11  accurately. The rule is clear.

12  　MR. CYS: Objection. Not every single

13  document.

14  Q. So it's December. Why did Exhibit 91 not

15  get created in September, if the final decision

16  wasn't made until December as to what to do?

17  　MR. CYS: Objection to form.

18  A. I'm not sure I understand your question.

19  Q. It's very easy. Exhibit 91 was created in

20  September. Explain it.

21  A. Explain?

Page 162

1  Q. This is a detailed chronology of how you

2  are going to do the RIF, lay people off and

3  reorganization the stations. It's created in

4  September of '05.

5  　You just told me that the decision

6  wasn't made by Bonneville Corporate until December

7  of '05. Explain that discrepancy.

8  A. For one thing, we couldn't come to an

9  agrees with the Post. So it gave corporate more

10  time to decide what they wanted to do.

11  Q. Look at page 309, sir. You see that the

12  items down at the bottom of the page that are your

13  responsibility that is already done?

14  A. Yes.

15  Q. When did you decide the cut-off date for

16  GMS?

17  A. Cut-off date for GMS in this scenario was

18  going to be 11-15. Meaning it would cut over to,

19  from 103.5 to 104.1.

20  Q. By November 15 that decision was to be

21  implemented?

Page 163

1  A. We were to have to do it then, yes. We

2  would need to do it then.

3  Q. But you say you created this, had this

4  timetable but didn't have a final decision from

5  corporate that you could do this until -- until

6  December of '05. Was that your testimony under

7  oath?

8  　MR. CYS: Objection to form. He didn't

9  create the document.

10  Q. Go ahead.

11  A. Yes. We were still debating on what to

12  do. We knew that would be one of the list of items

13  that we needed to get done.

14  Q. By that time the decision had been made to

15  move GMS?

16  A. No.

17  Q. It's checked here as done, sir.

18  A. That was decide what the cut-off date

19  would be if we moved GMS.

20  Q. If you moved?

21  A. Yes. We still didn't have a final

Page 164

1  decision from Bruce Reece as to what type of lineup

2  he wanted to have. And Bruce Reece changed his mind

3  a couple of times.

4  Q. Between September and December, when

5  Mr. Reece made up his mind about what to do, did you

6  have discussions concerning personnel?

7  　MR. CYS: With him?

8  Q. Did he have, you or Bonneville Corporate,

9  have discussions regarding personnel, who would go,

10  who would stay?

11  A. We had discussions about the structure and

12  what departments but not about individual personnel.

13  Q. Did you discuss the national sales of WTOP

14  or GMS?

15  A. No.

16  Q. Did you discuss Leo Donohoe?

17  A. Between September and December?

18  Q. Yes.

19  A. Yes.

20  Q. What did you talk about and with who?

21  A. We talked about --

Joel Oxley                                              Leo Donohoe v. Bonneville Int'l Corp.

Page 165

1    Q. Who?

2    A. With who?  We did -- another question.
3    Did we talk about national sales with corporate
4    between September and December?

5    Q. No, sir.  Don't limit my question.

6    A. I'll answer both of them.  I said no.  The
7    answer is yes, we did.  We did talk about the
8    national sales department.  So we did.  We talked
9    and we had a meeting out in Salt Lake, where I was
10   there with Bob Johnson, David Red, Scarlett Pate and
11   Jim Farley.

12          And we talked about what would be --
13   what would happen in the RIF.  And we discussed the
14   three departments that we would let go.  They asked
15   if national sales would be included in GMS sales.
16   And yes, I said yes, there would be.

17   Q. Why?

18   A. Because that was part of -- the national
19   sales was part of the WGMS sales department.

20   Q. That's the only reason?

21   A. Yes.

Page 166

1    Q. You are saying that's why you would get
2    rid of TOP national sales department as well?  Is
3    that your testimony?

4    MR. CYS: Objection to form.

5    A. It was part of the GMS sales department.
6    So the national sales was part of the TOP sales, it
7    was part of the GMS sales department so it was part
8    of the RIF.

9    Q. I understand the GMS. I got that.  TOP,
10   its national sales department.  Did you have a
11   specific discussion about Mr. Leo Donohoe and
12   Mr. Kleiner, about what their fate would be because
13   the vast majority of their job was with WTOP
14   national sales, as opposed to the smaller percentage
15   of GMS?

16   MR. CYS: Objection to form.

17   A. Not with the corporate people, I do not
18   recall having that.

19   Q. Who did you have that discussion with?

20   A. Certainly we had it with Joan Henson and
21   Matt Mills and Linda Pfluger.

Page 167

1    Q. When was that meeting?

2    A. I do not recall a specific date of the
3    meeting.

4    Q. What month?

5    A. That would have been talked about in
6    September-October.

7    Q. What was discussed?  Was there one meeting
8    or more?

9    A. I remember it being discussed a couple of
10   different times.

11   Q. Tell me exactly what was discussed and
12   what was said by who in each meeting.

13   A. I don't recall exactly what was said and
14   who said what.

15   Q. Tell me the best of your recollection.

16   A. The best of my recollection was that we
17   needed to include national sales, Leo Donohoe and
18   Daniel Kleiner in with the WGMS sales department
19   because we were eliminating the WGMS sales
20   department in the RIF.

21   Q. Sir, with all due respect, the way you

Page 168

1    worded that doesn't make sense.  I think the better
2    way to phrase it is, you had to terminate Kleiner
3    and Donohoe from WTOP's positions because they were
4    included in the GMS RIF.  Is that what you're
5    saying?

6    MR. CYS: Objection to form?

7    A. No.  I'm saying he was part of the GMS
8    sales department.  So was Daniel Kleiner and they
9    were part of GMS sales department and we were, that
10   was part of the reduction of force.

11   Q. That position at GMS went away.  I agree
12   with you, sir.  There was another position of
13   national sales at WTOP.

14   A. We were creating an entirely new position.

15   Q. Where did that idea come from?

16   A. That idea came from me.

17   Q. All right.  Have you discussed that with
18   me previously?

19   A. I believe I did.

20   Q. When did you make -- no, you gave me some
21   options you were considering.  Tell me what else you

Page 197

1  if it was truly a performance deficiency, wouldn't
2  it?
3      **A. It should have been put in the**
4  **evaluations, yes.**
5      Q. You're number 1 station is WTOP in terms
6  of revenue?
7      **A. Yes.**
8      Q. Wouldn't logic dictate that the person you
9  would want selling national sales for WTOP now
10 moving to a stronger station and thereby getting
11 greater ratings, wouldn't you want that person to be
12 the person who has the most experience selling a
13 news format?
14     **A. No.**
15     Q. That logic doesn't dictate that to you?
16     **A. No, it does not.**
17     Q. You would agree with me, I think you
18 already have, that selling news radio is different
19 than selling music. Different formats.
20     **A. Yes.**
21     Q. Different formats. Require different

Page 198

1  skills and abilities?
2      **A. Yes.**
3      Q. Wouldn't you consider it or does logic
4  dictate to you that your number one revenue
5  generator for national sales, wouldn't you want the
6  person with prior experience selling the news format
7  in that position?
8      MR. CYS: Objection to form.
9      **A. Restate the question.**
10     Q. Sure. Doesn't logic dictate that for your
11 number one revenue generator a news format WTOP that
12 you would want someone with experience selling news
13 format for a radio station?
14     **A. No, not necessarily.**
15     Q. Why not?
16     **A. You want the absolute best person. You**
17 **want the absolute best salesperson that you can get.**
18 **Experience can be that someone did the same thing**
19 **over and over again for many years and produced the**
20 **same results. Or you might be able to get somebody**
21 **who could be even better.**

Page 199

1      Q. Or they did the same thing for years and
2  exceeded their expectations and budgets. Did that
3  change the calculation, if you have someone who has
4  done better than you have required them to do,
5  exceeded their budgets?
6      **A. It could certainly be a factor.**
7      Q. Have to be a factor, wouldn't it?
8      **A. Certainly. You would want to consider**
9  **that, absolutely.**
10     Q. It says here, the inventory would be
11 changing from the current method. What does that
12 mean?
13     **A. It simply meant there would be more**
14 **inventory available, that there would not be, that**
15 **we would have a harder time selling it.**
16     Q. Selling what?
17     **A. The inventory.**
18     Q. Which inventory?
19     **A. The commercials.**
20     Q. For which station?
21     **A. Particularly WGMS we would have a more**

Page 200

1  **difficult time selling that. We would also with the**
2  **new station, Washington Post Radio, we would have a**
3  **lot more inventory available.**
4      Q. I'm talking national sales here. That's
5  the topic.
6      **A. Yes, it would apply to year, but yes.**
7      MR. McCALLY: Let's take a five-minute
8  break.
9      (Brief Recess.)
10 BY MR. McCALLY:
11     Q. Mr. Oxley, we are back on record. We are
12 back in the September to December timeframe
13 regarding your meetings and how to proceed. You now
14 said you have had meetings with Mills, Rud, Pate,
15 Farley and yourself regarding sales, et cetera. And
16 we had talked about your discussion with national
17 sales. What was the next step in the process?
18     **A. Could you state those names again.**
19     Q. Sure. Pate, Rud, Farley --
20     **A. Red. David Red.**
21     Q. Who is he?

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 201

1    A. He is our corporate counsel.

2    Q. He's Bonneville Corporate?

3    A. Yes.

4    Q. Is this the first time he was involved?

5    A. Yeah, as I remember, yes.

6    Q. So at this meeting where national sales

7    position was being discussed --

8    A. I just want to make sure you get the right

9    people. Farley, me, Pate, Johnson, Red.

10    Q. Johnson was at this meeting too?

11    A. Yes.

12    Q. Was that out in Salt Lake?

13    A. Yes.

14    Q. So the first meeting where the national

15    sales position was specifically discussed you had

16    corporate counsel David Red there?

17    A. Where it was specifically discussed. This

18    meeting happened in November, as I remember,

19    somewhere in that timeframe.

20    Q. Okay.

21    A. I think.

Page 202

1    Q. All right. And Johnson was there as well?

2    A. Johnson was there as well, yes.

3    Q. Did an outside firm represent you all in

4    this process?

5    A. In --

6    Q. The RIF reorganization.

7    A. We had Parr Wadoups, Heidi Leithead at

8    Parr Wadoupos review the notice to displaced

9    employees. Yes, they were talked to.

10    Q. Where is she located?

11    A. Salt Lake City.

12    Q. Any other firms?

13    A. There might have been another one. I

14    don't remember for sure. No, I don't believe so.

15    Q. Did you seek legal advice regarding the

16    people that were being let go, other than somebody

17    reviewing the RIF notice?

18    A. No.

19    Q. All you had for outside legal advice was

20    someone to review the RIF notice?

21    A. That was my understanding of all, what the

Page 203

1    people did at corporate in Salt Lake City did to

2    review, yes.

3    Q. All right. What was the discussion about

4    the national sales position at these meetings?

5    A. With the outside counsel?

6    Q. No. Did you have meetings with outside

7    counsel?

8    A. No. I thought you were referring to the

9    meeting --

10    Q. Mr. Red, your corporate counsel.

11    A. With Mr. Red, the lunch we had with Mr.

12    Red, Mr. Johnson. You're referring to that one?

13    Q. Referring to Red, Pate, Farley, Johnson

14    and yourself.

15    A. Correct.

16    Q. Go.

17    A. And your question?

18    Q. What was discussed?

19    A. What was discussed was --

20    MR. CYS: Objection. Just a minute. You

21    may answer.

Page 204

1    THE WITNESS: What was discussed is how,

2    what we were going to do in terms of the reduction

3    in force and the reorganization of our Washington

4    market.

5    Q. All right. Tell me what was said. I

6    don't want to know topics. I want to know what you

7    said. I want to know what they said, et cetera.

8    A. I can recall topics for you. I cannot

9    recall exact --

10    Q. Give me the topics.

11    A. We talked about the new, the plusses and

12    minuses of the new configurations. We were still,

13    at that point there was still some debate at that

14    point whether or not to keep Z104 or GMS. we talked

15    about what departments would be included in the

16    reduction in force.

17    Q. When you say departments, what do you

18    mean?

19    A. Looking at, the three departments that I

20    would be referring to there would be GMS sales, Z104

21    sales, Z104 programming.

