**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CIVIL DIVISION**

| | | |
|---|---|---|
| LEO DONOHOE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 07-949 (RWR) |
| | : | |
| BONNEVILLE INT'L CORP., | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**PLAINTIFF'S RULE 72.2 OBJECTIONS TO**
**MAGISTRATE JUDGE DEBORAH A. ROBINSON'S ORDER OF JULY 29, 2008,**
**DENYING PLAINTIFF'S MOTION TO COMPEL AND**
**GRANTING PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER**

**"Broad and liberal discovery is one of the foundation-stones of modern Federal procedure. Nothing should be done and no ruling should be made that would detract, or in any way restrict, the salutary purpose of the Rules. Discovery should not be hampered or circumscribed by technical rulings...."** *U. S. v. Maryland and Virginia Milk Producers Ass'n,* 22 F.R.D. 300 D.D.C., 1958; *see also Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In this vein, courts must "construe the scope of discovery liberally to ensure that litigation proceeds with "the fullest possible knowledge of the issues and facts before trial," *Moore v. Hartman,* 241 F.R.D. 59 DDC 2007 citing *Hickman,* 329 U.S. 495 at 501.

In this case, Plaintiff Leo Donohoe ("Mr. Donohoe") seeks to recover damages he sustained as the direct result of Bonneville's wrongful termination of his employment and refusal to rehire him on the basis of his age. Discovery to date has provided Mr. Donohoe with some

compelling evidence in support of his claims[1].   Nevertheless, Mr. Donohoe has only been allowed to explore narrow issues and facts.  His efforts to conduct permissible discovery to gain the fullest possible knowledge of issues and facts before trial have been thwarted by technical and erroneous rulings.

On May 2, 2008, Mr. Donohoe filed an Objection to Magistrate Judge Deborah A. Robinson's April 23, 2008 Order denying Mr. Donohoe leave to take additional depositions. Magistrate Judge Robinson denied Mr. Donohoe's request for leave to take additional depositions even though:  (a) this Court initially restricted the number of depositions to be taken to seven (7) - less than the minimum amount provided for under the Federal Rules of Civil Procedure; (b) at the initial scheduling conference, Mr. Donohoe specifically requested to be

---

[1] For example, Mr. O'Brien, a former management level employee who is no longer affiliated with Bonneville, testified that Mr. Mills' daily vernacular included discriminatory remarks about Mr. Donohoe based on his age.  Mr. O'Brien testified in detail about Mr. Mill's routine comments, such as "you can't teach an old dog new tricks."  Mr. O'Brien, who was Bonneville's management level employee at the time, has personal knowledge of complaints from older, veteran employees regarding the discriminatory manner in which Mr. Mills treated them. According to Mr. O'Brien, Bonneville's long-time employees (who had been with Bonneville for more than ten years) reasonably believed they were being forced out of Bonneville based upon their ages.  Mr. O'Brien heard such complaints from veteran employees including Jean Fowler, Jody Lish and Leo Donohoe.. Mr. O'Brien also testified that Mr. Donohoe's performance was exemplary and that Mr. Donohoe always made, or exceeded, budget.

Ms. Fears, also a former management level employee at Bonneville with no interest in the outcome of this litigation, stated that many employees worked for Matt Mills complained about him - particularly the veterans.  According to Ms. Fears, Bonneville's older workers used to comment that employees had to be a young with long legs for Matt Mills to pay any attention to them. According to Ms. Fears, the mature staff really believed that Mills did not treat them fairly.  Ms. Fears also witnessed Matt Mills' discriminatory comments and attitude, such as "you can't teach an old dog new tricks."  He made comments about Leo Donohoe doing things the "old" way.   According to Ms. Fears, Matt Mills said that Leo Donohoe was "too set in his ways" and that Leo Donohoe had been doing this for "too long."  Matt Mills also said that "if Leo can't get it together I am going to get rid of him, and I know people who can get it done."

Ms. Fears also testified that she was shocked that Mr. Donohoe was included in the RIF, as he was "primarily a WTOP guy," and as far as she could tell, he was the only one included in the RIF from WTOP.  She further stated that it did not make any sense to include Mr. Donohoe in the group of people who were being let go, that she knew immediately that the younger workers would be rehired.  Ms. Fears testified that Bonneville's using the RIF to terminate employees that it would be risky to eliminate, including those in protected statuses, was obvious. After eliminating workers through the RIF, Bonneville then rehired a much younger staff, particularly in sales.

Ms. Lish, a current Bonneville employee, testimony confirms that Bonneville, through management level employees such as Mr. Mills, treat older workers differently than younger workers, and that Bonneville was attempting to eliminate older workers such as Mr. Donohoe through the implementation of the RIF.

Mr. Spacciapolli testified that he was clearly informed several months in advance that there would be a RIF, and that Bonneville would be hiring someone to fill the National Sales Director/Sports Sales position.  Mr. Donohoe was never provided the same information as his younger counterpart.

permitted to take at least the minimum of ten (10) depositions permitted under the Federal Rules of Civil Procedure; (c) this Court informed the parties at the initial scheduling conference that if more than seven depositions were needed, either party could seek leave to take additional depositions; (d) initial disclosures identified thirty-nine (39) non-expert witnesses; and (e) Mr. Donohoe demonstrated good cause for leave to take the additional depositions based upon documents, testimony and admissions provided by Defendant throughout discovery.

On July 31, 2008, Mr. Donohoe was unduly prejudiced by another of Magistrate Judge Robinson's orders regarding discovery in this case. This time, Magistrate Judge Robinson issued an Order summarily denying Plaintiff's Motion to Compel [Dkt#19] and Granting Defendant Bonneville International Corporation's ("Bonneville") Motion for a Protective Order [Dkt#21]. In Mr. Donohoe's motion to compel, Mr. Donohoe sought, among other things, (a) Bonneville's file containing harassment claims made against Mr. Donohoe's direct supervisor Matt Mills; (b) all documents requested in Donohoe's Supplemental Requests for Production of Documents and 30(b)(6) Notice of Deposition; and (c) all documents and information (including a 30(b)(6) deposition) relating to Bonneville's similar RIF in San Francisco, California, including documents properly requested of Bonneville's corporate representative pursuant to Donohoe's Notice of 30(b)(6) Deposition.

All of the information requested by Mr. Donohoe is relevant and reasonably calculated to the discovery of admissible evidence. The Court's refusal to allow him reasonable access to this information unfairly and prejudicially prevents him from properly prosecuting his claims. Moreover, the Court's granting Bonneville's Protective Order bestows upon Bonneville unfettered control over discovery and, therefore, the evidence in this case. This allows

Bonneville, and not the Rules of this Court, to determine the boundaries of permissible discovery. For these reasons, Mr. Donohoe objects to Magistrate Judge Robinson's July 31, 2008 Order summarily denying Plaintiff's Motion to Compel [Dkt#19] and Granting Defendant Bonneville International Corporation's ("Bonneville") Motion for a Protective Order [Dkt#21].

## FACTUAL BACKGROUND

Plaintiff filed this action seeking to recover damages he sustained as the direct result of the Defendant's wrongful termination of, and refusal to rehire, Donohoe on the basis of his age. On January 4, 2006, Bonneville terminated Donohoe's employment after nearly twenty years (20). At the time of his termination, Mr. Donohoe's direct supervisor (and one of the individuals responsible or Mr. Donohoe's termination) was Mr. Matt Mills. According to Mr. Mark O'Brien, a former Bonneville Vice President and General Manager (WWZZ) and one of Mills' former supervisors, "you can't teach an old dog new tricks," was part of Mr. Matt Mills' vernacular. *See* Deposition Transcript of Mark O'Brien, Exhibit 13 p. 43:13-46:4; 47:8-12; 49:21-51:3; 91:12-92:6). Mr. O'Brien also testified that Mr. Mills told Mr. Donohoe that Donohoe was old and would never change. *Id*. at p. 47:13-48:17.

At the time of his termination, Mr. Donohoe worked primarily for WTOP in the role of National Sales Director. As part of his job, he also undertook sales of WGMS and WFED. National Sales for WTOP, however, constituted ninety percent (90%) of Mr. Donohoe's job. *Id*. at p. 55:16-56:20.

In an obvious effort to eliminate Mr. Donohoe as National Sales Director and replace him with a much younger and less qualified worker, Michael Spacciapolli, Bonneville contrived a "reduction in force" of the WGMS station. Mr. Donohoe was the <u>only</u> WTOP employee permanently terminated as a result of the alleged RIF. In fact, by Bonneville's own statements,

all individuals who worked primarily for WTOP were specifically exempted from the RIF – that is except Mr. Donohoe.

As a result of the alleged RIF in January 4, 2006, ten (10) WGMS sales employees were terminated.   Of the ten (10) WGMS employees RIF'd, five (5) were over-40 and five (5) were under-40.   Only twelve (12) days after the alleged RIF, Bonneville rehired five (5) sales employees to work for WGMS.   All but one of the individuals rehired were under-40; the only under-40 employee not rehired, Ms. Tiffani Gates, was not rehired only because she did not reapply.   Therefore, all of the under-40 employees who reapplied for employment following the January 4, 2008, RIF were rehired.

The over-40 employees, on the other hand, did not fare as well as the under-40 employees following the January 2006 RIF.   Although all of the under-40 employees who reapplied for employment were rehired, only one such employee over-40 was rehired.   As for that only over-40 employee rehired, Ms. Patricia Cochran, she was not even rehired into the position from which she was RIF'd.   Instead, she was demoted from the Sales Manager position to the non-management level position of account executive.   All other over-40 employees applied, but were denied rehire.

With regard to Mr. Donohoe's position, which Bonneville claims was a different position (although the position still required national sales of WTOP, WGMS, WFED), Bonneville replaced Mr. Donohoe with a much younger individual, Michael Spacciapolli, who had never sold any of these stations on a national level.   In fact, Mr. Spacciapolli had never even sold news radio, which according to Mr. O'Brien is a much different sell than music.   *See* Exhibit 13 at p. 13:8-14:12.   Mr. Spacciapolli was removed from that position less than six (6) months later.

Clearly, the evidence thus far unequivocally demonstrates that Mr. Donohoe's termination, and Bonneville's refusal to rehire him, were improperly motivated by age discrimination. Mr. Donohoe strongly believes, however, that the limited information provided by Bonneville represents only the surface of the evidence of discriminatory animus and pretext, and that Bonneville is stonewalling the discovery process to avoid providing Mr. Donohoe with even more incriminating evidence.

