IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| LEO DONOHOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 07-949 (RWR) |
| | ) | Hearing Requested |
| BONNEVILLE INT'L CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENT TO THE AUGUST 8, 2008 JOINT SUPPLEMENTAL MEMORANDUM**

Defendant Bonneville International Corporation's ("Bonneville") Opposition to Plaintiff's Motion for Leave does not address the real issue before this Court. Rather than address Defendant's accusations regarding the "timeliness" of Plaintiff's filing, this Court should review Defendant's failure to provide the document during discovery. This is just another demonstration of Bonneville's practice of providing documents late, or not at all. Despite the fact that the email was created on October 27, 2005, and should have been provided as responsive to requests propounded by Mr. Donohoe on December 20, 2007, it was not provided until July 3, 2008. It is hypocritical for Bonneville to even raise such an argument when it is the party who failed to provide the document when it should have been produced to Plaintiff. Unlike the *Lightfoot* case cited by Defendant (Pl. Opp. at 3), Plaintiff has not been in possession of this material throughout the litigation, but rather, filed its supplement relatively soon after having received it. Therefore, the holding of that case is inapplicable to this matter.

There cannot be any serious argument that the document at issue is not relevant, because it is directly germane to the matters before this Court. The email demonstrates the high level of

involvement between Bonneville's corporate management offices and its Washington, DC offices. It clearly shows an exchange of concerns regarding the costs associated with severance packages. Bonneville cannot deny that this email demonstrates that its corporate officers are reviewing the budget and severance packages, and that these two factors play a crucial role in decisions made regarding terminations or personnel. It is clear from the references in this email that Mr. Oxley is looking to Bonneville's corporate officers for guidance on decisions regarding terminations.

Finally, it is also important to note that to this day the document production remains incomplete[1]. Bonneville completely avoids addressing in its Opposition the fact that the attachment to this email has not been produced allows for evidentiary inferences to be drawn in our favor and against Bonneville. *See Rice v. U.S.*, 917 F.Supp. 17, 20 (D.D.C.,1996)("The rule that a fact-finder may draw an inference adverse to a party who fails to preserve relevant evidence within his exclusive control is well established in this jurisdiction"). This is especially true given Bonneville's explanation as to possible reasons why the document is missing and self-serving denial that the document implicated employment decisions made by Bonneville's corporate offices. *See* July 3, 3008 Deposition Transcript of Joel Oxley at 208-211, attached hereto as Exhibit B. The explanation being given by Bonneville is at odds with a fair and reasonable interpretation of the plain language of the email.

---

[1]   In the Motion for Leave, Plaintiff inadvertently made a reference to a "litigation hold notice" based on the belief that one was submitted to Defendant in 2006. *See* Pl. Supplement at 3-5. Undersigned counsel recently became aware that a litigation hold notice was not issued to Defendant and wishes to correct that statement. Undersigned counsel wanted to bring it to the Court's attention.

Moreover, when inferences are drawn against Bonneville for not producing the attachment, there is at least a question of fact that should be drawn in our favor. Bonneville should not be permitted to benefit from stalling their production of the documents, then providing an incomplete document, then complaining that Plaintiff should not be allowed to raise the issues contained in the document to this Court. The fact that Plaintiff filed its supplement and Defendant challenges the document only on erroneous procedural grounds only underscores their practice of running away from documents that reveal matters which they deny, namely, that Bonneville's corporate offices had an absolute role and were involved in all phases of the RIF and subsequent rehire. Bonneville is not prejudiced by having to explain this document and its contents to the Court. Quite the opposite, it is Plaintiff who is prejudiced by only receiving half a document seven months after it was due. Furthermore, Bonneville is given an opportunity to respond to Plaintiff's arguments, and for that reason, it should not be excluded from consideration.

Until the attachment is located and produced, Defendant will be the only one who knows the true nature of the involvement of Bonneville's corporate management offices with the Washington DC RIF. As was previously stated, Bonneville enjoys the advantage it receives in this litigation by not being made to answer these questions. Bonneville can no longer continue to disregard Mr. Donohoe's requests for responsive discovery or to assert groundless objections to his needs.