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 205

1  Q. Say again.
2  A. Z104 programming, Z104 sales, GMS sales.
3  Q. So at this point was it decided Z104 was
4  going away?
5  A. That was one of the -- no, it was not
6  decided yet.
7  Q. Why wouldn't you include GMS sales and GMS
8  programming?
9  A. We were talking about the different
10  options. We were talking about the different ways
11  it could go.
12  Q. You just said GMS sales. Then you said
13  Z104 sales and programming.
14  A. We talked about, if GMS went away, what
15  that would look like. We talked about if Z104, what
16  would happen if that happened.
17  Q. What other topics?
18  A. Talked about the PR, public relations
19  ramifications from moving classical -- from not
20  having classical around anymore at all vis-a-vis
21  keeping it on a reduced signal. That was a big part

Page 206

1  of the debate.
2  Q. Any other topics?
3  A. We talked about the financial
4  ramifications in terms of what would make us the
5  most money.
6  Q. You've already told me what that would
7  have been.
8  A. Yes. In my estimation what I put in front
9  of them was that actually keeping Z104 and having
10  GMS the way it was going to be in my examination and
11  what I had given to them was the best financial
12  option.
13  Q. They didn't take that, did they?
14  A. No, they did not.
15  Q. Did you discuss anything else about
16  finances other than the options you've already told
17  me?
18  A. No.
19  Q. All right. Did you discuss the national
20  sales position?
21  A. We discussed if it would be part of the

Page 207

1  GMS sales department, yes.
2  Q. Tell me what you discussed about the
3  national sales?
4  A. We briefly discussed that it was part of
5  the GMS sales department. So if indeed -- that
6  WGMS, that we were going to go, some of the options
7  we were going to go with, if GMS sales department
8  was going to go, it was going to be part of the
9  reduction in force, than national sales would be
10  part of that reduction in force.
11  Q. Why was that even a topic of discussion?
12  A. As it was --
13  Q. Was there a question as to whether
14  national sales was part of GMS sales?
15  A. No.
16  Q. Then why were you discussing it?
17  A. We were discussing whether or not what
18  exactly would happen and what the moves would be.
19  Q. You weren't discussing national sales at
20  GMS. You were discussion Leo Donohoe.
21  A. We were discussing national sales and how

Page 208

1  we would handle national sales in the future.
2  Q. Was there any discussion concerning Leo
3  Donohoe and how he would impacted considering
4  somewhere between 60 to 70, 80 percent of his job
5  was at WTOP?
6  A. I do not remember it, no.
7  Q. No one brought that up?
8  A. I remember talking about national sales.
9  The question was brought up, would that fall under
10  GMS sales, would that fall under reduction in force.
11  I said yes.
12  Q. What is that? What are you talking about?
13  A. National sales.
14  Q. Okay. So you said the national sales
15  position at GMS would fall under GMS sales?
16  A. Yes.
17  Q. Was Leo Donohoe discussed at all?
18  A. I do not remember his name being
19  specifically discussed, no.
20  Q. What was the result of this meeting?
21  A. The result of this meeting was to really

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

| Page 209 | Page 211 |
|---|---|
| 1 give these people, to inform these people of and | 1 said that he made a decision. |
| 2 talk about what was going on at that point. But the | 2 Q. What exactly did he say? |
| 3 final decision still on how we would decide what | 3 A. I do not remember. |
| 4 formats were where was up to Bruce. So it was | 4 Q. Of course not. |
| 5 sharing of information. | 5 MR. CYS: Excuse me? |
| 6 Q. What was the next step in the process? | 6 Q. Of course not. |
| 7 A. The next step in the process was to | 7 MR. CYS: I object to that. Gratuitous. |
| 8 continue to try to work out the deal with Post, | 8 MR. McCALLY: I'm sure you do. Gratuitous |
| 9 which was a very long and arduous task. | 9 but accurate. |
| 10 Q. I'm not interested in that. What was the | 10 BY MR. McCALLY: |
| 11 next process in the RIF? | 11 Q. Was there any other meeting leading up to |
| 12 A. The next process in the RIF was to get the | 12 this decision from Johnson other than the meeting |
| 13 final decision from Bruce as to what the | 13 you told me about in which Mr. Red was involved? |
| 14 configuration would be and to continue to analyze | 14 A. No. |
| 15 things and make sure we were making the absolute | 15 Q. So there was the meeting with Red, Pate, |
| 16 best decision that would maximize profits, ratings | 16 Farley, you and Johnson out in Salt Lake City that |
| 17 and revenue. | 17 happened sometime you said in the October-November |
| 18 Q. When did that occur? Was that the | 18 time -- |
| 19 decision in late December that you referenced? | 19 A. I believe it was November. |
| 20 A. That was, the decision in late December | 20 Q. -- timeframe. The next thing that |
| 21 was when we got the final go ahead to do it because | 21 happened is, you get a call from Johnson in early |

| Page 210 | Page 212 |
|---|---|
| 1 we had the deal finalized with the Post. | 1 December with a decision. |
| 2 Q. Forget about the Post. When was the | 2 A. Reece. |
| 3 decision made about the RIF? | 3 Q. You just said Johnson. |
| 4 A. The decision about -- well, the decision, | 4 A. No, I said Reece. Bruce Reece and Bob |
| 5 if we could come to a conclusion with the Post, the | 5 Johnson. |
| 6 decision was made by Bruce in early December that we | 6 Q. Sorry. My mistake. So that was the next |
| 7 would choose the option of moving TOP to 103.5, | 7 event, a call from Reece. |
| 8 start Washington Post Radio on 1500/1077 and put GMS | 8 A. That was the next event. |
| 9 on 104.1 and 103.9. | 9 Q. From going forward use their last names, |
| 10 Q. When in early December? | 10 please. |
| 11 A. I do not recall the exact date. | 11 A. Will do. |
| 12 Q. Who made the decision? | 12 Q. With Reece what was the decision that was |
| 13 A. On that -- decision was made, like I said, | 13 communicated to you? |
| 14 by Bruce Reece. | 14 A. To go ahead with, that he was fine on |
| 15 Q. Were you involved in it? | 15 going ahead -- |
| 16 A. I gave him my input, yes. | 16 Q. We got all that. TOP, Post, GMS. What |
| 17 Q. Was there a meeting when this happened or | 17 about the RIF? |
| 18 what? | 18 A. Was to go forward, yes, with the RIF, that |
| 19 A. No. It was over the phone. | 19 that would be part of what we were doing. |
| 20 Q. Tell me exactly what happened. | 20 Q. What decisions or issues had been |
| 21 A. I cannot recall exactly what happened. He | 21 discussed with any RIF prior to that? |

Joel Oxley                                                   Leo Donohoe v. Bonneville Int'l Corp.

Page 213

1    A. I had discussed with, like I told you,
2    with that group that then communicated to him what
3    our thoughts were on the RIF. That, if we took the
4    option that Bruce Reese ultimately chose, we would
5    eliminate and make part of the RIF the TOP, GMS
6    sales department, Z104 sales department, Z104
7    programming.
8        Q. Why was the decision made to RIF GMS?
9        A. GMS sales department?
10       Q. Yes.
11       A. GMS sales department was mainly because
12   business conditions would be changing.
13       Q. Because you're going to a weaker signal?
14       A. We were going to a weaker signal, which
15   would have dramatically less revenue and ratings.
16   And profit. And, therefore, that was the reason for
17   the new business methods.
18       Q. Why didn't you just lay people off from
19   the GMS sales staff?
20       A. We did a reduction in force.
21       Q. I know. Why didn't you just lay people

Page 214

1    off instead of firing the whole staff?
2        A. Because we decided, as a business unit,
3    that we had dramatically different needs going
4    forward. And we took that business unit and decided
5    it did not make sense for that business unit to be
6    what we needed for our new environment.
7        Q. Meaning the sales staff at GMS?
8        A. Yes.
9        Q. At the time of the RIF you knew GMS was
10   going to continue?
11       A. Yes.
12       Q. Your plans for WGMS's future were for it
13   to continue on. I know it ultimately didn't. But
14   at this point in time, when these decisions were
15   being made, the thought was GMS would continue on,
16   on a different signal?
17       A. Yes.
18       Q. And what dramatically changed that
19   required you, thought the best decision was to get
20   rid of the entire sales force for GMS?
21       A. Moving to much weaker signals which we

Page 215

1    felt would cut our ratings in half and, therefore,
2    cut our revenue dramatically.
3        Q. You rehired most of the GMS sales staff,
4    didn't you?
5        A. No.
6        Q. And what were you looking for in terms of
7    different talent because of a weaker signal with
8    less ratings?
9        A. We were looking now for people who could
10   sell three things; we were looking for people who
11   could sell GMS, sell Washington Post Radio and sell
12   sports.
13       Q. The Post Radio ultimately failed, right?
14       A. Yes.
15       Q. Turned out not to be a good business
16   decision?
17       A. Yes.
18       Q. Did you lose money on that?
19       A. Yes.
20       Q. How much?
21       A. Maybe 4 and a half million dollars.

Page 216

1        Q. Did you receive any criticism for that?
2        MR. CYS: Internally or externally?
3        Q. Both.
4        A. Externally some. Internally no.
5        Q. What happened after this early December
6    decision was handed down?
7        A. We went into full action mode to make sure
8    that everything got taken care of.
9        Q. What does that mean?
10       A. Meaning we had a long list of things that
11   we needed to do to make sure that this happened.
12   And we started going down our list to make it
13   happen.
14       Q. Tell me, what did you do?
15       A. Okay. Well, it was by department. There
16   are a lot of different departments that we had to
17   consider. And so everything from looking at the
18   signals and actually figuring out how we were going
19   to do the signal switch the day of.
20           We had to set up new accounting
21   systems and new budget systems for how accounting

Joel Oxley                                              Leo Donohoe v. Bonneville Int'l Corp.

Page 217

1  would be handled for the next year, since we had a
2  new alignment of products. We had new budgets that
3  we had to make sure were in place.
4         We had to start developing new sales
5  materials and new logos and new marketing. And we
6  work with a PR firm to go through all the different
7  things that we needed to do to try to make, put our
8  best foot forward, when we made the switch on
9  January 4th.
10        We had to put together a lot of
11 packages for the 51 people that were going to be
12 impacted by this, severance packages, and figure out
13 all the different things that would be involved for
14 those people for their benefits and the like.
15        We had to start really ramping up to
16 try to determine who we would bring onboard on the
17 programming side of things to see, we had to work
18 with the Post to determine exactly what our
19 programming philosophy would be and how decisions
20 would be made there.
21        We had to still, even though it was

Page 218

1  December, we still had to spend an enormous amount
2  of time still working on the Post, in negotiating
3  the contract with the Post. So there was a long
4  list of items to be done.
5     Q. Your discussions with Matt Mills in the
6  earlier meetings before the final decision was made
7  about including Mr. Donohoe, the WTOP national sales
8  in the job elimination, because he also worked for
9  GMS. What input did Mr. Mills have?
10    A. Mr. Mills give me his assessment of Mr.
11 Donohoe.
12    Q. What did he say?
13    A. He said, you know, he pretty much weighed
14 in with the positives and negatives.
15    Q. What were they?
16    A. Positives would be that, we both agreed
17 that he was a good guy, he was well-liked. He was
18 somebody who had been at the job for a while. He
19 was, you know, a lot of people knew him, so he knew
20 quite a few people.
21    Q. What do you mean by a lot of people know

Page 219

1  him? Advertisers?
2     A. No, not advertisers as much as people,
3  people internally knew him and liked him. And
4  certainly he knew the people up in New York. So
5  some of the advertisers, some of the people at the
6  rep firm. So Leo was well known because he had been
7  doing the job for a while. Leo, we looked at Leo,
8  in Matt's assessment Leo was a solid guy. He was
9  solid.
10    Q. What were the negatives?
11    A. Negatives were that Leo was not proactive,
12 that Leo would not prepare well enough for sales
13 meetings. He would not prepare well enough for
14 sales calls. He did not prepare well enough for
15 individual pieces of business as they were being
16 negotiated. He let the rep firm do more work than
17 we would have liked.
18        He oftentimes came in late, which was
19 a concern. He was somebody who just was not being,
20 not really maximizing the situation. Leo also was
21 someone who we had a lot of concerns about in terms

Page 220

1  of truly maximizing the money and going for share.
2        What I mean by that is, there could
3  be times when TOP was tough to access because of
4  inventory. But there are also a number of months
5  where TOP was pretty wide open on inventory.
6  January, February, March, July, August, December
7  were all months where the access to inventory was
8  good.
9        And what was really difficult with
10 Leo then was, that we would, Mr. Donohoe then, we
11 would try to push him. I had this experience when I
12 was over him, and Matt had this experience as well.
13 We were trying to push Mr. Donohoe to get larger
14 share, especially when the inventory was open. Go
15 for more dollars per week. Get more from other
16 radio stations. He always hesitated on that. He
17 rarely went for the big share of the dollars that we
18 were hoping that he could get.
19        He would use a phrase oftentimes,
20 well, it's a pretty good deal. And we would go,
21 it's a pretty good deal but we would like more of

Joel Oxley                                          Leo Donohoe v. Bonneville Int'l Corp.