### PROCEDURAL BACKGROUND

On or about April 25, 2008, Mr. Donohoe filed a Motion to Compel Discovery [Dkt#19] seeking an order compelling Bonneville to produce properly requested documents, testimony and information that Bonneville had refused to provide, and of which it has exclusive possession. Absent an order compelling discovery, Donohoe has no other means by which to retrieve this necessary information and will be prejudiced in his ability to prove his case to a jury. Specifically, Mr. Donohoe sought an order compelling Bonneville to provide, among other things: (a) Bonneville's file containing harassment claims made against Mr. Donohoe's direct supervisor Matt Mills; (b) all documents requested in Donohoe's Supplemental Requests for Production of Documents and pursuant to its 30(b)(6) Notice of Deposition; and (c) all documents and information (including a 30(b)(6) deposition) relating to Bonneville's similar RIF in San Francisco, California, including documents properly requested of Bonneville's corporate representative pursuant to Donohoe's Notice of 30(b)(6) Deposition.[2]

---

[2] Mr. Donohoe raises objections to Magistrate Judge Robinson's rulings on all issues argued in Donohoe's Motion except for Bonneville's financial materials (Donohoe's Suppl. Req. No. 5) and Bonneville's program logs (Donohoe's Suppl. Req. No. 7).

On July 31, 2008, Magistrate Judge Robinson issued an order reflecting her ruling of July 29, 2008, summarily denying Mr. Donohoe's Motion to Compel and granting Bonneville's Motion for a Protective Order.

### RULE 72.2 OBJECTIONS TO MAGISTRATE JUDGE ROBINSON'S JULY 31, 2008, ORDER DENYING MR. DONOHOE'S MOTION TO COMPEL AND GRANTING BONNEVILLE'S MOTION FOR PROTECTIVE ORDER

This Court's July 31, 2008, Order hampers and circumscribes Mr. Donohoe's ability to engage in proper discovery to obtain the fullest possible knowledge of the issues and facts before trial. It denies Mr. Donohoe the opportunity to obtain documents, information and testimony reasonably calculated to lead to the discovery of admissible evidence. Mr. Donohoe will be irreparably harmed and prejudiced by this Court's ruling, which has detracted and restricted the very purpose of this Court's discovery rules.

### A.    Donohoe's Supplemental Request for Documents and Request for Documents pursuant to 30(b)(6) Notice of Deposition

As explained in Mr. Donohoe's motion to compel, Bonneville refuses to provide responses to any more than thirty (30) requests for production of documents including all of Mr. Donohoe's March 21, 2008, supplemental document requests, all documents requested pursuant to Donohoe's Rule 30(b)(6) notice of deposition and others. In refusing to provide any responsive documents, Bonneville argues that the parties "stipulated" in their Rule 16.3 Statement that thirty (30) requests per side would be sufficient. Without explanation, the Court accepted Bonneville's argument, even though (as Mr. Donohoe effectively explained in oral argument) Bonneville misrepresented the record.

First, the parties did not make any such "stipulation." Instead, in their Rule 16.3 Statement, the parties indicated that, at the time they prepared the statement they "anticipated"

that thirty (30) requests per side would suffice.  An "anticipation" is simply not equivalent to a "stipulation."

More importantly, on October 26, 2007, this Court issued a Scheduling Order in this matter.  *See* Exhibit 2.  While the Court limited each side to seven (7) depositions and thirty (30) interrogatories, **it did not set a limit on the number of Requests for Production of Documents**.    Neither this Court's order nor the Rules of this Court restrict Mr. Donohoe's ability to obtain the documentary evidence relevant to this case.  Bonneville should not be allowed to unilaterally impose such restriction; instead, Bonneville should be compelled to provide all responsive documents.  The Court's July 31, 2008 Order should be reversed.[3]

B.    **Documents and information relating to Bonneville's similar "Reduction in Force" conducted in San Francisco, California.**

As explained to Judge Robinson in Mr. Donohoe's Motion to Compel and in oral argument on July 29, 2008, in close temporal proximity to the alleged reduction in force that caused many older workers to suffer lost employment by Bonneville in the District of Columbia, Bonneville implemented a similar RIF in San Francisco.  Mr. Donohoe has reason to believe that the result of the San Francisco RIF was the same as the alleged RIF in DC – intentional termination of the older workers.    In fact, Mr. Donohoe has a statement from a former Bonneville employee whose employment was terminated during the San Francisco RIF who asserts that her termination was the result of age-based discrimination.

As also explained to Judge Robinson, the information surrounding the ages of individuals whose employment was terminated in San Francisco is directly relevant to Mr. Donohoe's claims arising out of the District of Columbia.  In support of his claim for punitive damages, as well as liability, Mr. Donohoe has the right to prove that the wrongful acts by the DC management was

---

[3] Alternatively, Donohoe sought leave from the court to request the supplemental documents and documents pursuant to the 30(b)(6) Notice of Deposition to avoid undue prejudice and irreparable harm to him resulting from the arbitrary constraints placed on his ability to seek evidence and the truth as to why Bonneville terminated his employment in 2006.  The court failed to address this request in its summary denial of Mr. Donohoe's motion.  Mr. Donohoe objects to this denial, as well.

authorized and ratified by the corporation, not merely perpetrated by certain employees. *Lake Shore & Michigan Southern Railway v. Prentice,* 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1883); *Franklin Investment Co., Inc. v. Smith, D.C.App.*, 383 A.2d 355, 359 (1978); *Wardman-Justice Motors, Inc. v. Petrie*, 59 App.D.C. 262, 265, 39 F.2d 512, 515 (1930). One way to prove that the corporation was involved is to show that an executive officer of high rank participated in the misconduct or that Bonneville maintained a pattern and practice of terminating older workers and maintaining only the younger employees. *Wardman-Justice Motors, Inc. v. Petrie*, supra.   .

In open court on July 29, 2008, the Court announced its ruling that Mr. Donohoe's motion to compel documents, information and testimony regarding Bonneville's San Francisco RIF was denied.  *See* Hearing Transcript at p. 45, 50.  Upon further argument, the Court then conceded that further briefing would be necessary to determine whether Bonneville's corporate level employees were involved in the D.C. and San Francisco RIFs.[4] The court instructed the parties to provide evidence of Bonneville's corporate headquarters involvement in a joint supplemental brief by August 8, 2008.[5]

The parties filed a joint supplemental brief on August 8, 2008, that demonstrated without question that corporate headquarters was involved in both RIFs.  Based upon the recent United States Supreme Court ruling in *Sprint/United Management Co. v. Mendelsohn*, 522 U.S. ____ (2008).  the trial court must now engage in a proper analysis of the probative value of the

---

[4] If the supplemental briefs demonstrate that corporate level employees were directly involved, the Court invited Mr. Donohoe to "seek reconsideration" of the Court's ruling.  *Id.* at p. 50.  Notwithstanding, the Court's written order does not reflect this invitation to seek reconsideration.  As such, Mr. Donohoe has no option but to file this objection.

[5] As explained by counsel for Donohoe during oral argument on 7/29/08, the Court's directive to Mr. Donohoe to produce testimony or evidence that Corporate Headquarters was involved in the San Francisco RIF placed Mr. Donohoe in a tenuous position.  The Court's directive requires Mr. Donohoe to prove Corporate Headquarters involvement without allowing Mr. Donohoe access to the information or testimony he would need to offer that proof.  Notwithstanding, and in spite of Bonneville's refusal to answer any direct questions about the San Francisco RIF, Mr. Donohoe demonstrated in a supplemental brief filed on August 8, 2008, that not only was Corporate Headquarters involved in each RIF, they were directly involved in the decision to terminate Mr. Donohoe's employment.

evidence of the San Francisco RIF pursuant to Federal Rule of Civil Procedures 401 and 403 to determine if the facts surrounding that RIF provides sufficient probative and material evidence to be admissible as to Bonneville's discriminatory animus against Mr. Donohoe. This analysis, the Supreme Court explained, is fact-intensive and context-specific.

This court simply cannot conduct a proper analysis under Federal Rules of Civil Procedures 401 and 403 if it does not have any evidence (obtained through discovery) to analyze. Instead, to conduct the proper analysis the highest Court of this land requires the trial court must allow the parties to gather necessary facts and information. The only way the parties can accomplish this task is through proper discovery.

In this case, through his motion to compel, Leo Donohoe is simply asking permission to conduct reasonable and appropriate discovery to gather necessary facts and information for this court to determine if evidence of discrimination arising out of Bonneville's San Francisco Reduction in Force (RIF) is admissible in this case. Mr. Donohoe seeks responses to its request for production of documents surrounding the San Francisco RIF; documents requested pursuant to its 30(b)(6) Notice of Deposition pertaining to the San Francisco RIF; and, a 30(b)(6) deposition to discuss the San Francisco RIF.

Denial of Mr. Donohoe's motion to compel discovery as to the San Francisco RIF would amount to nothing less than a ruling by this court that evidence of other employees' age-based discrimination by supervisors other than the ones involved in this case is *per se* inadmissible – the exact result the Supreme Court has prohibited and found to be reversible error.

**C.     Bonneville's file containing harassment claims made against Matt Mills or a verification of a diligent search for the same.**

In the Motion to Compel, and at the July 29, 2008 hearing, Mr. Donohoe asked the court to order Bonneville to produce a file containing harassment claims made against Matt Mills, a

Bonneville manager.[6] (Suppl. Reqs. Nos. 10, 16)  Mr. Donohoe based his request on the fact that Mr. Mark O'Brien, Bonneville's former General Manager, testified that Bonneville maintains a file containing harassment complaints filed by employees against Mills.[7] Notwithstanding the admission of its former General Manager that the file does, in fact, exist, Bonneville conveniently alleges it does not.[8]  In light of Bonneville's insistence that the file does not exist, Mr. Donohoe requested that in the absence of providing the requested file, Bonneville provide a verification of the search conducted to ensure the file no longer exists.  Magistrate Judge Robinson denied, without explanation, each of Mr. Donohoe's requests.

Mr. Donohoe is entitled to ensure that reasonable, good faith efforts were made to locate the file that its former General Manager swore, under oath, exists.  Otherwise, Bonneville (and other litigants in the future) will be able to improperly evade discovery by denying the existence of the evidence requested.  Surely this is the intent of neither this court nor the Rules of Civil Procedure.  Accordingly, Bonneville should be compelled to provide Mr. Donohoe will the file or a verification of all efforts made to locate it.