Respectfully submitted,

CARR MALONEY, P.C.

By: _____
 Thomas L. McCally, Esq., #391937
 1615 L Street, NW, Suite 500
 Washington, DC  20036
 (202) 310-5500/(202) 310-5555 (FAX)
 Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 5th day of September, 2008, a copy of the foregoing was sent via the Court's electronic filing system and via e-mail to Richard Cys, Esquire, and Constance Pendleton, Esquire, Davis, Wright, Tremaine, LLP, 1919 Pennsylvania Avenue, NW, Suite 200, Washington, DC  20006, Attorney for Defendant.

_____
Thomas L. McCally

# EXHIBIT B

Page 1

1           In The United States District Court
                For The District of Columbia
2                      Civil Division
3   --------------------------------x
    Leo Donohoe,                    :
4                                   :
               Plaintiff            :
5                                   :
                    v.              :   NO. 07-949 (RWR)
6                                   :
    Bonneville International        :
7   Corp.,                          :
                                    :
8              Defendant            :
    --------------------------------x
9
10                         Wednesday, July 2, 2008
11  VIDEOTAPED DEPOSITION OF:
12                  Joel Oxley,
13  a witness, called by counsel pursuant to notice,
14  commencing at 10:04 a.m., which was taken at Carr
15  Maloney P.C., 1615 L Street, N.W., Suite 500,
16  Washington, D.C. 20036.
17
18
19
20
21

Page 206

1     MR. McCALLY: We certainly can.
2  BY MR. McCALLY:
3     Q.  I handed you an e.mail Exhibit No. 132,
4  which is from you to Bob Johnson, Bruce Reese, sent
5  October 27, 2005. According to your attorney this
6  morning, this was just found; is that correct?
7     A.  Correct.
8     Q.  What is this?
9     A.  An update on the scenarios of the changes
10 that we are thinking about.
11    Q.  And there's an attachment to this
12 document, correct?
13    A.  Correct.
14    Q.  What you provided me is not the complete
15 e.mail, because you haven't provided the attachment,
16 correct?
17    A.  The attachment no longer exists.
18    Q.  How do you know that?
19    A.  I was told that by our IT guy.
20    Q.  Who is your IT person?
21    A.  John Spalding. He consulted with

Page 207

1  corporate to see if it was housed out there as well.
2  When we switched from Novelle to Microsoft, text
3  were kept but attachments were not.
4     Q.  Who is Mr. Bob Johnson?
5     A.  COO.
6     Q.  Bruce Reese?
7     A.  CEO.
8     Q.  Did you check with them to see if they had
9  copies of the attachment?
10    A.  The IT guys did.
11    Q.  You know that for a fact?
12    A.  They told that they were going to.
13    Q.  Did they?
14    A.  As far as I know. They would have had the
15 same issue.
16    Q.  When did you switch from Novelle to
17 Microsoft?
18    A.  I believe it was in the middle of '06.
19    MR. McCALLY: Counsel, we submitted a
20 litigation hold notice to Bonneville at the
21 beginning of this matter. That required any and all

Page 208

1  documents to be preserved. And that was submitted
2  well before the middle of '06.
3     I'm requesting to be notified of what was
4  done to preserve the documents in your system prior
5  to this change pursuant to litigation hold notice,
6  which directly impacts the attachment that was here,
7  that apparently cannot be retrieved now.
8     MR. CYS:  You are going to need to send me
9  a letter, Tom. This is at best empirical. The
10 reason we are furnishing what we have is because it
11 arose at the last deposition of Mr. Oxley.
12    MR. McCALLY:  Why did it -- I'm not
13 following you.
14    MR. CYS:  You asked questions --
15    MR. McCALLY:  I know that.
16    MR. CYS:  -- about this area. You asked
17 specifically about any documents like this. That's
18 why it's produced.
19    MR. McCALLY:  Pertaining to the decision
20 of which station to get rid of?
21    MR. CYS:  No, the revenues.