Page 237

1  WWZZ account manager supervisor.  What other jobs
2  did he have?
3  A. He was in accounting.  His situation would
4  have been similar to Joe Koontz, in that he would
5  certainly help out at times on maybe a project or
6  help backing up.  He was primary Z104.
7  Q. So he had responsibilities at TOP as well?
8  A. Pretty minimal.
9  Q. I understand that, sir.  He had
10  responsibilities.  That's why you had discussion
11  about him?
12  A. Yes.  Sure.
13  Q. How did this discussion go?  How did you
14  choose to get rid of Mr. Koontz and keep Jennings?
15  A. Ms. Pfluger decided that the skill sets
16  that Mr. Jennings were stronger for what the new
17  configuration would be.
18  Q. Why?
19  A. She felt he had better accounting skills
20  and needed less management.  He was able to do
21  things on his own.

Page 238

1  Q. So it's not a different skill set.  It's
2  better performance?
3  A. It was a different skill set as well is
4  the way she described it.
5  Q. How did accounting skill sets -- have they
6  changed over time?
7  A. Different stations would have different
8  types of requirements.  Z104 had a different set of
9  needs to some degree than WGMS.
10  Q. In marketing who was the person discussed?
11  A. I'm blanking on her name at this point.
12  Q. Who was she with?
13  A. She was a marketing assistant that had
14  responsibilities for primarily --
15  Q. Look at 1A.  The names on the left-hand
16  column.
17  A. She was discussed.  She ended up not
18  eventually being part of the RIF.
19  Q. Was she Z104?
20  A. She was doing things for all the stations.
21  I'm not recalling.

Page 239

1  Q. Erin Payne?
2  A. Actually Erin Payne.  Yes.
3  Q. Promotion coordinator, 23 years old?
4  A. GMS and Z104.
5  Q. She's listed as both GMS and Z104.  What
6  work did she do at any other station?
7  A. She primarily was GMS and Z104.  TOP had
8  very few promotions in comparison.  There could be a
9  once-in-a-while TOP event where we might do
10  something.  It was rare in comparison to GMS an to
11  Z104.
12  Q. Minimal?
13  A. Yes.
14  Q. And what happened to her?
15  A. It was determined that we would still be
16  doing a lot of promotions, even with the new station
17  Washington Post Radio with sports and that GMS would
18  also continue to have promotions or might have even
19  more because the ratings were going lower and
20  sometimes promotions is the way to get more money.
21  Q. So you kept her?

Page 240

1  A. She kept her position.
2  Q. Who made that decision?
3  A. Ultimately her supervisor, Mary Kay LeMay.
4  Q. Who was involved in the decision?
5  A. Who was involved in the decision?  I took
6  her feedback but I was involved and so was Mary Kay
7  LeMay.
8  Q. Was Matt Mills?
9  A. No.
10  Q. How about the business department?  Who
11  was involved in that decision?
12  A. Me and Linda Pfluger.
13  Q. Matt Mills?
14  A. No.
15  Q. When you got the decision from Reece, we
16  have already talked about what you were going to do,
17  Z104 was going away, TOP goes to 103, Post Radio
18  goes to the Z104 channel, correct?
19  A. Right.
20  Q. At that time you were given the go ahead
21  to implement the RIF?

Page 241

1 A. Yes.
2 Q. Up until that early December decision from
3 Reece, were all the options still on the table?
4 A. No. The two options were on the table of
5 do we keep Z104 and, in other words, the new lineup
6 would be -- well, three options were really still on
7 the table. There was still a possibility that the
8 Post deal would not come about, you know, the
9 negotiations didn't finish in a, until a few weeks
10 later.
11 Q. If the Post deal didn't come about?
12 A. Then we would have kept status quo we
13 would have kept Z104 playing the music it was, GMS
14 playing the music it was and leave TOP on the same
15 signal.
16 Q. All right. So that was one option.
17 A. Another option was to do what we
18 ultimately did. And then --
19 Q. What I'm trying to get at here, was there
20 any narrowing of the options prior to Reece making
21 the decision in early December?

Page 242

1 A. It was really just down to those three
2 options.
3 Q. Okay. We've already discussed those
4 three.
5 A. Yes.
6 Q. Did you object because in your opinion it
7 wasn't the best financial solution?
8 MR. CYS: Object to what?
9 MR. McCALLY: His decision.
10 MR. CYS: Okay.
11 THE WITNESS: I made it clear to him that
12 it wasn't my place to object. He was CEO. It was
13 up to him to make that decision. Did I object? No.
14 I presented the information to him. I did not
15 object.
16 Q. You disagreed with the decision on a
17 financial basis?
18 A. Financially it made more sense to do Z104.
19 From a PR standpoint probably it made more sense to
20 do keep the GMS option.
21 Q. When you say to do Z104, to continue it?

Page 243

1 A. No. Yes, to keep Z104 around was a better
2 financial answer --
3 Q. In your opinion.
4 A. In my opinion. But having GMS completely
5 go away was a much more difficult public relations
6 situation.
7 Q. If you had eliminated GMS instead of Z104,
8 what were the RIF plans at that time?
9 A. The RIF plans at that time would have been
10 to -- repeat the question.
11 (The reporter read back as requested.)
12 THE WITNESS: Our feeling at that time
13 was, you're talking in regards to the sales
14 department?
15 Q. No. I'm talking, if you had, one of your
16 options was to get rid of GMS.
17 A. Entirely, yes. Keep Z104 and put 103.5 on
18 TOP and put TOP on 103.5 and start Washington Post
19 Radio. In that option we would have, we would have
20 kept the Z104 sales department and the Z104 program
21 department because the station would have continued

Page 244

1 to exist. And the entire GMS would have been let
2 go.
3 Q. Would you have been moving Z104 to a new
4 signal?
5 A. No, it would have stayed 104.1, 103.9.
6 Q. So you had given Post the lesser signal?
7 A. No, we would have given Post 1500/1077.
8 And TOP would have had 103.5.
9 Q. TOP would have been gone to 103.5?
10 A. Right.
11 Q. Under that scenario would Mr. Donohoe's
12 position have been eliminated?
13 A. Yes.
14 Q. Why?
15 A. Because he's part of the GMS sales staff.
16 Q. Any other reason?
17 A. No.
18 Q. Under that scenario would there have been
19 a director of national sales, sports sales?
20 A. Yes.
21 Q. When did the decision to create the

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 245

1  director of national sales, sports sales come about?
2      A. That came about probably in October.
3      Q. Tell me about it.
4      A. Well, we felt it was really important to
5  get a lot of sports on Washington Post Radio.
6      Q. Who is we?
7      A. Me, Linda Pfluger, Matt Mills and Jim
8  Farley.
9      Q. Go ahead.
10     A. We thought that sports would be important
11  because of the programming.  It would be a lot of
12  time for us that we wouldn't have to fill for
13  Washington Post Radio.  We also felt that it was an
14  opportunity for us to make revenue.  It was also an
15  opportunity to attract audience.
16         So the feeling was that we needed
17  somebody to really spearhead the sales and
18  operations of managing the sports team and our
19  relationships with them and try to make as much
20  money off them as we possibly could.
21     Q. You said sports were important to sell,

Page 246

1  opportunity to make more revenue, attract more
2  audience.  You mean all in relation to sports?
3      A. Just for the station in general in terms
4  of audience you mean?
5      Q. What station?
6      A. For Washington Post Radio.  We thought
7  that it would, nighttime programming having baseball
8  could be something that would attract more people to
9  the radio station.
10     Q. This is the reason you combined the two
11  national sales jobs at GMS, WTOP, FED with the Post
12  sales and sports?  That was what my question was.
13  How did the decision come about and why to combine
14  the national sales jobs for TOP/FED that were
15  continuing forward, for GMS that were continuing
16  forward, with sports sales?
17     A. In this scenario you were talking about
18  Z104 sticking around.
19     Q. No, no, no, sir.  My question is, I asked
20  you when did the decision come about to create the
21  director of national sales/sports sales.  You said

Page 247

1  in October.  Okay.  There had been no decision yet
2  as to what the final outcome would be because that
3  didn't occur until December.
4      A. Correct.  Or the decision was made to, if
5  we ended up doing, as we had suggested, that this
6  position would be part of.  That's when we made the
7  decision that we would combine them.
8      Q. As what suggested?
9      A. If we went ahead with the deal with
10  Washington Post Radio, then we decided that it would
11  make sense to have a director of national sales and
12  sports sales?
13     Q. Why?  Why would you combine national sales
14  with sports sales?
15     A. Because we felt for one there would be a
16  lot more capacity in this job.  Because GMS was
17  either going to have much diminished ratings or was
18  going to be gone entirely.
19     Q. More capacity means you have more time to
20  do it, because you wouldn't have as much sales to do
21  so for GMS.

Page 248

1      A. Correct.
2      Q. What else?
3      A. We felt this was something that really
4  needed to be focused on, and this was a cost
5  efficient way to get that done.
6      Q. Because you could lump sports in with
7  national sales, because they would have more
8  capacity?
9      A. Yes.
10     Q. Okay.  Did the Post Radio have any
11  national sales component?
12     A. Yes.
13     Q. It sounds like to me in terms of capacity
14  you have got equal or more capacity needed for TOP.
15  That hasn't diminished, correct?
16     A. It would be similar, yes.
17     Q. Right.  In fact, it went up.  There was
18  greater demand.  Because you moved to a stronger
19  signal.  Correct?
20     A. Not immediately, no.
21     Q. Over time.

Page 249

1    A. Recently, yes.
2    Q. Let's not mince words, Mr. Oxley. You
3  didn't move to 103.5 with the understanding that you
4  were going to have less opportunity to sell?
5    A. We did not.
6    Q. The whole plan and anticipation of
7  forecasting was that by moving your best seller,
8  your best product to your best signal, you were
9  going to sell more?
10   A. Over time, yes. Immediately, no.
11   Q. So there would be an increase need for
12  sales, national sales I'm talking about, for
13  TOP/FED. Now you're in a better signal, correct?
14   A. Long-term, yes.
15   Q. Okay. Then we still have GMS. But it's
16  in a weaker signal. You still have national sales
17  needs but weaker. We know from the documents that
18  in the next year the sales nationally for GMS went
19  down by about a million, correct?
20   A. Yes.
21   Q. All right. Then you've added on top of

Page 250

1  that Post Radio national sales?
2    A. Yes.
3    Q. Okay. That seems to me, based on the
4  breakout of Mr. Spacciapoli's budgetary breakdown,
5  Exhibit 122, that it's about a wash, when you add
6  all these things together, that the total budgetary
7  constraints remained about the same?
8    A. Yes.
9    Q. Is that true?
10   A. Yes. Including sports, yes.
11   Q. So the budgetary requirements for the old
12  position of national sales for TOP/FED, GMS compared
13  to national sales for TOP, GMS now reduced, Post and
14  then the anticipated sports sales, it's about the
15  same?
16   A. Yes.
17   Q. Okay. So now you are only adding in
18  sports as the new -- we already talked about Post.
19  The new element there is sports, correct, under the
20  job?
21   A. Yes. New elements, yes.