## CONCLUSION

Magistrate Judge Robinson's July 31, 2008, Order denying Mr. Donohoe's Motion to Compel constitutes an abuse of discretion, is clearly erroneous, and is severely prejudicial to the Mr. Donohoe.  It prohibits Mr. Donohoe from obtaining evidence that is critical to establishing the essential elements of his claim, as well as discriminatory animus and pretext.  Accordingly,

---

[6] *See* Transcript of July 29, 2008 hearing at p.15, attached hereto as Appendix.
[7] *See* Depo. Transcript of O'Brien, Exhibit 1, at p. 31:13-32:20; 39:6-7; 83:8-86:3; 92:7-18.
[8] Notably, in the same correspondence, counsel for Bonneville also asserted that Mr. Mills had no written notes from interviews he conducted for Mr. Donohoe's National Director of Sales position following the January 2006 RIF.  During his deposition, Mr. Mills perpetuated this misrepresentation.  On April 24, 2008, however, Bonneville supplemented its discovery responses to provide the written interview notes that both counsel and Mr. Mills insisted did not exist. *See* Donohoe's Motion at Exhibit 8.

the Magistrate's ruling should be overturned, and the Mr. Donohoe's motion to compel should be granted.

WHEREFORE, Plaintiff Leo Donohoe respectfully requests the Court to reverse the Order of the Magistrate Judge, and compel the discovery requested in Donohoe's Motion to Compel.

Respectfully submitted,

CARR MALONEY, P.C.

By:_____
    Thomas L. McCally, Esquire
    DC Bar No.:  391937
    1615 L Street, NW, Suite 500
    Washington, DC  20036
    (202) 310-5500/(202) 310-5555 (FAX)
    tlm@carrmaloney.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th  day of August, 2008, a copy of the foregoing was sent via the Court's electronic filing system to Richard Cys, Esq., Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC  20006, Attorney for Defendant.

_____
Thomas L. McCally

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                               :
In the Matter of:              :
                               :
LEO DONOHOE,                   :
                               :
        Plaintiff,             :
                               :
            vs.                :    Civil Action No. 07-0494
                               :
BONNEVILLE INTERNATIONAL       :
CORPORATION,                   :
                               :
        Defendant.             :
                               :    Washington, D.C.
- - - - - - - - - - - - - - - x    July 29, 2008


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:        THOMAS L. McCALLY, ESQ.
                          ALI BEYDOUM, ESQ.

For the Defendant:        RICHARD L. CYS, ESQ.
                          CONSTANCE MORROW PENDLETON, ESQ.


Proceedings recorded by the Court, transcript produced by
Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,
Washington, D.C.  20005, 202-347-5395, www.pro-typists.com
M2562V/bf

1 **P R O C E E D I N G S**

2     THE CLERK:  Call Case Number 07-494.  This is in

3 the matter of Leo Donohoe versus Bonneville International

4 Corporation.  Present in the courtroom for the Plaintiff is

5 Thomas L. McCally and Ali Beydoun.  For the Defendant is

6 Richard L. Cys and Constance Morrow Pendleton.  This is set

7 for a motions hearing.

8     THE MAGISTRATE JUDGE:  Now, good morning to all of

9 you.  I think it's appropriate that I begin by thanking you

10 for your further efforts to meet and confer.  I believe you

11 have narrowed at least some of the issues as set forth in

12 your joint status report.

13     I have reviewed the status report in the context

14 of the Plaintiff's motion to compel, the motion which bears

15 Document Number 19, and the Defendant's motion for a

16 protective order, coupled with the opposition to the

17 Plaintiff's motion.

18     I have, of course, reviewed the prior rulings in

19 the case, the arguments you have articulated at earlier

20 points which were the subject of the Court's earlier

21 rulings, and I'm now prepared to hear first from you,

22 Mr. McCally or Mr. Beydoun, with respect to the issues that

23 remain involving the Plaintiff's motion, and then I will

24 hear from you, Mr. Cys or Ms. Pendleton, in opposition and

25 in support of your own motion.  I will allow you, Mr. Cys --

1   excuse me -- Mr. McCally or Mr. Beydoun, a brief reply.

2           My expectation is that I will rule from the bench.

3   As I said, I am familiar with your arguments.  I was

4   familiar with them in early July, when I had hoped that we

5   would be able to proceed but we could not because of the

6   press of other matters on the Court's calendar.  And as I

7   said, I have read the joint status report that you filed

8   just a few days ago.

9           Now, Mr. McCally or Mr. Beydoun?

10          MR. McCALLY:  It will be Mr. Beydoun, Your Honor.

11          THE MAGISTRATE JUDGE:  Very well.  Mr. Beydoun,

12  good morning.

13          MR. BEYDOUN:  Good morning, Your Honor.  Shall I

14  approach the podium, or --?

15          THE MAGISTRATE JUDGE:  Yes.

16          MR. BEYDOUN:  Good morning, Your Honor.

17          THE MAGISTRATE JUDGE:  Good morning.

18          MR. BEYDOUN:  Ali Beydoun on behalf of

19  Mr. Donohoe.

20          Your Honor, just to give some context within which

21  we ask for these documents, I think it's important that I

22  give the Court a small little introduction here.  And I've

23  been trying to think about what would be a good analogy that

24  could help simplify and crystallize what it is that we're

25  after here.  And with all due respect, the analogy is that

1  of a jigsaw puzzle.  What we're trying to do here is re-

2  create a picture of events that took place a couple of years

3  ago.  And we're trying to get an understanding -- a full

4  understanding -- of that picture, so that we may present it

5  to the Court.

6         We believe that some illegal acts took place

7  involving the termination of Mr. Donohoe.  And what we're

8  trying to do now is to re-create that picture here in Court,

9  under the rules of this Court, to be able to properly

10  present it to a jury at a trial, as well as to Her Honor.

11  The problem is, the pieces are held by the other side.  And

12  we're trying to get those pieces so that we may re-create

13  that picture for this Court.  And the reason we're here now

14  is because the other side is refusing to give us those

15  pieces.

16         As you know, by way of background we're here

17  because Mr. Donohoe was terminated in 2006, and what makes

18  it particularly suspicious to us is that he was the only

19  WTOP employee that was permanently terminated as a result of

20  what was called a "reorganization in force" -- or, I'm

21  sorry, a "reduction in force," which took place in 2006.  Of

22  the 10 employees that were fired, five of them were over the

23  age of 40.  Mr. Donohoe was the only over-age-40 employee

24  that was not rehired.  In fact, that's because Mr. Donohoe

25  who was, I think, 52 years old at the time, was replaced by

1    a 20-year-old.  We're trying to figure out why that

2    happened.

3           In the context of the Plaintiff's claims, our

4    claims, is it important to know that the Defendants are not

5    going to be expected to admit that they acted with any sort

6    of discriminatory intent.  In fact, they're going to try to

7    put forth some business reasons, some nondiscriminatory,

8    legitimate business reasons to tell us why they replaced a

9    53-year-old employee with an employee that was in his 20s.

10          And what's making this more difficult is that

11   they've asserted a series of objections to the documents

12   that we're asking for.  Because what they're trying to do,

13   what this massive, nationwide corporation with hundreds of

14   employees is trying to do is say, "No.  You're limited to 30

15   requests for documents, you're limited to documents that

16   only have to do with one person in one city in one office."

17   When, in fact --

18          THE MAGISTRATE JUDGE:  Well, now, you do

19   acknowledge that when you say they have said you are limited

20   to this, that that is largely a function of the ruling of

21   the Court in setting limits on discovery?

22          MR. BEYDOUN:  Absolutely, Your Honor.  And we

23   acknowledge that and we understand that.  But again, it has

24   to do with this larger picture of a discriminatory practice

25   that we believe was going on not only in the Bonneville

1    offices in Washington, D.C., but coming out of headquarters

2    in Utah.  For example, there was more than one RIF that went

3    on around the 2006 timeframe.  There also a similar RIF

4    going on in San Francisco.  And, upon information and

5    belief, based on investigations that we're carrying out,

6    there were similar acts of age discrimination going on in

7    San Francisco.  And this has to do with the requests for

8    documents regarding the RIF that was happening in

9    San Francisco.

10         THE MAGISTRATE JUDGE:  To what extent do you

11   contend that the same official was involved in these so-

12   called "other acts" in Utah?

13         MR. BEYDOUN:  Right.  Based on testimony that

14   we've received from some of the Bonneville management

15   employees in depositions we've taken, we understand that

16   headquarters is in Utah and decisions do come out of the

17   Utah office.  And that when it came to implementing the RIF,

18   that some of the decisions did come out of that office.  So

19   we have this "headquarters doctrine," if you will, regarding

20   a corporate-wide implementation of reduction in force.  One

21   took place in Washington; one took place in San Francisco.

22   So we feel that there is some sort of a connection, a common

23   river that runs through all these offices.

24         We're talking about a corporation.  We're not

25   talking about one office.  We're talking about policies and

1   procedures that were implemented across the board.  And if

2   it would make it a little bit easier, based on some of the

3   information we already do have we can limit it just to

4   San Francisco and Washington, D.C.  If that would help make

5   any sense.  And based on the conversations we've had, we

6   know about three employees in their 50s and 60s that also

7   faced the same fate that Mr. Donohoe faced.

8        THE MAGISTRATE JUDGE:  In what office?

9        MR. BEYDOUN:  In the San Francisco office, Your

10  Honor.  In the San Francisco radio offices.

11       THE MAGISTRATE JUDGE:  And at what time?

12       MR. BEYDOUN:  2006, I believe?  Yes, Your Honor,

13  there was a reorganization going on in 2006, I apologize.

14  In 2006.

15       THE MAGISTRATE JUDGE:  You may continue.

16       MR. BEYDOUN:  Thank you, Your Honor.  Again, I

17  think it's important that we also talk about some of the

18  objections that have been thrown out.

19        The first objection, and probably the one that's

20  easiest to dismiss, is the concept that Mr. Donohoe is

21  limited to 30 requests for production of documents.

22  Opposing counsel bases her argument on the limit of 30 as

23  saying that in reports submitted to this Court before, that

24  the parties stipulated that there would be no more requests

25  than 30.  And I'm sure Your Honor has seen this argument in

1   the motion.

2          We're saying that there was no stipulation of any

3   sort.  The word "anticipate."  The parties anticipate that

4   we will only need 30 document requests, is something that

5   was very soon discovered to be inadequate and that we would

6   have to continue asking for further documents.  Not only

7   because, again, we're talking about one person trying to

8   challenge a corporation and receive documents from a

9   corporation, but also the supplemental requests were based

10  on many of the objections that were asserted in the first

11  request for production of documents.