Page 209

1     MR. McCALLY:  This is being produced
2  pursuant to the revenues?
3     MR. CYS:  Right.
4  BY MR. McCALLY:
5     Q.  Do you recall what the attachment, the
6  numbers that it contained?
7     A.  The ones that are listed on here.
8     Q.  What else was it made up of? What went
9  in -- who created the attachment?
10    A.  Linda Pfluger.
11    Q.  How many pages was it?
12    A.  One, as I remember.
13    Q.  It had more numbers than just these,
14 correct?
15    A.  Yes.
16    Q.  What were the numbers drawn from? Were
17 they your best guesses, speculations about what
18 would happen in the future?
19    A.  Yes.
20    Q.  Who prepared it?
21    A.  Me and Linda Pfluger.

Case 1:07-cv-00949-RWR-DAR   Document 53-2   Filed 09/05/2008   Page 4 of 4

Joel Oxley  
Beta Court Reporters  
Wednesday, July 2, 2008  
Leo Donohoe v. Bonneville, Inc.

Page 210

1  Q. What did you use to prepare it?
2  A. The historical information looking back at
3  what had happened. What we thought, we did an
4  analysis of the signal, and how much it would, how
5  much less coverage it would have and, therefore, how
6  much less ratings it would have.
7  Q. Did this come to fruition?
8  A. I believe that this is what we ended up
9  doing.
10 Q. Is it or isn't it?
11 A. Let's see if there's anything in here that
12 we did not do. No, this was a scenario, we didn't
13 quite do this scenario.
14 Q. GMS went to what station?
15 A. This was looking at TOP -- well, manage
16 and sell GMS. There are some savings there. So we
17 did not end up doing that much.
18 Q. GMS went to what station?
19 A. GMS went to 104.1.
20 Q. Did the revenues drop from ten million to
21 6 million?

Page 211

1  A. Approximately, yes.
2  Q. In what time period?
3  A. In 2006.
4  Q. Where are the ratings information
5  contained?
6  A. Arbitron.
7  Q. You have possession of all of those?
8  A. Yes.
9  Q. And you use the Arbitron ratings to help
10 make these projections that are on the missing
11 attachments?
12 A. Used the historical ratings of the
13 station, yes.
14 Q. And did the ratings fall from a 1.8 share
15 to a 3 share, from a 3 share to a 1.8?
16 A. Yes, if not a little more.
17 Q. What do you recall the exact number being?
18 A. I think it was pretty close to a 1.8.
19 1.7.
20 Q. The NOI, that stands for?
21 A. Net operating income.

Page 212

1  Q. Did it decrease from 3.5 to one million?
2  A. It wasn't quite that bad. As I remember,
3  we did better than the one million.
4  Q. Severance cost of WGMS sales department,
5  is that accurate, 300,000?
6  A. I believe so.
7  Q. Severance cost Z104, 800,000?
8  A. Yeah, that would have been for the entire
9  programming and sales.
10 Q. Then you're saying, TOP did not manage and
11 sell GMS?
12 A. Right. That was just another one of the
13 options that we looked at, at one point.
14 Q. This was to move Z104 instead of
15 keeping -- I'm sorry -- to move GMS to 104 instead
16 of keeping Z on it, cost more than -- a million
17 dollars more expensive?
18 A. Yes, it was more expensive to move GMS to
19 104 vis-a-vis keeping Z104.
20 Q. Why would you do something that had an
21 extra million dollars in cost?

Page 213

1  A. Public relations.
2  Q. What do you mean by that?
3  A. Bruce Reese felt it was important to keep
4  the classical format going in Washington.
5  Q. Why?
6  A. He felt that was important to Bonneville's
7  reputation.
8  Q. Why?
9  A. He felt that it was a format that was
10 highly regarded by those in the industry, Capitol
11 Hill, and the FCC. And he felt that Bonneville had
12 always held a high standard for these type of
13 formats, and he wanted, felt that, that was
14 something worth looking at.
15 Q. When did that thought process change? You
16 ultimately took GMS off the air.
17 A. We moved it to WETA. So the format was --
18 Q. You sold it.
19 A. No. We moved the intellectual property to
20 WETA.
21 Q. What channel is that?