Page 251

1    Q. Why --
2    A. And another radio station, Washington Post
3  Radio. So another station and sports.
4    Q. Why would you add in, you agree with me,
5  sports is predominantly local sales?
6    A. Yes, high percentage of local sales, yes.
7    Q. In this situation what is the breakdown
8  local-national?
9    A. I think it's probably about --
10   Q. In '06?
11   A. 75/25 maybe.
12   Q. 75 local?
13   A. Probably 70 local. 25, 30 percent
14  national.
15   Q. Why would you lump that, something so
16  heavily locally oriented into a national sales job?
17   A. Because we felt that that job had the
18  capacity to do that.
19   Q. The only reason is because that person
20  would have more time to do it. That's what you mean
21  by capacity?

Page 252

1    A. Yes. They would have more time to do it.
2  Because, when you're selling a couple of much lower
3  rated stations, there isn't anywhere near as much
4  demand. So you certainly have capacity to do more.
5    Q. Who had that meeting -- was you, Pfluger,
6  Mills and Farley, when you made the decision to do
7  this?
8    A. Do?
9    Q. To create the director of national sales,
10  sports sales.
11   A. I remember having meetings with them to
12  discuss that, yes.
13   Q. You already testified that in October you
14  all had a meeting where that decision was made?
15   A. Yes. Absolutely.
16   Q. What was Mr. Mills's input?
17   A. I already gave it to you.
18   Q. I'm sorry. Give it one more time.
19   A. We went through some of the pros and cons.
20   Q. We talked about pros and cons of Leo
21  Donohoe.

Page 253

1    A. You mean of the position itself?
2    Q. Of this new position. I want to know
3    about your discussions and did anybody oppose it,
4    did anybody think it was not a good idea, anybody
5    think it was a good idea?
6    A. The people in the meeting agreed, they
7    thought it was a good idea. I do not remember or
8    recall anyone thinking it was a bad idea.
9    Q. Was Mr. Donohoe discussed at that meeting?
10   A. Yes.
11   Q. By who?
12   A. Mr. Mills. I do not remember Mr. Farley
13   having any comments. I don't remember Ms. Pfluger
14   really having any comments.
15   Q. What did Mr. Mills say about Mr. Donohoe
16   in this meeting in which you decided to create the
17   director of national sales/board sales?
18   A. I do not remember his exact words.
19   Q. Give me the best you can recall.
20   A. The best I recall, something that we
21   should look at. Something that we should really

Page 254

1    strongly consider doing this.
2    Q. No. I asked you if you discussed Leo
3    Donohoe. You said yes. Then you said Matt Mills
4    discussed him. Tell me, the best you can remember,
5    what was said about Leo Donohoe at this meeting.
6    A. All I can remember of that meeting was
7    that we talked about Leo Donohoe could be somebody
8    who we possibly could consider for that. But he
9    would be part of the GMS sales department being
10   RIF'd. I don't remember really much else about it.
11   Q. And the fact that he could be considered
12   for it, what was discussed?
13   A. That would he apply. Would he want to do
14   it?
15   Q. Anything else?
16   A. I don't remember anything else.
17   Q. Did you discuss anyone else applying for
18   that position?
19   A. Jeff Kessler, who was at Z104, was and
20   ended up being part of the RIF. Would he possibly
21   apply?

Page 255

1    Q. Did you discuss that he would be qualified
2    for it, as you did with Mr. Donohoe?
3    A. I remember thinking, yes, that we had
4    talked about him because he had some national --
5    Nationals baseball sales experience.
6    Q. Anyone else?
7    A. I don't remember talking about anybody
8    else at that point, no.
9    Q. In October of 2005, before you got the
10   final word to do anything, the decision had been
11   made, if we get the Post, and we go one of the three
12   scenarios, we will be creating a director of
13   national sales/sports sales jobs?
14   A. Right.
15   Q. That would require the elimination of the
16   national sales position for TOP/FED?
17   A. Yes, there would be included in part of
18   RIF, because of him working with GMS, it's yes.
19   That would be part of the reduction in force.
20   Q. And that was the decision made by the
21   people at this meeting?

Page 256

1    A. Ultimately it was my decision.
2    Q. But if it was your decision, why did you
3    meet with people about it?
4    A. Get their input.
5    Q. Okay. What if they objected?
6    A. Might have thought differently.
7    Q. They all approved it?
8    A. Nobody objected, to my memory, at all.
9    Nobody said this was a bad idea.
10   Q. Did you go to them to seek their approval
11   or disapproval?
12   A. To get their input. I wouldn't say
13   approval or disapproval. Input.
14   Q. Did any prior interaction between Mr.
15   Mills and Mr. Donohoe or Mr. you in any way
16   contribute to your idea to come up with this
17   director of national sales, sports sales job?
18   MR. CYS: Excuse me. Mr. U?
19   Q. I'm sorry.
20   MR. CYS: You said Mr. U.
21   Q. No. Did any discussions between you, Mr.

Joel Oxley                                              Leo Donohoe v. Bonneville Int'l Corp.

Page 257

1  Mills, Mr. Donohoe or any interactions between the
2  three of you in any way contribute at all to your
3  decision to eliminate the WTOP national sales job
4  and consolidate it into the director of national
5  sales, sports sales?
6      A. No.
7      Q. So there weren't any problems you were
8  concerned about between Mr. Mills and Mr. Donohoe at
9  that juncture?
10     A. There were concerns that I had about Mr.
11 Mills and Mr. Donohoe's communication like I
12 mentioned before.
13     Q. Anything else?
14     A. No, that was the big concern. There was a
15 lack of communication from Leo Donohoe to Matt Mills
16 about Leo's concerns about how the job was going.
17     Q. What were those concerns? Those the ones
18 you already told me about?
19     A. Yes. He also -- Leo talked to me about
20 how he wished Matt would smile more. He talked to
21 me about how he felt, he agreed that Matt was doing

Page 258

1  a great job and moving the station in the right
2  direction, but he felt that Matt was too uptight and
3  needed to be looser and more fun.
4      Q. That's it?
5      A. He also had complaints at times about
6  access to inventory. I think by that point I think
7  we had done a pretty good job of resolving that.
8      Q. In fact, Mr. Donohoe was so concerned
9  about access to inventory in July 2003, you had a
10 meeting with him and Mr. Mills at Starbucks?
11     A. I called that meeting because of the
12 communication between them. The main subject matter
13 was not access to inventory.
14     Q. Was access to inventory discussed?
15     A. Yes, it was.
16     Q. All right. That was in 2003, correct?
17     A. That sounds right.
18     Q. After that did Mr. Donohoe get access to
19 inventory, after that meeting?
20     A. I think they came to an arrangement where
21 they got better access to inventory.

Page 259

1      Q. In fact, you changed the policy, sir.
2  Don't you recall that?
3      A. Yes, we did. We made it easier for them
4  to get to inventory, yes, we did.
5      Q. You didn't allow the local salespeople to
6  pre-block out time so the national people could get
7  it, correct?
8      A. Yes.
9      Q. And you saw --
10     A. They could still prebook time, but they
11 needed a signed deal instead of -- and so did Leo to
12 prebook time. Both sides had to have written
13 confirmation of orders coming from clients. Before
14 that either nationally or locally you could prebook
15 time and take up time.
16     Q. Mr. Donohoe didn't do that without a
17 signed deal?
18     A. At times he did, yes.
19     Q. But not routinely like the local
20 salespeople?
21     A. He did it fairly routinely.

Page 260

1      Q. Let's cut to the chase. As a result of
2  Mr. Donohoe's complaints, you or Mr. Mills changed
3  the station's policy about prebooking, correct?
4      A. Yes.
5      Q. We can go through the memos.
6      A. His complaints and other complaints too,
7  but yes.
8      Q. It wasn't just Mr. Donohoe complaining?
9      A. Yes, other people felt that there were
10 some people trying to take up too much inventory.
11     Q. Who is responsible for the inventory in
12 that process?
13     A. Matt Mills.
14     Q. And as a result of Mr. Donohoe's
15 complaints that he raised at that meeting in
16 Starbucks, the policies were changed to give him
17 greater access to inventory?
18     A. Yes, that was one thing that happened,
19 yes.
20     Q. Fair to say that was a good suggestion of
21 Mr. Donohoe's or a good complaint?

Page 270

1    Q.   He was refused that request, right?
2    A.   Yes, he was.
3    Q.   On Exhibit 85 in front of you.  Turn to
4  Bates stamp 6791.
5    A.   Which one you want me to go to?
6    Q.   6791.
7    A.   Yes.
8    Q.   Look at the bottom of the page that
9  section entitled positions that will need to be
10  Posted.  It reads, management discussed the
11  positions that will be needed with the new
12  structure.  Postings and descriptions were prepared
13  by managers and sent to Joan for finalization.  Is
14  that Henson?
15    A.   Yes.
16    Q.   Continues.  Emphasis being placed on
17  distinguishing the differences from old postings and
18  new postings.  What does that last sentence mean?
19    A.   Well, we would have had current postings
20  at that time for any number of positions.  So this
21  would be, these were new postings to make it clear

Page 271

1  by putting the new call letters on there these were
2  the new positions, new responsibilities.
3    Q.   Just new call letters?
4    A.   And some of them would be new positions as
5  well.
6    Q.   Why was emphasize being placed on
7  distinguishing the differences between old postings
8  and new postings?
9    A.   So people wouldn't get confused.
10    Q.   Do you think they would get confused?
11    A.   Possible that they could get confused,
12  yes.
13    Q.   Wasn't any effort to try to distinguish
14  the job posting so people couldn't claim a job going
15  forward was actually their old job from which they
16  had been RIF'd.
17    A.   What's the question.
18        MR. McCALLY:  Read it back.
19        (The reporter read back as requested.)
20        THE WITNESS:  No, we weren't trying to.
21        MR. McCALLY:  Rick, I would have gone into

Page 272

1  all the national, what happened nationally using
2  that descriptor, I know you object to it, you know
3  what I'm talking about.  I would have gone into all
4  that now about the national RIF, San Francisco RIF,
5  what happened there, how it was handled differently,
6  the ages of the people, et cetera.
7        But based on your objection, not wanting
8  to raise it every single time, I'm just nothing this
9  for the record, we have that same agreement.  I'm
10  not waiving my right to go into that pending the
11  outcome of the protective order.
12        MR. CYS:  No, that is understood.  Of
13  course, we should also state that I would have
14  instructed the witness not to answer on those
15  questions.
16        MR. McCALLY:  The same for the financials,
17  you would instructed him not to answer.
18        MR. CYS:  Correct.
19  BY MR. McCALLY:
20    Q.   With the reorganization, after you let go
21  of the GMS sales staff, Z104 was gone, the WTOP

Page 273

1  local sales staff stayed intact, correct?
2    A.   Correct.
3    Q.   That was untouched?
4    A.   Correct.
5    Q.   What were you rehiring for?
6    A.   Well, there were a number of positions we
7  were rehiring for.
8    Q.   In sales.
9    A.   In sales we were hiring for the director
10  of national sales and sports sales.  We were hiring
11  for a general sales manager to oversee -- we were
12  hiring salespeople.
13    Q.   For which station?
14    A.   For the new configuration of the
15  GMS/Washington Post Radio and sports sales that went
16  along with --
17    Q.   So the new people you were hiring would be
18  selling GMS, the classical station, the Post Radio
19  and then the sports sales?
20    A.   Yes.
21    Q.   The GMS who you hired then was --

Joel Oxley                                                    Leo Donohoe v. Bonneville Int'l Corp.