12          Based on the fact that the first request for

13  production of documents asserted all sorts of objections

14  saying, "too broad," "you need to be more narrow in your

15  scope," "you're asking for things that you're not entitled

16  to," we came back with a supplemental request asking for

17  different documents.

18          Furthermore, some of those documents were based on

19  the depositions that had already taken place.  We feel that

20  their argument saying that we're limited to 30 really is

21  part and parcel of their plan to limit discovery, to really

22  confine us to a very limited and narrow set of documents

23  that, at their choosing, are given to us and provided to us.

24          There's also other sorts of arguments, what I call

25  "transitional arguments," regarding their objections.  For

 1   example, as we've seen and as has already been argued in the

 2   motion, they've asserted objections saying that no such

 3   documents exist.  For example, for the Matt Mills file.

 4   Only later to find out that documents do exist and then they

 5   give us those documents.

 6          In particular, in the one that's been argued in

 7   the motion, we had to go through a deposition of Mr. Mills,

 8   only to later find out that there were documents that were

 9   necessary that should have been given to us before the

10   deposition.  In fact, we had to have a second Court-ordered

11   deposition of Mr. Mills to be able to go over those

12   documents.  We keep running into this problem again and

13   again.  And we'll get back to what we would offer as a

14   resolution for that.

15          But again, so we have all these different

16   objections, what I call transitional objections, and then

17   likewise with the financial documents, they make a

18   transitional objection, saying that "such requests are

19   premature."

20          THE MAGISTRATE JUDGE:  Is that not the state of

21   the law in this district?

22          MR. BEYDOUN:  Not specifically in the District of

23   Columbia, Your Honor.  I wouldn't say that -- the rules

24   don't allow for it and it's not something that the District

25   Court has affirmatively ruled on.  There are some cases

1    cited to in their opposition, but it really is for circuits

2    around the country, Your Honor.

3           THE MAGISTRATE JUDGE:  Hasn't the Court addressed

4    this issue as recently as January, in D'Onofrio versus FSX

5    Sports?

6           MR. BEYDOUN:  Is that a case that was cited in --

7           THE MAGISTRATE JUDGE:  It's 247 Federal Rules

8    Decision 43.

9           MR. BEYDOUN:  Your Honor, I would ask for leave to

10   be able to review that case, and I would stick to the

11   argument that we made in our motion.  But really -- if I

12   may, Your Honor?

13          THE MAGISTRATE JUDGE:  Very well, you may

14   continue.

15          MR. BEYDOUN:  Thank you.  This has to do with us

16   needing these documents now so that we may review them,

17   because the alternative argument, the one that they're

18   putting forth, is, "Let's wait till we go to Court, let's

19   wait until, you know, the jury hears certain things and we

20   establish a prima facie case, and then we'll give you those

21   documents."

22          I think that this is not only an inefficient and

23   ineffective way of handling discovery, but I also think that

24   it dismisses the fact that we have proven our prima facie

25   case already.  And these documents could be given to us with

1    all sorts of protections.  For example, we're operating

2    right now under an operative protective order.  Nobody's

3    violated that.  We respect that and honor that protective

4    order.  There's no reason why we can't look at these

5    documents now and, then, at trial, make the decision whether

6    or not we can use these documents.

7         Again, I think a lot of the objections that are

8    being made here in this motion for discovery and in the

9    opposition to the motion for compelling discovery are

10   objections that might have a little bit more weight if we

11   were in trial, but being in the discovery process we need

12   these documents.  And again, it goes toward their whole

13   concept of limiting discovery, really giving us only a very

14   short amount of discovery and expecting us to be able to

15   prove our case when, in fact, it's hamstringing us.

16        And I won't get into the depositions, but that's

17   also another way to show that the Plaintiffs really are

18   trying to limit what is an obligation of theirs to give us.

19        THE MAGISTRATE JUDGE:  Well, again, I will ask

20   whether you acknowledge that the limit is the limit fixed by

21   the Court in --

22        MR. BEYDOUN:  Of the depositions?

23        THE MAGISTRATE JUDGE:  -- the scheduling order,

24   yes.

25        MR. BEYDOUN:  I'm sorry.  Well, yes, Your Honor.

1     And Mr. McCally would probably be able to give the Court

2     some sort of an indication as to discussions that were had

3     in Court.

4              MR. McCALLY:  Excuse me, Your Honor.

5              THE MAGISTRATE JUDGE:  You may confer.

6              MR. BEYDOUN:  Okay.  Thank you

7              [Lawyers confer]

8              MR. BEYDOUN:  With regard to the request for

9     production of documents, Your Honor, I think it was left --

10    the scheduling order never ruled on a limit.  They never

11    said we were only allowed 30 requests for production of

12    documents.  The only limits that they set were for

13    interrogatories and for depositions.

14             THE MAGISTRATE JUDGE:  You may continue.

15             MR. BEYDOUN:  Thank you, Your Honor.

16             So, for the following reasons, Bonneville is going

17    to ask for certain documents to be -- for the Court to order

18    Plaintiff to give us certain documents, and I will be using

19    the joint status report as a roadmap to guide us through our

20    requests.

21             THE MAGISTRATE JUDGE:  Very well.

22             MR. BEYDOUN:  Okay.  We'll start with the

23    supplemental request for documents, and if I may break it up

24    into the categories that were broken up in the motion to

25    compel.  We're asking for documents regarding the 2006

1   reduction in force, or the RIF, of which Mr. Bonneville was

2   a part of in terms of being terminated from his employment.

3   We would ask that we receive documents reflecting the

4   reasons for conducting the RIF, why Mr. Donohoe is the only

5   employee, over-40-year-old employee that was not rehired,

6   and we're asking for documents regarding conversations

7   involving him.

8          Again, we're not just asking for these documents

9   from the Washington D.C. office, which they have produced

10  some documents regarding that, but we're also asking for --

11         THE MAGISTRATE JUDGE:  That was my next question.

12  What is your response to the Defendant's contention that the

13  documents have been produced?

14         MR. BEYDOUN:  We say that they've been produced as

15  limited with the objections that they've given us.  They've

16  given us some documents, that is true, but the two areas

17  that they haven't given us is, one area is with regard to

18  outside of Washington, the other one is with regard to

19  reasons why Mr. Donohoe was involved in that, and

20  conversations that were held between internal management and

21  nationwide management levels as to what documents there are

22  regarding the 2006 RIF.

23         THE MAGISTRATE JUDGE:  You may continue.

24         MR. BEYDOUN:  Okay.  We're asking for employees

25  that were terminated, employees that were rehired or

1   replaced, since January of 2003.  Regarding the RIF, Your

2   Honor.

3          Second category of documents has to do with the

4   financial documents.  Previously, it was sales and financial

5   documents.  We feel that they've satisfied their obligations

6   regarding providing us with sales documents, but now we're

7   left with the financial documents, Your Honor.

8          And again, as I've just indicated to the Court, we

9   need these documents now so that we may be able to review

10  them and not get caught up by surprise at trial or just be

11  behind where we should be in terms of understanding what

12  information these documents possess.  It would be

13  inefficient and ineffective to receive these documents after

14  trial when now would be a good time for us to have them,

15  understand them, and potentially hope to use them at trial.

16  We do anticipate that we will be able to prove our prima

17  facie case very easily.  Okay.

18         Beyond that, Your Honor, and this is an important

19  one, we need all files that exist regarding complaints of

20  harassment against one of their employees, Mr. Matt Mills.

21  This is an important one, Your Honor, and I'd just like to

22  explain a little bit as to what the status of the

23  negotiations are for these documents.

24         The objection they give us is that no such

25  documents exist.  And I think they're puzzled why we can't

1   accept their answer.  As I mentioned before and as written

2   in our motion, they've said that before regarding other

3   documents and then, only later, almost at too late of a

4   point, we find out that such documents are in existence.

5          We're in this situation again, and what we're

6   asking for this time is a verification, a verification from

7   a person, a human being, that could explain to us where the

8   search was conducted, who was consulted as part of this

9   search, what was found, if anything at all, and then an

10  affirmation that the person actually did these things.  But

11  for some reason, Defendant counsel is refusing to give us

12  this and we can't understand why.

13         We're justified in asking for this, given our

14  history in terms of documents appearing all of a sudden.

15  And it's not that we're guessing whether -- or speculating

16  whether these documents actually exist.  A former general

17  manager of Bonneville, under sworn testimony, told us that

18  such a file is in existence.

19         And I think the best the Defendants can do to

20  challenge that is to say he has a bad memory or he's not

21  telling the truth when, in fact, under the rules, Your

22  Honor, under case law, it's actually an admission of the

23  Defendants that such a document exists.  And all we're

24  asking for is, give us another piece of sworn testimony to

25  indicate whether or not somebody actually searched for these

1    files, where they searched for these files, and then to sign

2    off in telling us that no files exist, if they actually do

3    not exist.

4        But for them just to object and to put on a

5    supplemental response to our request for production of

6    documents that no such document exists, Your Honor, is

7    insufficient and inadequate.  This is a very important

8    document.  We had Mr. O'Brien, as I said, testifying that

9    such a document exists and that -- and here's another

10   important part -- that it wouldn't be kept in the normal

11   place of Mr. Mills's personnel file, but that he had seen

12   the file and it was actually kept in a separate location.

13       Maybe this is in Utah, maybe it's in one of the

14   other offices outside of the D.C. office, but given the fact

15   that they're limiting it to Washington, D.C., we're hoping

16   they're not getting around producing it using that, and we

17   also don't understand why they won't give us the

18   verification if that's what we're asking for.

19       We're also asking for program logs.  And I think

20   this is an important one, too.  And that's supplemental

21   request number 7.  Based on deposition testimony that we've

22   heard from some of the Bonneville employees, the program

23   logs could help us understand, if we compare the pre-RIF

24   program logs to the post-RIF program logs, exactly the level

25   of achievement that Mr. -- it would be a way for us to

1    compare the levels of achievement between the 53-year-old

2    employee who was terminated and the employee in his 20s who

3    was hired to replace him.

4         Your Honor, in fact we believe by getting these

5    logs we're going to be able to show the Court that there was

6    actually a change in the way that this advertising air time

7    was sold in an effort to maximize the new, less experienced

8    employee's ability to achieve the same results that the 53-

9    year-old employee was achieving before he was terminated.

10        Again, by giving us these pre-RIF and post-RIF

11   program logs, so we're talking a time period of 2003 2007,

12   we'd be able to compare the two achievements by the 53-year-

13   old and the employee who replaced him who was in his 20s.

14   And we think it'll also help us in establishing our prima

15   facie case.