Page 273

1   local sales staff stayed intact, correct?
2       A. Correct.
3       Q. That was untouched?
4       A. Correct.
5       Q. What were you rehiring for?
6       A. Well, there were a number of positions we
7   were rehiring for.
8       Q. In sales.
9       A. In sales we were hiring for the director
10  of national sales and sports sales. We were hiring
11  for a general sales manager to oversee -- we were
12  hiring salespeople.
13      Q. For which station?
14      A. For the new configuration of the
15  GMS/Washington Post Radio and sports sales that went
16  along with --
17      Q. So the new people you were hiring would be
18  selling GMS, the classical station, the Post Radio
19  and then the sports sales?
20      A. Yes.
21      Q. The GMS who you hired then was --

Page 274

1       A. We ended up hiring Steve Goldstein.
2       Q. And the DNS/SS was Spacciapoli?
3       A. Correct.
4       Q. And the local salespeople you hired, they
5   would be selling GMS classical station, Post Radio
6   and sports?
7       A. Right.
8       Q. And Goldstein is general manager who
9   oversaw the local salespeople?
10      A. Correct.
11      Q. In terms of the reorganization going
12  forward and the salespeople that were brought, that
13  were rehired in some instances or new hires, was
14  there a different commission structure in the
15  reorganized station?
16      A. Yes.
17      Q. What was it?
18      A. I do not recall. It's something I had. I
19  know it's been produced.
20      Q. I would disagree. That's one of the items
21  for the 30(b)(6).

Page 275

1           Is there a document you can look at
2   to determine how the commissions for the local
3   salespeople changed pre-RIF reorganization and post?
4       A. If you don't have it, we can get it to
5   you.
6           MR. McCALLY: Rick, I would ask for that
7   document, whatever it may be.
8           MR. CYS: If it hasn't been produced, we
9   will do that.
10      Q. What do you recall of the change in the
11  commissions?
12      A. Matt Mills redid the commission structure.
13      Q. Did you have any involvement with it?
14      A. The particular percentages, no.
15      Q. Did they go up or down, do you know?
16      A. I believe they would have gone up because
17  the -- somewhat less revenue. I don't remember. I
18  don't recall for sure.
19      Q. When you say they would go up, GMS has now
20  gone to a weaker signal where you expected less
21  sales?

Page 276

1       A. Right.
2       Q. Post Radio is a brand new --
3       A. That was going to be starting at the end
4   of March.
5       Q. Tougher to sell, as you said before?
6       A. Right.
7       Q. And sports sales?
8       A. As I remember some of the percentages were
9   higher than they had on say just --
10      Q. Why would they be raised percentages?
11      A. To try to encourage people to go out and
12  get business.
13      Q. Because you thought it was going to be
14  tougher to get sales, so you had to give a higher
15  percentage?
16      A. Exactly. And therefore -- right.
17      Q. By increasing the percentages, if you
18  happened to be wrong in your estimates about the
19  total revenue or total sales, these people could
20  actually make more money than anticipated?
21      A. They could. But you could also always

OVERNIGHT COURT REPORTING SERVICE          Page 273 - Page 276
Washington, D.C. (301) 593-0671

Joel Oxley                                                    Leo Donohoe v. Bonneville Int'l Corp.

Page 277

1  change the commission.
2      Q. You don't change commission mid year, do
3  you?
4      A. We have.
5      Q. You have?
6      A. Yes.
7      Q. That must go over well. Did you do it in
8  2006?
9      A. No, we did not do it in 2006.
10     Q. Did you do it in 2007 for the local
11  salespeople?
12     A. No.
13     Q. When is the last time you did it?
14     A. I believe we did it in 2003.
15     Q. To increase or decrease commissions?
16     A. Decrease them.
17     Q. Why?
18     A. Cost containment.
19     Q. Were people making too much money?
20     A. I don't know that they were making too
21  much money. The sales had gotten ahead of things

Page 278

1  and we felt this was an area that we could contain
2  cost.
3      Q. Contain costs, let's be clear. You lower
4  the commissions. People take home less. Corporate
5  gets more.
6      A. Yes. All right.
7          MR. McCALLY: Let's take a break. The
8  tape has to be changed.
9          (Brief Recess.)
10  BY MR. McCALLY:
11     Q. Mr. Oxley, we are back on the record and
12  you're still under oath. Did you have any
13  discussions with your counsel regarding your
14  testimony?
15     A. No.
16     Q. Were you involved in a decision process to
17  hire Mr. Spacciapoli for the new director of
18  national sales, sports sales?
19     A. Yes, I interviewed him.
20     Q. What involvement did you have in the
21  interviewing and hiring of individuals for the

Page 279

1  director of national sales sports sales position?
2      A. I met with Mr. Spacciapoli and Mr.
3  Donohoe.
4      Q. Well, my question is a bit broader. What
5  involvement did you have other than interviewing
6  those two people?
7      A. It was ultimately my decision and I could
8  veto, if I felt that Mr. Mills wasn't making the
9  right decision, if he was making a very wrong
10  decision. But Mr. Mills was the one who had the
11  primary responsibility for interviewing and
12  ultimately choosing who would take that position.
13     Q. When you say you had veto power, what do
14  you mean by that?
15     A. I mean that, if I felt like Mr. Mills was
16  hiring somebody who really and truly could
17  absolutely not do the job, that I might go to Mr.
18  Mills and say I think that's the wrong person.
19     Q. You have veto power over any hiring
20  position?
21     A. Correct.

Page 280

1      Q. Have you ever exercised it?
2      A. No.
3      Q. So that's the only involvement you had?
4      A. I interviewed both of them.
5      Q. Other than that. You could veto it and
6  then you interviewed Mr. Spacciapoli and Mr.
7  Donohoe?
8      A. Correct.
9      Q. Did you interview any of the other people?
10     A. No.
11     Q. Why not?
12     A. Mr. Mills interviewed all the other
13  people. I felt I wanted to, anybody who reapplied
14  to the station, who had been part of the reduction
15  in force, I wanted to talk to them. So anybody who
16  reapplied after reduction in force I asked to talk
17  to them.
18     Q. Why is that?
19     A. Because I had worked with these people. I
20  felt it would make sense for me to talk with them.
21     Q. That's it?

Joel Oxley                                                    Leo Donohoe v. Bonneville Int'l Corp.

Page 281

1    A. Yes.
2        Q. How could you accurately evaluate a
3    decision by Mr. Mills, if you didn't interview the
4    other people he was interviewing?
5        A. Mr. Mills -- I did not interview other
6    people in these situations either. So I left it to
7    Mr. Mills to make his final recommendation.
8        Q. How could you veto or exercise that veto
9    power over a decision of his, if you didn't
10   interview the other people? You have no basis for
11   knowing his decision.
12       A. I waited until Mr. Mills made his
13   recommendation. And his recommendation was Mr.
14   Spacciapoli. So I had interviewed him. So I said
15   fine.
16       Q. That's not my question. If you -- you
17   said your involvement with this process was, you
18   interviewed Spacciapoli and Donohoe. You could have
19   vetoed, if he made a bad decision. How can you know
20   if he made a bad decision if you are not
21   interviewing all the potential candidates?

Page 282

1        A. If he had picked someone I had not
2    interviewed, I would have interviewed them as well.
3        Q. You would have?
4        A. Yes.
5        Q. When did you decide that?
6        A. That's the way I have always done.
7        Q. It is. You have never exercised the veto
8    power before?
9        A. I have never felt someone made a decision
10   that was so incorrect that I needed to exercise veto
11   power, no.
12       Q. Without seeing all the other candidates,
13   how would you know?
14       A. I trusted Mr. Mills to make a good
15   recommendation.
16       Q. Fair to say Mr. Mills had the primary
17   responsibility for selecting the person to be the
18   director of national sales sports sales?
19       A. Yes.
20       Q. It was his call?
21       A. Yes.

Page 283

1        Q. Absent some egregious error that you
2    perceived in which you could exercise your veto
3    power, which you have never done before?
4        A. Yes.
5        Q. When did you interview Mr. Donohoe?
6        A. Within a week to ten days after the 4th.
7        Q. Did you do any interview with Mr. Mills?
8        A. Yes.
9        Q. You were in the same meeting?
10       A. No.
11       Q. Was yours before or after?
12       A. After.
13       Q. What happened in that meeting?
14       A. Mr. Donohoe came in to talk to me about
15   why he felt that he would be good for the job. He
16   talked solely about the fact that he had done the
17   job before so, therefore, he felt that he would be
18   good for the job again.
19       I talked to him about that the job
20   would have a lot of different and new
21   responsibilities, and be very different, and asked

Page 284

1    him what his thoughts were on that, what kind of
2    plans for it he had on that. And his response
3    basically was that he would continue to do what he
4    had always done.
5        Q. Is that all you remember of your
6    conversation?
7        A. It was not a long interview. Maybe 30-40
8    minutes, if I remember correctly. We talked some
9    about that had been a hard situation. We talked
10   about how he was doing. And since we had known each
11   other quite sometime, we talked about how each
12   others families were doing, that type of thing.
13       Q. Did Mr. Donohoe know he was being
14   interviewed by you?
15       A. Yes.
16       Q. He didn't just stop by your office to say
17   hello?
18       A. No.
19       Q. You asked him to come in to be
20   interviewed?
21       A. Yes. We discussed that he would come talk

Joel Oxley                                          Leo Donohoe v. Bonneville Int'l Corp.

Page 285

1  to me and we would talk about the job after he met
2  with Mr. Mills.
3     Q. That's all you remember of the interview?
4  Anything else?
5     A. I remember of that morning being very
6  surprised that Mr. Donohoe was late to the meeting
7  with Mr. Mills. He was supposed to be there at
8  8:00. He showed up about 8:05.
9     Q. How do you know that?
10    A. I was outside my office and Mr. Mills'
11 office is down the hall. And I asked Mr. Mills if
12 Mr. Donohoe had come in. He had not. We were both
13 surprised that he was late.
14    Q. Do you recall telling Mr. Donohoe that it
15 was Matt Mills' decision who to hire and to close
16 him hard?
17    A. Yes.
18    Q. When did you have that conversation?
19    A. I might have had that in the interview. I
20 think that was in the interview. I also talked to
21 him on the phone shortly after the reduction in

Page 286

1  force. It might have been then as well. I can't
2  recall which one it was. I remember saying
3  something to that effect.
4     Q. What did you mean by close him hard?
5     A. I meant to close him, meaning that's a
6  sales term for get the job.
7     Q. Do you feel Mr. Donohoe was qualified for
8  the position?
9     A. I feel he had some of the qualifications
10 for the position.
11    Q. Was he qualified for the position or not?
12    A. Yes.
13    Q. Why?
14    A. Because he had done certain aspects of the
15 job that were important.
16    Q. What aspects?
17    A. He had -- well, he had been a national
18 sales manager. So he had overseen national sales at
19 WTOP and WGMS which was, WTOP was going to be
20 continuing in a very similar vein. GMS would have
21 less ratings, but he had been involved with WGMS.

Page 287

1     Q. What else?
2     A. He had sold sports before, so he had sold
3  Orioles baseball, like we discussed earlier, from
4  like '86 through 2000. So he had, you know, he had
5  some knowledge of baseball.
6     Q. 14 years?
7     A. Yes.
8     Q. That's a lot of knowledge.
9     A. He did the same position every year. He
10 sold it every year, yes.
11    Q. What else?
12    A. What were his other qualifications? I
13 thought Leo was a good guy. I thought he was a good
14 guy. He got along, a lot of people liked him. He
15 got along with a lot of people. He was a good guy.
16 Likable. Good personality.
17    Q. Anything else?
18    A. I think Leo was a solid guy. That sums it
19 up pretty well.
20    Q. How about been there, done that in
21 terms of TOP, GMS budgets, hit his budgets in the

Page 288

1  past -- exceeded his budgets.
2     A. He's done a good job. He missed budgets
3  in maybe 2002 and then again 2005. Leo had done a
4  good job making budgets.
5     Q. You want to go over 2002. We can go
6  through those the reason why the budget wasn't made,
7  because of inventory?
8     A. There were a couple reasons -- inventory
9  and also it was a tough year after 9/11.
10    Q. Right. That wasn't his fault.
11    A. No, I think Leo did a solid job. No, I'm
12 not going to say that.
13    Q. He got higher rates than expected almost
14 every year, correct?
15    A. His rates moved up over the years, yes.
16    Q. In fact, you've written him some memos
17 about his good relationship with the Katz people,
18 correct? Did you read his file before this
19 deposition?
20    A. Yes, I did.
21    Q. Do you recall seeing memos, if not from

Joel Oxley                                                    Leo Donohoe v. Bonneville Int'l Corp.