16        Again, Your Honor, if they're going to give us a

17   nondiscriminatory, legitimate business reason that, "Well,

18   the employee in his 20s was much more qualified," they have

19   to be able to demonstrate that.  And comparing pre- and

20   post-program logs will help us do just that.  So that's the

21   program logs.

22        Supplemental request number 11, contracts with the

23   Nationals teams.  They're saying that this is outside the

24   scope but, again, one of the reasons that they've given us

25   for the hiring of the younger employee in his 20s to replace

1    the employee in his 50s that was terminated is because of

2    some very important contacts that were established with the

3    Nationals team.  And we feel that by reviewing these

4    documents maybe we'll get a picture of that and see if it

5    actually is true.

6            And I think this is going to open the door and

7    lead us down a road of admissible discovery, Your Honor,

8    because we've only heard one side of it.  For example, in

9    deposition testimony that was given by Mr. Oxley, it was

10   said that it was very important -- the Nationals contract

11   was very important and that the new employee in his 20s had

12   had strong contacts with them, so he'd be able to sort of

13   increase the revenue, if you will, or increase the standing

14   with the Nationals team.  That's the one side of the story.

15   We'd like to see the other side of the story through

16   documents, and hear the other side of the story through a

17   deposition.

18           We believe that it's also interesting and

19   important to note because our understanding is that the

20   Nationals, the people, the representatives from the

21   Nationals were told about the RIF before it was actually

22   implemented.  And we want to understand, if those

23   conversations occurred, what was discussed in those

24   conversations, because Mr. Donohoe was involved in some of

25   this.  He did a lot of sports advertising.  Was his name

1  mentioned?  Is there something that we could learn about why

2  he was terminated that's within those documents?

3          Again, I believe that for discovery purposes these

4  documents are discoverable and admissible.  They've been

5  referred to in deposition testimony, they've been alluded to

6  as helping support reasons why Mr. Spacciapolli, the younger

7  -- the employee in his 20s who replaced the older employee -

8  - was hired.  It has to do with his qualifications.  So we'd

9  like the opportunity to look at the documents to see if

10 there really is another side to this story.

11         Number 12, 13 and 6 of the supplemental requests

12 also have to do with us wanting some documents regarding the

13 Katz Group.  This is another one where the Defendant has

14 said that this is outside the scope of discovery.  But Your

15 Honor, we think that this is a very important group of

16 documents that we need to review.

17         The Katz Group, to put it simply, is the vendor

18 who goes to a national advertiser like the Bonneville radio

19 stations and gives them a lot of business.  And we know from

20 deposition testimony that Leo's relationship with the Katz

21 Group in getting them to pay the type of rates that Leo was

22 able to bring in as revenue to the team, to the Bonneville

23 team, was really something that needs to be investigated

24 because at times he challenged them regarding the rates and

25 he was supported by his managers, who thought he did a great

1    job.  We've seen emails saying, "Great job, Leo," you know,

2    "stick to your guns."

3            But then at the same time, now we flip it -- they

4    flip it and say well, there was problems there and it had to

5    do with Leo's attitude or whatnot.  We need to see the other

6    side of this story.  We need to understand what were the

7    conversations that Leo's managers were having with the Katz

8    Group, whether there's anything there that would help us

9    understand why Mr. Donohoe was terminated.  So that's the

10   Katz Group.

11           And then we get into the supplemental request

12   number 16 and 17, regarding discrimination.  Number 16, Your

13   Honor, requests all documents regarding any complaints of

14   age discrimination for any of the offices -- again, we'll

15   limit it to San Francisco and Washington, for purposes of

16   this motion to compel.  And then number 17 is for complaint

17   of any discrimination, whether it be age, race, gender,

18   religious, whatever it is, that are happening inside and

19   outside of Washington, D.C.

20           Defendants would like to limit it to one category

21   of discrimination -- age discrimination, happening in one

22   office -- Washington, D.C.  And their response to us is that

23   there are no documents.  But we think that especially given

24   recent Supreme Court precedent discussing the fact that any

25   sign of discrimination or any factor of discrimination is

1    important in understanding whether a single person was

2    discriminated against, I think it's important that we find

3    out if this was happening in San Francisco, if people were

4    complaining in San Francisco with regard to the RIF

5    happening around the same time or even earlier RIFs or

6    earlier job terminations.

7          THE MAGISTRATE JUDGE:  So you do acknowledge,

8    then, that in response to request number 16 the Defendant

9    states that, quote, "There are no responsive documents."

10         MR. BEYDOUN:  For the Washington D.C. office, Your

11   Honor.  And they've provided us a supplemental response

12   which was on July 17th, indicating that, that they limited

13   it to the Washington D.C. office.

14         THE MAGISTRATE JUDGE:  You may continue.

15         MR. BEYDOUN:  Okay.  Thank you, Your Honor.  So

16   that's why we're asking for those documents.  Again, it has

17   to do with that jigsaw puzzle analysis where we're trying to

18   re-create a picture here and we're trying to get these

19   pieces from them because only they hold them.  This is a

20   privately held corporation, I believe, and we're not going

21   to be able to get these documents in any other way.  If they

22   don't give them to us, if they hold them, then the balance

23   of information is tilted in their favor.

24         And Your Honor, it's their actions that are on

25   trial here.  I believe that under the proper framework we've

1    been able to establish our prima facie case of

2    discrimination, now it's their burden to show us that it was

3    non-discriminatory and legitimate, and done for legitimate

4    business purposes.

5         By withholding these documents from us, all we

6    have are their objections as to why these documents are

7    irrelevant, but we don't have any information as to sort of

8    the background conversations that were happening.  And that

9    is because we believe that those conversations and documents

10   will reveal discriminatory practices at work.

11        The last category, Your Honor, has to do with the

12   requests made as part of the 30(b)(6) notice that was given

13   back in May, I believe.  Attached to the deposition notice

14   was a schedule of, I believe it was 18 areas that we would

15   like to ask the 30(b)(6) representative to answer.  Some of

16   those were topics that they would be expected to answer.

17   Some of those were documents that they would be expected to

18   produce.

19        Defendant has objected primarily, based on the

20   fact that they believe that the Court has limited us to 30

21   requests without having a scheduling order or any case law

22   or citing any part of the rule that would support their

23   argument of that, and they also say that many of those

24   requests were repetitive, when they were not.

25        But even if they were -- and this is important,

1  Your Honor -- we're not simply asking them to produce these

2  documents.  We're asking them to produce a person who will

3  bring these documents, who will be able to answer questions

4  on these documents.  And I think that's an important part of

5  the analysis when we think about the 30(b)(6).  It's not the

6  same analysis necessarily that you would have regarding the

7  supplemental requests for production of documents.

8         Again, the important part here is that we're

9  asking them to provide somebody -- a living person -- who

10 would be able to answer questions on those topics.

11 Otherwise, they have given us some of these documents but we

12 don't have anybody to ask the documents -- or, to ask

13 questions regarding the documents.

14        When we came to the deposition, the 30(b)(6)

15 deposition, they were instructed not to answer any questions

16 on the Attachment A to the notice of deposition.  And again,

17 we feel that it's because they base their argument on a

18 limitation to _____ request that we feel is

19 unilaterally and self-servingly drawn by them, Your Honor.

20        So, with that, we would ask for another

21 opportunity to have somebody, a 30(b)(6) representative,

22 come to a deposition with those documents so that they'll be

23 able to answer questions regarding those documents and

24 provide us with some of the information that the rules allow

25 us to get from a 30(b)(6) corporate designee.

```
 1              THE MAGISTRATE JUDGE:  Very well.  Thank you,
 2  Mr. Beydoun.
 3              Mr. Cys or Ms. Pendleton?
 4              MR. CYS:  Ms. Pendleton will present the argument.
 5              THE MAGISTRATE JUDGE:  Very well.  Ms. Pendleton,
 6  good morning.  Good morning.
 7              MS. PENDLETON:  Good morning, Your Honor.
 8              THE MAGISTRATE JUDGE:  You may proceed.
 9              MS. PENDLETON:  Your Honor, I'll try to follow the
10  order that Mr. Beydoun outlined the issues.
11              But just as sort of an overall summary and the
12  most important point in this case is that this is a single
13  plaintiff, single market, reduction in force that was
14  organized and instituted by the Washington D.C. office of
15  Bonneville.  It has nothing to do with Bonneville's
16  operations in San Francisco.  It was a RIF of 51 employees,
17  one of which included the Plaintiff.
18              THE MAGISTRATE JUDGE:  Now, what is your response
19  to Mr. Beydoun's contention that there were two employees in
20  the San Francisco office who were -- I'll use the pejorative
21  term, "RIF'd" -- at approximately the same time?
22              MS. PENDLETON:  As I understand, that RIF occurred
23  in 2005, before the RIF in Washington, D.C.  It had nothing
24  to do with the RIF in Washington.  They're two separate
25  markets.  The only involvement of anyone outside of
```

1    Washington, D.C., at Bonneville were the people at

2    headquarters who decided which radio stations would be moved

3    to what frequencies in the Washington, D.C., market.

4         After that decision was made, after the decision

5    was made to eliminate Z104, the rock music station, and to

6    keep WGMS for one more year, the classical station, then the

7    decision was left to the Washington D.C. management to

8    decide exactly which people would be RIF'd, which people

9    would then be interviewed and rehired for the stations that

10   remained and the new station, Washington Post Radio, that

11   was added into the D.C. market.  There's no connection.

12        THE MAGISTRATE JUDGE:  To what extent was the

13   decision of what I will just call the Washington Office to

14   proceed with a RIF a function of a decision regarding RIFs

15   made at headquarters in Utah?

16        MS. PENDLETON:  It had nothing to do with it.

17   There was a decision that originated in Utah to increase and

18   bolster the sort of news and talk radio format in

19   Washington, D.C., to be more competitive.  So in order to do

20   that, because they have four networks, they needed to move

21   around a few of their radio stations to put Washington Post

22   Radio on a better frequency.  And that necessitated some

23   format changes -- the format changes necessitated moving

24   certain radio stations to different frequency.  That then

25   necessitated --

1          THE MAGISTRATE JUDGE:  So did headquarters direct

2   the RIF?  Or order the RIF?

3          MS. PENDLETON:  I don't believe that they did.  I

4   think it was up to Washington, D.C., to determine that,

5   "Okay, now we're going to have to let go of a whole sales

6   force," and it sort of happens necessarily because when you

7   get rid of an entire station you automatically get rid of

8   their employees.  So to the extent that they said, "We're

9   not going to have Z104 any more," certainly that

10  necessitated -- would, you know, reducing in force the

11  employees who had worked for Z104.