Page 293

1    Q. That's your subjective opinion, correct?
2    A. That is my opinion, correct.
3    Q. In terms of Mr. Donohoe, did you evaluate
4    him in 2000?
5    A. No. Mr. Hamer would have done that.
6    Q. Mr. Hamer didn't mention his evaluation,
7    correct?
8    A. Not that I'm aware of.
9    Q. You never wrote a separate memo to Mr.
10   Donohoe about concerns you had. You never even
11   discussed it with him after that thing came out,
12   that 2000 memo, correct?
13   A. Yes, I did talk to him about it.
14   Q. After it came out. What did you discuss?
15   A. That he needed to make sure to get back to
16   them. That he needed to make sure to really be on
17   top of things, to try to move himself where he could
18   on that list, that he could not -- to be in position
19   as good as possible.
20   Q. Did he explain to you that the basis of
21   their complaints were because TOP's inventory was so

Page 294

1    tight, that he wouldn't cut deals for them because
2    the salespeople wouldn't allow him to and they were
3    upset about it that?
4    A. That was part of it. But another part was
5    they just simply had a hard time getting hold of
6    him.
7    Q. Well, another part of it was, he didn't
8    have anything to sell to them, and couldn't cut the
9    rate because TOP was doing so well in local sales
10   that you couldn't cut any deals on national sales,
11   correct?
12   A. No.
13   Q. Explain to me then what the problem with
14   inventory was he was having in relation to that 2000
15   survey?
16   A. He was having problems with
17   inventory getting people on. Leo --
18   Q. What does that mean?
19   A. Well, he, one, Leo did not prebook. That
20   was one thing that they were asking him to do a lot
21   more of. Leo didn't do it. We asked Leo to do more

Page 295

1    prebooking. Important to do more prebooking. He
2    oftentimes didn't do it.
3    Q. Mr. Oxley, after this '07, July '03
4    Starbucks meeting you forebade prebooking?
5    A. No, we did not forebade prebooking at all.
6    We said that you had to have something in writing.
7    Q. Signed contract.
8    A. We had to have something in writing saying
9    that the client approved you putting it in. So
10   yeah, we still allowed it. It happened a lot. Leo
11   did it quite often. He would actually have things
12   that came from the rep firm, contracts that said
13   prebook on the top of it, as would the locals.
14   Q. Without a signed contract yet?
15   A. We don't do signed contracts in our
16   business.
17   Q. Why is it a prebook? It's before you have
18   the business.
19   A. Because you feel like there's strong
20   likelihood you'll get it.
21   Q. You don't have a deal yet?

Page 296

1    A. No, you don't have a deal yet. So both
2    side of the fence locally and nationally do prebooks
3    and still do.
4    Q. Did you discuss your thoughts of Mr.
5    Donohoe's qualifications with Matt Mills?
6    A. When?
7    Q. During the selection process for director
8    of national sales, sports sales?
9    A. Yes.
10   Q. Tell me about your discussions with Mr.
11   Mills.
12   A. We discussed many things I have already
13   talked about, about the pros and cons of Leo, that
14   he had been a national sales manager at TOP.
15   Q. We discussed the pros. You have already
16   given me the qualifications.
17   A. And the cons.
18   Q. Those were given to me by you. I asked
19   you what did you think he was qualified. You said
20   yes. I asked you what the qualifications were. You
21   listed them. That's different than a conversation

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 297

1    with Matt Mills.

2        A. About the qualifications.

3        Q. What discussions did you have with Mr.

4    Mills or involvement in the decision process

5    regarding Leo Donohoe?

6        A. I do not remember having many discussions

7    with Mr. Mills at all about that. I really don't.

8        Q. You don't recall any discussions about,

9    with Mr. Mills regarding the selection of the person

10   the director of national sales, sports sales?

11       A. I remember talking about, to Mr. Mills

12   about how Leo was late for the meeting. Mr. Mills

13   was surprised that Leo didn't have any kind of

14   presentation for him. He was surprised that Mr.

15   Donohoe did not have a real plan as to what he would

16   do. He did not have some ideas about how he would

17   handle the job now that the job was changing. So I

18   remember him being surprised that Mr. Donohoe didn't

19   come with a lot more ideas about how to handle the

20   new job.

21       Q. Those are all the discussions you had with

Page 298

1    Mr. Mills about the selection of Mr. Spacciapoli

2    over Mr. Donohoe?

3        A. That was the discussion we had about Mr.

4    Donohoe about the cons to Mr. Donohoe.

5        Q. Those were the cons?

6        A. Those were the cons. There was not a

7    plan. There was not a presentation. There was not

8    any reasons.

9        Q. You said all that.

10       A. Right, right, right. I'm being

11   repetitive.

12       Q. I'm being very specific in my question

13   now. Did you have discussions with Mr. Mills about

14   who was going to be selected for director of sales

15   national sales, sports sales?

16       A. Yes.

17       Q. For the ultimate decision?

18       A. Yes.

19       Q. When did that occur?

20       A. When did Mr. Mills's decision occur?

21       Q. When you had these discussions.

Page 299

1        A. Between the time after the reduction in

2    force until when Mr. Mills decided to choose Mr.

3    Spacciapoli?

4        Q. How many discussions?

5        A. Four or five.

6        Q. Did you interview Mr. Spacciapoli?

7        A. Yes.

8        Q. When did you do that?

9        A. Approximately a week to ten days after

10   reduction in force.

11       Q. Did you interview him the same day he came

12   in to meet with Mr. Mills?

13       A. I believe so, yes.

14       Q. Is it possible you met with him on a

15   separate day?

16       A. It's possible. I don't recall.

17       Q. Tell me about your interview with Mr.

18   Spacciapoli.

19       A. He came very prepared. He had a lengthy

20   plan and presentation about what he was going to do

21   and how he was going to make this job, have a

Page 300

1    significant difference in our revenues, what he was

2    going to do specifically was to do a good job, how

3    he was going to manage the sellers, and how he was

4    going to deal with the sports teams, what other

5    sports teams he was going to pursue.

6            How he would deal with the rep firm.

7    And how he would deal with a new station, with the

8    rep firm. And how he would deal with a lower rated

9    station with the rep firm. How he would maximize

10   the opportunity on WTOP.

11       Q. How long was your interview?

12       A. Probably 35-40 minutes.

13       Q. Did he show you a PowerPoint presentation?

14       A. He had a written presentation. He had a

15   bound presentation that he showed me, yes.

16       Q. Was he qualified for the position?

17       A. Yes.

18       Q. Why?

19       A. Well, Mr. Spacciapoli had been at the rep

20   firm. He had been in local sales. He had been a

21   national sales manager. He had been a local sales

Joel Oxley                                            Leo Donohoe v. Bonneville Int'l Corp.

Page 301

1  manager.
2         He had overseen an entire sales
3  department. He had a lot of experience dealing with
4  the Washington Nationals, dealing with them on the
5  highest level, with the CEO, the COO putting a
6  presentation together, putting a proposal together,
7  working on the contract, implementing that contract,
8  working internally at our station with programming,
9  with sales. So he had a lot of experience.
10     Q. Okay. He had never sold news format,
11 correct?
12     A. No, he had not.
13     Q. He never sold classical format, correct?
14     A. That is true.
15     Q. He had never sold FED?
16     A. Correct.
17     Q. He never sold Post Radio, correct?
18     A. No one had.
19     Q. No one had. He had less than one year of
20 experience selling the Nationals baseball team
21 sports sales, correct?

Page 302

1      A. Yes.
2      Q. The Nationals contract, when did it come
3  due? When was it over for '05.
4      A. End of the season.
5      Q. When was that?
6      A. Approximately October 2nd, October 3rd.
7      Q. When did the new contract come into place?
8      A. It was January or February. January
9  maybe. February.
10     Q. Did you handle primary negotiations on
11 that contract?
12     A. Yes.
13     Q. Anyone else assist?
14     A. Michael Spacciapoli.
15     Q. What were your responsibilities?
16     A. My responsibilities were to try to figure
17 out what the right combination of -- what the right
18 compensation would be, what the right money deal
19 points would be.
20     Q. It was a different deal in '06, when they
21 paid you a larger lump sum and they kept the air

Page 303

1  inventory?
2      A. In '06, no. In '06 we paid them and we
3  got a lot more inventory.
4      Q. It changed in '07?
5      A. Yes, it changed again in '07.
6      Q. Where they paid you and they kept the
7  inventory?
8      A. No. Actually now --
9      Q. Not now.
10     A. '07. Yes, which has gone into '08. I
11 would have to check on that. I have to check on
12 that for '07. I have to check on that.
13     Q. What was the budget for sports sales in
14 '07 -- gross '07?
15     A. It's been produced. I do not remember off
16 the top of my head.
17     Q. Under two million?
18     A. That sounds right.
19     Q. Just above a million?
20     A. For '07. Yes, because the deal changed
21 because for '07 onward they got a lot more of the

Page 304

1  inventory and we went back to much less inventory.
2      Q. You had less to sell and got a lump sum
3  payment instead. They held onto more inventory to
4  sell?
5      A. No, not for '07. I got to double-check.
6      Q. I ask that you double-check so you can
7  answer these questions.
8      A. Right.
9         MR. McCALLY: Counsel, I would request
10 that be produced either through another deposition
11 or the documents?
12        MR. CYS: I think it's been produced.
13        MR. McCALLY: There is nothing for the
14 Nationals contract. Nothing.
15        In terms of 2006 you were selling
16 one-third of the air time and they had two-thirds?
17     A. '05 was one-third, two-thirds. '06 we had
18 two-thirds. They had one-third.
19     Q. Okay. What were Mr. Spacciapoli's
20 positives, negatives?
21     A. I don't remember thinking that there were

Joel Oxley                                          Leo Donohoe v. Bonneville Int'l Corp.

Page 305

1  a lot of negatives, as far as Mr. Spacciapoli.
2      Q. How about the fact that he never sold a
3  news format which was the largest --
4      A. I felt that wasn't an issue for him.
5      Q. How about the fact he had never sold a
6  talk format?
7      A. I, once again, I thought he could do that.
8      Q. No issue?
9      A. I thought that in terms of being national
10  sales manager functions, I thought he could do the
11  job.
12      Q. Not even a minimal negative, that he had
13  never sold these two primary formats, including
14  classical. Make it three formats.
15      A. I remember thinking he could do the job.
16      Q. I know that. That's not my question.
17      A. No, I don't remember thinking that would
18  be an issue.
19      Q. Not even a minimal negative?
20      A. No, I don't remember that being a minimal
21  negative.

Page 306

1      Q. So he had no negatives. Is that right?
2      A. I thought Mr. Spacciapoli possibly had
3  almost too much ambition, that he was trying to,
4  that he was somebody who was moving up very quickly
5  and that he would always be looking for the next
6  job.
7      Q. Why was that a negative?
8      A. Because we would have to replace him. He
9  was very good.
10      Q. That negative came to fruition?
11      A. He ended move up, yes. He's a very
12  talented guy.
13      Q. We'll get to that, whether he moved up or
14  not, shortly. In terms of your discussions with Mr.
15  Mills. Tell me about the four to five discussions
16  you had regarding who to select for the national
17  sales manager sports sales position?
18      A. Most of those discussions revolved around,
19  we had other people apply too, and Matt would talk
20  to me about the other people who would apply.
21      Q. Who else was in consideration?

Page 307

1      A. Really the top two in consideration were
2  Donohoe and Spacciapoli. There was no one we ever
3  looked at and said, oh, that's a number 3. We were
4  surprised that Jeff Kessler didn't approach us about
5  that job. We also -- who had worked at Z104 in that
6  capacity. We were also surprised that Patty Fears
7  didn't approach us about that position. She had
8  worked at WGMS in that capacity.
9      Q. Kessler had no sports sales experience,
10  did he?
11      A. Yeah, he did. Because he was the national
12  sales manager when we had the Nationals.
13      Q. So he had the same amount as Spacciapoli.
14  Only had that contract for '05?
15      A. Right.
16      Q. Ms. Fears had no sports sales, correct?
17      A. I don't think she did.
18      Q. Why were you expecting her to apply then?
19      A. I thought she might apply because she
20  wanted to get back into the group and be a manager.
21  She had always liked being a manager. She had been

Page 308

1  at GMS as national sales manager.
2      Q. Was she qualified for the position of
3  national sales sports sales?
4      A. Certainly would have considered her. I
5  think she could have done the job.
6      Q. How about Mr. Kessler?
7      A. I think Mr. Kessler could have done the
8  job too.
9      Q. And mr. Donohoe?
10      A. Mr. Donohoe could have done the job, yes.
11      Q. What were your discussions with Mr. Mills?
12      A. We discussed about the various candidates
13  who were applying. We discussed --
14      Q. What did you discuss? Tell me exactly
15  what you remember.
16      A. He would bring up a number of names. I do
17  not remember the names. Because he brought up names
18  and said that this person, he didn't feel that good
19  about this person, that they were not somebody who
20  he thought was going to be able to step in the job
21  and do as good a job as some of the people he had

OVERNIGHT COURT REPORTING SERVICE          Page 305 - Page 308
Washington, D.C. (301) 593-0671

Joel Oxley                                              Leo Donohoe v. Bonneville Int'l Corp.