12         THE MAGISTRATE JUDGE:  And was that a decision of

13  headquarters or of Washington?

14         MS. PENDLETON:  I think that was a joint -- joint

15  decision.  But the most important point here, for purposes

16  of this case, was that headquarters had nothing to do with

17  deciding which individual people would be RIF'd.  That was

18  purely Washington.

19         THE MAGISTRATE JUDGE:  Is it correct, then, that

20  headquarters did have some role in deciding that there would

21  be a RIF?

22         MS. PENDLETON:  To the extent that they decided

23  they would eliminate entire radio stations, yes.  But that's

24  it.  When it came to the people -- if you eliminate a radio

25  station and you say, "We're going to keep one, get rid of

1  this one, in order to keep competitive, for economic

2  reasons, from that the thought is that people have to be

3  fired, certain people have to be hired, and D.C. made those

4  decisions.  After headquarters decided that they were going

5  to eliminate the rock format and keep the classical format

6  for one more year.

7           THE MAGISTRATE JUDGE:  Is it an accurate summary,

8  then, to state that headquarters in Utah decided to change

9  the format in Washington and other areas?

10          MS. PENDLETON:  I don't know about other areas,

11 but just in Washington.

12          THE MAGISTRATE JUDGE:  Well, let's just say

13 Washington, then.

14          MS. PENDLETON:  Yes.

15          THE MAGISTRATE JUDGE:  That headquarters did

16 decide to change the format of the stations --

17          MS. PENDLETON:  Yes.

18          THE MAGISTRATE JUDGE:  -- in Washington.

19          MS. PENDLETON:  That was the extent of their

20 decision-making.

21          THE MAGISTRATE JUDGE:  Headquarters did not make a

22 decision regarding what would happen to employees who worked

23 at stations whose formats were changed.

24          MS. PENDLETON:  That's correct.  That was left

25 completely to the Washington, D.C., group.  Certainly, there

1    is no connection beyond that.  There is no connection

2    between the RIFs in San Francisco and Washington.  RIFs

3    occur in the radio industry all the time, unfortunately.

4    It's a very volatile industry.  There's constant change in

5    order to keep competitive, and it's not unusual.  Many

6    people being deposed in this case can testify about having

7    been RIF'd from prior radio stations, and it's unfortunately

8    not uncommon.

9         So the RIF in D.C. was a response purely to local

10   market considerations.

11        THE MAGISTRATE JUDGE:  You may continue.

12        MS. PENDLETON:  Along that point, Your Honor, with

13   regard to the discovery the Plaintiff seeks in other

14   geographic areas, particularly San Francisco, it's far

15   outside the scope of this case.  It really amounts to pure

16   harassment.  There's abundant case law limiting discovery in

17   single-plaintiff discriminations, cases such as this, to the

18   geographical limits of the relevant work unit in which they

19   allege discrimination took place.  Plaintiff has made no

20   showing that San Francisco information is remotely relevant

21   to his claims arising from his employment in D.C.

22        He has to make a particularized showing of need

23   that's absent here.  Vague possibilities are insufficient.

24   He needs specific factual allegations of discrimination, and

25   those are absent.  As I said, Bonneville's operations in

1  D.C. are the only geographical region that are relevant to
2  this suit.

3       With regard to Plaintiff's contention about the
4  number of document requests that each party may make, we
5  agreed to 30 in substance.  Stipulations regarding the scope
6  of discovery are binding unless contradicted by Court order.
7  Instead of unilaterally serving over 74 document requests,
8  Plaintiff should have asked for our consent and then, had we
9  not given it to increasing the number of document requests,
10 he could have easily gone to Court to get permission to do
11 so.

12      Instead, Plaintiff has cavalierly propounded over
13 74 document requests which include 32 original requests, 17
14 supplemental requests, 25 requests appended to his 30(b)(6)
15 deposition notice, and further requests appended to the
16 notice of deposition of Joel Oxley.

17      Plaintiff apparently believes he can get as many
18 requests as he wants, and we'd like to know what is the
19 limit here.  Is it into the hundreds?  He just hasn't
20 followed what we think would be appropriate procedure of
21 seeking consent and going to the Court.

22      Notwithstanding our well-founded objections and
23 without waiving our objections, we actually have produced a
24 number of categories of documents to Plaintiff anyway, in
25 the spirit of compromise and in an attempt to accommodate

1    his requests.

2         These include, but aren't limited to, report

3    generations that reflect the sales budgets and actual sales

4    billing beyond the dates that Plaintiff originally

5    requested; _____ capital reports which give sales

6    numbers both yearly and monthly, dating back, I believe, to

7    2002 -- or, 2003; account executive applications for people

8    who applied for the account executive job at Bonneville,

9    including I-9 files that would reflect their ages; employee

10   compensation information, including the salary structure for

11   the local sales managers and national sales managers;

12   information about Mr. Donohoe's compensation, his earnings

13   split.

14        We produced documents in response to a number of

15   the requests that were appended to the 30(b)(6) notice, even

16   though it was far beyond the original 30 requests.  We

17   produced written complaints that were filed against managers

18   in Bonneville, Bonneville's D.C. radio group, organizational

19   charts, training materials, and on and on and on.

20        Your Honor, with regard to this alleged file of

21   complaints about Matt Miles, Mr. Beydoun says that

22   Bonneville has a history of documents appearing all of a

23   sudden.  What he refers to is that Mr. Mills was deposed and

24   one of the requests that was asked in the discovery request

25   was any interview notes he took when he interviewed

1    candidates for the director of national sales sports sales

2    position, which was being filled after the RIF.  And

3    Mr. Mills produced what he believed was the entire file.

4        After his deposition he was looking for some other

5    documents and he discovered a small stack of resumes with a

6    few scratched-on notes in a cupboard in his -- a cabinet in

7    his office.  As soon as he discovered that, he thought oh my

8    god, he didn't know it existed, he'd forgotten, these

9    interviews happened a long time ago.  He believed in good

10    faith he'd produced everything.  He called us immediately,

11    he said, "I found some extra documents that are responsive,"

12    sent them over to us that day, we produced them immediately

13    the next day.  There's no hiding of evidence here.  And I

14    think that the fact that we in good faith produced it as

15    soon as we became aware of it is testament to that.

16        Now, Plaintiff insists that there is this file of

17    complaints, harassment complaints about Matt Mills that

18    exists somewhere at Bonneville.  The basis for Plaintiff's

19    understanding of this is an employee who has not been

20    employed by the company for five years, who never actually

21    saw this file.

22        I think Mr. Beydoun misspoke earlier, because in

23    his deposition testimony Mark O'Brien said he never actually

24    saw this file.  He doesn't know who made any of these

25    complaints or what's contained in the file.  The basis for

1  his belief that this file exists, which is a faulty belief,

2  is a conversation he had with Joel Oxley in which he seems

3  to have conflated a discussion of two different employees

4  and comes to some belief that there's a file of complaints

5  about Matt Mills.  This file does not exist.  We've looked

6  for it.  We have sworn testimony --

7         THE MAGISTRATE JUDGE:  When you say "We do not

8  believe it exists," to whom do you refer?  Who is the "we"?

9         MS. PENDLETON:  The Bonneville employees who

10  assisted with producing -- in the D.C. office who assisted

11  with responding to all the discovery requests.

12         THE MAGISTRATE JUDGE:  So what have you done to

13  determine whether or not the file exists?

14         MS. PENDLETON:  We've asked numerous times the

15  employees, the HR employees; Mr. Oxley, the alleged source

16  of this information, who swore under oath in his deposition

17  that no file existed.  We have sworn testimony of Matt

18  Mills, I believe, from his deposition that no file existed.

19  I really believe that should be sufficient when you have

20  sworn testimony from employees.  An affidavit to that effect

21  just seems really superfluous.

22         In addition, we the lawyers have, on numerous

23  times, signed papers to the effect where arguments are

24  included, you know, facts are stated that this file doesn't

25  exist.  Are we going to have to produce affidavits for every

1    discovery request where there are no responsive documents?

2    It just seems to go too far.

3              THE MAGISTRATE JUDGE:  You may continue.

4              MS. PENDLETON:  Okay.  I'll move on to

5    Bonneville's financial network information.  To get to any

6    financial information, including net worth information, the

7    Plaintiff must make a prima facie showing of some

8    entitlement to punitive damages.  Nothing even hints at the

9    possibility of punitives in this case.  There's no ill will,

10   no fraud, no recklessness.

11             This is a case where 51 people were RIF'd on

12   January 4th, 2006.  This included the entire sales staff of

13   the station WGMS, and Plaintiff unfortunately was a member

14   of that sales staff.  He was not singled out for

15   termination.

16             In multiple decisions, this Court has declined to

17   allow premature discovery of financial information.  Not

18   only has the Court repeatedly deferred requiring such

19   discovery until necessary to prove up punitive damages, it's

20   also recognized that a defendant may never put the financial

21   condition at issue.

22             The burden's on the Plaintiff to make a prima

23   facie case for punitive damages before that information is

24   discoverable, and Plaintiff hasn't done so.  This request is

25   premature.

1          Bonneville is a privately held corporation whose

2     confidential information is tantamount to trade secrets.  So

3     Plaintiff shouldn't be allowed to go on a fishing expedition

4     through sensitive financial information at this point.

5     Bonneville's even offered a method by which the information

6     could be put before the Court -- and Plaintiff has said

7     nothing about this -- and that would be to file, under seal

8     and ex parte, with the Court a certified net worth statement

9     at the appropriate time, which would be available to the

10    Plaintiff if it ever became relevant to the trial on the

11    merits.

12          THE MAGISTRATE JUDGE:  You may continue.

13          MS. PENDLETON:  Mr. Beydoun addressed a few

14    additional issues that weren't included in the stipulation

15    that I thought had been resolved and were not before the

16    Court today.  One that has to do with documents relating to

17    the RIF, the reasons for conducting the RIF, Donohoe's

18    inclusion in the RIF.  These documents have been produced to

19    the extent that they relate to Washington, you know, all the

20    decisions that were in Washington, D.C.  And there's been

21    deposition testimony as to the reasons that Mr. Donohoe was

22    involved.  I don't know what other documents exist or why

23    the Plaintiff is bringing that up today.

24          He also raised the issue of information about

25    employees terminated and hired since 2003.  I understood

1    that was one of the issues that was resolved in the

2    discussions that we had on July 2nd.  We gave them

3    information about account executives who had been hired

4    since that date or applied for the job since that date, and

5    I believe that was an agreed-to area in which we've narrowed

6    the dispute.