Page 309

1   already seen.
2       Q. Do you remember anything else about these
3   discussions?
4       A. No, not particularly.
5       Q. Do you remember discussions about choosing
6   between Mr. Spacciapoli and Mr. Donohoe?
7       A. Yes. We had some discussions.
8       Q. When was that?
9       A. Like I said, in that time period from
10  1-5-06 through about the 20th.
11      Q. Tell me about the discussions.
12      A. It was just what I told you.
13      Q. You haven't told me anything about --
14      A. The discussions about the two of them? We
15  discussed the pros and cons, like I told you, about
16  each person.
17      Q. Other than the pros and cons, what else do
18  you remember discussing with Mr. Mills regarding the
19  selection of the director of national sales, sports
20  sales coming down between Mr. Spacciapoli and Mr.
21  Donohoe?

Page 310

1       A. We discussed the pros and cons.
2       Q. You've already said that.
3       A. And then Mr. Mills came to me, maybe the
4   4th or 5th times and said, I'm going with Mr.
5   Spacciapoli.
6       Q. What else was said?
7       A. I don't remember.
8       Q. Did you say anything?
9       A. I said that sounds like a good idea. When
10  can he start?
11      Q. Did you object in any way?
12      A. No.
13      Q. Did you question why he didn't go with Mr.
14  Donohoe?
15      A. No.
16      Q. If he had said to you, I'm going with Leo
17  Donohoe, would you have agreed with that?
18      A. Yes.
19      Q. Why is that?
20      A. Because of the things that I mentioned,
21  that Leo was a good guy and Leo had some relevant

Page 311

1   experience with the position.
2       Q. Any other recollection of your discussions
3   with Mr. Mills concerning Mr. Donohoe for the
4   director of national sales, sports sales position?
5       A. No.
6       Q. Did you ever discuss his age?
7       A. No.
8       Q. Did you ever discuss how long he had been
9   at the station?
10      A. No.
11      Q. That he was set in his ways?
12      A. No.
13      Q. Any comments along the lines of, you can't
14  teach an old dog new tricks?
15      A. No.
16      Q. Along those lines, you were at O'Brien's
17  deposition, correct?
18      A. Yes.
19      Q. You heard him testify that Mr. Mills used
20  part of his regular everyday speak, the comments
21  that you can't teach a old dog new tricks? Remember

Page 312

1   that?
2       A. I heard Mr. O'Brien say that.
3       Q. You heard him also say that he said to Leo
4   Donohoe, at least on one occasion, you're old and
5   you're never going to change. You heard that
6   testimony as well?
7       A. I do not remember the testimony being
8   that. But I was there for the deposition.
9       Q. All right. He said you were present when
10  Mr. Mills would make such statements. Do you recall
11  that?
12      A. I remember him saying that.
13      Q. What recollection do you have of such
14  statements by Mr. Mills?
15      A. Absolutely none.
16      Q. You have no recollection of those
17  statements at all?
18      A. None.
19      Q. Do you have any recollection of Mr. Mills
20  in any context -- socially, at the workplace,
21  anywhere, making any comments regarding longevity in

**OVERNIGHT COURT REPORTING SERVICE**          Page 309 - Page 312
**Washington, D.C. (301) 593-0671**

Joel Oxley

Leo Donohoe v. Bonneville Int'l Corp.

Page 361

1 correct?

2     A. Correct.

3     Q. And in the director of national sales,

4 sports sales that position also reported directly to

5 Matt Mills?

6     A. Yes. As do the traffic director,

7 continuity director.

8     Q. Mr. Spacciapoli earned less than

9 Mr. Quast, correct?

10     A. Yes.

11     Q. And how much greater were Mr. Quast's

12 responsibilities?

13     A. Some.

14     Q. What were they?

15     A. He had Spacciapoli reporting to him. He

16 also had the salespeople working with him too. The

17 salespeople would go to both of them.

18     Q. Who was under Quast? We know Mr.

19 Spacciapoli was under him. Then who else? Anyone

20 else?

21     A. The salespeople also would work with him

Page 362

1 as well.

2     Q. Okay. Who else was under Mr. Quast? Who

3 else was under him besides Mr. Spacciapoli?

4     A. Salespeople.

5     Q. Anyone else?

6     A. No.

7     Q. He was director of local sales, Mr. Quast?

8     A. Yeah, I believe that was his title.

9     Q. For WTOP, WFED?

10     A. Yes.

11     Q. How was his position different than Mr.

12 Spacciapoli's as local sales manager?

13     A. Responsibilities were quite similar except

14 that Spacciapoli would report to Skip.

15     Q. Mr. Quast?

16     A. Yes.

17     Q. Did you talk to Mr. Spacciapoli about why

18 he wanted to leave the director of national sales

19 position?

20     A. He wanted to move up.

21     Q. Did you have discussions with him?

Page 363

1     A. Yes.

2     Q. And what were those discussions?

3     A. That he wanted to move up, take on more

4 responsibility and work with local salespeople at

5 TOP.

6     Q. Would you look at Exhibit 111, I'm sorry,

7 122 and 117.

8     A. I have got it.

9     Q. You'll see the base compensation package

10 on 122 and the position of director of national

11 sales is $235,000, correct?

12     A. Yes.

13     Q. And the base compensation package in

14 Exhibit 117, which is Mr. Spacciapoli's commission

15 package for local sales manager, is 215, correct.

16 Lower.

17     A. Yes.

18     Q. It's still a promotion in your opinion?

19     A. Yes. We did that because we felt it was

20 important to keep, since Mr. Spacciapoli would be

21 reporting to Mr. Quast, to keep his compensation

Page 364

1 just below that. Mr. Spacciapoli decided that he

2 felt it was a worth it to do the promotion, to get

3 the promotion to work with that new compensation.

4     Q. Even though the base comp was lower?

5     A. Slightly, yes.

6     Q. That's still a promotion into a position

7 with a lower base comp.

8     A. More responsibility. In our business many

9 of our salespeople, when they go into management,

10 actually take a cut in pay to go into management.

11 That's fairly typical in our business. It happened

12 to me when I went into management.

13     Q. When he took a cut in pay, he was already

14 in management, he was director of national sales.

15     A. As you move up in management, sometimes

16 that happens to you.

17     Q. Salary keeps going down?

18     A. Salaries aren't exactly going up in our

19 business right now.

20     Q. Were there any problems with Mr.

21 Spacciapoli's performance in the first half of 2006

Joel Oxley                                        Leo Donohoe v. Bonneville Int'l Corp.

Page 365

1    while he was director of national sales?
2        A. No.
3        Q. The station that he worked out in local
4    sales and national sales, Z104, was taken off the
5    air, right?
6        A. Yes.
7        Q. And why was that?
8        A. Z104 had a record year in 2005 in terms of
9    profitability. The highest it had ever done.
10       Q. It was still under GMS?
11       A. What's that.
12       Q. Still below GMS?
13       A. In profitability, yes, slightly below GMS.
14   But, like I discussed, the decision was ultimately
15   made for public relations move that it would be best
16   to keep GMS and not Z104.
17       Q. So the station went off the air?
18       A. Yes.
19       Q. Fair to say, if they had sold more, been
20   more profitable than GMS, that decision might have
21   been made differently?

Page 366

1        A. No.
2        Q. Well, in fact, you were pushing for that I
3    thought?
4        A. I was pushing for Z104 to stay.
5        Q. Right. You thought finally it could be a
6    better product, even though it wasn't at that time?
7        A. On those signals it was thought it would
8    be a superior product. That was proven out the next
9    year.
10       Q. How was it proven out?
11       A. In the amount of profit that was delivered
12   by the radio stations. Z104 was, in 2005, much more
13   profitable than WGMS on those same signals in 2006.
14   To the point the decision --
15       Q. You mean you comparing Z104 after moving
16   to -- GMS moving to the Z104 signal. That's what
17   you are comparing?
18       A. I'm comparing what those signals produced,
19   104.1, 103.9 produced in '05 versus what they
20   produced in '06.
21       Q. But they were different formats. One was

Page 367

1    classical, one was rock and roll.
2        A. Rock and roll was '05 and classical was
3    '06.
4        Q. Completely different formats?
5        A. Absolutely.
6        Q. Yet you are still comparing sales
7    revenues?
8        A. I'm comparing their profitability.
9        Q. How did Mr. Spacciapoli do in the local
10   sales manager position?
11       A. He did well.
12       Q. Did he make his budgets?
13       A. I would have to double-check. As I
14   remember, yes.
15       Q. Did he miss any budgets?
16       A. I do not recall.
17       Q. Mr. Wollinsky was hired to replace him.
18   Is that correct?
19       A. Yes.
20       Q. I show you what is marked as Exhibit 120.
21

Page 368

1        (Deposition Exhibit Number 120 marked for
2            purposes of identification.)
3    BY MR. McCALLY:
4        Q. This is a memo from Mr. Mills to Mr.
5    Wollinsky, cc'ing you and Mr. Goldstein, dated
6    August 9, 2006. Why was Mr. Goldstein cc'd?
7        A. Because Mr. Goldstein, part of his budget
8    was made up in sports.
9        Q. What do you mean by that?
10       A. Well, part of the 3WT revenue was sports
11   so we wanted to keep him in the loop.
12       Q. So mr. Goldstein gets to see Mr.
13   Wollinsky's comp package because Mr. Goldstein is
14   also involved in sales sports?
15       A. Part of his budget was there but really he
16   was, Mr. Wollinsky or previous to him Mr.
17   Spacciapoli handled responsibilities. Certainly Mr.
18   Goldstein would be the backup on these type of
19   things, if Mr. Spacciapoli or Mr. Wollinsky had been
20   out.
21       Q. It was -- Mr. Goldstein was general sales

398

1                          Certificate of Deponent

2           I hereby certify that I have read and

3    examined the foregoing transcript, and the same

4    is a true and accurate record of the testimony

5    given by me.

6           Any additions or corrections that I feel

7    are necessary I will attach on a separate sheet

8    of paper to the original transcript.

9

10

11                   Signature of witness

12          I hereby certify that the individual

13    representing him/herself to be the above named

14    individual, appeared before me this _30th_

15    day of _June 2008_ and executed the above

16    certificate in my presence.