7            With regard to supplemental requests 7, 11, and

8    12, those are the program logs, that's number 7.  Your

9    Honor, this request is burdensome and I don't see the

10   relevance here.  How program logs would reflect or would

11   enable the Plaintiff to compare the achievements of these

12   two individuals, it just is completely irrelevant.  We've

13   had the opportunity to depose these individuals and people

14   who've supervised them and other employees, and they've seen

15   their personnel files and it seems really tangential.

16           THE MAGISTRATE JUDGE:  Let me ask you to address

17   the 30(b)(6) deposition, please.

18           MS. PENDLETON:  Your Honor, we --

19           THE MAGISTRATE JUDGE:  Or, perhaps I should say

20   the Plaintiff's arguments with respect to the 30(b)(6).

21           MS. PENDLETON:  Mr. Oxley was deposed in his

22   individual capacity and also as the 30(b)(6) representative.

23   They appended -- how many was it?  I believe a number of

24   document requests to the notice -- let me find the number.

25   It was 25 document requests to the 30(b)(6) notice.  Some of

1    those were duplicative.  Many of those -- we actually

2    produced documents before the deposition, just in the effort

3    of compromise and not waiving our objections.  So many of

4    those documents, although they go over the 30 request limit,

5    have been produced.

6         Mr. Oxley was deposed and he answered questions.

7    It's absolutely not necessary for them to get another bite

8    at the apple.

9         And Mr. Beydoun is not correct when he says that

10   Mr. Oxley was instructed not to answer questions.  That's

11   not in the transcript; it's not correct.

12        THE MAGISTRATE JUDGE:  Did Mr. Oxley answer

13   questions regarding whether or not headquarters directed the

14   RIF in the District of Columbia?

15        MS. PENDLETON:  I believe he did.  Mr. Cys can

16   speak more directly to it because he attended the

17   deposition, but -- believe he did.  Yes.

18        And then he was deposed in his individual

19   capacity, as well.  So they've had two bites already at

20   Mr. Oxley in both capacities.

21        THE MAGISTRATE JUDGE:  Very well.  Thank you,

22   Ms. Pendleton.

23        Mr. Cys, if you have that cite I'll have you read

24   it, please, with the page and line number.

25        MR. CYS:  I don't have it with me, Your Honor.

1    I'd be happy to furnish it.

2            THE MAGISTRATE JUDGE:  What is your recollection?

3    As to this, I believe Ms. Pendleton has deferred to you, so

4    I will hear your response and then I'll hear your reply,

5    Mr. Beydoun, to both Ms. Pendleton's argument and Mr. Cys's

6    brief argument on this question.

7            MR. CYS:  Your Honor, my recollection is that

8    Mr. Oxley made it clear, just as Ms. Pendleton said, the

9    decision about relocating frequencies and stations was what

10   was made in headquarters, but nothing with respect to the

11   RIF, nothing with respect to who would be involved in the

12   RIF.  That was completely up to the Washington, D.C.,

13   operation.

14           THE MAGISTRATE JUDGE:  Very well.  Thank you,

15   Mr. Cys.

16           Now, Mr. Beydoun, I'll hear your reply.

17           MR. McCALLY:  Your Honor, if I may?

18           THE MAGISTRATE JUDGE:  Mr. McCally?

19           MR. McCALLY:  Yes, Your Honor.  I was at all the

20   depositions, and if I may answer that question.  They're

21   really mixing and matching the words here.

22           THE MAGISTRATE JUDGE:  Well, do you have the

23   transcript?

24           MR. McCALLY:  I don't, Your Honor, but I will

25   provide it.  Mr. Oxley made it crystal clear that nothing

1    happened without the approval of headquarters.  They're

2    trying to make this look like, "We did this in San Francisco

3    in '05 and then we did it in D.C. in '06."  That's not the

4    case.

5        The RIF in D.C., the discussions began in August-

6    September of 2005, simultaneously with the decisions moving

7    forward with the RIF in San Francisco.  This was a corporate

8    decision to decrease their costs, an attempt to increase

9    revenue.  And how do you do that, Your Honor?  You get rid

10   of the older, highly compensated individuals.  These two

11   RIFs were done by the corporate entity and impacted the

12   older workers.

13       This is a Catch-22 for us, Your Honor, because

14   your questions are quite well made, they're very good

15   questions, but we don't have the answers because they

16   haven't produced any of the San Francisco documents.  The

17   only information we've been able to obtain is from

18   interviewing people out in San Francisco, a woman by the

19   name of Ms. Dorren, Mary Beth Dorren, who was also RIF'd,

20   had a similar job to Mr. Donohoe's, and she was in her 50s

21   as well.  Highly compensated, national sales -- I believe

22   national sales, I know it was sales -- and she feels she was

23   a victim of age discrimination as a result of that RIF.

24       Our hands have been tied, Your Honor, to get any

25   information about the San Francisco RIF, which we believe

1    will demonstrate a corporate policy to reduce their costs,

2    increase revenues, by getting rid of the older workers.

3           I could go through line and verse about the RIF

4    that occurred in D.C., Your Honor, but let me just say this.

5    The stations Mr. Donohoe worked for were WTOP.  He was a

6    national sales director there, had been there for almost 20

7    years.

8           THE MAGISTRATE JUDGE:  Let me stop you one moment,

9    Mr. McCally.

10          MR. McCALLY:  Yes, Your Honor.

11          THE MAGISTRATE JUDGE:  Have you segued into the

12   reply to Mr. --

13          MR. McCALLY:  Not yet, Your Honor.

14          THE MAGISTRATE JUDGE:  Very well.  Let me --

15          MR. McCALLY:  I'm just trying to demonstrate why

16   this idea about the RIF and decisions who were made who

17   would be RIF'd, it was approved by corporate.

18          THE MAGISTRATE JUDGE:  Well, I've heard your

19   proffer or your -- your proffer regarding why you believe

20   that is so.  I've also heard from the other side.  But I'm

21   ready now to hear the reply to all of Ms. Pendleton's

22   arguments.

23          MR. McCALLY:  And Your Honor, if I may, with the

24   consent of my counsel, co-counsel, I was at the status

25   conference before Judge Roberts, so if I could address that

1    as well.

2         The number of requests for production of

3    documents, nowhere in the scheduling order is it limited.

4    The only thing that Defendants are hanging their hat on is

5    the joint report that was filed prior to that.  On page 9 it

6    reads, "The parties anticipate that 30 interrogatories and

7    30 document requests per party should be adequate."  Nowhere

8    did we stipulate to 30.  We told the Court we anticipated.

9         We had discussions in front of the Judge and he

10   didn't include any limitation on the requests for production

11   of documents.  Based on our discussions with the Judge -- I

12   hemmed and hawed, Your Honor.  I said, "We're just getting

13   into this case.  I think it might be enough, but I can't

14   guarantee that."  We had the same discussion about the

15   number of depositions.

16        Your Honor, nowhere in that pretrial order does it

17   say we are limited by what the Federal Rules allow, which is

18   unlimited requests for production of documents.

19        For Ms. Pendleton to say we've had 72 requests for

20   production of documents is simply not going to be borne out

21   by the record.  What we did is we filed one request; we

22   filed a supplemental request.  They are mixing and matching

23   our 30(b)(6) notices of deposition and trying to claim that

24   now we're up to 72 requests for production of documents.  If

25   you read the Attachment A to the notice of 30(b)(6) for

1    corporate designee, we identify areas we want the witnesses

2    to go into.  And Your Honor, that's attached as an exhibit

3    to our motion.

4            THE MAGISTRATE JUDGE:  I have it in front of me.

5            MR. McCALLY:  Okay.  Your Honor, that lists the

6    areas that we want them to go into.

7            I will agree with Ms. Pendleton that, number one,

8    Mr. Oxley wasn't going to be the 30(b)(6).  It was going to

9    be Ms. Henson, head of HR.  They changed that.  We didn't

10   ask for Mr. Oxley to be the 30(b)(6); they put him forward.

11   He answered questions relevant to the D.C. radio group.

12           And I can walk through the notice and the

13   Attachment A, Your Honor.  That's not what our motion to

14   compel is about.  They refused to answer any questions about

15   the San Francisco RIF, which was a specific area of inquiry

16   we asked the corporate designee to go into.  So they did

17   answer the questions about D.C.; we agree with that.

18   Mr. Oxley answered those questions.  They did not -- and

19   actually it was over instruction of counsel, he instructed

20   Mr. Oxley not to answer any questions concerning

21   San Francisco.  I then inquired, as per the rules, "Are you

22   going to answer the questions?" "No, I'm not," and we moved

23   on.  And I went through a litany of the areas that I would

24   have gone into.

25           Your Honor, specifically on Attachment A, the

1   areas that they would not go into were Items 1, 3, 6, 7, 9,

2   and 19.  And those are the areas that deal with what we're

3   calling a national RIF.  Where they did it in San Francisco,

4   as well.  It was undisputed that Mr. Oxley's testimony --

5   and we'll provide it -- was that, "We couldn't do anything

6   without the approval of corporate."

7           The only person terminated from WTOP in this RIF

8   was Mr. Donohoe.  And they argue that, "We did that because

9   20 percent of his job was at WGMS," a classical radio

10  station.  But, Your Honor, that station continued.  So the

11  two stations Mr. Donohoe worked for continue forward, yet he

12  gets RIF'd.  And on top of that, Your Honor, Mr. Donohoe was

13  the only person in that organization with sales experience

14  in classical music as well as news-talk that he'd been doing

15  for 20-plus years.

16          THE MAGISTRATE JUDGE:  Very well.  Thank you,

17  Mr. McCally.  I'm going to hear Mr. Beydoun's reply now, to

18  Ms. Pendleton's arguments.

19          MR. McCALLY:  Thank you, Your Honor.

20          THE MAGISTRATE JUDGE:  Thank you.

21          MR. BEYDOUN:  Thank you, Your Honor.  And I will

22  cover the remainder of what Mr. McCally did not, regarding

23  the replay.

24          Regarding the San Francisco documents that we've

25  asked for, the defense says that we need to make a showing

1    of specific allegations or a showing of need.  And Your

2    Honor, we are conducting investigations right now and we're

3    trying to speak with people who could give us something that

4    we can show.  But again, this is something that is within

5    their control.  They haven't given us any documents

6    regarding this, they haven't allowed us to depose any of the

7    people that would have information about this, and then they

8    turn around and say, "Well, you haven't shown us anything."

9         We'd like to be able to review what documents are

10   there.  We'd like to be able to look at the documents

11   regarding the RIF that occurred in San Francisco so we'd be

12   able to continue to draw this picture that upon information

13   and belief right now we feel is there and we will be able to

14   do.