17

18

19

20

21                      Notary Public
                                MAGDALENA AMAYA GOMEZ
                         NOTARY PUBLIC STATE OF MARYLAND
                         My Commission Expires  8-01-09

1  Thomas McCally, Esq.
   Carr Maloney, P.C.
2  1615 L Street, N.W., Suite 500
   Washington
3  D.C. 20036
   (202) 310-5500

4

5      E R R A T A   S H E E T

6      Case Name:   Donohoe v. Bonneville

7  Witness name:  JOEL OXLEY

8  Deposition Date:  5/9/08

9  Page No.   Line No.      Change

10    9        7           Jeff Stewart to J.E.B. Stuart

11    66       9           104.9 to 103.9

12    112      14          Jodi Lisch to Jody Lish

13    112      19          Waxler to Wexler

14    113      7           Lisch to Lish

15    113      7           Waxler to Wexler

16    152      13          Reece to Reese

17    152      21          Reece to Reese

18    156      18          Reece to Reese

19    156      20          Reece to Reese

20    1·57     1           Reece to Reese

21    157      2           Reece to Reese

22    157      14          Reece to Reese

1   Thomas McCally, Esq.
    Carr Maloney, P.C.
2   1615 L Street, N.W., Suite 500
    Washington
3   D.C. 20036
    (202) 310-5500

4

5       E R R A T A   S H E E T – Page 2

6       Case Name:   Donohoe v. Bonneville

7   Witness name:  JOEL OXLEY

8   Deposition Date: 5/9/08

9   Page No.  Line No.      Change

10    158     11           Reece to Reese

11    158     12           Reece to Reese

12    164     1            Reece to Reese

13    164     2            Reece to Reese

14    164     5            Reece to Reese

15    200     14           Rud to Redd

16    200     19           Rud to Redd

17    200     20           Red to Redd

18    201     9            Red to Redd

19    201     16           Red to Redd

20    203     10           Red to Redd

21    203     11           Red to Redd

22    203     12           Red to Redd

1   Thomas McCally, Esq.
    Carr Maloney, P.C.
2   1615 L Street, N.W., Suite 500
    Washington
3   D.C. 20036
    (202) 310-5500

4

5       E R R A T A   S H E E T – Page 3

6       Case Name:   Donohoe v. Bonneville

7   Witness name:  JOEL OXLEY

8   Deposition Date:  5/9/08

9   Page No.  Line No.    Change

10   203    13         Red to Redd

11   210    14         Reece to Reese

12   211    13         Red to Redd

13   211    15         Red to Redd

14   212    2          Reece to Reese

15   212    4          Reece to Reese

16   212    7          Reece to Reese

17   212    12         Reece to Reese

18   213    4          Reece to Reese

19   223    18         Reece to Reese

20   230    16         Red to Redd

21   232    17         Reece to Reese

22   233    3          Reece to Reese

1  Thomas McCally, Esq.
    Carr Maloney, P.C.
2  1615 L Street, N.W., Suite 500
    Washington
3  D.C. 20036
    (202) 310-5500

4

5    E R R A T A  S H E E T – Page 4

6    Case Name:  Donohoe v. Bonneville

7  Witness name: JOEL OXLEY

8  Deposition Date: 5/9/08

9  Page No.  Line No.    Change

| | Page No. | Line No. | Change |
|---|---|---|---|
| 10 | 240 | 15 | Reece to Reese |
| 11 | 241 | 3 | Reece to Reese |
| 12 | 241 | 20 | Reece to Reese |
| 13 | 314 | 2 | Waxler to Wexler |
| 14 | 314 | 4 | Jodi Lisch to Jody Lish |
| 15 | 317 | 1 | Lisch to Lish |
| 16 | 318 | 7 | Lisch to Lish |
| 17 | 318 | 16 | Waxler to Wexler |
| 18 | 318 | 21 | Troy Stiber to Jory Stieber |
| 19 | 355 | 19 | Jane to Janie |
| 20 | 367 | 17 | Wollinsky to Wolinsky |
| 21 | 368 | 5 | Wollinsky to Wolinsky |
| 22 | 368 | 13 | Wollinsky's to Wolinsky's |

1   Thomas McCally, Esq.
    Carr Maloney, P.C.
2    1615 L Street, N.W., Suite 500
    Washington
3   D.C. 20036
    (202) 310-5500

4

5       E R R A T A   S H E E T – Page 5

6       Case Name:   Donohoe v. Bonneville

7   Witness name:  JOEL OXLEY

8   Deposition Date:  5/9/08

9   Page No.  Line No.       Change

10    368    16              Wollinsky to Wolinsky

11    368    19              Wollinsky to Wolinsky

12    369    12              Wollinsky's to Wolinsky's

13    370    20              Wollinsky to Wolinsky

14    371    2               Wollinsky to Wolinsky

15

16

17

18

19

20

21

22

# EXHIBIT 3

**Due to the operative Protective Order that is in effect between the parties, Exhibit 3 will be filed with this Court, under seal, on August 11, 2008.**

# EXHIBIT 4

# TRANSITION TIMETABLE

**TUESDAY, NOVEMBER 1**

| | | |
|---|---|---|
| 10am | Contact WGTS about broadcasting G | Reese |
| 10am | Bring in 'Need to know' Managers on plan (Wolfe, Meyer, Dolge, Others?) | Oxley |
| 11am | Talk to Art Rose about plan | Oxley/Garner |

**MONDAY, NOVEMBER 7**

| | | |
|---|---|---|
| COB | Finalize all severance packages | Henson/Pate |
| 1. | Determine if we will bridge some employees who are within a few months (6?) of significant benefit advantages | |
| 2. | Determine calculations of bonuses owed | |

**MONDAY, NOVEMBER 14**

| | | |
|---|---|---|
| 2pm | Talk to McMearty, Floyd, Quast, Oliger | Oxley |
| 2pm | Severance Document Review | Pate/Henson |
| 5pm | Final PR Strategy Meeting | Reese/Pate/Dept. Hds Edelman |
| 6pm | Dinner to determine final details | Reese/Pate/Dept. Hds. |

**TUESDAY, NOVEMBER 15**

| | | |
|---|---|---|
| 930am 1. | Announcement to G/Z Managers (Fears, Cochran, Allison, Thureen, Donohoe, Spacciapolli, Simpson, Sellers, Kessler, Others?) | Reese/Oxley/Pate |
| 2. | Details Discussion | Pate |
| A. | Money | |
| B. | Benefits | |
| C. | Outplacement | |
| D. | Today is last day (explain 10a meeting, that today is last day and that they are to leave by 1130a) | |
| E. | Turn in keys and company equipment returned | |
| F. | Boxes | |
| 3. | Posting of new positions explanation | Pate |
| 4. | Hand out severance agreements/final checks | Pate |

| | | |
|---|---|---|
| 930am | Info to Post (Fahri) | LeMay/Edelman |
| 10am 1. | Announcement - G/Z Staff (4th Fl) | Reese/Oxley/Pate |

930am | Info to Post (Fahri) | LeMay/Edelman

10am 1. | Announcement - G/Z Staff (4th Fl) | Reese/Oxley/Pate
2. | Details discussion | Pate
   A.   Money
   B.   Benefits
   C.   Outplacement
   D.   Today is last day (leave by 1130am)
   E.   Turn in keys and company equipment returned
   F.   Boxes
3. | Posting of new positions explanation | Pate
4. | Hand out severance agreements/final checks | Pate

10am | Website changes for Z/G/V/T/F | Dolge

10am | Computer changes (What about personal items on computer?) | Spaulding

10am | On-air switch | Garner/Rose

10am | Key changes | Henson

10am | Tier one Client/Rep firm calls | Mills

10am | Implementation of Edelman plan | LeMay/Edelman

1015a | Press Releases distributed (List TBD but to include Press, Haslam, BIC DC, FCC) | LeMay/Edelman

1015a | TOP/FED department heads meet with their staff | Dept. Hds.

1045a | Record GMS on-air goodbyes | Moshos

1045a | Notify Parris he will be in cont/trf TFN | Mills

1045a | Determine who is not present and call immediately by looking at who did not receive severance package | Oxley/Pate

11am | Announcement - T/F Staff (Newsroom) | Reese/Oxley

1130a | Vendor/Client calls (List TBD) | Dept. Hds.

1130a | GMS Account Assignments | Mills

BIC 000274

# EXHIBIT 5

| | |
|---|---|
| **From:** | Matt Mills |
| **To:** | Henson, Joan;  Oxley, Joel;  Pate, Scarlett |
| **Date:** | 12/26/2005 2:00:05 PM |
| **Subject:** | another question |

when Janie, Skip and I were meeting about logistics on the 4th, the question came up about what we can and cannot, or should say to people like Leo and Daniel (they are both positioned right outside our offices and running into them seems all but a definite)...

The question is also true for anyone else for that matter...

maybe this is something that everyone who is in the loop should have some "training" on.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Matt Mills
General Sales Manager
WTOP and WFED...Federal News Radio 1050 AM
For Washingtonians, it's a necessity...For Advertisers, it WORKS!
(202) 895-5021 (p)
(202) 895-5140 (f)
(301) 520-3185 (c)
mmills@wtopnews.com

Visit us at www.WTOPNEWS.com or www.FederalNewsRadio.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BIC 000288

# EXHIBIT 6

Scarlett Meeting - Topics for Agenda

NOI Bonuses? They will not be on rolls on payment date, but I am assuming they would still be paid.

Other Bonuses?  Ratings, sales, etc

Any open language for the Severence agreements?
        Outplacement - what can be used for; amount?  Deadline?

Hiring new positions
        How long before we can rehire for each position?
        How many interviews or candidates need to be seen?
        Is there a suggested script for what we say to the other employees?
        We should all be on the same page.
        How soon can we post? (that day, next day?)

Script for Scarlett/Joan for answering severance package questions
        What is the anser if someone askes to be laid off?
        If people have individual questions on the package can they ask that day or do they need to call at another time?

Script for Joel/Bruce for "day-of"

Timeline for "Day-of"
        What are the meeting times and locations?- conf room?
        What happens hr by hr or min by min?

Leaving the building - logistics
        timing?  Can they say goodbye?  How long before they leave bldg
        what if they want to pack their own personal stuff
        what if they cannot carry all their stuff? Can they come back
        how do we ask for/get:  keys, laptops, phones, equipment, desk keys
        boxes, packing supplies

Processing of Final paychecks
        will need to get vacation usage for last 2 weeks. Can Joan take a good guess at this?
        Who will cut the manual checks?  HQ?
        Need to figure out unused vacation

BIC 000291

How will they get here?
What is the deadline for faxing or calling in timesheets for the last 2 weeks?
Who do we call it in to?

References

Are we allowed to write letters of recommendation?

BIC 000292

# EXHIBIT 7

| | |
|---|---|
| **From:** | Scarlett Pate |
| **To:** | Joan Henson; Joel Oxley; John Spaulding |
| **Date:** | 12/22/2005 11:33:54 AM |
| **Subject:** | Re: blowfish IT security proposal |

We've secured all access denying passwords to all company equipment. We've informed employees that we were more then willing to help them with retrieving personal data but that for today we didn't want them to have to worry about any of that and when they had time to reflect on what was needed that they could call HR. We've also worked with our on-air personalities to come back into the studio to do tapes.

>>> Joel Oxley 12/21/2005 4:33 PM >>>
Scarlett, How have you done this in the past? And what do you suggest we do?

Joel Oxley
Senior VP/Market Manager
WGMS/WFED/WTOP/WWZZ
(202) 895-5012
joxley@wtopnews.com


>>> John Spaulding 12/21/05 10:10 AM >>>
One item of great concern to me on 1/4 is the security of the PC's, e-mail, files and voicemail once all of the affected people are informed. Two items of greatest risk during such an event on as grand a scale as this is the potential for important files to be lost or stolen, and the probability of the e-mail system to be exploited as to send out messages to contacts that we don't want sent.

The only way to be able to secure our IT assets from all involved that day is to secure all of the PC's, e-mail and voicemail passwords during the time they are being informed of the changes and deny them access once they return to their desks.

The result of such an action will most likely result in people wanting to be granted access to retrieve personal files they have stored on the PC and e-mail. We have no legal obligation to provide such access, since they have stored personal material on company owned assets.

There is a way to soften the blow so to speak and get the employees the personal material they want. I propose that in the exit package they be provided a form that allows them to request whatever personal files they want, and I can retrieve the files after the fact and burn it to CD and send it out to them. There should be no guarantee that I can find the files as the more cryptic the request the less likely I will be in finding them, but I will do my best.

If this won't work, I still propose that they be denied access as the risk of unpoliced, potentially angry and confused employees doing something harmful is too great, and they only way to defend against the potential of a few is to be uniform in the security to all.

I have one other question as well. I have worked out with Matt and Mary Kay the action plan for what to do with all of the sales and marketing employees files, email and voicemail after the have been secured, but whom do I work with regarding Z104 programming staff? Is there going to be anyone who wants to have access to anyones e-mail or voicemail for retrieval of important messages after the fact? The same goes for important files on the PC's and network as well as any automatic responses that should be broadcast on e-mails sent or personalized voicemail greeting changes, etc.

If both of these have already been accounted for, forgive the redundancy.

John Spaulding

*Just so if they need any personal e-mail or personal file downloaded, then our IT person can handle that - (then?)*

BIC 000279