15        Regarding the allegations -- or, regarding the

16   opposition that was given on the Matt Mills file.  We're not

17   asking for them to give us a verification or an affidavit

18   regarding every document that they say does not exist.  But

19   with this one in particular, we are.  And this one, we don't

20   want to just know whether or not the documents do exist.  We

21   want to know where they were searched, who did the search,

22   and just a sign-off saying that an adequate search was

23   conducted and that no documents are there at the end.  I

24   think that this is fair.  It's not unreasonable with this

25   particular group of requests that we ask for such

1  verifications, and it's not something against counsel; it's

2  having to do with the search that was conducted in the

3  offices.

4          Regarding the financial information, I know that

5  we're talking a lot about whether the prima facie case has

6  been made, has been demonstrated. Again, that is something

7  that would really go to trial and at what point in trial we

8  can present documents that would draw a picture of

9  Bonneville's financial or net worth. We're talking about

10 discovery, and these documents would allow us to be more

11 prepared so that when that moment does come in trial we can

12 go right into it and not lose any time. If it's a matter of

13 confidentiality or secrets, we can honor that and we can

14 protect that by making it attorneys' eyes only or whatnot,

15 but we need to see those documents now.

16         Regarding the 2006 RIF, again, when I say that

17 we're still asking for documents, it really has to do with

18 documents outside of the D.C. office, for all of the reasons

19 we've already described.

20         The program logs, there is something that we can

21 do with them and that is draw a picture to see if they

22 actually did change the way that the air time was sold or

23 the way that the newer, the younger employee handled that,

24 and if any adjustments were made based on his ability to be

25 successful at that, the way that Mr. Donohoe was successful

1    at that.  We need to draw that picture, Your Honor, and we

2    need the documents to be able to see if there is anything

3    there.  So again, it would be 2003 2007, what I would call

4    the pre- and post-RIF.

5            And I think those are all the points that

6    Defendant counsel has made.

7            THE MAGISTRATE JUDGE:  Very well.  Thank you,

8    Mr. Beydoun.

9            MR. BEYDOUN:  Thank you, Your Honor.

10           THE MAGISTRATE JUDGE:  Now, the Court has very

11   carefully reviewed the pending motions, 19 and 21, the

12   oppositions, the replies, the Court's prior rulings on

13   issues related to the conduct of discovery, including Judge

14   Roberts's scheduling order, and as you know, I have listened

15   to your arguments this morning and reviewed the status

16   report that you filed on Friday, July 25th.  Having done so,

17   the Court is prepared to rule, and rules as follows.

18           For the reasons offered by the Defendant, the

19   Court grants the Defendant's motion for protective order and

20   denies the Plaintiff's motion to compel, except with respect

21   to discovery regarding headquarters' role, if any, in the

22   RIF in the District of Columbia -- perhaps I should say

23   District of Columbia market, by which the Plaintiff in this

24   case was affected.  As to that issue, the Court will stay

25   its determination until the parties file what I will call a

1    "supplement" to today's hearing in which the parties attach

2    the transcript of the deposition of Mr. Oxley, since both

3    sides appear to agree that during the deposition Mr. Oxley

4    gave testimony which you've each characterized as

5    dispositive.

6            The Court's difficulty at this time is that

7    counsel have different recollections of what he said, and

8    nobody has the transcript.  So when I say attach the

9    transcript, I mean the entire portion of it in which the

10   role of headquarters, if any, is addressed.  I'm sure there

11   were a number of other issues that were the subject of

12   inquiry during this deposition, but it is only the portions

13   that relate to the role of headquarters which I must review

14   in order to rule on the question of what discovery regarding

15   headquarters' role will be permitted.

16            If it is indeed the case, as the Plaintiff

17   suggests this morning, that Mr. Oxley indicates that

18   headquarters did have a role, then the Court's ruling may

19   well be one which permits discovery; indeed, I envision that

20   it would be to permit discovery with respect to what that

21   role was.  If it is the case, as the Defendant suggests,

22   that headquarters had no role except to dictate changes

23   regarding what I believe we've characterized as "format"

24   having to do with stations and frequencies and other terms

25   of art, and did not provide for or dictate or require any

1   reduction in force, then the Court's ruling would likely be

2   that no discovery regarding headquarters would be permitted.

3           How much time do you believe you will require in

4   order to file this supplement to today's, perhaps we'll call

5   it a "Supplement to Your Oral Arguments." I recognize that

6   your vacation time may be approaching. Perhaps in ordinary

7   circumstances you could complete this task within a day or

8   so. Perhaps I should ask that you just take a moment now

9   and confer, to decide whether you need a week, 10 days, two

10  weeks. You're welcome to just step to one or the other

11  table and agree upon a date.

12          [Attorneys confer]

13          MR. McCALLY: Your Honor, we've agreed on a week.

14  So if we could have one week from today, both parties can

15  submit.

16          THE MAGISTRATE JUDGE: Very well. August 5th. My

17  request is for a joint submission.

18          MR. McCALLY: Oh, I'm sorry.

19          THE MAGISTRATE JUDGE: A joint -- we're struggling

20  with language here. A memorandum which you will file

21  jointly, to supplement your oral arguments.

22          MR. BEYDOUN: Your Honor, if I may request, could

23  we each submit our own memorandums? I'm just having that

24  difficulty logistically how we would each make our -- we can

25  do it in one document with each of our separate arguments,

1   about --

2           THE MAGISTRATE JUDGE:  That is what the Court will

3   order.

4           MR. McCALLY:  Okay.

5           MR. CYS:  That's fine.

6           MR. McCALLY:  That's fine, Your Honor.

7           THE MAGISTRATE JUDGE:  You were both there.  You

8   both have access to the same transcript, so there is no

9   reason that you cannot jointly file the transcript --

10          MR. McCALLY:  Yes.

11          THE MAGISTRATE JUDGE:  -- with whatever brief

12  argument you believe is appropriate on this issue.

13          The Court would be aided by a reference to pages

14  and line numbers, since I can only imagine that the

15  questions and answers consumed more than a page or so, and I

16  can envision that one side will place emphasis on some one

17  series of questions and answers, the other will place

18  greater emphasis on another series of questions and answers.

19  So I would like for you to direct the Court's attention to

20  the questions and answers that you believe are most

21  probative of this issue of what role, if any, headquarters

22  had in dictating or providing for or ordering or supervising

23  the RIF in the D.C. market.

24          MR. McCALLY:  Very well, Your Honor.  And a point

25  of clarification for myself, if I may, Your Honor.

 1          THE MAGISTRATE JUDGE:  Yes.

 2          MR. McCALLY:  Does this then go -- is the question

 3   about the San Francisco RIF still alive if the Court finds

 4   headquarters, for example, did approve the D.C. RIF and then

 5   was involved in the San Francisco RIF?  The point I'm

 6   getting at here, Your Honor, we don't have any information

 7   about the San Francisco RIF.  The only information we have

 8   is about the D.C. RIF because that's all they talk about.

 9          THE MAGISTRATE JUDGE:  Let me suggest the

10   following.  If, as part of your argument that headquarters

11   did direct or require or provide for or supervise the D.C.

12   RIF and that the San Francisco RIF was part of this same

13   RIF, you may seek reconsideration of my ruling.  I have not

14   heard anything this morning as part of your argument,

15   Mr. McCally, or yours, Mr. Beydoun, that suggests that the

16   RIF was the same RIF.

17          MR. McCALLY:  Your Honor, that's the Catch-22 I

18   alluded to.  We don't have any information.  The only

19   information we have is from Mr. Oxley saying that a local

20   radio group can't just RIF somebody.  This was a corporate

21   authorized RIF in which the vice president of HR from

22   headquarters was involved.  In information and belief, and

23   speaking to one witness from the San Francisco, same thing

24   happened out there.  All within the 2005-2006 timeframe.

25          I'm in a Catch-22, Your Honor, because I've been

1    denied any documents.  I've been denied my 30(b)(6) witness

2    to go into it.  They refused to let him testify about it.  I

3    can't prove the existence of a fact without the documents or

4    discovery to get the information I need to do that.

5           As a general statement, Your Honor, based on

6    Mr. Oxley's testimony, I would argue to the Court

7    San Francisco didn't just decide -- the radio group there

8    and those stations didn't just decide, "We're going to RIF

9    some people."  It had to get approval from corporate.  And

10   this was all part of this -- it's my belief on information

11   and belief, Your Honor, this corporate restructuring to

12   lower costs, increase revenues, how do you do that, you get

13   rid of the older workers.  And that's what they did in

14   San Francisco, as well.

15          THE MAGISTRATE JUDGE:  Well, as the Court has

16   already ruled, the Court would be aided by the deposition

17   testimony of Mr. Oxley.  Both sides seem to agree that the

18   testimony of Mr. Oxley is dispositive of this question.

19   Unfortunately, neither of you brought the transcript of the

20   testimony of Mr. Oxley, so I have no alternative at this

21   point but to stay consideration of the issue regarding

22   headquarters' role until you have this opportunity which I'm

23   permitting you to file the relevant portions of Mr. Oxley's

24   transcript.

25          MR. McCALLY:  Very well, Your Honor.  Could we

1    have perhaps until next Thursday, rather than until next

2    Tuesday?

3              THE MAGISTRATE JUDGE:  You may.

4              MR. McCALLY:  Thank you.

5              THE MAGISTRATE JUDGE:  In fact, I can set the date

6    for next Friday, which would be the 8th.

7              MR. McCALLY:  That would be more helpful, Your

8    Honor.

9              THE MAGISTRATE JUDGE:  Very well.

10             MR. McCALLY:  Thank you very much, Your Honor.

11             THE MAGISTRATE JUDGE:  So by July 8th.  Very well,

12   Thank you very much.

13             We'll take a brief recess.

14             (Whereupon, the proceedings were concluded.)

15

16

17

18

19

20

21

22

23

UNITED STATES OF AMERICA )
                        )   Civil Action No. 07-0494
DISTRICT OF COLUMBIA     )

      I, PAUL R. CUTLER, do hereby certify that a recording of the foregoing proceedings in the above matter was duplicated from an original recording by the Office of the Clerk, United States District Court for the District of Columbia, and that said duplicate recording of the proceedings was transcribed under my direction to typewritten form.

_____
      PAUL R. CUTLER

      I do hereby certify that the foregoing transcript was typed by me and that said transcript is a true record of the recorded proceedings to the best of my ability.

_____
      BONNIE FURLONG